**DECLARATION OF LISA GREIF**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 2**

000010



CITY CLERK
File # ⎡6⎤⎡0⎤⎡0⎤-⎡6⎤⎡0⎤

## AGENDA STATEMENT
## CITY COUNCIL MEETING DATE:  July 17, 2007

**SUBJECT:**  Disposition and Development Agreement for the Arroyo Vista Redevelopment Project with the City of Dublin, the Housing Authority of the City of Dublin, the Housing Authority of the County of Alameda, Eden Housing, Inc., and Citation Homes Central
*Prepared By: Joni Pattillo, Assistant City Manager, Jeri Ram, Community Development Director, and Sue Bloch, City Attorney's Office*

**ATTACHMENTS:**
1) Resolution
2) Disposition and Development Agreement (DDA)
3) Dublin Municipal Code Chapter 8.68 (Inclusionary Zoning Ordinance)
4) Budget Change Form

**RECOMMENDATION:**
1) Adopt the Resolution (1) approving the Disposition and Development Agreement; (2) approving financial assistance to the Housing Authority of the City of Dublin in the amount of up to $1,500,000 to assist the Authority in relocating the existing residents of Arroyo Vista; and (3) waiving the affordability, allocation, location, bedroom size, and preference point requirements and conditionally waiving the concurrent construction requirements of the City's Inclusionary Zoning Ordinance.
2) Approve the Budget Change.
3) Direct Staff to negotiate a loan agreement and related documents to provide financing to Eden Housing, Inc. or its affiliate in an amount not to exceed $1,500,000 to assist in financing the construction of affordable rental units for low-income families and low-income seniors.
4) Authorize the City Manager to sign the DDA on behalf of the City of Dublin.

**FINANCIAL STATEMENT:**  There are two components that make up the financial contribution from the City's Inclusionary Zoning In Lieu Fee Funds for the Arroyo Vista Project.  The first element is a future loan that was approved by City Council at the April 3, 2007 City Council meeting in the amount of $1,500,000 that would be provided to Eden

---

Housing, Inc. or its affiliate to assist in financing the construction of affordable rental units for low-income families and low-income seniors. This $1,500,000 has been appropriated in the adopted City of Dublin's Fiscal 2007-2008 budget. The second element is the proposed financial assistance that would be provided to the Housing Authority of the City of Dublin in the amount of up to $1,500,000 to assist the Authority in relocating the existing residents of Arroyo Vista. Such assistance will be funded from the Inclusionary Zoning In Lieu Fee Fund. The total City of Dublin contribution to the relocation and redevelopment of Arroyo Vista is projected at $3,000,000.

## DESCRIPTION:

### Background

Arroyo Vista is a public housing development on approximately 22.9 acres of land located at 6700 Dougherty Road in the City of Dublin and owned by the Housing Authority of the City of Dublin (Authority). The development currently contains 150 public housing units and a children's day care center, all in need of substantial rehabilitation. On July 25, 2006, the Authority decided to seek redevelopment of Arroyo Vista after determining that rehabilitation was economically infeasible. After a competitive selection process, the Authority selected Eden Housing, Inc. (Eden), a non-profit developer, and Citation Homes Central (Citation), a for-profit developer, to assist in the redevelopment of Arroyo Vista.

On April 3, 2007, the City Council approved execution of an Exclusive Negotiating Rights Agreement (ENRA) with the City of Dublin, the Authority, the Housing Authority of the County of Alameda (HACA), Eden and Citation for the redevelopment of Arroyo Vista. The ENRA granted Eden and Citation exclusive rights to negotiate a Disposition and Development Agreement (DDA) with the City, Authority and HACA which would govern the disposition and development of Arroyo Vista. The original date that was established in the ENRA for the City Council to review and consider the DDA was July 3, 2007 but due to the complexity of the agreement all parties agreed to extend the original date to July 17, 2007.

Since the execution of the ENRA, City Staff has negotiated a proposed DDA with the Authority, HACA, Eden and Citation (Attachment 2).

On May 23, 2007, Eden and Citation submitted a pre-application to the City. The City anticipates that Eden and Citation will submit the following applications for the development of the property: a general plan amendment, a rezoning, a parcel map to divide the property into parcels, a tentative map to further subdivide the project, and Site Development Review. In addition, development of the property will require review under the California Environmental Quality Act (CEQA) and the National Environmental Policy Act (NEPA) and approval by HUD.

### Loan to Eden

Eden has requested, and the Council agreed on April 3, 2007, by execution of the ENRA to provide a loan to Eden from the City's Inclusionary Zoning In Lieu Fund in the amount of up to $1,500,000 to assist in financing the construction of the affordable multi-family and senior rental units. The loan will be evidenced by a promissory note requiring payment on a residual receipts basis, which means that Eden

000012

will be required to pay off the loan using surplus cash generated by the project (gross revenue less debt service, operating expenses and deposits to required reserves), and the loan will be secured by a deed of trust. The terms and conditions of the loan to Eden will be set forth in a loan agreement and related documents to be negotiated by the City and Eden prior to the conveyance of the property. Staff recommends that the City Council authorize Staff to negotiate a loan agreement between the City and Eden and related documents.

*Inclusionary Zoning Ordinance*

The purpose of the City's Inclusionary Zoning Ordinance (Attachment 3) (Inclusionary Ordinance) is to (i) enhance the public welfare and assure that further housing development contributes to the City's housing goals by increasing the production of affordable units; and (ii) to assure that the remaining developable land in the City is utilized in a manner consistent with the City's housing policies and needs.

The Inclusionary Ordinance requires that 12.5% of the units in a new residential for-sale or rental development project consisting of 20 units or more must be affordable to households with very low-, low-, or moderate- incomes. Of these affordable units, 30% must be allocated to very-low-income households, 20% to low-income households, and 50% to moderate-income households as defined by the State Department of Housing and Community Development based on Alameda County median income levels.

In addition, the Inclusionary Ordinance requires the affordable units to be constructed concurrently with the market-rate units, unless the City Manager determines in writing that concurrent construction is infeasible or impractical. All of the affordable units must reflect the range of numbers of bedrooms provided in the project as a whole, must not be distinguished by exterior design, construction, or materials, and must be reasonably dispersed throughout the project.

Pursuant to the Inclusionary Ordinance, the developer must use an equitable selection method to select the tenants and owners of the affordable units in the project. The selection of qualified tenants and owners should be based on priorities using the following point system:

- Persons employed within the boundaries of the City of Dublin (3 points, one per household)
- Persons employed by a public agency in the City of Dublin (1 additional point)
- Persons who have been a resident of the City of Dublin for at least a one-year period prior to the eligibility determination (3 points, one per household)
- Seniors (1 point, one per household)
- Persons who are permanently disabled (1 point, one per household)
- Persons whose immediate family member has been a resident of the City of Dublin for at least a one-year period prior to the eligibility determination (1 point, one per household)
- Persons who have been required to relocate from their current Dublin residence due to demolition of dwelling or conversion of dwelling from rental to for-sale unit (1 point, one per household).

The Inclusionary Ordinance provides that the City Council may waive the requirements of the ordinance and approve alternate methods of compliance with the ordinance if the applicant demonstrates, and the City Council finds, that such alternative methods satisfy the purposes of the Inclusionary Ordinance.

000013

**DISCUSSION AND ANALYSIS:**

**Terms of the DDA**

Eden and Citation have proposed to redevelop Arroyo Vista as a mixed-income development of approximately 405 units, consisting of affordable multi-family and senior rental units, affordable and market rate for-sale units, open space, a community center and a childcare facility. The rental component of the development will be constructed and managed by Eden, and will consist of 150 affordable rental units, which will replace the existing public housing units, and approximately 29 additional affordable units. Approximately fifty of the affordable rental units will be reserved for occupancy by seniors. All of the rental units will be subject to recorded regulatory restrictions which require the units to be offered for rent and occupancy by extremely low-, very low-, and low-income households for 55 years. The for-sale component of the development will be constructed by Citation, and will consist of approximately 210 market-rate units and 16 affordable units. The affordable for-sale units will be subject to recorded regulatory restrictions which will impose household income eligibility and resale price restrictions on such units for 55 years. In total, there will be approximately 45 affordable units in addition to the 150 replacement units.

Citation will purchase approximately half of the Arroyo Vista property from the Authority for the sum of $12 million. Of this amount, Citation will pay (i) $8 million to the Authority to be used by the Authority as a subsidy for the affordable rental housing to be developed by Eden, (ii) $3 million to HACA to support the processing, on behalf of the Authority, of necessary HUD approvals and the conveyance of the property, and (iii) $1 million to the Authority to partially finance the costs of relocating the existing residents of Arroyo Vista prior to disposition of the property. The remainder of the property will be conveyed to Eden at no cost. The property will be divided into separate legal parcels that will separate Eden's component of the project from Citation's.

The DDA acknowledges that the disposition of the property and development of the project is contingent upon environmental review, HUD approval, and City approval of the land use entitlements.

Risk Mitigation

As with any project of this size and complexity it naturally carries certain risks for all the parties concerned. The City Council should be advised that there is a remote possibility that the development will not be constructed even after the Authority and the City incur relocation costs. Such scenario, while extremely unlikely, could occur if HUD fails to approve the disposition application; the market declines, making it economically infeasible for Citation to construct the for-sale units; there is strong political opposition to the development; Eden is unable to obtain financing for the affordable component; or environmental contamination is discovered on the property that cannot be mitigated. While such events are unlikely to occur, there are terms in the DDA designed to mitigate the City's potential risk. First, Citation and Eden are required to comply with all deadlines within the schedule of performance in a timely manner. In the event that the developers do not satisfy their obligations within the established deadlines, the City may exercise its remedies under the Agreement and potentially could terminate the Agreement and pursue an alternate proposal for development of the property. Furthermore, the City's and Authority's relocation funds will only be disbursed incrementally to cover relocation costs as they are incurred.

The City Council will be provided monthly Arroyo Vista Redevelopment Updates from the Dublin Housing Authority in ensure that the City Council is aware of the progress being made on this project. As

000014

tne other projects of significance the City Council will be made aware of any significant issues as it relates and will weigh in on any critical change of plans.

Staff recommends that the City Council approve the DDA and authorize the City Manager to execute the DDA on behalf of the City because redevelopment of Arroyo Vista pursuant to the DDA will replace the existing dilapidated housing, create new market-rate housing, new affordable rental and ownership housing, and community amenities within a mixed-income development.

### Proposed Financial Assistance for Relocation

As a result of the redevelopment, all existing residents of Arroyo Vista must be relocated to replacement housing prior to disposition of the property in accordance with all applicable state and federal laws. At the time the ENRA was negotiated, a relocation consultant had not yet been retained by the Authority. Following execution of the ENRA, a relocation consultant was retained and meetings were held with tenants. As a result of those meetings and based on the opinion of the relocation consultant, it is likely that the costs for relocation will exceed what was originally estimated.

While the Authority is responsible for all costs and expenses related to relocation of the existing residents, the DDA contains provisions that Citation, and the City will provide financial assistance for such relocation costs. The DDA proposes that each party's contribution for anticipated relocation costs would be as follows: Citation will pay $1,000,000; the Authority will pay up to $600,000; the City will pay up to $1,500,000; and, HACA will supply up to 150 Section 8 vouchers as part of the an overall relocation plan for the residents of Arroyo Vista

In the event that relocation costs exceed $3,100,000, the parties will discuss possible sources of funds to cover such additional costs. The parties have already identified one potential source of funds, which is the balance of the transactional expense payment that Citation and Eden are required to pay to the City. Pursuant to the DDA, Citation and Eden must pay up to $250,000 to cover legal, consulting and other costs and expenses incurred by the City and Authority in connection with the ENRA and the disposition and development of the property and if that amount is exceeded the City of Dublin will pay for such costs from the City's Inclusionary Zoning In Lieu Fee Funds, provided that, upon transfer of property to Eden and or Citation, Citation and Eden jointly and severally agree to reimburse the City for such costs up to the amount of $250,000 so that the aggregate amount of Transactional Costs paid by Eden and Citation does not exceed $500,000. If the amount of transactional costs incurred by the City and Authority is less than $500,000 and relocation costs exceed the sum of $3.1 million, the balance of the transactional payment may be used to fund additional relocation costs. In the event that Relocation Costs exceed the sums set forth above, the parties agree to discuss possible alternatives methods to pay such costs.

Staff recommends that the City Council approve the allocation of up to $1.5 million from the City's Inclusionary Zoning In Lieu Fee Funds to the Authority for relocation costs.

### Waivers Requested from the Inclusionary Zoning Ordinance

Eden and Citation's May 23rd pre-application to the City for the redevelopment of Arroyo Vista is not consistent with the requirements of the Inclusionary Ordinance.

Eden and Citation plan, generally, to apply to the City for a parcel map to divide the property into three or four parcels. Eden's family project and senior project would be constructed on separate parcels and each

000015

would consist of more than 20 units. Citation would subdivide a large parcel into up to 226 parcels for the for-sale units. Each of these – the family project, the senior project and the 226-unit subdivision – would be subject to the Inclusionary Ordinance's requirements for Affordability and Allocation, Concurrent construction, Bedroom Size, etc.

The Citation project does not meet the number of affordable units required by the Inclusionary Ordinance whereas the Eden project exceeds the required number. There is no provision in the DDA that requires Citation to phase construction of its market rate units so that the affordable units that Eden will build will be constructed concurrently with the Citation units.

To remedy the proposed project's inconsistency with the Inclusionary Ordinance, Citation proposes that the Council treat the family project, the senior project and the 226-subdivision as one project for purposes of the Inclusionary Ordinance. For the reasons set forth below, Staff recommends the Council do so, with the exception of concurrent construction (discussed below).

Specifically, Eden and Citation have requested the following five waivers from the Inclusionary Ordinance, each of which is discussed in detail below:

1. Affordability - the requirement that 12.5% of the new units be affordable and that such units be allocated to very low-, low-, and moderate-income households.

2. Allocation - the requirement that the affordable units be dispersed throughout the project.

3. Concurrence - the requirement that the affordable units be constructed concurrently with the market rate units.

4. Bedroom Size - the requirement that the affordable units reflect the range of numbers of bedrooms provided in the project as a whole.

5. Preference Points - the requirement that qualified tenants and owners be selected pursuant to the preference point system set forth in the Inclusionary Ordinance.

As noted above, under "Background," the City Council may waive the requirements of the Inclusionary Ordinance and approve alternate methods of compliance with the Ordinance if the applicant demonstrates, and the City Council finds, that such alternative methods satisfy the purposes of the Inclusionary Ordinance.

### 1 & 2.  Affordability and Allocation

The Inclusionary Ordinance requires that 12.5% of the units in a new residential for-sale or rental development project consisting of 20 units or more be affordable to households with very low-, low-, or moderate- incomes. Of these affordable units, 30% must be allocated to very-low-income households, 20% to low-income households, and 50% to moderate-income households as defined by the State Department of Housing and Community Development based on Alameda County median income levels.

Additionally, the Inclusionary Ordinance requires that the affordable units be reasonably dispersed throughout the development. The Arroyo Vista development does not satisfy the dispersion requirement because the multi-family and senior components will be 100% low and extremely low-income units and therefore the affordable rental units will be clustered together. The market rate units and affordable units, however, will be in close proximity to one another although they may be located on separate legal parcels. In addition, the affordable for-sale units will be dispersed throughout the for-sale component. During the

000016

development process, Staff will work with the developers on ensuring as much dispersal of the low-income units as feasible.

The total development proposed by Eden and Citation for Arroyo Vista will includes approximately up to 405 residential units, 150 of which will be are replacement units and 255 of which will be new units. Pursuant to the Inclusionary Ordinance, a development consisting of 255 new units requires 32 affordable units. Of these 32 affordable units, 10 must be very low-income units, 6 must be low-income units, and 16 must be moderate-income units.

If the rental (family and senior) and for-sale projects are considered by the City Council in the aggregate as one project, the total Arroyo Vista development exceeds the affordability and allocation requirements of the Inclusionary Ordinance by providing a total of 45 new affordable units which is 13 affordable units more than are required under the Inclusionary Ordinance. Additionally, the project provides a deeper level of affordability than required by the City's Ordinance. However, the composition of those affordable units varies from the requirements under the Inclusionary Zoning Ordinance as described below:

### Eden's Rental Component

Eden proposes to construct 150 replacement rental units and 29 additional rental units. Pursuant to the Inclusionary Ordinance, a development consisting of 29 new units requires 4 affordable units. Of these 4 affordable units, 1 must be a very low-income unit, 1 must be a low-income unit, and 2 must be moderate-income units.

Eden's proposed rental project is not entirely consistent with the affordability requirements of the Inclusionary Ordinance. Eden proposes to construct 29 new affordable units. While Eden's rental project provides deeper affordability and 25 additional affordable units than required by the Inclusionary Ordinance, the project does not satisfy the allocation requirement because it does not provide any moderate-income units.

### Citation's For Sale Component

Citation proposes to construct up to 226 for-sale units. Pursuant to the Inclusionary Ordinance, a development consisting of 226 new units requires 28 affordable units. Of these 28 affordable units, 8 must be very low-income units, 6 must be low-income units, and 14 must be moderate-income units.

Standing alone, Citation's proposed for-sale project does not satisfy the requirements of the Inclusionary Ordinance. Citation proposes to construct 16 moderate-income for-sale units, which falls short of the 28 affordable units required by the Inclusionary Ordinance. In addition, the Citation portion of the project does not satisfy the allocation requirement because the project does not provide any very low-income or low-income units.

Citation requests and Staff recommends that the City Council calculate the affordable units in the aggregate together with the Eden units because the Arroyo Vista development satisfies the purposes of the Inclusionary Ordinance by providing more affordable units and deeper affordability. The market rate units and affordable units will be in close proximity to one another although they may be located on separate legal parcels. In addition, the affordable for-sale units will be dispersed throughout the for-sale component.

000017

### 3. Concurrent Construction

The Inclusionary Ordinance requires that the affordable units be constructed concurrently with the market-rate units, unless the City Manager determines in writing that concurrent construction is infeasible or impractical.

The Arroyo Vista development does not satisfy the requirement that the affordable units be constructed concurrently with the market rate units because certain financing and regulatory constraints may impede or prevent Eden's ability to initiate construction of the affordable rental units prior to or concurrently with Citation's construction of the market rate units in the development or at all.

As discussed above, because there is no provision in the DDA that requires Citation to phase its construction of its market rate units so that the affordable units that Eden will build will be constructed concurrently, and because it is the Citation project that does not provide the required number of affordable units, Citation proposes that the Council treat the family project, the senior project and the 226-subdivision as one project for purposes of the Inclusionary Ordinance.

Staff recommends that the City Council conditionally grant the waiver and treat the family project, senior project and 226-unit subdivision as one project, provided: (a) the moderate for-sale units are constructed concurrently with the market rate for-sale units to a maximum of 144 for-sale units (128 market rate units and 16 moderate units); and (b) no building permit shall be issued for any units on the Citation property in excess of 144 units unless [i] Eden has secured financing for both the family project and the senior project, to the satisfaction of the City Manager; [ii] Citation constructs affordable units that, together with the 16 moderate units, satisfy the Inclusionary Ordinance's requirements for the Citation project; or [iii] Citation pays fees in lieu of constructing the remaining affordable units required for compliance with the Inclusionary Ordinance's 12.5% requirement for the Citation project. In the event that Citation pays in lieu fees pursuant to (b)[iii], the City will place such fees in an account and shall return such monies to Citation, with accrued interest, when Eden has secured financing for both the family project and the senior project, to the satisfaction of the City Manager.

Staff will propose conditions on the parcel maps and tentative maps to implement this conditional waiver. However, because conditions of a parcel map and tentative map are of no force or effect once the final map is recorded, staff will also propose that the Council zone the property to a Planned Development district and include the above restrictions as part of the PD zoning. Staff will then be able to deny issuance of building permits beyond the 144th building permit unless [i], [ii] or [iii] above has occurred.

### 4. Bedroom Size

As proposed, the for-sale component of the Arroyo Vista development does not satisfy the Inclusionary Ordinance requirement that the affordable units reflect the full range of numbers of bedrooms provided in the project. Citation has proposed that the for-sale component of the project will consist of up to 210 three- and four-bedroom market rate units and approximately 16 three-bedroom affordable units.

While the DDA does not specify the proportion of four-bedroom market rate units to three-bedroom market rate units, it is clear that Citation plans to construct some four-bedroom market rate units and no four-bedroom affordable units. Consequently, the affordable units do not reflect the full range of numbers of bedrooms provided in the project as a whole.

000018

Staff recommends that the City Council can grant the waiver because the redevelopment of the project will replace the existing dilapidated housing, create new market-rate housing, new affordable rental and ownership housing, and community amenities within a mixed-income development and have an overall benefit to the community.

### 5. Preference Points

Eden and Citation request a one-time waiver from the preference point system contained in the Inclusionary Ordinance that will enable eligible relocated Arroyo Vista residents to receive express preference or priority for all affordable rental and for-sale units in the new Arroyo Vista development. Such express preference or priority will end once all of the affordable Arroyo Vista units are occupied. (As it relates to the for-sale units, former residents must meet financial eligibility requirements.)

Staff recommends that the City Council grant the waiver because such preference is consistent with representations made by the Authority to existing Arroyo Vista residents and satisfies the City's housing goals by ensuring that former residents of Arroyo Vista find suitable permanent replacement housing.

### RECOMMENDATION:

Staff recommends that the City Council: [1] Adopt a Resolution (a) approving the DDA; (b) approving financial assistance to the Authority in the amount of up to $1,500,000 to assist Authority in the relocation of the existing residents of Arroyo Vista; and (c) waiving the affordability, location, bedroom size, and preference point requirements of the City's Inclusionary Zoning Ordinance and conditionally waiving concurrent construction; [2] Approve Budget Change; [3] direct Staff to negotiate a loan agreement and related documents between the City and Eden in an amount not to exceed $1,500,000 to assist in financing the construction of affordable rental units for low-income families and low-income seniors; and [4] authorize the Mayor to sign the DDA on behalf of the City of Dublin.

000019

RESOLUTION NO. ____ - 07

## A RESOLUTION OF THE CITY COUNCIL
## OF THE CITY OF DUBLIN
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**APPROVING A DISPOSITION AND DEVELOPMENT AGREEMENT FOR THE ARROYO VISTA REDEVELOPMENT PROJECT WITH THE HOUSING AUTHORITY OF THE CITY OF DUBLIN, THE HOUSING AUTHORITY OF THE COUNTY OF ALAMEDA, EDEN HOUSING INC., AND CITATION HOMES CENTRAL; APPROVING FINANCIAL ASSISTANCE TO THE HOUSING AUTHORITY OF THE CITY OF DUBLIN FOR RELOCATION COSTS; AND PRELIMINARILY GRANTING WAIVERS TO THE CITY'S INCLUSIONARY ORDINANCE SUBJECT TO FINAL APPROVAL OF ZONING, PARCEL MAP AND TENTATIVE MAP**

WHEREAS, the Housing Authority of the City of Dublin (the "**Authority**") owns Arroyo Vista, a public housing development located in the City of Dublin (the "**City**") at 6700 Dougherty Road (the "**Property**");

WHEREAS, the Property is currently developed with 150 public housing units and a children's day care center, all in need of substantial rehabilitation;

WHEREAS, on July 25, 2006, the Authority determined that rehabilitation was economically infeasible and decided to seek redevelopment of the Property;

WHEREAS, on April 3, 2007, the City Council approved execution of an Exclusive Negotiating Rights Agreement ("**ENRA**") with the Authority, the Housing Authority of the County of Alameda ("**HACA**"), Eden Housing, Inc., a California nonprofit public benefit corporation ("**Eden**"), and SCS Development Company, a California corporation, dba Citation Homes Central ("**Citation**");

WHEREAS, pursuant to the ENRA, City staff negotiated a proposed Disposition and Development Agreement with the Authority, HACA, Eden and Citation, a copy of which is attached hereto as Exhibit A ("**DDA**"), which would govern the disposition and development of the Property;

WHEREAS, pursuant to the DDA, following approval by the U.S. Department of Housing and Urban Development ("**HUD**"), compliance with the California Environmental Quality Act ("**CEQA**") and the National Environmental Policy Act ("**NEPA**"), and the recordation of a final map subdividing the Property, the Authority will sell approximately half of the Property to Citation for the sum of $12,000,000 and will convey the remainder of the Property to Eden at no cost;

WHEREAS, Citation and Eden (collectively, the "**Developer**") propose to redevelop the Property as a mixed-income development of approximately 405 units, consisting of affordable multi-family and senior rental units, affordable and market rate for-sale units, open space, a community center and a childcare facility (the "**Project**");

WHEREAS, the rental component of the Project is proposed to be constructed and managed by Eden, and will consist of 150 affordable rental units, which will replace the existing public housing units,

7-17-07     7.1

**ATTACHMENT 1**

000020

2₃ ۱۰۱

and approximately 29 additional affordable units (the "**Rental Component**"). Approximately fifty of the affordable rental units will be reserved for occupancy by seniors;

WHEREAS, the for-sale component of the Project is proposed to be constructed by Citation, and will consist of approximately 210 market-rate units and 16 affordable units (the "**For-Sale Component**");

WHEREAS, Eden has requested, and the City Council has agreed by execution of the ENRA, to provide a loan to Eden from the City's Inclusionary Zoning In Lieu Fee Fund in the amount of up to $1,500,000 to assist in financing the construction of the affordable multi-family and senior rental units;

WHEREAS, all existing residents of the Property (the "**Existing Residents**") must be relocated to replacement housing prior to disposition of the Property in accordance will all applicable state and federal laws;

WHEREAS, Citation and the Authority will contribute $1,000,000 and $600,000, respectively, for relocation costs;

WHEREAS, the City proposes to contribute $1,500,000 for relocation costs, to be disbursed incrementally as such costs are incurred;

WHEREAS, on May 23, 2007, the Developer submitted a pre-application to the City for the Project;

WHEREAS, the Developer intends to submit an application to the City for the Project;

WHEREAS, the Developer intends to apply for a parcel map to divide the Property into four parcels and Citation intends to apply for a tentative map to further subdivide two of the parcels;

WHEREAS, the City's Inclusionary Zoning Ordinance (the "**Inclusionary Ordinance**") requires that 12.5% of the units in a new residential for-sale or rental development project consisting of 20 units or more must be affordable to households with very low-, low-, or moderate incomes, and of these affordable units, 30% must be very low-income units, 20% must be low-income units and 50% must be moderate-income units;

WHEREAS, the Inclusionary Ordinance also requires the affordable units (1) to be constructed concurrently with the market-rate units; (2) to reflect the range of numbers of bedrooms provided in the project as a whole; (3) to not be distinguished by exterior design, construction, or materials; and (4) to be reasonably dispersed throughout the project;

WHEREAS, the Inclusionary Ordinance requires qualified owners and tenants to be selected pursuant to the preference point system set forth in the Inclusionary Ordinance;

WHEREAS, the City may waive the requirements of the Inclusionary Ordinance and approve alternate methods of compliance with the Inclusionary Ordinance if the applicant demonstrates, and the City Council finds, that such alternate methods satisfy the purposes of the Inclusionary Ordinance;

WHEREAS, the For-Sale Component does not satisfy the number of affordable units required by the Inclusionary Ordinance, and the Rental Component exceeds the required number;

000021

3 of 101

WHEREAS, to remedy the For-Sale Component's inconsistency with the Inclusionary Ordinance, Citation proposes that the Council consider the Rental Component and For-Sale Component as one project for purposes of the Inclusionary Ordinance;

WHEREAS, the Developer requests a waiver from some of the requirements of the Inclusionary Ordinance, including permission to calculate the affordable units constructed in the Rental Component and the For-Sale Component in the aggregate for the entire development;

WHEREAS, the Rental Component and For-Sale Component, in the aggregate, exceed the affordability requirement of the Inclusionary Ordinance by providing 13 additional affordable units and deeper affordability;

WHEREAS, the Developer requests a waiver from the preference point requirement of the Inclusionary Ordinance so that a one-time exception would be provided to enable Existing Residents to receive express preference or priority for all affordable units in the Project;

WHEREAS, the Developer requests a waiver from the requirement of concurrent construction because certain financing and regulatory constraints may impede Eden's ability to initiate construction of the affordable rental units prior to or concurrently with Citation's construction of the market-rate units; provided however, Citation will construct the affordable for-sale units concurrently with the market-rate for-sale units;

WHEREAS, the Developer requests a waiver from the equivalent bedroom requirement because Citation plans to construct some 4-bedroom market-rate, for-sale units but no 4-bedroom affordable, for-sale units;

WHEREAS, the Developer requests a waiver from the allocation requirement because the Rental Component is 100% affordable and therefore the affordable rental units will be clustered together; provided however, Citation will disperse the affordable for-sale units throughout the For Sale Component; and

WHEREAS, any preliminary waivers to the Inclusionary Ordinance that are granted by the Council herein are not intended to be and are not final waivers because the Inclusionary Ordinance requires that waivers be granted as conditions on the parcel maps and tentative maps and the Developer has not yet submitted an application for development of the Property, including parcel maps or tentative maps.

## NOW, THEREFORE, BE IT RESOLVED THAT THE City Council hereby:

1. Approves the DDA and authorizes the City Manager to execute and deliver the DDA substantially in the form on file with the City Clerk.

2. Approves the provision of financial assistance to the Authority in the amount of up to $1,500,000 to assist the Authority in relocating the Existing Residents.

986845

7

3. Preliminarily finds that the Developer's alternate methods of compliance with the affordability, allocation, bedroom size, and preference point requirements of the Inclusionary Ordinance meet the purposes of the ordinance.

4. Preliminarily finds that the Developer's alternate method of compliance with the concurrent construction requirement of the Inclusionary Ordinance will meet the purpose of the ordinance as conditioned.

5. Preliminarily waives the affordability, allocation, bedroom size, and preference point requirements of the Inclusionary Ordinance and approves Developer's alternate methods of compliance.

6. Preliminarily conditionally waives the concurrent construction requirement of the Inclusionary Ordinance provided: (a) the affordable for-sale units in the For-Sale Component are constructed concurrently with the market rate for-sale units in the For-Sale Component to a maximum of 144 for-sale units (128 market rate units and 16 affordable units); and (b) no building permit shall be issued for any units in the For-Sale Component in excess of 144 units unless [i] Eden has secured financing for the entire Rental Component, to the satisfaction of the City Manager; [ii] Citation constructs affordable units that, together with the 16 affordable units, satisfy the Inclusionary Ordinance's requirements for the For-Sale Component; or [iii] Citation pays fees in lieu of constructing the remaining affordable units required for compliance with the Inclusionary Ordinance's 12.5% requirement for the For-Sale Component. In the event that Citation pays in lieu fees pursuant to (b)[iii], the City will place such fees in an account and shall return such monies to Citation, with accrued interest, when Eden has secured financing for the entire Rental Component, to the satisfaction of the City Manager.

7. Directs Staff to propose to zone the Property to a Planned Development district and to include the foregoing restrictions as part of the Planned Development zoning.

8. Directs Staff to propose conditions on the parcel maps and tentative maps to implement the preliminary waivers of the Inclusionary Ordinance and the preliminary conditional waiver for the concurrent construction requirement.

9. Directs Staff to include a provision in the Affordable Housing Agreement between the City and Citation implementing the preliminary waivers of the Inclusionary Ordinance and the preliminary conditional waiver for the concurrent construction requirement.

10. Intends to grant Developer final waivers from the affordability, allocation, bedroom size, concurrent construction, and preference point requirements of the Inclusionary Ordinance as described herein.

11. Directs Staff to negotiate a loan agreement and related documents to provide financing to Eden or its affiliate in an amount not to exceed $1,500,000 to assist in financing the construction of affordable rental units for low-income families and low-income seniors.

**PASSED, APPROVED AND ADOPTED** this _____ day of July 2007.

5 of 101

**AYES:**

**NOES:**

**ABSENT:**

**ABSTAIN:**

_____
City Manager

**ATTEST:**

_____
City Clerk

DISPOSITION
AND
DEVELOPMENT AGREEMENT
FOR THE
REDEVELOPMENT
OF
ARROYO VISTA

By and among

HOUSING AUTHORITY OF THE CITY OF DUBLIN,

THE CITY OF DUBLIN,

THE HOUSING AUTHORITY OF THE COUNTY OF ALAMEDA,

EDEN HOUSING, INC.

and

CITATION HOMES CENTRAL

ATTACHMENT 2

000025

# TABLE OF CONTENTS

7*b* 1*d* 1

Page

ARTICLE 1. DEFINITIONS ...................................................................................2

    Section 1.1 Definitions....................................................................................2
    Section 1.2 List of Exhibits.............................................................................7

ARTICLE 2. REVITALIZATION PLAN; DEVELOPMENT COMPONENTS;
        FINANCING..................................................................................................7

    Section 2.1 Revitalization Objectives ............................................................7
    Section 2.2 Authority Disposition of Property to Developer ..........................7
    Section 2.3 Scope of Development .................................................................8
    Section 2.4 Revisions to Scope of Development ............................................8
    Section 2.5 Affordability Requirements ........................................................9
    Section 2.6 Commencement and Completion of Construction of the
        Development...................................................................................11
    Section 2.7 Schedule of Performance ..........................................................11
    Section 2.8 Financing Terms. ......................................................................11
    Section 2.9 Development Costs; Design Review ..........................................14
    Section 2.10 Planning and Entitlement Costs; Environmental Review ..........14
    Section 2.11 Expenses ...................................................................................14
    Section 2.12 Revitalization Plan Evolution. .................................................15
    Section 2.13 Budgetary Controls. .................................................................16

ARTICLE 3. GENERAL DUTIES OF PARTIES .................................................16

    Section 3.1 Developer's Obligations ...........................................................16
    Section 3.2 Authority Obligations ...............................................................18
    Section 3.3 City Obligations ........................................................................20
    Section 3.4 HACA Obligations....................................................................20
    Section 3.5 Mutual Obligations. ..................................................................20

ARTICLE 4. PREDEVELOPMENT REQUIREMENTS ......................................21

    Section 4.1 Disposition Approval.................................................................21
    Section 4.2 Relocation and Rehousing. .......................................................21
    Section 4.3 Tenant and Homebuyer Selection .............................................23
    Section 4.4 Demolition ................................................................................23

ARTICLE 5. DEVELOPER PREDEVELOPMENT COMPONENT ......................23

    Section 5.1 Developer Responsibility and Management ..............................23
    Section 5.2 License ......................................................................................24
    Section 5.3 Master Planning ........................................................................24
    Section 5.4 Infrastructure and Site Improvements........................................24

TABLE OF CONTENTS
(continued)

Page

Section 5.5 Timing of Subdivision and Conveyance ........................................................24

ARTICLE 6. CONDITIONS PRECEDENT TO AUTHORITY ...................................................25

CONVEYANCE OF PROPERTY TO DEVELOPER..................................................................25

Section 6.1 Conditions Precedent to Authority Performance. ..........................25
Section 6.2 Financing Plans and Commitments ...............................................25
Section 6.3 Construction Documents.................................................................26
Section 6.4 Permits and Approvals...................................................................26
Section 6.5 Affiliate...........................................................................................26
Section 6.6 HUD Approval ...............................................................................27
Section 6.7 Environmental Review and Approval.............................................27
Section 6.8 Approval Process ...........................................................................27

ARTICLE 7. DESIGN ...............................................................................................................28

Section 7.1 Design in Conformance with Scope of Development and
            Conceptual Design ........................................................................28
Section 7.2 City Entitlement Procedures and Submittal Requirements.............28
Section 7.3 Design Documents ..........................................................................28
Section 7.4 Submittal and Review of Documents ..............................................28
Section 7.5 Project Approvals............................................................................29
Section 7.6 Approval Process .............................................................................29
Section 7.7 Additional Permits and Approvals...................................................29
Section 7.8 Authority Review .............................................................................29

ARTICLE 8. CONSTRUCTION ...............................................................................................30

Section 8.1 Commencement of Construction .....................................................30
Section 8.2 Completion of Construction.............................................................30
Section 8.3 Construction Pursuant to Plans .......................................................30
Section 8.4 Construction Bonds..........................................................................30
Section 8.5 Compliance with Applicable Law.....................................................30
Section 8.6 Non-Discrimination During Construction ........................................30
Section 8.7 Equal Opportunity/Non-Discrimination in Employment and
            Contracting Procedures, Including Utilization of Minority and
            Women Businesses. ........................................................................31
Section 8.8 Prevailing Wages .............................................................................31
Section 8.9 Progress Reports ..............................................................................32
Section 8.10 Entry by the Authority and the City ...............................................32
Section 8.11 Taxes; Fees.....................................................................................32
Section 8.12 Hazardous Materials. .....................................................................32

000027

# TABLE OF CONTENTS
(continued)

Page

Section 8.13 As-Is Conveyance. ...............................................................34
Section 8.14 Environmental Work..............................................................35
Section 8.15 City and Other Governmental Authority Permits ....................35
Section 8.16 Zoning of the Property ...........................................................36
Section 8.17 Mitigation Requirements ........................................................36
Section 8.18 Certificates of Occupancy ......................................................36
Section 8.19 City Requirements..................................................................36

ARTICLE 9. OWNERSHIP, OPERATION AND DISPOSITION OF RENTAL
   DEVELOPMENT ........................................................................37

Section 9.1 Ownership ..............................................................................37
Section 9.2 Regulatory Restrictions...........................................................37
Section 9.3 Property Management ..............................................................38

ARTICLE 10. OBLIGATIONS WHICH CONTINUE THROUGH AND
   BEYOND THE COMPLETION OF CONSTRUCTION...............................38

Section 10.1 Maintenance...........................................................................38
Section 10.2 Mechanics' Liens....................................................................38
Section 10.3 Developer To Indemnify Authority, City.................................38
Section 10.4 Non-Discrimination ................................................................39
Section 10.5 Mandatory Language in All Subsequent Deeds, Leases and
   Contracts .............................................................................39
Section 10.6 Employment Opportunity........................................................40

ARTICLE 11. NON-DISCRIMINATION AND OTHER FEDERAL AND
   STATE REQUIREMENTS ...............................................................40

Section 11.1 Certain Requirements..............................................................40
Section 11.2 Access to Records...................................................................41
Section 11.3 Interest of Members of Congress .............................................41
Section 11.4 Interest of Member, Officer, or Employee and Former
   Member, Officer, or Employee of Authority ...........................41
Section 11.5 Lobbying Activities.................................................................41

ARTICLE 12. ROLE OF HUD....................................................................42

Section 12.1 HUD Approval........................................................................42
Section 12.2 No Relationship Created..........................................................42

ARTICLE 13. INSURANCE ........................................................................42

Section 13.1 Developer...............................................................................42

TABLE OF CONTENTS
(continued)

Page

ARTICLE 14. TERMINATION FOR CAUSE ............................................................43

Section 14.1 Events of Default by the Developer. ...............................................43
Section 14.2 Events of Default by the Authority, City. ........................................44
Section 14.3 Procedure for Termination For Cause.............................................44
Section 14.4 Continuing Obligations..................................................................45

ARTICLE 15. DEVELOPER TERMINATION WITHOUT FAULT............................45

Section 15.1 Development Contingencies ...........................................................45
Section 15.2 Revision or Termination ................................................................46
Section 15.3 No Liability....................................................................................46

ARTICLE 16. PARTIES' DISPUTES ....................................................................46

Section 16.1 Definition of Claim Governed by Dispute Clause ...........................46
Section 16.2 Applicability of Dispute Clause......................................................46
Section 16.3 Written Claims to be Submitted to Contracting Officer ..................46
Section 16.4 Notice of Decision or Decision Date ..............................................46
Section 16.5 Effect of Contracting Officer's Decision..........................................47
Section 16.6 Developer's Duty to Perform Pending Claim Resolution .................47
Section 16.7 Identification of Contracting Officer ..............................................47

ARTICLE 17. SECURITY FINANCING AND RIGHTS OF HOLDERS ....................47

Section 17.1 Holder Not Obligated to Construct ................................................47
Section 17.2 Additional Mortgagee Protections .................................................47

ARTICLE 18. REPRESENTATIONS AND WARRANTIES ......................................48

Section 18.1 Developer's Warranty of Good Standing and Authority ..................48
Section 18.2 Authority's Warranty of Good Standing and Authority ...................49
Section 18.3 City's Warranty of Good Standing and Authority ...........................49

ARTICLE 19. MISCELLANEOUS.........................................................................49

Section 19.1 Term.............................................................................................49
Section 19.2 Decision Standards.......................................................................50
Section 19.3 Notices .........................................................................................50
Section 19.4 Representatives .............................................................................51
Section 19.5 Further Assurances.......................................................................52
Section 19.6 Restrictions on Transfers and Assignments. ..................................52
Section 19.7 Permitted Transfers ......................................................................53
Section 19.8 Transfers with Authority, City Consent. .........................................54
Section 19.9 Counterparts.................................................................................54

1460\02\435574.9

## TABLE OF CONTENTS
(continued)

Page

Section 19.10 Interpretation and Governing Law ............................................................54
Section 19.11 Severability ...............................................................................................54
Section 19.12 Final Agreement........................................................................................54
Section 19.13 Non-Recourse ...........................................................................................55
Section 19.14 Developer Employees and Liabilities .......................................................55
Section 19.15 Developer Not an Agent ...........................................................................55
Section 19.16 Conflict of Interest ...................................................................................55
Section 19.17 Waivers .....................................................................................................55
Section 19.18 Successors .................................................................................................56
Section 19.19 Headings; Exhibits....................................................................................56
Section 19.20 Construction..............................................................................................56
Section 19.21 Cumulative Rights ....................................................................................56

| Exhibit A | Legal Description |
| Exhibit B | Financing Plan and Development Budget |
| Exhibit C | Scope of Development |
| Exhibit D | Preliminary Site Plan/Schematic Design |
| Exhibit E | Schedule of Performance |
| Exhibit F | Insurance |
| Exhibit G | Equal Opportunity/Non-Discrimination Policies |
| Exhibit H | Escrow Terms |

1460\02\435574.9

000030

12ఫ్ 101

## DISPOSITION AND DEVELOPMENT AGREEMENT
## FOR THE REDEVELOPMENT OF ARROYO VISTA

This Disposition and Development Agreement ("Agreement") is entered into as of the _____ day of _____, 2007 among the HOUSING AUTHORITY OF THE CITY OF DUBLIN, a public body, corporate and politic organized under the laws of California (the "Authority"), the CITY OF DUBLIN, a municipal corporation (the "CITY"), the HOUSING AUTHORITY OF THE COUNTY OF ALAMEDA, a public body, corporate and politic ("HACA"), EDEN HOUSING, INC., a California nonprofit public benefit corporation ("Eden") and SCS DEVELOPMENT COMPANY, a California corporation, dba Citation Homes Central ("Citation")(Eden and Citation, collectively, the "Developer").

## RECITALS

A.     Arroyo Vista is currently an Authority-owned public housing development on approximately 22.9 acres of land located at 6700 Dougherty Road in the City of Dublin, known as Alameda County Assessor's Parcel Nos. 941-0007-001-07, and more particularly described on Exhibit A attached hereto (the "Property").

B.     The Property is currently developed with 150 public housing units and a children's day care center (collectively, the "Existing Housing"). The Authority has determined that in order to ensure that the Existing Housing meets current standards, substantial rehabilitation is necessary and that it is economically infeasible to undertake such rehabilitation given the limited revenue generated by tenant rents and subsidies provided to the Authority by the United States Department of Housing and Urban Development ("HUD"). Accordingly, the Authority issued a Request for Qualifications ("RFQ") inviting submissions from developers interested in redeveloping the site with rental and ownership housing affordable to households with a range of income levels.

C.     In response to the Authority's RFQ, Developer submitted a proposal to develop the Property as a mixed-income development consisting of multi-family rental and ownership housing and senior housing and community facilities and amenities (the "Development"). The Authority selected the Developer through a competitive selection process to assist it in developing an enhanced revitalization plan for Arroyo Vista that includes a long-term commitment to high-quality, affordable housing.

D.     The Authority entered into an Exclusive Negotiating Rights Agreement ("ENRA") with the Developer, as well as with the City and HACA, dated as of April 11, 2007, and pursuant to direction from the Authority's Commission (the "Commission") has been negotiating with the Developer for the purpose of reaching agreement on this disposition and development agreement ("DDA") whose terms and conditions would govern the conveyance of the Property and the development of the Development.

E.     The City has agreed to provide financial assistance, as described in more detail

000031

1305 101

below, to help with the relocation costs of the residents of the Existing Housing, and to help with the construction cost of the Affordable Family Rental Housing and/or Affordable Senior Rental Housing.

F.    HACA has agreed to provide Section 8 Housing Choice Vouchers to eligible residents of the Existing Housing in order to ensure that existing residents who are eligible have the opportunity to relocate to new housing with an affordable rent.

G.    The Development to be constructed on the Property will consist of approximately 405 housing units, including approximately 179 affordable rental units, approximately 50 of which will be reserved for seniors, approximately 16 affordable for-sale units, approximately 210 market-rate for-sale units, a community center and a child care facility.

H.    Pursuant to the California Environmental Quality Act ("CEQA") and the National Environmental Policy Act ("NEPA") and their respective implementing regulations, the City is conducting a study pursuant to CEQA and NEPA of the environmental impacts of the Development. Approval and certification of the environmental documentation for the Development by the City and HUD is a precondition to the Authority's agreement to convey the Property under this Agreement.

I.    Notwithstanding anything in this Agreement to the contrary, the Authority has not nor will it approve the sale of the Property, and the City has not nor will it approve the use of the Property for the Development until all required environmental reviews under CEQA and NEPA have been completed.

In consideration of the foregoing recitals and underlying promises, which all parties agree to be good and valuable consideration, the parties agree as follows:

## ARTICLE 1.
## DEFINITIONS

Section 1.1 Definitions.

(a)    "Act" shall mean the United States Housing Act of 1937, as amended from time to time, and any successor legislation.

(b)    "Additional Affordable Units" shall mean the approximately 29 affordable rental units to be constructed, owned and operated by Eden in addition to the Replacement Units, and the Affordable For-Sale Housing units being developed by Citation.

(c)    "Affiliate" shall mean, with respect to either party constituting Developer, (1) any entity which has the power to direct Developer's management and

000032

140 of 101

operation, or any entity whose management and operation is controlled by Developer; or (2) any entity in which an entity described in (1) has a controlling interest; or (3) any entity a majority of whose voting equity is owned by Developer, or for which Developer serves as the managing member or general partner; or (4) any entity in which, or with which, Developer, its successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions for merger or consolidation, so long as the liabilities of the entities participating in such merger or consolidation are assumed by the entity surviving such merger or created by such consolidation.

(d)    "Affordable Family Rental Housing" shall mean the Development Component to be developed by Eden consisting of approximately 129 units for low-, very low-, and extremely low-income families, a community center, childcare facility and open space.

(e)    "Affordable For-Sale Housing" shall mean the affordable units to be developed by Citation which shall be offered to households whose incomes do not exceed Moderate Income (as defined herein).

(f)    "Affordable Senior Rental Housing" shall mean the Development Component to be developed by Eden consisting of approximately 50 rental units for low-income seniors.

(g)    "Affordable Units" shall refer collectively to the 150 Replacement Units and approximately 45 Additional Affordable Units.

(h)    "Agreement" shall mean this Agreement (including all Exhibits attached hereto and made a part hereof).

(i)    "Applicable Requirements" shall mean applicable Federal, State, and local laws, rules and regulations, including without limitation, all applicable provisions of California Labor Code Section 1720 et seq. and the regulations adopted in connection therewith.

(j)    "Authority" shall mean the Housing Authority of the City of Dublin, organized pursuant to Section 34200, et seq. of the California Health and Safety Code, as amended, including any successor in interest or assigns by act of the Authority, or by operation of law, or otherwise.

(k)    "Authority Financing" shall mean the loan, forgivable loan and/or grant to be made by the Authority to Eden to develop the Affordable Units.

(l)    "CEQA" shall mean the California Environmental Quality Act (Public Resources Code Section 21000 et. seq.).

000033

(m)    "Citation" shall mean SCS Development Company, a California corporation, dba Citation Homes Central, or its Affiliate.

(n)    "City" shall mean the City of Dublin, California.

(o)    "City Loan" shall mean the loan to be made by the City to Eden to assist in the development of the Affordable Family Rental Housing and/or the Affordable Senior Rental Housing components.

(p)    "Closing" or "Close of Escrow" shall mean, (1) with regard to the Property, the date on which the grant deed conveying the Property by the Authority is recorded; and (ii) with regard to any Development Component, the date on which the deed(s) of trust securing the loan(s) or grant(s) for a Development Component is recorded.

(q)    "Closing Documents" shall mean such Authority and City documents as may be necessary to close the Authority Financing and the City Loan.

(r)    "Commission" shall mean the Board of Commissioners of the Authority.

(s)    "Construction Completion" shall mean the dates on which the Certificates of Occupancy or the equivalent are issued by the appropriate local authority.

(t)    "Construction Documents" shall include, or incorporate as they come into existence, (a) the construction contract(s) and the general, special, and supplemental conditions to such contract(s); (b) site surveys, soil boring tests and any other tests, examinations or documents prepared from time to time in connection with the Development, (c) the plans and (d) all written or graphic interpretations, clarifications, amendments, shop drawings and changes of any of the foregoing.

(u)    "DDA" shall refer to this Disposition and Development Agreement.

(v)    "Declaration of Trust" shall refer to the Declaration of Trust by the Authority in favor of HUD, currently recorded against the Property in connection with the Existing Housing.

(w)    "Developer" shall refer to Eden and Citation until the conveyance of the Property, as described in Section 2.2; thereafter, "Developer" shall refer to either Eden or Citation with respect to the portion of the Property conveyed to Eden or Citation, as applicable.

(x)    "Developer Proposal" shall mean the Response to the RFQ submitted by the Developer to the Authority on March 22, 2006 which proposal is incorporated herein by reference.

000034

1605 161

(y)    "Development" shall refer to the improvements to be constructed hereunder or, as the context may require, to those improvements to be constructed in a particular Development Component.

(z)    "Development Budget" shall refer, as the context may require, to the budget for the Development Component specified thereon (attached hereto as Exhibit B), as they may be amended.

(aa)    "Development Components" shall mean the (A) Affordable Family Rental Housing, (B) Affordable Senior Rental Housing, (C) For-Sale Housing.

(bb)    "Development Contingencies" shall have the meaning described in Section 15.1.

(cc)    "Eden" shall mean Eden Housing, Inc., or its Affiliate.

(dd)    "Environmental Law" shall mean any present or future federal, State or local law, ordinance, rule, regulation, permit, license or binding determination of any governmental authority relating to, imposing liability or standards concerning, or otherwise addressing Hazardous Materials, the environment, health or safety, including, but not limited to: the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq. ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. ("RCRA"); the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq. ("TOSCA"); the Clean Air Act, 42 U.S.C. Section 7401 et seq.; and the Clean Water Act, 33 U.S.C. Section 1251 et seq. and any so-called "Superfund" or "Superlien" law; and the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq. ("OSHA"), as each is from time to time amended and hereafter in effect.

(ee)    "Existing Housing" shall mean the 150 units of public housing (HUD Project No. CA-142-1) commonly known as Arroyo Vista, located on the Property.

(ff)    "Final Map" shall mean any and all final maps and parcel maps to be filed by the Developer.

(gg)    "Financing Plan" shall have the meaning given in Section 6.2.

(hh)    "For-Sale Housing Component" shall mean the Market Rate For-Sale Housing" and the Affordable For-Sale Housing, collectively.

(ii)    "HACA" shall mean the Housing Authority of the County of Alameda.

(jj)    "Hazardous Materials" shall mean "hazardous substances" as defined by CERCLA, "hazardous wastes" as defined by RCRA, any hazardous, dangerous or toxic chemical, waste, pollutant, contaminant or substance ("pollutant") within the meaning of any

.000035

17ठ 101

Environmental Law prohibiting, limited or otherwise regulating the use, exposure, release, emission, discharge, generation, manufacture, sale, transport, handling, storage, treatment, reuse, presence, disposal or recycling of such pollutant, petroleum crude oil or fraction thereof, any radioactive material, including any source, special nuclear or by-product material as defined in 42 U.S.C. Section 2011 et seq. and amendments thereto and reauthorizations thereof, asbestos-containing materials in any form or condition, or polychlorinated biphenyls in any form or condition.

     (kk)   "HUD" shall mean the U.S. Department of Housing and Urban Development.

     (ll)   "Low-Income Housing Tax Credit" or "LIHTC" shall refer to the credit available under Section 42 of the Internal Revenue Code of 1986, as amended.

     (mm)   "Market Rate For-Sale Housing" shall mean up to 210 market rate for-sale units to be developed by Citation.

     (nn)   "NEPA" shall mean the National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321-4347).

     (oo)   "Prior Resident" shall have the meaning given in Section 4.2.

     (pp)   "Property" shall refer to the real estate described in Exhibit A on which the Development will be constructed.

     (qq)   "Relocation Plan" shall mean the Relocation Plan approved by HUD.

     (rr)   "Replacement Units" shall mean the 150 affordable rental housing units that will replace the Existing Housing units.

     (ss)   "Revitalized Community" shall mean the Development or any portion thereof, after it is placed in service.

     (tt)   "Revitalization" shall mean the totality of activities and tasks described in the Revitalization Plan.

     (uu)   "Revitalization Plan" shall mean this Agreement and the Disposition Application, as amended or supplemented, as the parties may agree and as HUD may approve.

     (vv)   "RFQ" shall mean the Request for Qualifications for Real Estate Developer issued by the Authority on January 11, 2006, as supplemented with addenda, which is incorporated herein by reference.

     (ww)   "Schedule of Performance" shall mean the development schedule

1460\02\435574.9

6

000036

attached hereto as Exhibit E, as the parties may revise from time to time.

(xx)    "Scope of Development" means the description of the improvements to be constructed as part of the Development attached hereto as Exhibit C, as the parties may revise from time to time.

(yy)    "TCAC" shall refer to the California Tax Credit Allocation Committee.

(zz)    "Term" shall mean the period for which this Agreement is effective, and shall commence with the execution hereof and shall terminate upon Construction Completion, as such period is more fully described in Section 19.1.

(aaa)    "Transfer" shall have the meaning given in Section 19.6.

Section 1.2  List of Exhibits.
Exhibit A    Legal Description
Exhibit B    Financing Plan and Development Budget
Exhibit C    Scope of Development
Exhibit D    Preliminary Site Plan/Conceptual Design
Exhibit E    Schedule of Performance
Exhibit F    Insurance
Exhibit G    Equal Opportunity/Non-Discrimination Policies
Exhibit H    Escrow Terms

## ARTICLE 2.
## REVITALIZATION PLAN; DEVELOPMENT COMPONENTS; FINANCING

Section 2.1    Revitalization Objectives.  The parties are entering into this Agreement in order to effect the Revitalization of the Property.  The Revitalization is intended to cause the demolition of the Existing Housing, improvement of the existing infrastructure, and redevelopment of the Property with a mixed-income housing development, as more particularly described below.  As of the date hereof, the Revitalization shall be defined as the totality of activities, tasks and other matters detailed in the Revitalization Plan (which is incorporated herein by reference as if attached as an exhibit), as the Revitalization Plan may be amended from time to time as provided herein.

Section 2.2    Authority Disposition of Property to Developer.  The Authority agrees to convey the Property to Developer, and Developer agrees to accept the conveyance of the Property for development, all in accordance with and subject to all terms, conditions and covenants set forth in this Agreement and the Escrow Terms set forth in Exhibit H attached hereto and incorporated herein.

000037

19?? 101

(a)    After the Property is divided into separate legal parcels, the Authority shall sell to Citation approximately one-half of the Property for a Purchase Price equal to Twelve Million Dollars ($12,000,000) in cash as described in Section 2.8 below. Additionally, Citation shall pay for the pro-rata share of common offsite infrastructure and site improvement costs associated with or attributed to the Affordable Senior Rental Housing to be developed by Eden and not less than half of the Transactional Expense Payment as defined in this Agreement.

(b)    Concurrently with the sale of approximately one-half of the Property to Citation, the Authority shall transfer the remaining portion of the Property to Eden for the purpose of developing the Replacement Units and other affordable rental housing for very low to lower income households in accordance with this Agreement. The portion of the property conveyed to Eden shall be conveyed to Eden for One Dollar ($1), plus Eden's share of all escrow costs as set forth in the Exhibit H and Eden's development obligations with respect to the affordable rental housing units set forth in this Agreement.

Section 2.3    Scope of Development.  Subject to Section 2.4 below, the Property shall be subdivided into separate legal parcels for the development and construction of approximately 405 housing units described below, open space, a community center and childcare facility.

(a)    Replacement Units.  Eden shall construct, own and operate 150 affordable rental housing units (the "Replacement Units") that will replace the Existing Housing. The Replacement Units will include one hundred (100) multifamily rental units and fifty (50) senior rental apartments.

(b)    Additional Affordable Units.  Approximately Forty-five (45) additional affordable units (the "Additional Affordable Units") shall be developed, of which approximately sixteen (16) shall be for-sale units constructed by Citation, and approximately twenty-nine (29) shall be multifamily rental units constructed, owned and operated by Eden.

(c)    Market Rate For-Sale Units.  Citation shall construct up to 210 market-rate for-sale units (the "Market Rate For-Sale Units").

Section 2.4    Revisions to Scope of Development.  The Parties acknowledge that the Development and the Development Components described herein are preliminary and remain subject to change as more detailed plans are formulated during the formal planning process. Notwithstanding anything to the contrary contained herein, the construction of the Development is conditioned upon compliance with the CEQA and NEPA. No physical activity, not otherwise exempt from CEQA and NEPA, shall commence on the Property without CEQA and NEPA compliance. In addition, the Development as described in Section 2.3 is also conditioned upon, subject to and/or may be modified for any of the following: (i) HUD approval and compliance with NEPA; (ii) the City's application process for discretionary land use entitlements and building requirements; (iii) availability of utilities; (iv) availability of

000038

funding under affordable rental housing programs; (v) site constraints; and (vi) changes necessary to make the Development or portions of it more competitive for financing and financially feasible.

Section 2.5    Affordability Requirements.  The Affordable Units will be subject to recorded regulatory restrictions.  The regulatory agreements for the rental Affordable Units will require the rental units to be offered for rent and occupancy by extremely low-, very low-, and low-income households for a term of at least fifty-five (55) years.  The recorded restrictions on the Affordable For-Sale Housing units will impose household income eligibility and resale price restrictions for a term of at least fifty-five (55) years.  The affordability requirements for the Development shall, at minimum, meet the requirements of the City's Inclusionary Zoning Ordinance, as specified more particularly in Section 8.19.

The City and Authority agree to execute, and record at Eden's cost, subordination agreements to subordinate the City's Regulatory Agreement and Authority's Regulatory Agreement to Eden's construction and/or permanent loans for the affordable rental housing component if (A) such construction and/or permanent financing is provided by (i) the Department of Housing and Community Development ("HCD"), the California Housing Financing Agency ("CalHFA"), HUD, or other public senior lender that requires by statute or regulation that regulatory agreements with local public entities be subordinated, or (ii) in the case of tax-exempt bond financing, subordination of the Regulatory Agreements is required by such financing or Bond Counsel, or (B) (1) the affordable rental component is financed in part by HUD, Low-Income Housing Tax Credits, or tax-exempt bond financing and is subject to a recorded regulatory agreement in connection with such financing, and (2) Eden demonstrates to the City and Authority that, compared to financing available to Eden if the Regulatory Agreements are subordinated, financing without such subordination will be offered on materially less favorable terms.  In all cases, the City and Authority shall each be entitled to receive notice of default and shall each be entitled to cure defaults arising under the senior documents.

Within the time frame specified in the Schedule of Performance, the Developer shall provide a breakdown of the Affordable Housing Rental Units and Affordable Housing For-Sale Units by number of units, unit size, and targeted AMI levels.  Subject to the availability of sufficient financing and other conditions set forth in Section 2.4, the targeted breakdown of the units is as follows:

SENIOR RENTAL HOUSING

Estimated Number of Units by Unit Size and Targeted Area Median Income (AMI) Levels

| | 30% AMI | 40% AMI | 50% AMI | Sub-Total | Manager's Unit | Total |
|---|---|---|---|---|---|---|
| 1-Bedroom | 5 | 8 | 36 | 49 | 1 | 50 |

TOTAL:  50 Senior Housing Rental Units

000039

21 of 101

## FAMILY RENTAL HOUSING

Estimated Number of Units by Unit Size and Targeted Area Median Income (AMI) Levels

|  | 30% AMI | 40% AMI | 50% AMI | 60% AMI | Sub-Total | Manager's Unit | Total |
|---|---|---|---|---|---|---|---|
| 1-Bedroom | 3 | 2 | 3 | 2 | 10 | N/A | 10 |
| 2-Bedroom | 3 | 27 | 33 | 6 | 69 | 1 | 70 |
| 3-Bedroom | 3 | 11 | 15 | 5 | 34 | N/A | 34 |
| 4-Bedroom | 4 | 6 | 5 | 0 | 15 | N/A | 15 |
| Total | 13 | 46 | 56 | 13 | 128 | 1 | 129 |

TOTAL:  129 Family Rental Units

In accordance with the RFQ and Developer's response thereto, not less than six (6) rental units (i.e., 20% of 12.5% of the total number of projected units (405) less the Replacement Units) will be affordable to families who have household incomes between 50% and 80% of AMI.  Eden agrees to make six (6) rental units (or 20% of 12.5% of the total number of projected units (405) in the Development excluding the Replacement Units, whichever is greater) available for rent to returning residents of the Existing Housing ("Prior Residents") who are eligible and who have household incomes between 60% and 80% of AMI.  If some of the six units reserved for Prior Residents at incomes between 60% and 80% of AMI are not leased to such Prior Residents because less than six Prior Residents fail to apply, qualify or are ineligible, then Eden may rent those units to qualified families whose household incomes do not exceed 60%* of AMI so that such units qualify as LIHTC-eligible units.  The calculation of household incomes shall be in conformance with LIHTC regulations.

*NOTE:  In the event the applicable LIHTC regulations which restrict LIHTC-eligible units to 60% of AMI increase to a higher income level, the 60% income restriction set forth in the preceding sentence shall increase to the higher LIHTC-eligible level.

## RESIDENTIAL FOR-SALE UNITS

Estimated Number of Units by Unit Size and Targeted
Area Median Income (AMI) Levels

|  | 80-120% AMI | Market-Rate | Total |
|---|---|---|---|

000040

| 3-Bedroom | 16** | N/A | 16 |
| 3 & 4-Bedroom | N/A | 210 | 210 |
| Total | 16** | 210 | 226 |

TOTAL:   Up to 226 Residential For-Sale Units

**Note:  The number of Affordable For-Sale Units has been agreed upon by the parties to be seven percent (7%) of the total number of For-Sale Units in the Development.  To the extent that the number of For-Sale Units in the Development changes, the number of Affordable For-Sale Units will also change.

Section 2.6    Commencement and Completion of Construction of the Development. The Final Map for the Development shall be processed and recorded within the time frame set forth in the Schedule of Performance.  The City and the Authority agree to work cooperatively and in good faith with the Developer to ensure that the Final Map is processed in a timely manner; provided, however, that nothing in this Agreement shall be deemed to require the City, its Planning Commission or other local agency with discretionary approval authority to approve entitlements for the Development or otherwise commit their discretionary powers in any particular manner.  Citation and Eden shall commence and complete the construction of each of their respective components of the Development within the timeframe set forth in the Schedule of Performance.

Section 2.7    Schedule of Performance.  All parties shall perform their respective obligations within the time frames set forth in the Schedule of Performance initially attached hereto as Exhibit E, which may be amended and updated from time to time with the approval of all parties, which approval shall not be unreasonably conditioned, withheld or delayed, and which shall not require the formal approval of the governing bodies of the City, Authority or HACA.  Each such amended or updated Schedule of Performance when approved shall be initialed by all of the parties and made a part of this Agreement whether or not physically attached hereto.

Section 2.8  Financing Terms.

(a)    Purchase Price for the Property Conveyed to Citation.  The purchase price for the portion of the Property to be conveyed to Citation is Twelve Million Dollars ($12 million)("Purchase Price"), which is the total of the following three payments:   (i) Citation will pay $8 million to the Authority to be used by the Authority as a subsidy for the Affordable Family Rental Housing and the Affordable Senior Rental Housing to be developed by Eden; (ii) Citation will pay $3 million (the "Transaction Allocation") to HACA to support the processing, on behalf of the Authority, of necessary HUD approvals and the conveyance of the Property; and (iii) Citation will pay $1 million (the "Relocation Contribution") to the Authority to cover costs associated with relocation of existing residents in the Existing Housing prior to disposition of the Property.

000041

23½ 101

    (b)    <u>Payment of Purchase Price</u>.  Citation shall pay the Purchase Price in accordance with the following:

    (1)    Following the execution of, and in accordance with, the ENRA among the parties, Citation made a nonrefundable deposit to the City in the amount of Fifty Thousand Dollars ($50,000) (the "Initial Deposit"), which the City has placed in a City-managed cost-recovery account to secure the payment of certain legal and consulting fees that have been or will be incurred by the City and/or Authority in connection with the Development.  At close of escrow for conveyance of the Property, any remaining balance of the Initial Deposit will be credited toward the Purchase Price.  If, at the time of conveyance of the Property, the remaining balance of the Initial Deposit is less than $50,000, Citation will pay any shortfall in such amount at that time.

    (2)    Upon the City's approval of a tentative map and/or a vesting tentative map for the Development (hereinafter, collectively, "Tentative Map") Citation will pay:  (i) the sum of Two Hundred Fifty Thousand Dollars ($250,000) to Authority, and (iii) the sum of One Million Five Hundred Thousand Dollars ($1,500,000) to HACA.  These sums shall be credited toward the Purchase Price, and shall be nonrefundable unless Authority fails to secure HUD approval of the disposition of the Property, relocate all residents of the Existing Housing, and convey title to the Property to Developer.

    (3)    Upon the earlier to occur of the City's approval of the Final Map or HUD approval of the Disposition Application, Citation will pay:  (i) Seven Hundred Thousand Dollars ($700,000) to the Authority, and (ii) One Million Five Hundred Thousand Dollars ($1,500,000) to HACA.  These sums shall be credited toward the Purchase Price, and shall be nonrefundable unless Authority fails to relocate all residents of the Existing Housing and convey title to the Property to the Developer.

    (4)    Upon the later to occur of the City's approval of the Final Map or release by HUD of the Declaration of Trust, Citation will pay the sum of Eight Million Dollars ($8,000,000) to the Authority or its order.  The $8,000,000 shall be placed in Escrow (as that term is defined in Exhibit H attached hereto) within three (3) business days following the City's approval of the Final Map or HUD's release of the Declaration of Trust, whichever is later.  The $8,000,000 shall remain in Escrow until the conveyance of the Property to Citation and Eden at which time Escrow shall release the $8,000,000 to the Authority or its order.  The $8,000,000 shall be used by the Authority, or its order, to fund the Authority Financing to subsidize the Affordable Family Rental Housing and/or Affordable Senior Rental Housing as set forth in Section 2.8(a)(i).

    (i)    During the time that the $8,000,000 is held in Escrow, the funds shall be held in an interest-bearing account and all interest shall accrue and be paid to the Authority or its order, subject to the last sentence of this subsection (i).  If the conditions precedent for the release of the $8,000,000 from Escrow to the Authority or its order are not

000042

met and Citation is entitled to have the $8,000,000 released to Citation, then all interest on the $8,000,000 which accrued while held in trust by Escrow, shall be paid to Citation with the $8,000,000 principal. Upon conveyance of the Property to Citation and Eden, any accumulated interest shall be used to reimburse the City for the City's contribution to Relocation Costs.

(ii)    If the parties mutually agree to hold the $8,000,000 in trust in an investment account and not in an interest-bearing account in Escrow, the parties may do so, provided that prior to Escrow releasing the funds to an investment account holder, the Authority, City, HACA, Citation, Eden, Escrow and the investment account holder all execute a written agreement relating to the investment of funds, conditions for release and such other matters that the parties deem necessary which agreement shall be in form and substance acceptable to each party in each party's discretion (defined in Section 19.2(c)). If no agreement can be reached, the funds shall remain in an interest-bearing account in Escrow. Each party shall pay for its own costs and expenses related to the preparation review and negotiation of any investment agreements or other instruments relating to the investment account and to the deposit and release of the funds to and from Escrow.

(c)    City Loan. Provided that all conditions to conveyance of the Property have been satisfied, the City agrees to provide a loan to Eden in the amount of One Million Five Hundred Thousand Dollars ($1,500,000)(the "City Loan") to assist in financing the construction of the Affordable Family Rental Housing and/or Affordable Senior Rental Housing components. The City Loan will be evidenced by a nonrecourse promissory note, requiring payment on a residual receipts basis on such terms as the City and Eden shall mutually agree upon, and secured by a deed of trust recorded against the affected parcel(s) and subordinated to Eden's rental housing construction and permanent loans for affected parcel(s). The City Loan will be funded following satisfaction of the conditions agreed upon by the City and Eden as set forth in a Loan Agreement to be executed by the City and Eden. The City's financial contribution to the Development is limited to the City Loan and City Relocation Funds, as such term is defined in Section 3.3(b).

(d)    Authority Financing. Provided that all conditions to conveyance of the Property have been satisfied, the Authority agrees to provide financial assistance to Eden in the amount of Eight Million Dollars ($8,000,000)(the "Authority Financing") to assist in development and construction of the Affordable Family Rental Housing and/or Affordable Senior Rental Housing components. The loans and/or grants will be structured in such manner as the parties determine will maximize the feasibility of the transaction and, where relevant, its tax credit eligibility or HUD Section 202 financing. Eden and the Authority shall execute such loan and/or grant agreements, notes, deeds of trust, security agreements and other documentation as may be necessary to effectuate the Authority Financing. Any portion of the Authority Financing in the form of a loan will be evidenced by a nonrecourse promissory note, requiring payment on a residual receipts basis on such terms as the Authority and Eden shall mutually agree upon. The Authority Financing, whether in the form of a loan or grant, shall be secured by a deed of trust recorded against the affected parcel(s) and subordinated to Eden's

000043

2557 101

rental housing construction and permanent loans for affected parcel(s). The Authority Financing will be funded with funds to be provided to the Authority by Citation pursuant to Section 2.8(b)(4) of this Agreement, following satisfaction of the conditions agreed upon by the Authority and Eden as set forth in a Loan Agreement to be executed by the Authority and Eden. The Authority's financial contribution to the Development Components under this Agreement is limited to the Authority Financing and the Authority Relocation Funds, as such term is defined in Section 3.2(e).

Section 2.9    Development Costs; Design Review.  Except as otherwise expressly stated herein, Developer will be responsible for all development costs, including without limitation all design, development, demolition and construction costs, the cost of all permits, impact and processing fees, and the cost of all on-site and off-site public improvements required in connection with the Development.

Section 2.10    Planning and Entitlement Costs; Environmental Review.  Except as otherwise expressly stated herein, Developer shall be responsible for payment of all costs incurred by the Authority, HACA and City in connection with the environmental review requirements associated with the disposition of the Property and the Development pursuant to the California Environmental Quality Act ("CEQA") and National Environmental Policy Act ("NEPA").

Pursuant to Section 2.11(a) below, Citation and Eden established and funded a standard cost recovery account with the City's Planning Department to ensure prompt payment of all City costs associated with processing CEQA and NEPA clearance documents, Tentative Maps, General Plan Amendment, and zoning amendments for the Development. The parties acknowledge that prior to the execution of this Agreement, Citation and Eden have deposited $175,000 into the cost recovery account which was a condition precedent to initiating formal planning activities for the Development. Citation and Eden will be jointly responsible for payment of all planning and entitlement costs and fees as they are incurred.

Section 2.11    Expenses.  Citation and Eden will be responsible for paying up to Five Hundred Thousand Dollars ($500,000) (the "Transactional Expense Payment") to cover City and Authority legal, consulting and other costs and expenses incurred commencing on August 1, 2006 in connection with the negotiation and preparation of the Exclusive Negotiating Rights Agreement and this Agreement and other transactional activities associated with the disposition and development of the Property ("Transactional Costs"). The Transactional Expense Payment shall be in addition to the Purchase Price and the sums payable pursuant to Sections 2.8 and 2.11(a). The Transactional Expense Payment shall be paid as follows:

(a)    Cost Recovery Account.  The City shall establish a separate cost-recovery account (the "Transactional Cost Account") to manage payment of all Transactional Costs.

(b)    Payment of Transactional Costs.  As Transactional Costs are incurred,

000044

26 of 101

City and Authority shall submit invoices to Eden and shall clearly mark such invoices as Transactional Costs. Invoices shall include copies of any third-party (e.g., consultant and legal) invoices. Eden and Citation shall be jointly responsible for payment of such invoices, and shall ensure payment in full within 30 days after receipt.

(c)  Reimbursement of City-Incurred Transactional Costs. If the total Transactional Costs incurred by the City and Authority exceed $250,000, the City will pay for such additional costs with funds from the City's Inclusionary Zoning In Lieu Fee Fund; provided, however, upon transfer of the Property to the Developer, Citation and Eden jointly and severally agree to reimburse the City for such additional costs up to the amount of $250,000 so that the aggregate amount of Transactional Costs paid by Citation and Eden equals the total of Transactional Costs incurred, up to a maximum of $500,000.

(d)  Use of Funds in Cost Recovery Account. The Initial Deposit described in Section 2.8(b)(1) above will be deposited into the Transactional Cost Account to serve as security to ensure prompt payment of the City and Authority Transactional Costs. If any invoice for Transactional Costs remains unpaid 30 days following transmittal to Eden, then the City or Authority, as applicable, may draw funds from the Transactional Cost Account, and Citation and Eden shall be required to replenish the Transactional Cost Account up to the amount of $50,000 within 30 days. At the close of escrow for conveyance of the Property after any remaining reimbursements due the City are made in accordance with this Section 2.11 and subject to Section 4.2(a)(4), any remaining balance in the Transactional Cost Account shall be credited toward Citation's Purchase Price.

Section 2.12    Revitalization Plan Evolution.

(a)  Initial Plan. Under the Disposition Application, the Authority is committed to have a Revitalization Plan initially consisting of the Disposition Application together with such amendments, supplements or clarifications as HUD may require and accept, and such further amendments as the Authority and Developer may propose and HUD approves.

(b)  Improvement. It is contemplated by the parties that as Developer pursues the further planning and implementation of the Revitalization, Developer, Authority and/or the City will identify areas in which the Revitalization Plan can be improved upon so as to make it more economically feasible or so as to better achieve its underlying objective of community revitalization. Where future amendments to the Revitalization Plan are advisable or required by unforeseen circumstances, subject to HUD approval, the Authority and Developer will work together to develop changes which accomplish the original goals set forth in the Revitalization Plan to the maximum extent feasible. The Authority, City and the Developer shall execute such documents acceptable to all parties as may be necessary and appropriate to the implementation of this Agreement.

(c)  Amendments. Developer shall cooperate with the Authority in the preparation of any amendment to the Revitalization Plan and submission to HUD that may be

000045

necessitated by the evolution of plans prior to Closing.

Section 2.13    Budgetary Controls.

(a)    The Revitalization Plan shall include a budget (referred to herein as the "Development Budget," notwithstanding that it may also include expense items other than for the Development Components), as it may be amended from time to time, which Development Budget is attached hereto as Exhibit B. The City, Authority and HACA shall have no contractual obligation to pay or provide any amount to Developer or for the Revitalization under this Agreement, except for the City Loan, Authority Financing, City and Authority relocation assistance as described in Section 4.2(a)(2) and (3) herein respectively, HACA relocation vouchers as described in Section 4.2(b) herein, and Transactional Costs over $500,000. The parties recognize that financial needs may arise which require budget revisions so that the Revitalization may be accomplished, and they will consider and pursue such revisions in good faith.

(b)    It is the responsibility of Developer to propose, prepare and ascertain the sufficiency of the Development Budget, discuss its conclusions with the Authority and the City, and identify sources for such further funds as may be required for completion those portions of the Revitalization which are the obligation of the Developer.


# ARTICLE 3.
## GENERAL DUTIES OF PARTIES

Section 3.1    Developer's Obligations. In addition to any obligations stated elsewhere in this Agreement, the Developer shall have the following duties and responsibilities which shall be performed within any applicable Performance Deadlines set forth in the Schedule of Performance.

(a)    Affiliates. All obligations of the Developer stated herein shall include, without explicit mention, Citation's or Eden's obligation to cause their respective Affiliates to meet the same obligations with respect to matters in which the Affiliate is involved.

(b)    Requirements. Developer shall diligently and in good faith seek to develop and construct the Development in accordance with the requirements of this Agreement, the Closing Documents and all Applicable Requirements.

(c)    Compliance with Revitalization Plan. Developer shall diligently and in good faith manage and implement the Development in compliance with the Revitalization Plan, and so as not to cause a default thereunder. Developer shall not be deemed to have failed in the foregoing obligation if any default under the Revitalization Plan was materially caused, occasioned or hindered in its cure by any actions, omissions, delays or breaches of warranty of the Authority or the City, or for reasons beyond the control of the Developer.

1460\02\435574.9

16

000046

287 |e i

(d)    Development Schedule. Developer shall accomplish all tasks shown on the Schedule of Performance to be performed by Developer by the applicable Performance Deadline shown on the Schedule of Performance.

(e)    Financing. Developer shall obtain binding commitments for all construction and permanent financing, including any public funding, needed for the Development as shown in the approved Financing Plan. The Developer will be responsible for maximizing use of leveraged financing sources from the Low Income Housing Tax Credit program, and other housing, community economic development funding sources, as available.

(f)    Employees, Agents and Contractors. Except as otherwise stated herein, Developer shall be solely responsible for the selection, hiring, contracting with, directing, and discharging of all employees, agents and contractors whom or which Developer utilizes in accomplishing its duties hereunder. Developer shall use reasonable care and due diligence to select qualified, competent and trustworthy entities and individuals for such purposes. Notwithstanding the foregoing, the Authority and the City shall have the right to require Developer to terminate or reassign any employee, agent or contractor upon evidence of a conflict of interest causing the Authority or the City to violate its obligations under Applicable Requirements.

(g)    Information. Upon request, the Developer shall provide the Authority on a timely basis with all information with respect to the Development which the Authority requires to prepare any filings and reports required by the Revitalization Plan.

(h)    Approvals. Developer shall, on an ongoing and timely basis, advise the Authority and the City as to the status of the processing of all applications necessary to obtain all governmental approvals required in accordance with this Agreement and all Applicable Requirements. Developer shall as soon as practical advise the Authority and the City of any hearings regarding matters described in this Agreement to enable the Authority and the City to elect to attend such hearings.

(i)    Applications. Developer shall keep the Authority and the City fully informed concerning the development of all applications for government assistance and public or private financing. Upon request, Developer will provide the Authority and the City with a reasonable number of copies of all formal submissions.

(j)    Cooperation and Skill. Developer recognizes the relationship of trust and confidence established between it and the Authority and City by this Agreement and agrees to (i) keep itself and the Authority and City fully informed as to the progress of the Development (ii) consult and cooperate fully with the Authority and City in furthering the interest of the Authority and City in the Development as set forth in the Revitalization Plan, (iii) furnish its best skill and judgment in the accomplishment of the Development, and (iv) furnish sound business administration and management.

000047

240 101

(k)   Indemnification.  Developer shall indemnify, defend and hold harmless the Authority and the City and its Commissioners, Council members, officers, employees and agents from and against any and all losses, costs, damages, claims, causes of action, demands, suits, liabilities, obligations, judgments and expenses (including any attorney fees and other costs of litigation) arising out of or relating to any injury, disease or death of persons or damage to or loss of property resulting from or in connection with any breach by Developer, its Affiliates, or its or their respective agents or employees of any provision of this Agreement, or arising out of any performance of activities under this Agreement, except to the extent such claims arise from the gross negligence or willful misconduct of the Authority or City, their board members, council members, officers, employees, agents, successors, and assigns. The Developer's liability shall not be limited by any provisions or limits of insurance set forth in this Agreement. This indemnification shall survive the expiration or termination of this Agreement.

(l)   Real Estate Tax Exemptions and Abatements.  Developer shall be responsible for obtaining property tax exemptions for the Development, or any portion thereof, or shall be responsible for the payment of property taxes or possessory interest taxes on such sites. Developer shall apply for welfare exemption for low income housing to the extent applicable.

(m)   Additional Responsibilities.  Except at the election of the Authority, Developer, in consultation with the Authority, shall prepare for execution by the Authority all required applications to the City or to any and all other agencies from which the Developer may be required to obtain permits, approvals and the like.

(n)   Security for Subdivision Improvements.  Developer shall, at Developer's sole cost and expense, provide a bond or such other security as City may approve in City's sole discretion to secure performance of conditions of approval imposed in connection with the Final Map and/or any Subdivision Improvement Agreement required in connection with the subdivision of the Property.

(o)   Execution of Documents.  Whenever statute or regulation or the successful implementation of the Agreement requires the Developer to take actions or execute documents consistent with the Developer's powers and obligations under this Agreement, the Developer will do so promptly, provided that any documents prepared for the Developer's execution shall be in form and substance acceptable to the Developer in its sole discretion.

Section 3.2   Authority Obligations.  In addition to any obligations stated elsewhere in this Agreement, the Authority shall have the following duties and responsibilities which shall be performed within any applicable Performance Deadlines set forth in the Schedule of Performance.

(a)   Approvals.  The Authority shall review on an expeditious basis any matter submitted and advise Developer of approval or of why approval is being withheld. The

1460\02\435574.9

18

30 $ 101

Authority's approval, where called for in this Agreement, shall in all instances be evidenced by a writing explicitly granting such approval and signed by the Executive Director, or her written designee.

(b)    HUD Approval. The Authority will promptly submit the Disposition Application to HUD and will work diligently to obtain HUD approval of such application. Upon approval by HUD the Authority will make diligent efforts to comply with the Revitalization Plan, and will not permit any default thereunder which would adversely affect the Revitalization. The Authority will endeavor, with Developer's assistance, to secure the approval of HUD for all activities contemplated herein over which HUD has authority, such as the disposition of the Property. HUD approval of the Disposition Application shall be deemed HUD approval of the disposition of the Property and of this Agreement. The Authority shall not be deemed to have failed in the foregoing obligation if any default was caused, occasioned or hindered in its cure by any actions, omissions, delays or breaches of warranty of the Developer, or Developer's Affiliates, contractors or employees.

(c)    Access to Site. So long as it retains title to or control of the Property, or any portion thereof, the Authority shall provide Developer reasonable access to such Property (including buildings and improvements thereon) pursuant to that License and Right of Entry Agreement dated April 11, 2007 between the Authority and Developer.

(d)    Protection of Authority Funds; Efficient Administration. The Authority shall ensure that the proceeds to be provided by Citation to the Authority shall be set aside specifically for use in a manner consistent with this Agreement, and shall expend such funds only in accordance with this Agreement, the Revitalization Plan, any approved development plan and the budgets and schedules therein contained, as the same may be amended from time to time.

(e)    Authority Assistance. In addition to the Authority Financing described in Section 2.8(d) above, the Authority shall pay up to Six Hundred Thousand Dollars ($600,000)("Authority Relocation Funds") of costs incurred in the relocation of residents of the Existing Housing.

(f)    Indemnification. The Authority shall indemnify, defend and hold harmless Developer and their respective officers, directors, employees and agents from and against any and all losses, costs, damages, claims, causes of action, demands, suits, liabilities, obligations, judgments and expenses (including any attorney fees and other costs of litigation) arising out of or relating to or resulting from or in connection with the Authority's actions or omission or by and of their respective agents or employees of any provision of this Agreement relating to relocation, or arising out of any performance of relocation activities under this Agreement (the "Relocation Costs"), except to the extent such claims arise from the gross negligence or willful misconduct of the Developer, their officers directors, employees, or agents. This indemnification shall survive the expiration or termination of this Agreement.

000049

31 of 101

    (g)    <u>Execution of Documents</u>.  Whenever statute or regulation or the successful implementation of the Agreement requires the Authority to take actions or execute documents consistent with the Authority's powers and obligations under this Agreement, the Authority will do so promptly, provided that any documents prepared for the Authority's execution shall be in form and substance acceptable to the Authority in its sole discretion.

    Section 3.3    <u>City Obligations</u>.  In addition to any obligations stated elsewhere in this Agreement, the City shall have the following duties and responsibilities which shall be performed within the applicable Performance Deadlines set forth in the Schedule of Performance.

    (a)    <u>Approvals</u>.  The City shall review on an expeditious basis any matter submitted and advise Developer of approval or of why approval is being withheld.  The City's approval, where called for in this Agreement, shall in all instances be evidenced by a writing explicitly granting such approval and signed by the City Manager, or his written designee.

    (b)    <u>City Assistance</u>.  In addition to the City Loan described in Section 2.8(c) above and Transactional Costs in excess of $500,000 pursuant to Section 2.11 above, the City shall provide additional financial assistance to the Authority in the amount of up to One Million Five Hundred Thousand Dollars ($1,500,000)("City Relocation Funds") to assist Authority in the relocation of residents of the Existing Housing.

    Section 3.4    <u>HACA Obligations</u>.  In addition to any obligations stated elsewhere in this Agreement, the Authority shall have the following duties and responsibilities which shall be performed within any applicable Performance Deadlines set forth in the Schedule of Performance.

    (a)    <u>Approvals</u>.  The Authority shall review on an expeditious basis any matter submitted and advise Developer of approval or of why approval is being withheld.  The Authority's approval, where called for in this Agreement, shall in all instances be evidenced by a writing explicitly granting such approval and signed by the Executive Director, or her written designee.

    (b)    <u>Vouchers</u>.  HACA shall provide up to 150 Section 8 Housing Choice Vouchers to assist eligible residents of the Existing Housing in relocating to new homes. HACA shall also apply to HUD for a special allocation of such vouchers, although such application shall not be construed to qualify or condition in any way HACA's obligation to provide vouchers to eligible residents of the Existing Housing.

    Section 3.5 <u>Mutual Obligations</u>.

    (a)    <u>External Communications</u>.  The parties agree to cooperate and consult with each other regarding any public statements or publications made regarding the Revitalization.  The Authority, as property owner, shall have the final decision with regard to

1460\02\435574.9

20

communications with local elected officials, former and prospective tenants, and with HUD relating to the Revitalization Plan.

(b)    Information.  The Authority, City and HACA and Developer shall provide each other all necessary information relating to the Revitalization Plan, as expeditiously as possible for the orderly progress of the Revitalization. The Authority shall coordinate all relevant communication with HUD, and each shall provide the other with copies of all relevant correspondence, directives, and other written material either to or from HUD with respect to this Revitalization.  Prior to the transfer of title to the Property, the Authority, City and Developer will meet as frequently as may be necessary, but no less often than monthly, for regular briefings and progress reports.

## ARTICLE 4.
## PREDEVELOPMENT REQUIREMENTS

Section 4.1    Disposition Approval.  The Authority shall diligently pursue such HUD approval as may be required pursuant to Section 18 of the Act and 24 CFR Part 970 as may be required to obtain HUD approval to dispose of the Property in accordance with the Revitalization Plan. Developer shall provide reasonable assistance in preparing submissions and obtaining approval, as requested by the Authority.

Section 4.2  Relocation and Rehousing.
(a)    In accordance with the Schedule of Performance, the Authority will relocate all residents of the Property to relocation housing, in accordance with the Revitalization Plan and in compliance with all Applicable Requirements, including HUD.  The Authority shall be responsible for all federal and state relocation benefits, costs incurred in moving residents to their new homes, and any other cost or expense arising from or related to all relocation matters in connection with the Revitalization Plan.  Citation, the City and the Authority shall each contribute financially to cover the anticipated Relocation Costs, as more specifically described below and each party's contribution shall be applied to the Relocation Costs in the order specified below:

(1)    FIRST:  Citation shall pay $1,000,000 to the Authority to cover Developer's share of the Relocation Costs, pursuant to Section 2.8(a)(iii) herein; provided, however, that Citation shall not be obligated to pay the $1,000,000 unless and until the conditions precedent described in Sections 2.8(b)(2) and (3) above are satisfied.  In the event, as expected, the City or the Authority have advanced funds for Relocation Costs prior to Citation's payment, upon the Authority's receipt of Citation's $1,000,000, all or a portion of Citation's $1,000,000 may be used to reimburse the Authority and/or the City for funds advanced for Relocation Costs;

(2)    SECOND:  The Authority shall contribute up to $600,000 pursuant to Section 3.2(e) herein.

000051

33ع 101

(3)    THIRD:  The City shall contribute up to $1,500,000 pursuant to Section 3.3(b) herein;

(4)    FOURTH:  Under Section 2.11, Citation and Eden are responsible for paying up to $500,000 for Transactional Costs.  In the event the Transactional Costs are less than $500,000 and the Relocation Costs exceed $3.1 million, Developer agrees to use such savings (i.e., the difference between the actual Transactional Costs that Developer is responsible for under Section 2.11 and the $500,000 maximum) to reimburse the Authority for Relocation Costs.  Such reimbursement, if any, shall be made through escrow upon conveyance of the Property.

(5)    FIFTH:  The parties acknowledge that the RFQ states:  "The Authority would manage and fund the relocation of the existing Arroyo Vista Residents."  Notwithstanding that representation, the parties have agreed to share Relocation Costs to the extent provided above.  In the event that Relocation Costs exceed the sums set forth above, the parties agree to discuss possible alternative methods to obtain the funds necessary to pay such costs.  Nothing in this paragraph (5) is intended to obligate nor should this paragraph (5) be construed to mean that Citation or Eden are responsible for any Relocation Costs in excess of Citation's and Eden's contribution stated in paragraphs (1) and (4) above.

(b)    HACA shall provide rental assistance vouchers to eligible residents of the Existing Housing and shall coordinate the distribution of such vouchers to residents.  HACA shall also apply to HUD for a special allocation of vouchers, although such application shall not be construed to qualify or condition in any way HACA's obligation to provide vouchers to eligible residents.

(c)    Consistent with the Relocation Plan and representations made by the Authority to relocated Arroyo Vista residents regarding their first priority to reapply to the newly constructed Affordable Units, the Developer shall submit to the Authority, for its review and approval, a Rehousing Policy which will contain the following elements, at a minimum:

(1)    Households that were eligible under the Relocation Plan ("Prior Residents") who apply to move to the Revitalized Community in accordance with established procedures and who meet eligibility and screening standards shall have a preference over other applicants who are not Prior Residents.  Developer shall propose such procedures and standards for Authority's approval.

(2)    Eligibility for Prior Residents will require that household members demonstrate a continuing commitment to be law-abiding and lease-compliant and to meet behavioral standards which would be expected in the private rental market; and have no disqualifying prior history of serious criminal acts or lease violations.

(3)    Eligibility of Prior Residents for purchase of the Affordable For-

1460\02\435574.9                          22

000052

Sale Housing units will require that households meet income eligibility requirements and screening standards including mortgage qualification requirements, and that such residents shall have a preference over other similarly situated applicants who are not Prior Residents.

(4)    The Authority shall be responsible for maintaining a list of Prior Residents whom are eligible for return to the Revitalized Community, and shall maintain regular contact with such residents so that they are fully informed as to the progress of the Development.

Section 4.3    Tenant and Homebuyer Selection.  Developer shall comply with the City Inclusionary Zoning Regulations, defined in Section 8.19 herein, and with all applicable state and federal fair housing laws in the selection of tenants and homebuyers.

Section 4.4    Demolition.  Following the completion of relocation from the Property and transfer of the Property to the Developer, the Developer shall undertake the following activities:

(a)    Existing Housing and all physical improvements and unusable infrastructure on the Property shall be demolished.  Developer agrees to grant a license and right of entry for HACA to enter the Property for thirty (30) days after the Closing in order for HACA to remove such appliances, doors, and other components of the Existing Housing as HACA may request for use in its other facilities, in the event it has not already completed such tasks prior to Closing;

(b)    All debris from the demolition of the Existing Housing and all other known surface and subsurface physical obstructions shall be removed;

(c)    If and to the extent of any known Hazardous Materials, all remediation and removal of Hazardous Materials shall be performed.

(d)    Developer shall comply with the City's Construction Debris and Recycling Ordinance.

The Developer shall complete all demolition and remediation activities on the Property in compliance with all Applicable Requirements and by the Performance Deadline set forth in the Schedule of Performance.

## ARTICLE 5.
## DEVELOPER PREDEVELOPMENT COMPONENT

Section 5.1    Developer Responsibility and Management.  Developer shall conduct any predevelopment work described in Section 2.3 and this Article, all in accordance with the Schedule of Performance.  Developer will ensure that work which it conducts is conducted in

000053

35 101

conformance with all applicable laws and will obtain all necessary permits and approvals of third parties.

Section 5.2    License. The Developer may enter the Property and the Existing Housing and conduct all such inspections and testing as it wishes, pursuant to that License and Right of Entry Agreement dated April 11, 2007 between the Authority and Developer.

Section 5.3    Master Planning. Developer shall conduct such master planning as is necessary and economically feasible, consistent with the approved Revitalization Plan and Applicable Requirements, and will best achieve the Revitalization. Within such responsibility:

(a)    Developer will analyze the current development plans and review their conclusions with the Authority.

(b)    Developer will conduct such design, planning, marketing, engineering and other studies as are necessary. Developer and its consultants shall actively participate in the community meetings carried out by the Authority. The Authority shall provide Developer with reasonable advance notice of such community meetings.

(c)    Developer will obtain issuance of applicable zoning, land use, planned unit development ("PUD") subdivision, resubdivision, street and alley closings and dedications, historic preservation approvals, environmental reviews, and other approvals and interpretations consistent with and necessary for the Development.

(d)    Developer shall propose a plan for interrelating the various Development Components and phases, which shall address cost-sharing arrangements, CC&Rs, reciprocal easement agreements and similar issues.

Section 5.4    Infrastructure and Site Improvements. Developer shall design and construct all roads, streets, utility lines and conduits, sewers, and other site improvements, consistent with Applicable Requirements.

Section 5.5    Timing of Subdivision and Conveyance. In accordance with the Schedule of Performance and consistent with the preconditions specified in this Agreement, the respective parties shall undertake the following activities, in sequential order: (a) Developer shall prepare the Final Map and take all actions necessary to obtain approval for recording the Final Map; (b) upon HUD approval of the Disposition Application, the Authority shall sign the Final Map; (c) upon relocation of all residents of the Existing Housing from the Property, the Final Map is recorded; and (d) the Authority shall convey title to the subdivided parcels directly to Citation or Eden, or their respective Affiliates. Concurrently with the recording of the grant deeds, the deeds of trust for the Authority Financing and the City Loan to Eden, and their regulatory agreements, will be recorded on the appropriate parcels.

1460\02\435574.9                              24

3608 101

## ARTICLE 6.
### CONDITIONS PRECEDENT TO AUTHORITY
### CONVEYANCE OF PROPERTY TO DEVELOPER

Section 6.1  Conditions Precedent to Authority Performance.

(a)  Conditions Precedent in General.  In addition to the completion of the activities in Section 3.1, as conditions precedent to the Authority's obligation to make the Authority Financing and to convey the Property to the Developer and as conditions precedent to the City's obligation to make the City Loan, the conditions set forth in this Article 6 must first be met by the Developer or waived by the Authority and City by the times specified in the Schedule of Performance or such other date as may be agreed upon by the Parties.  Each of the disposition requirements set forth below must be met by the Developer prior to the conveyance of the Property to the Developer.  No portion of the Property shall be conveyed by the Authority until all disposition requirements identified herein and in the Revitalization Plan have been fully satisfied.

(b)  Additional Agreements to be Negotiated.  It is anticipated that the satisfaction of the disposition requirements listed below will require further negotiation and the execution of additional agreements necessary for the sale of the Property, for the Authority's funding of the Authority Financing and for City's funding of the City Loan.  These agreements will include, but will not be limited to:

(1)  Authority loan and/or grant agreements for the predevelopment, construction and/or permanent funding of Authority funds for the Affordable Family Rental Housing and the Affordable Senior Rental Housing components.

(2)  City loan documents and City Affordable Housing Regulatory Agreements.

Section 6.2  Financing Plans and Commitments.  The Developer shall submit to the Authority and City for approval an updated Financing Plan for each separate Component, i.e. Affordable Family Rental Housing Component, Affordable Senior Rental Housing Component, and the For-Sale Housing Component.

(a)  The Financing Plan shall contain, at a minimum:

(1)  a preliminary development budget;

(2)  a proposed sources and uses statement for the period of the construction; and

(3)  a proposed sources and uses statement from the date of the origination of the permanent loan, if any, or in the absence of a permanent loan, from the date

000055

37 of 101

of the issuance of the Certificate(s) of Occupancy or the equivalent for the development.

For the rental Affordable Units only, the Financing Plan should also include the following:

(4)    a preliminary 30-year cash flow analysis of the development, including an analysis of the development from the date of the issuance of the Certificates of Occupancy or the equivalent;

(5)    a preliminary initial operating budget for the development, including without limitation an operating reserve fund and capital replacement reserve fund; and

(6)    all underlying assumptions for each of the above, including terms, conditions, and pricing of all debt and equity.

(b)    Approvals.  The Developer shall also submit to the Authority and City for approval any revisions to any of the Financing Plans for the Development.

Section 6.3    Construction Documents.  The Developer will have prepared, or will have seen to the preparation of, construction plans and specifications, budgets, schedules and a construction contract as provided in Article 8 (the "Construction Documents") and will diligently perform all obligations described in that Article; provided, however, that as of conveyance of the Property, the Construction Documents shall only cover demolition, grading, preliminary site improvements and infrastructure.  The Construction Documents shall be subject to the review and approval of the Authority.  Developer will make best efforts to minimize development costs, consistent with long term efficient operation and upkeep, marketability, and contribution to family and neighborhood quality of life.

Section 6.4    Permits and Approvals.  The Developer shall have obtained, with the approval of the Authority and in the name of the Authority, where appropriate) all necessary permits, approvals, and entitlements including, without limitation, all building and construction permits, licenses, easements, zoning and approvals necessary for the portion of the Development for which it is responsible, including utilities necessary for that portion of the Development, and roads, transportation, and other facilities or physical improvements contemplated by the Revitalization Plan and Construction Documents.  Developer shall, on an ongoing and timely basis, advise the Authority as to the status of the processing of all applications necessary to obtain all governmental approvals required in accordance with this Agreement, applicable approvals and requirements, and the Construction Documents. Developer shall advise the Authority of any hearings regarding matters described in this section with sufficient advance notice to enable the Authority to elect to attend such hearings.

Section 6.5    Affiliate.  If Developer intends to request the Authority to convey the Property or any part thereof to an Affiliate of Eden or Citation, the Developer shall submit to

000056

38 of 101

the Authority for its approval, which shall not be unreasonably withheld, conditioned or delayed, the formation documents of such Affiliate.

Section 6.6    HUD Approval. The Developer shall cooperate with the Authority, and provide such documents as the Authority may reasonably request, in support of the Authority's efforts to obtain HUD approval of the Disposition Application.

Section 6.7 Environmental Review and Approval.

(a)    The City, with the cooperation of the Authority and the Developer, shall diligently pursue the required environmental review of the development of the Property pursuant to this Agreement, in accordance with the provisions of CEQA and NEPA, including, but not limited to, any required reviews or studies and any necessary archaeological or historical resource assessments. The Developer acknowledges that the environmental review process under CEQA and NEPA for the Development may involve consideration of input from interested organizations and individuals; that approval or disapproval of the use of the Property following completion of the environmental review process is within the discretion of the City as lead agency; and that neither the Authority nor the City make any representation regarding the ability of the City to approve the use of the Property at the conclusion of the environmental review process required by CEQA and NEPA, or regarding the imposition of any mitigation measures as conditions of any approval that may be granted.

(b)    Consistent with CEQA and NEPA requirements, this Agreement only constitutes a basis for negotiation of the Development documents as those documents pertain to the Property, and does not constitute approval of the use of the Property. The parties recognize that the City has the absolute discretion and right to approve or disapprove the use of the Property, and no cost shall be incurred by the City or the Authority as a result of such decision.

(c)    The Developer shall have prepared and submitted to the City such information and such environmental documentation as may be necessary to perform the environmental review process required by NEPA and CEQA for the Development. The Authority shall have no obligation to convey the Property until HUD has certified the NEPA environmental documentation and City has certified an Environmental Impact Report ("EIR") for the Development. The Developer shall be responsible for implementing at Developer's cost, any environmental mitigation measures required by HUD or the City as a condition of approval pursuant to NEPA or City certification of the EIR.

Section 6.8    Approval Process. After the Developer submits to the Authority for approval any item provided for in the Schedule of Performance, the Authority shall have twenty-one (21) days following the submission to approve or disapprove such submission. If rejected by the Authority in whole or in part, the Authority shall provide Developer with reasons for the rejection, either orally or in writing. Developer shall then submit modified documents to the Authority within fifteen (15) days or such longer period as the parties may

000057

390 101

agree upon. The Authority shall then have fifteen (15) days to review and approve or disapprove the modified submission, and shall provide Developer with reasons for any disapproval. If, by the end of the Authority's period of review, Developer does not receive the written approval of the Authority, and has not received any reason for a disapproval, Developer must provide the Authority with written notice pursuant to Section 23.3 that the Authority will be deemed to have approved the submission unless the Authority approves or disapproves the submission within five (5) days. The Developer and the Authority may repeat the foregoing process and time periods if both parties shall so agree in writing.

## ARTICLE 7.
## DESIGN

Section 7.1     Design in Conformance with Scope of Development and Conceptual Design. In designing and constructing the Development, the Developer shall cause all subsequent design documents to be consistent with the Scope of Development, attached as Exhibit C, and the Conceptual Design, attached as Exhibit D, approved by the City and the Authority; provided, however, the parties acknowledge that the site plan and elevations submitted with Developer's proposal are preliminary. The parties will cooperate in good faith to develop and refine the Development's site plan and elevations. The Scope of Development and the Conceptual Design shall establish the baseline design standards from which the Developer shall prepare all subsequent Design Documents.

Section 7.2     City Entitlement Procedures and Submittal Requirements. Developer shall comply with all City regulations and procedures required in connection with Developer's application for planning approvals, entitlements and permits necessary for development of the Development and each component thereof.

Section 7.3     Design Documents. The Developer shall proceed diligently to prepare design development and construction documents for the proposed Development, consistent with the Scope of Development and the Conceptual Design, including, without limitation, such drawings as may reasonably be required to show the location, bulk, height and other principal external features of the proposed Development. In connection with its submittal to the City and the Authority for its approval, the Developer shall provide to the Authority such elevations, sections, plot plans, specifications, diagrams and other design documents ("Design Documents") at each of the stages described in Section 7.3, as may reasonably be required by the Authority for its review. The Design Documents shall incorporate any conditions imposed by the City's entitlements process.

Section 7.4     Submittal and Review of Documents. Within the times set forth in the Schedule of Performance, the Developer shall submit to the City and the Authority the Documents as set forth below:

(a)     Design Development Drawings. The Design Development Drawings

000058

40 of 101

shall be based on the Conceptual Design and the Scope of Development and shall be submitted to the City and the Authority concurrently. The Design Development Drawings shall indicate estimated structural dimensions, and delineation of site features and elevations, materials and colors, landscaping and other features. The drawings shall fix and describe all design features, as well as the size, character, and quality of the entire Development as to architectural, structural, and mechanical systems. Key details shall be provided in preliminary form.

(b)    Final Construction Drawings. Final Construction Drawings are to be a continuation of approved Design Development Drawings and shall be submitted by the Developer to the City. The Final Construction Drawings must provide all the detailed information necessary to obtain a building permit for that phase. The Final Construction Drawings to allow for the Developer to obtain the building permit must provide all the detailed information necessary to build the Development including complete building, site, landscape, requirements, standards, and specifications.

Section 7.5    Project Approvals. Within the times set forth in Section 7.6, the Authority shall have the right to review and approve the Design Documents. The purpose of the Authority's review of the Design Documents is to ensure consistency with the Scope of Development and the provisions of this Agreement. Provided that the architectural submittals meet the requirements set forth in Section 7.3, the Authority shall be required to approve those Design Documents which are logical progressions from concepts set forth in previously approved Design Documents.

Section 7.6    Approval Process. The Authority shall approve or disapprove submittals under this Article 7 within ten (10) days of receipt of the submittal from the Developer. In the event the Authority disapproves a submittal of the Design Documents pursuant to Section 7.4, the Authority shall submit a list of reasons for such disapproval to the Developer, together with its notice of disapproval. Upon receipt of such a list, the Developer shall have ten (10) days to resubmit a revised submission. The Authority's failure to approve or disapprove within seven (7) days shall be deemed to be approval of such change.

Section 7.7    Additional Permits and Approvals. Within the times specified in the Schedule of Performance, Developer shall obtain all permits and approvals necessary to construct the Development including demolition and building permits. All applications for such permits and approvals shall be consistent with the approved Design Documents. The Developer acknowledges that execution of this Agreement by the City does not constitute waiver by the City of any of its ordinances, resolutions, or regulations applicable to the application to the City for land use entitlements, does not constitute approval by the City of any required permits, applications, or allocations, and in no way limits the discretion of the City in the permit, allocation and approval process.

Section 7.8    Authority Review. The Developer shall be solely responsible for all aspects of Developer's conduct in connection with the Development, including, but not limited to, the quality and suitability of the Plans and Specifications, the supervision of construction

000059

4/05/01

work, and the qualifications, financial condition, and performance of all architects, engineers, contractors, subcontractors, suppliers, consultants, and property managers. Any review or inspection undertaken by the Authority with reference to the Development is solely for the purpose of determining whether the Authority is properly discharging its obligations to the Authority, and should not be relied upon by the Authority or by any third parties as a warranty or representation by the Authority as to the quality of the design or construction of the Development.

## ARTICLE 8,
## CONSTRUCTION

Section 8.1    Commencement of Construction.  The Developer shall commence or cause to be commenced construction of the Development in accordance with the Performance Deadline set forth in the Schedule of Performance.

Section 8.2    Completion of Construction.  The Developer shall diligently prosecute or cause to be prosecuted to completion the construction of the Development, and shall complete or cause to be completed the construction of the Development no later than the Performance Deadline specified in the Schedule of Performance.

Section 8.3    Construction Pursuant to Plans.  The Developer shall construct or cause to be constructed the Development substantially in accordance with the Final Construction Drawings and the terms and conditions of all City and other governmental approvals.

Section 8.4    Construction Bonds.  The Developer shall require its contractor to procure and deliver to the Authority and the City copies of labor and material (payment) bonds and performance bonds, or a dual bond which covers both payment and performance obligations, in a penal sum each of not less than one hundred percent (100%) of the scheduled cost of construction of the Affordable Senior Rental Housing and Affordable Family Rental Housing components of the Development, and one hundred percent (100%) payment bond, or such other assurance of completion as may be acceptable to the City, Authority and any applicable construction lenders.  Said bonds shall be issued by an insurance company which is licensed to do business in California and has a rating equivalent to AAA or AA+ by an insurance company listed in the current year's Federal Register or as otherwise approved by the Authority and the City.  The labor and materials (payment) bond shall name both the Authority and the City as a co-obligee or assignee.

Section 8.5    Compliance with Applicable Law.  The Developer shall cause all work performed in connection with the Property to be performed in compliance with all Applicable Requirements.

Section 8.6    Non-Discrimination During Construction.  The Developer, for itself and its successors and assigns, and transferees agrees that in the construction of the Development

1460\02\435574.9

30

000060

42 101

provided for in this Agreement:

(a)    It will not discriminate against any employee or applicant for employment because of race, color, religion, creed, national origin, ancestry, disability, medical condition, age, marital status, sex, sexual preference/orientation, Acquired Immune Deficiency Syndrome (AIDS) acquired or perceived, or retaliation for having filed a discrimination complaint (nondiscrimination factors). The Developer will take affirmative action to ensure that applicants are considered for employment by the Developer without regard to the nondiscrimination factors, and that Developer's employees are treated without regard to the nondiscrimination factors during employment including, but not limited to, activities of: upgrading, demotion or transfer; recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Developer agrees to post in conspicuous places, available to its employees and applicants for employment, the applicable nondiscrimination clause set forth herein:

(b)    It will ensure that its solicitations or advertisements for employment are in compliance with the aforementioned nondiscrimination factors; and

(c)    It will cause the foregoing provisions to be inserted in all contracts for the construction of the Development entered into after the Effective Date of this Agreement; provided, however, that the foregoing provisions shall not apply to contracts or subcontracts for standard commercial supplies or raw materials.

Section 8.7    Equal Opportunity/Non-Discrimination in Employment and Contracting Procedures, Including Utilization of Minority and Women Businesses. The Developer and the Authority acknowledge and agree that it is the policy of the Authority to promote and ensure equal opportunity through employment and in the award of contracts and subcontracts for construction. Subject to the foregoing, the Developer shall employ or select employees, contractors and subcontractors in accordance with the Equal Opportunity and Nondiscrimination policies attached hereto as Exhibit G.

(a)    During the construction of the Development, the Developer shall provide to the Authority such information and documentation as reasonably requested by the Authority.

(b)    The Developer shall use reasonable efforts to monitor and enforce, or shall cause its general contractor to monitor and enforce, the equal opportunity requirements imposed by this Agreement. In the event, after notice from the Authority and an opportunity to cure such failure as set forth in Article 14 of this Agreement, the Developer fails to use reasonable efforts to monitor or enforce these requirements, the Authority or City may declare the Developer in default of this Agreement and pursue any of the remedies available under this Agreement.

Section 8.8    Prevailing Wages. In the construction of the Development, for all on-site and adjacent construction activities, the Developer shall comply with, if and to the extent applicable, the federal Davis-Bacon Act and implementing rules and regulations, and Section

000061

43 of 101

1720 *et seq.* of the California Labor Code and its implementing regulations. The Developer shall be responsible for any costs or damages incurred by the Authority and the City as a result of the Developer's noncompliance with such laws. The Developer shall also comply with all applicable reporting and recordkeeping requirements of the applicable prevailing wage statutes and regulations.

Section 8.9     Progress Reports.  Until such time as the Developer is entitled to issuance of the Certificates of Occupancy or the equivalent for all units in the Development, the Developer shall provide the Authority and the City with monthly progress reports, as reasonably requested in writing by the Authority and/or the City, regarding the status of the construction of the Development.

Section 8.10     Entry by the Authority and the City.  The Developer shall permit the Authority and the City, through their officers, agents, or employees, to enter the Property at all reasonable times and in a safe, unobtrusive manner to review the work of construction to inspect the Property for compliance with this Agreement.  The Authority and the City are under no obligation to (a) supervise construction, (b) inspect the Property, or (c) inform the Developer of information obtained by the Authority or the City during any review or inspection, and the Developer shall not rely upon the Authority or the City for any supervision, inspection, or information.

Section 8.11     Taxes; Fees.  At all times both prior to and after obtaining any applicable property tax exemptions, the Developer shall pay when due all real property taxes and assessments assessed and levied on the Property after the Developer takes title to the Property or portions thereof, and shall remove any levy or attachment made on the Property. The Developer may, however, contest the validity or amount of any tax, assessment, levy, attachment or lien on the Property.  The Developer shall pay all charges, assessments, impact fees, permit fees, application fees, special taxes or levies related to the Development.  The parties acknowledge that Eden shall apply for welfare exemption for low-income housing to the extent applicable.

Section 8.12     Hazardous Materials.
        (a)     Certain Covenants and Agreements.  The Developer hereby covenants and agrees that:

                (i)     The Developer shall not knowingly permit the Development or any portion thereof to be a site for the use, generation, treatment, manufacture, storage, disposal or transportation of Hazardous Materials or otherwise knowingly permit the presence of Hazardous Materials in, on or under the Development in violation of any applicable law;

                (ii)     The Developer shall keep and maintain the Development and each portion thereof in compliance with, and shall not cause or permit the Development or any portion thereof to be in violation of, any Hazardous Materials Laws;

J460\02\435574.9

32

(iii)    Upon receiving actual knowledge of the same the Developer shall immediately advise the Authority and the City in writing of: (A) any and all enforcement, cleanup, removal or other governmental or regulatory actions instituted, completed or threatened against the Developer or the Development pursuant to any applicable Hazardous Materials Laws; (B) any and all claims made or threatened by any third party against the Developer or the Development relating to damage, contribution, cost recovery, compensation, loss or injury resulting from any Hazardous Materials (the matters set forth in the foregoing clause (A) and this clause (B) are hereinafter referred to as "Hazardous Materials Claims"); (C) the presence of any Hazardous Materials in, on or under the Development in such quantities which require reporting to a government agency; or (D) the Developer's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Development classified as "borderzone property" under the provisions of California Health and Safety Code, Sections 25220 et seq., or any regulation adopted in accordance therewith, or to be otherwise subject to any restrictions on the ownership, occupancy, transferability or use of the Development under any Hazardous Materials Laws.  If the Authority and/or the City reasonably determines that the Developer is not adequately responding to a Hazardous Material Claim, the Authority and/or the City shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any such Hazardous Materials Claims and to have their reasonable attorney's fees in connection therewith paid by the Developer.

(iv)    Without the Authority's or the City's prior written consent, which shall not be unreasonably withheld or delayed, the Developer shall not take any remedial action in response to the presence of any Hazardous Materials on, under, or about the Development (other than in emergency situations or as required by governmental agencies having jurisdiction), nor enter into any settlement agreement, consent decree, or other compromise in respect to any Hazardous Materials Claims.

(b)    Indemnity.  Without limiting the generality of the indemnification set forth in Section 13.3 below, the Developer hereby agrees to indemnify, protect, hold harmless and defend (by counsel reasonably satisfactory to the Authority and the City) the Authority, the City, their boardmembers, officers, and employees from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, administrative and judicial proceedings and orders, judgements, remedial action requirements, enforcement actions of any kind, and all costs and expenses incurred in connection therewith (including, but not limited to, attorney's fees and expenses), arising directly or indirectly, in whole or in part, out of: (1) the failure of the Developer or any other person or entity, other than any indemnitee, to comply with any Hazardous Materials Law relating in any way whatsoever to the handling, treatment, presence, removal, storage, decontamination, cleanup, transportation or disposal of Hazardous Materials into, on, under or from the Development; (2) the presence in, on or under the Development of any Hazardous Materials or any releases or discharges of any Hazardous Materials into, on, under or from the Development, except for any Hazardous Materials that existed in, on, or under those portions of the Property conveyed by the Authority to the Developer prior to such

000063

45of101

conveyance; or (3) and any activity carried on or undertaken on or off the Property subsequent to conveyance of the Property by the Authority to the Developer, and whether by the Developer or any successor in title or any employees, agents, contractors or subcontractors of the Developer or any successor in title, or any third persons at any time occupying or present on the Development, in connection with the handling, treatment, removal, storage, decontamination, cleanup, transport or disposal of any Hazardous Materials at any time located or present on or under the Development. The foregoing indemnity shall further apply to any residual contamination on or under the Development, or affecting any natural resources, and to any contamination of any property or natural resources arising in connection with the generation, use, handling, treatment, storage, transport or disposal of any such Hazardous Materials, and irrespective of whether any of such activities were or will be undertaken in accordance with Hazardous Materials Laws. The provisions of this subsection shall survive expiration or termination of this Agreement, and shall remain in full force and effect. This indemnity obligation shall not extend to any claim arising solely from the Authority's or City's gross negligence or willful misconduct.

(i)    No Limitation.  The Developer hereby acknowledges and agrees that the Developer's duties, obligations and liabilities under this Agreement, including, without limitation, under subsection (b) above, are in no way limited or otherwise affected by any information the Authority and the City may have concerning the Development and/or the presence within the Development of any Hazardous Materials, whether the Authority and the City obtained such information from the Developer or from its own investigations.

Section 8.13    As-Is Conveyance.

(a)    Any deed to Developer shall be made "AS IS," with no warranties or representations by the Authority or the City concerning the condition of the Property, including the presence or absence of any Hazardous Materials. Developer hereby agrees and acknowledges that except in the event of any fraud, misrepresentation, or withholding of information by Authority or the City: (i) neither Authority or the City, nor anyone acting for or on behalf of Authority or the City, has made any representation, statement, warranty or promise to Developer concerning the development potential or condition of the Property; (ii) in entering into this Agreement, Developer has not relied on any representation, statement or warranty of Authority or the City, or anyone acting for or on behalf of Authority or the City, other than as may expressly be contained in writing in this Agreement; (iii) all matters concerning the Property have been or shall be independently verified by Developer and that Developer shall purchase the Property on Developer's own prior examination thereof; and (iv) THAT DEVELOPER IS PURCHASING THE PROPERTY IN AN "AS IS" PHYSICAL CONDITION AND IN AN "AS IS" STATE OF REPAIR.

(b)    General Release.  Subject to Sections 8.12(b) and 8.13(a) above, Developer and its owners, employees, agents, assigns and successors agree that upon the Closing, Developer shall be deemed conclusively to have released and discharged Authority, City and their agents, employees, trustees, assigns and successors, from any and all damages,

000064

4605 101

losses, demands, claims, debts, liabilities, obligations, causes of action and rights, whether known or unknown, by Developer regarding the Property, including, but not limited to, the environmental condition of the Property.

(c)     Waiver of Civil Code § 1542. Developer agrees that, with respect to the General Release contained in Section 8.13(b) above, the General Release extends to all matters regarding the Property, whether or not claimed or suspected, to and including the date of execution hereof, and constitutes a waiver of each and all the provisions of the California Civil Code § 1542, which reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Developer herein acknowledges that the effect and import of the provisions of Civil Code § 1542 have been explained to it by its own counsel. Developer understands and acknowledges the significance and the consequence of such specific waiver of unknown claims and hereby assumes full responsibility for any injuries, damages, losses or liabilities that it may hereinafter incur from the waiver of these unknown claims.

Section 8.14   Environmental Work. The Developer shall be responsible for performing the work of any investigation and remediation on the Property which may be required in order to develop the Development. The determination as to whether any such remediation is needed, and as to the scope and methodology thereof, shall be made by mutual agreement of the governmental agency with responsibility for monitoring such remediation, the Authority, the City and the Developer. The Developer shall notify the Authority and the City promptly upon discovery of any actionable levels of Hazardous Substances, and upon any release thereof, and shall consult with the Authority and the City in order to establish the extent of remediation to be undertaken and the procedures by which remediation thereof shall take place. The Developer shall comply with, and shall cause its agents and contractors to comply with, all laws regarding the use, removal, storage, transportation, disposal and remediation of Hazardous Substances. The investigation and remediation work shall be carried out in accordance with all applicable laws (including Environmental Laws) and such other procedures and processes as may be described in this Agreement.

Section 8.15   City and Other Governmental Authority Permits. Before the commencement of construction or development of any buildings, structures or other work of improvement upon the Property, the Developer shall, at its own expense, secure or cause to be secured any and all permits which may be required by the City or any other governmental agency regulating such construction, development or work. The Authority and the City shall

000065

47 of 101

provide all assistance deemed appropriate by the Authority and the City to the Developer in securing these permits.

Section 8.16    Zoning of the Property. It shall be the responsibility of the Developer at the Developer's sole cost and expense, to ensure that the zoning of the Property shall be such as to permit the development and use of the Property in accordance with the provisions of this Agreement. The Authority shall cooperate with the Developer in seeking any variances, conditional use permits, parcel maps or other discretionary approvals needed to implement this Agreement.

Section 8.17    Mitigation Requirements. The Developer shall comply with any mitigation requirements imposed by the City in connection with any CEQA or NEPA review.

Section 8.18    Certificates of Occupancy. Promptly after completion of the various components of the Development in accordance with those provisions of this Agreement (including the dates for beginning and completion thereof, as they may have been extended by the Authority and the City), the Developer shall seek issuance of Certificates of Occupancy or the equivalent by the City in conformity with applicable rules and ordinances. Such Certificates of Occupancy or equivalent shall be conclusive evidence that the covenants in this Agreement with respect to the obligations of the Developer to construct the portions of the Development described in such certificates and the dates for the beginning and completion thereof have been met. Such certifications and determinations shall not constitute evidence of compliance with or satisfaction of any obligation of the Developers to any holder of a deed of trust securing money loaned to finance the Development or any part thereof and shall not be deemed a notice of completion under the California Civil Code.

Section 8.19    City Requirements. Developer will be required to comply with the City's Inclusionary Zoning Regulations (Dublin Municipal Code Chapter 8.68)(hereinafter "Chapter 8.68") for the Development. Compliance shall be achieved by constructing affordable units as defined in and required by Dublin Municipal Code Section 8.68.030 or by receiving City Council approval of a waiver pursuant to Dublin Municipal Code Section 8.68.040E prior to City approval of the last discretionary approval for the applicable Development Component. Unless waived or modified by the City Council, the Development will be subject to all of the requirements set forth in Chapter 8.68 including without limitation, requirements related to: (i) allocation of units by income levels, (ii) concurrent construction of affordable and market rate units within each Development Component, (iii) design of affordable units, (iv) geographic distribution of affordable units within each Development Component, (v) execution and recordation of affordable housing agreements for each Development Component, (vi) annual reporting, (vii) City right of first refusal, and (viii) tenant and homebuyer selection criteria. The parties acknowledge that certain financing and regulatory constraints may impede Eden's ability to initiate construction of the affordable units (senior and multifamily) concurrently with the market-rate units within the Development. Accordingly, the parties acknowledge that the affordable rental units may be constructed prior to, concurrently with, or following construction of the market rate units provided the

000066

Developer receives a waiver from the City of Chapter 8.68's requirements for, among other things, concurrent construction of market rate and affordable units.

      (a)   Family and Senior Housing. Eden and the City will execute and record an Affordable Housing Agreement and Declaration of Restrictive Covenants against the Family and Senior Housing parcels that will require compliance with the affordability requirements for a minimum of 55 years. The Affordable Housing Agreement and Declaration of Restrictive Covenants shall apply to the Affordable Family Rental Housing and the Affordable Senior Rental Housing components of the Development.

      (b)   For-Sale Housing. Citation and the City will execute and record an Affordable Housing Agreement against the single-family parcels that will require compliance with Chapter 8.68, including without limitation requirements addressing homebuyer eligibility and sale price restrictions. The Affordable Housing Agreement shall require, among other conditions, that seven percent (7%) of the units within the For Sale Development Component be sold to buyers whose household income falls between 80% and 120% of the Area Median Income, as defined in Chapter 8.68. Except as required pursuant to the Rehousing Policy described in Section 4.3(b), the Affordable Housing Agreement shall not require Citation to provide any for sale units to buyers whose household income falls below 80% of the Area Median Income.

**ARTICLE 9.**
**OWNERSHIP, OPERATION AND DISPOSITION**
**OF RENTAL DEVELOPMENT**

    Section 9.1   Ownership. The Affordable Family Rental Housing and Affordable Senior Rental Housing developed hereunder shall be owned by a either (a) Eden or its Affiliate, or (b) a limited partnership in which Eden or its Affiliate will be the sole managing general partner. Eden will determine the form of ownership entity for each Development Component which best effectuates the intent of this Agreement, including the utilization of Section 202 financing, LIHTC or any other financing or business plan in the most efficient manner.

    Section 9.2  Regulatory Restrictions.

      (a)   The owner of the Affordable Senior Rental Housing and Affordable Family Rental Housing components will employ admission and occupancy standards, rent policies, lease provisions, and other management practices which represent best practices in the private sector, and contribute to the success of the developments. The Authority and the City shall have the right to review and approve policies and lease documents substantially relating to statutory or regulatory rights of residents, such as admissions policies, continued occupancy policies, and grievance procedures, if any.

      (b)   Applicants for the Affordable Rental Units in the Development will be

000067

49₸ 101

drawn first from Prior Residents subject to screening and selection criteria approved by the Authority and the City, which approval shall not be unreasonably withheld, conditioned or delayed.

Section 9.3    Property Management. Eden's selection of a management agent, and the terms of any management agreement and management plan, will be subject to the Authority's and the City's review and approval. Notwithstanding the foregoing (but still subject to the Authority's and the City's review of the management agreement), the initial management agent will be the Eden Housing Management, Inc.

## ARTICLE 10.
## OBLIGATIONS WHICH CONTINUE THROUGH AND
## BEYOND THE COMPLETION OF CONSTRUCTION

Section 10.1    Maintenance. The Developer hereby agrees that, prior to completion of the construction of Development, the Property undergoing construction shall be maintained in a neat and orderly condition to the extent practicable and in accordance with industry health and safety standards, and that, once the Development is completed, the Development shall be well maintained as to both external and internal appearance of the buildings, the common areas, and the parking areas. So long as the Developer owns the Development or any portion thereof, the Developer shall maintain or cause to be maintained the Development in good repair and working order, and in a neat, clean and orderly condition, including the walkways, driveways, parking areas and landscaping, and from time to time make all necessary and proper repairs, renewals, and replacements. Developer agrees to comply with City requirements regarding maintenance of the Development and to submit to the City for review and approval such documents as may be reasonably requested by the City.

Section 10.2    Mechanics' Liens. The Developer shall indemnify the Authority and the City and hold the Authority and the City harmless against and defend the Authority and the City in any proceeding related to any mechanic's lien, stop notice or other claim brought by a subcontractor, laborer or material supplier who alleges having supplied labor or materials in the course of the construction of the Development by the Developer. This indemnity obligation shall survive the issuance of Certificates of Occupancy or the equivalent by the City and the termination of this Agreement.

Section 10.3    Developer To Indemnify Authority, City. The Developer shall indemnify, defend, and hold the Authority, the City, their directors, councilmembers, officers, employees, agents, and their successors and assigns harmless against all claims for bodily injury, death or property damage which arise out of or in connection with entry onto, ownership of, occupancy in, or construction on the Property by the Developer or its contractors, subcontractors, agents, employees or tenants. This indemnity obligation shall not extend to any claim to the extent arising from the Authority's or City's gross negligence or willful misconduct, or the Authority's or the City's failure to perform its obligations under this Agreement, and shall survive both the issuance of Certificates of Occupancy or the equivalent

000068

500 101

by the City and termination of this Agreement.

    Section 10.4   Non-Discrimination. The Developer covenants by and for itself and its successors and assigns that there shall be no discrimination against or segregation of a person or of a group of persons on account of race, color, religion, creed, sex, sexual orientation, marital status, ancestry or national origin in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Property by the Developer, nor shall the Developer or any person claiming under or through the Developer establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessee or vendees of the Property.

    Section 10.5   Mandatory Language in All Subsequent Deeds, Leases and Contracts. All deeds, leases or contracts entered into by the Developer on or after the date of execution of this Agreement as to any portion of the Property shall contain the following language:

(a)    In Deeds:

    "The grantee herein covenants by and for himself, herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of, any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the premises herein conveyed, nor shall the grantee or any person claiming under or through him or her, establish or permit any practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the premises herein conveyed. The foregoing covenants shall run with the land."

(b)    In Leases:

    "The lessee herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through him or her, and this lease is made and accepted upon and subject to the following conditions that there shall be no discrimination against or segregation of any person or group of persons, on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the premises herein leased nor shall the lessee himself or herself, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or

000069

5/07 101

segregation with reference to the selection, location, number, use, or occupancy, of tenants, lessees, sublessees, subtenants, or vendees in the premises herein leased."

(c)    In Contracts:

"The contractor herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through it, and this contract is made and accepted upon and subject to the conditions that there shall be no discrimination against or segregation of any person or of a group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the property herein transferred nor shall the contractor or any person claiming under or through it establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants, or vendees in the property herein transferred. The foregoing provisions shall be binding upon and shall obligate the contractor and any subcontracting parties, successors, assigns and other transferees under the contract."

Notwithstanding the foregoing, with respect to familial status, nothing herein shall be construed to apply to housing for older persons, as defined in Section 12955.9 of the Government Code nor shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11, and 799.5 of the Civil Code, relating to housing for senior citizens. Subdivision (d) of Section 51 and Section 1360 of the Civil Code and subdivisions (n), (o), and (p) of Section 12955 of the Government Code shall apply to this Section.

Section 10.6   Employment Opportunity.  During the operation of the Development, there shall be no discrimination by the Developer on the basis of race, color, creed, religion, sex, sexual orientation, marital status, national origin, ancestry, or handicap in the hiring, firing, promoting, or demoting of any person engaged in the operation of the Development.

## ARTICLE 11.
## NON-DISCRIMINATION AND OTHER FEDERAL AND STATE REQUIREMENTS

Section 11.1   Certain Requirements.  Developer will comply with all applicable state and federal laws, rules and regulations, including but not limited to the requirements of the following, as the same may be amended from time to time:

(a)    The Fair Housing Act, 42 U.S.C. 3601-19, and regulations issued thereunder, 24 CFR Part 100; Executive Order 11063 (Equal Opportunity in Housing) and

1460\02\435574.9

40

000070

5207 101

regulations issued thereunder, 24 CFR Part 107; the fair housing poster regulations, 24 CFR Part 110, and advertising guidelines, 24 CFR Part 109.

(b)    Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, and regulations issued thereunder relating to nondiscrimination in housing, 24 CFR Part 1.

(c)    Age Discrimination Act of 1975, 42 U.S.C. 6101-07, and regulations issued thereunder, 24 CFR Part 146.

(d)    Americans with Disabilities Act, 42 U.S.C. 12181-89, and regulations issued thereunder, 28 CFR Part 36.

Section 11.2    Access to Records.
(a)    The Authority, the City, or their duly authorized representatives, shall, until 3 years after completion of the Term, have access to and the right to examine, upon reasonable notice, any of the Developer's directly pertinent books, documents, papers, or other records involving transactions related to this Agreement for the purpose of making audit, examination, excerpts, and transcriptions.

(b)    The Developer agrees to include in first-tier subcontracts under this contract a clause substantially the same as paragraph (a). The term "subcontract" as used in this clause excludes contracts and purchase orders not exceeding $10,000.

(c)    The period of access and examination under paragraphs (a) and (b) for records relating to (1) litigation or settlements of disputes arising from the performance of this Agreement, or (2) costs and expenses of this Agreement to which the Authority, the City, or their duly authorized representatives has taken exception shall continue until disposition of such appeals, litigation, claims, or exceptions.

Section 11.3    Interest of Members of Congress.  No Member of or delegate to the Congress of the United States shall be admitted to any share or part of this Agreement or to any benefit to arise therefrom.

Section 11.4    Interest of Member, Officer, or Employee and Former Member, Officer, or Employee of Authority.  No member, officer, or employee of the Authority, no member of the governing body of the locality in which the project is situated, no member of the governing body by which the Authority was activated, and no other public official of such locality or localities who exercises any functions or responsibilities with respect to the project, shall, during his or her tenure, or for one year thereafter or such longer time as the Authority's Code of Ethics may require, have any interest, direct or indirect, in this Agreement or the proceeds thereof, unless the conflict of interest is waived by the Authority and by HUD.

Section 11.5    Lobbying Activities.  The Developer shall comply with 31 USC 1352 which prohibits the use of Federal appropriated funds to pay any person for influencing or

000071

53 of 101

attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with any of the following covered Federal actions: the awarding of any Federal contract; the making of any Federal grant; the making of any Federal loan; the entering into of any cooperative agreement; or the modification of any Federal contract, loan, or cooperative agreement. The Developer further agrees to comply with the requirement of such legislation to furnish a disclosure (OMB Standard Form LLL) if any funds other than Federal appropriated funds (including profit or fee received under a covered Federal transaction) have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress, in connection with a Federal contract, grant, loan, or cooperative agreement, which payment would be prohibited if made from Federal appropriated funds.

## ARTICLE 12.
## ROLE OF HUD

Section 12.1   HUD Approval.  The parties hereto acknowledge that this Agreement and the conveyance of the Property are subject to HUD approval.  Developer and the Authority agree to cooperate to obtain all necessary HUD approvals and acknowledge that HUD approvals must be obtained as a condition precedent to certain obligations contained herein.  Nothing herein shall be understood to authorize or obligate the Authority to act in the absence of required HUD approvals.

Section 12.2   No Relationship Created.  Nothing contained in the Revitalization Plan or this Agreement nor any act of HUD or the Authority, shall be deemed or construed to create any relationship of third-party beneficiary, principal and agent, limited or general partnership, joint venture, or any association or relationship involving HUD, except between HUD and the Authority as provided under the terms of the Revitalization Plan.

## ARTICLE 13.
## INSURANCE

Section 13.1   Developer.  Developer shall maintain and keep in full force and effect, and shall cause all of its Contractors to maintain and keep in full force and effect, during the term of this Agreement, such insurance as is set forth on Exhibit F, Insurance. Each such policy shall name the Authority and the City as additional insureds and, in instances where the Authority and City are acting as lenders, as loss payees.  Each such policy shall be underwritten and issued by reputable companies licensed to do business in California, shall not be subject to cancellation without 30 days' prior written notice to the Authority and the City, and shall be primary and non-contributory to any insurance carried by the Authority or the City.  Any language purporting to limit the insurer's liability for failure to give the required 30 days' prior written notice shall be unacceptable to Authority and City.  Developer shall provide

000072

5408\01

the Authority and the City with a certificate of insurance, and if such certificate evidences the limits and coverages required by Exhibit F, the Authority and the City shall provide Developer, upon request, with a notice of acceptance.

## ARTICLE 14.
## TERMINATION FOR CAUSE

Section 14.1    Events of Default by the Developer.
The following shall constitute an Event of Default by the Developer:

(a)    Subject to Section 14.1(d) and notice and cure, (i) if Developer shall fail to comply with the Performance Deadlines set forth in the Schedule of Performanceas the same may be extended from time to time; or (ii) if Developer shall materially breach or fail to diligently pursue its obligations under this Agreement or any other agreement between the Authority, the City and the Developer.

(b)    Subject to Section 14.1(d), if the Developer (i) is or becomes insolvent or bankrupt or otherwise ceases to pay its debts as they mature or makes any arrangement with or for the benefit of its creditors or consents to or acquiesces in the appointment of a receiver, trustee or liquidator for the Development or for any substantial part of it; (ii) institutes any bankruptcy, winding up, reorganization, insolvency, arrangement or similar proceeding under the laws of any jurisdiction, or any such proceeding is instituted against the Developer in any jurisdiction which is not stayed or dismissed within 90 days after its institution; (iii) files any action or answer admitting, approving or consenting to any such proceeding; (iv) becomes subject to levy of any distress, execution or attachment upon its property which interferes with its performance hereunder, and the Developer fails within 30 days to discharge such levy, execution or attachment, or to substitute another entity (whether or not an Affiliate) acceptable to the Authority and the City to perform the obligations of the Developer without material delay in performance; or (v) is convicted of any criminal offense or violation of law.

(c)    Prior to conveyance of the Property, default hereunder by either of the Developers or with respect to any portion of the Property shall constitute a default by both Developers for which the Authority and/or City may exercise any of its remedies under this Agreement with respect to both Developers and the entire Property. Following conveyance of the Property to Citation and Eden, default by Eden or default related to the Affordable Family Rental Housing or the Affordable Senior Rental Housing shall entitle the Authority and the City to exercise its remedies under this Agreement with respect only to Eden and the Affordable Family Rental Housing and the Affordable Senior Rental Housing (and not with respect to Citation and the For-Sale Housing Component) and default by Citation or default related to the For-Sale Housing Component shall entitle the Authority and the City to exercise its remedies under this Agreement with respect only to Citation and the For-Sale Housing Component (and not with respect to Eden and the Affordable Family Rental Housing and the Affordable Senior Rental Housing).  In such event, termination of the Agreement pursuant to

000073

55 101

Section 14.3 shall mean termination of the Agreement only with respect to Eden or Citation, whichever is in default hereunder. For purposes of this Section 14.1 only, "conveyance of the Property" shall mean recordation of grant deeds for the Property.

(d)    It shall not be an Event of Default if the delay in completing the work or proceeding with Developer's obligations hereunder arises from as a result of a delay in, or nonoccurrence of, a Development Contingency (defined in Section 15.1) or from other unforeseeable causes beyond the control and without the fault or negligence of Developer and materially interferes with the work or the timing of the work. Examples of such causes include (i) acts of God, or of the public enemy, (ii) acts of a governmental entity in either its sovereign or contractual capacity (iii) acts of a contractor other than Developer, or subcontractor, in the performance of an agreement with the Authority and the City (and not pursuant to a contract with the Developer or an affiliate of Developer), (iv) fires, (v) floods, (vi) epidemics, (vii) quarantine restrictions, (viii) strikes, (ix) freight embargoes, (x) unusually severe weather, or (xi) delays of subcontractors or suppliers at any tier arising from unforeseeable causes, or (xii) changes in regulatory requirements affecting the Development.

Section 14.2        Events of Default by the Authority, City.

(a)    Subject to Section 14.2(b) and notice and cure, it shall be an Event of Default by the Authority and/or City if (i) the Authority and/or City shall fail to diligently perform its obligations under this Agreement and such failure materially impairs the ability of Developer to accomplish the Development within the time required by this Agreement or otherwise perform its material obligations hereunder and (ii) the Authority and/or the City shall fail to perform its obligations within the Performance Deadlines set forth in the Schedule of Performance.

(b)    It shall not be an Event of Default if any failure by Authority and/or City arises from the failure to occur of any Development Contingency as hereinafter defined or of unforeseeable causes beyond the control and without the fault or negligence of Authority or City. Examples of such causes include (i) acts of God, or of the public enemy, (ii) acts of a governmental entity other than the Authority, HACA or the City, in either its sovereign or contractual capacity (iii) acts of another contractor or subcontractor in the performance of an agreement with the Developer (and not pursuant to a contract with the Authority and/or City or an affiliate of Authority and/or City), (iv) fires, (v) floods, (vi) epidemics, (vii) quarantine restrictions, (viii) strikes, (ix) freight embargoes, (x) unusually severe weather, or (xi) delays of subcontractors or suppliers at any tier arising from unforeseeable causes, or (xii) changes in regulatory requirements affecting the Development.

Section 14.3    Procedure for Termination For Cause. Upon the occurrence of an Event of Default by either the Authority, the City or the Developer, the other party shall have the right to notify the defaulting party in writing of such Event of Default, whereupon the defaulting party shall have sixty (60) days from its receipt of such notice to cure such Event of Default or begin curing of the default if such cure takes longer than 60 days to complete. If

000074

the defaulting party shall fail to cure the default or begin curing of the default, as applicable, within the time provided in such notice, the non-defaulting party may, by written notice, terminate this Agreement and/or pursue such other remedies as may be available at law or equity.

Section 14.4    Continuing Obligations.  In no event shall a termination of this Agreement impair or delay the performance by the Authority, City or Developer of their obligations under any of the Closing Documents.  The Authority's, City's and Developer's sole rights and remedies with regard to any Development Component which has gone to Closing shall be under the respective Closing Documents.

## ARTICLE 15.
## DEVELOPER TERMINATION WITHOUT FAULT

Section 15.1    Development Contingencies.  The parties agree that the following matters are conditions precedent to the Authority's, City's and Developer's ability to proceed with the Development and to fulfill the terms and conditions of this Agreement.  The parties' ability to perform responsibilities hereunder is substantially contingent upon (i) actions by third parties over which Developer, Authority and City have limited control, (ii) availability of funding for the Affordable Family Rental Housing and Affordable Senior Rental Housing components, or (iii) factual circumstances which cannot be fully determined as of the date of this Agreement ("Development Contingencies").  Such Development Contingencies are as follows, to be performed at the times set forth below, as included in the Schedule of Performance:

(a)    Allocation or award of financing for the Affordable Family Rental Housing or Affordable Senior Rental Housing components on terms acceptable to Eden, which in Eden's reasonable judgment (as described in Section 19.2(e)) makes such components financially feasible.  Terms include, without limitation, loan or grant amount, interest rate, term to maturity, payment terms, lien priority and subordination requirements.

(b)    The receipt of all necessary government approvals and permits, including without limitation HUD's approval of the Revitalization Plan and this Agreement, and the Authority's and City's approval of the Development after the completion of all required environmental review;

(c)    Recordation of the Final Map;

(d)    Execution, delivery and recordation, where appropriate, of the Authority Financing documents; and

(e)    Execution, delivery and recordation, where appropriate, of the City Loan documents.

000075

5703 101

Section 15.2    Revision or Termination.  In the event a Development Contingency does not occur, so long as Developer is in compliance with this Agreement and has used its best efforts to cause it to occur, in a manner generally consistent with the Revitalization Plan and in a manner which reasonably permits the accomplishment of the Revitalization in accordance with this Agreement, the parties will attempt to revise the Revitalization Plan in a mutually acceptable fashion by extending deadlines, revising scope of development, or otherwise.  If the parties cannot, within 60 days after Developer provides the Authority and City with notice that a Development Contingency has not occurred, agree to amend the Revitalization Plan or cannot thereafter secure HUD approval of any amendment so agreed to, then Developer may terminate this Agreement by delivering written notice to the Authority and the City.

Section 15.3    No Liability.  In the event that Developer terminates this Agreement as provided in this Article 15, no party shall have any liability to any other party except under any separate contracts entered pursuant to this Agreement and except for continuing indemnities provided elsewhere in this Agreement.

## ARTICLE 16.
## PARTIES' DISPUTES

Section 16.1    Definition of Claim Governed by Dispute Clause.  "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of Agreement terms, or other relief arising under or relating to this Agreement. A claim arising under the Agreement, unlike a claim relating to the Agreement, is a claim that can be resolved under the Agreement clause that provides for the relief sought by the claimant. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim by complying with the requirements of this Article, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

Section 16.2    Applicability of Dispute Clause.  Except for disputes arising under applicable labor standards (i.e., Davis-Bacon and California prevailing wage laws) all disputes arising under or relating to this Agreement, including any claims for damages for the alleged breach thereof which are not disposed of by the Agreement, shall be resolved under this Article.  Notwithstanding the above, this Article shall apply only to disputes involving the Authority or HACA.

Section 16.3    Written Claims to be Submitted to Contracting Officer.  All claims by Developer shall be made in writing and submitted to the Contracting Officer for a written decision.

Section 16.4    Notice of Decision or Decision Date.  The Contracting Officer shall,

000076

5807 101

within 15 days after receipt of the request, decide the claim or notify Developer of the date by which the decision will be made. In no event shall the Contracting Officer render a decision later than 60 days from the receipt of the request.

Section 16.5    Effect of Contracting Officer's Decision. The Contracting Officer's decision shall be final unless Developer files suit in a court of competent jurisdiction within the applicable statue of limitations.

Section 16.6    Developer's Duty to Perform Pending Claim Resolution. Developer shall proceed diligently with performance of this Agreement, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the Agreement, and comply with any decision of the Contracting Officer.

Section 16.7    Identification of Contracting Officer. For purposes of this Agreement, Authority's Contracting Officer shall be Christine Gouig, her written designee, or her successor as Authority Executive Director.

## ARTICLE 17.
## SECURITY FINANCING AND RIGHTS OF HOLDERS

Section 17.1    Holder Not Obligated to Construct. Deeds of trust or other security instruments securing loans approved by the Authority pursuant to the approved Financing Plan are each referred to as a "Security Financing Interest." The holder of any Security Financing Interest authorized by this Agreement is not obligated to construct or complete any improvements or to guarantee such construction or completion; nor shall any covenant or any other provision in this Agreement or in the grant deeds from the Authority to the Developer conveying the Property or any part thereof be construed so to obligate such holder. The holder of any Security Financing Interest which succeeds to the interest of the Developer through sale, assignment, foreclosure or deed in lieu of foreclosure shall not be deemed to be the successor in interest of Developer with respect to any obligation or liability of Developer under this Agreement. However, nothing in this Agreement shall be deemed to permit or authorize any such holder to devote the Property or any portion thereof to any uses, or to construct any improvements thereon, other than those uses of improvements provided for or authorized by this Agreement.

Section 17.2    Additional Mortgagee Protections. The Authority and the City shall consider in good faith requests to make amendments to this Agreement as reasonably requested by a holder of a Security Financing Interest, prior to or concurrently with the recording of a lien securing the Security Financing Interest, to provide any reasonably required modifications to this Agreement and other assurances to such holder and the Authority's and HACA's Executive Directors and the City's City Manager are hereby authorized to enter into such amendments without further action by the Authority, HACA or the City, respectively.

000077

57 101

## ARTICLE 18.
## REPRESENTATIONS AND WARRANTIES

Section 18.1   Developer's Warranty of Good Standing and Authority  .  Eden, with respect only to Eden's organization, and Citation, with respect only to Citation's organization, hereby represents and warrants to the Authority as follows:

(a)   Organization.  Developer is duly organized, validly existing and in good standing under the laws of the State of California and has the power and authority to own its property and carry on its business as now being conducted.

(b)   Authority of Developer.  Developer has full power and authority to execute and deliver this Agreement and to perform and observe the terms and provisions of all of this Agreement.

(c)   Authority of Persons Executing Documents.  This Agreement and all other documents or instruments executed and delivered, pursuant to this Agreement have been executed and delivered by persons who are duly authorized to execute and deliver the same for and on behalf of Developer, and all actions required under Developer's organizational documents and applicable governing law for the authorization, execution, delivery and performance of this Agreement and all other documents or instruments executed and delivered, have been duly taken (to the extent such actions are required as of the date of execution and delivery of the above-named documents).

(d)   Valid and Binding Agreements.  This Agreement and all other documents or instruments which have been executed and delivered pursuant to or in connection with this Agreement constitute or, if not yet executed or delivered, will when so executed and delivered constitute, legal, valid and binding obligations of Developer enforceable against it in accordance with their respective terms, subject to the laws affecting creditors rights and principles of equity.

(e)   No Breach of Law or Agreement.  Neither the execution nor delivery of this Agreement or of any other documents or instruments executed and delivered, pursuant to this Agreement, nor the performance of any provision, condition, covenant or other term hereof or thereof, will conflict with or result in a breach of any statute, rule or regulation, or any judgment, decree or order of any court, board, commission or agency whatsoever binding on Developer, or any provision of the organizational documents of Developer, or will conflict with or constitute a breach of or a default under any agreement to which Developer is a party, or will result in the creation or imposition of any lien upon any assets or property of Developer, other than liens established pursuant hereto.

(f)   Pending Proceedings.  Developer is not in default under any law or regulation or under any order of any court, board, commission or agency whatsoever, and

1460\02\435574.9

48

000078

there are no claims, actions, suits or proceedings pending or, to the knowledge of Developer, threatened against or affecting Developer or the Development, at law or in equity, before or by any court, board, commission or agency whatsoever which might, if determined adversely to Developer, materially affect Developer's ability to perform Developer's obligations under this Agreement.

      (g)    <u>Financial Statements</u>.  The financial statements of Developer and other financial data and information furnished by Developer to the Authority fairly present the information contained therein.  As of the date of this Agreement, there has not been any adverse, material change in the financial condition of Developer from that shown by such financial statements and other data and information.

    Section 18.2   <u>Authority's Warranty of Good Standing and Authority</u>.  The Authority represents and warrants to Developer that (i) the Authority is a duly organized, validly organized, public body, corporate and politic, and is in good standing under the laws of California, (ii) the Authority has all necessary power and authority under California law, (iii) this Agreement has been duly entered into and is the legally binding obligation of the Authority, (iv) this Agreement will not violate any judgment, law, consent decree, or agreement to which the Authority is a party or is subject to and will not violate any law or ordinance under which the Authority is organized, and (vi) there is no claim pending, or to the best knowledge of the Authority, threatened, that would impede the Authority's ability to perform its obligation hereunto.

    Section 18.3   <u>City's Warranty of Good Standing and Authority</u>.  The City represents and warrants to Developer that (i) the City is a duly organized, validly organized, public body, corporate and politic, and is in good standing under the laws of California, (ii) the City has all necessary power and authority under California law, (iii) this Agreement has been duly entered into and is the legally binding obligation of the City, (iv) this Agreement will not violate any judgment, law, consent decree, or agreement to which the City is a party or is subject to and will not violate any law or ordinance under which the City is organized, and (vi) there is no claim pending, or to the best knowledge of the City, threatened, that would impede the City's ability to perform its obligation hereunto.

<b><u>ARTICLE 19.</u></b><br><b>MISCELLANEOUS</b>

    Section 19.1   <u>Term</u>.  This Agreement shall commence with the execution hereof and shall terminate upon Construction Completion in accordance with the Schedule of Performance, as such schedule may have been amended by the parties, unless sooner terminated in accordance with provisions herein.  Completion of construction shall be evidenced by issuance of Certificates of Occupancy or equivalent are issued by the City for all units in the Development.  Notwithstanding the above, certain provisions of this Agreement shall survive the expiration or termination of this Agreement, and shall continue independently of the Closing Documents.  Those provisions are Sections 3.1(k), 3.2(f), 8.12(b), 10.2 and

000079

61 of 101

10.3.

Once the Closing has occurred, the Closing Documents will govern the parties' obligations as to matters set forth in them. In the event of any conflict between the Closing Documents and this Agreement, the Closing Documents will govern. No termination of this Agreement, in and of itself, shall release the other parties from the obligations it has undertaken in the Closing Documents nor increase the rights and remedies it may have under such documentation.

Section 19.2    Decision Standards.

(a)    In any approval, consent or other determination by any party required under any of this Agreement, the party shall act reasonably and in good faith, unless a different standard is explicitly stated.

(b)    "Good faith" means honesty in fact in the conduct or transaction concerned based on the facts and circumstances actually known to the individual(s) acting for the party.

(c)    "Discretion," "sole discretion," "option," "election" or words of similar import in this Agreement denote the party's privilege to act in furtherance of the party's interest.

(d)    "Judgment" denotes a subjective standard obligating the party to use good faith in forming its professional opinion or estimate.

(e)    "Reasonable judgment" denotes an objective standard obligating the party in good faith to act in a manner which is consistent with usual and customary practices of entities similarly situated, and not arbitrary or capricious.

Section 19.3    Notices. Any notice or other communication given or made pursuant to this Agreement shall be in writing and shall be deemed given if (i) delivered personally or by courier, (ii) telecopied, (iii) sent by overnight express delivery, or (iv) mailed by registered or certified mail (return receipt requested), postage prepaid, to a party at its respective address set forth below (or at such other address as shall be specified by the party by like notice given to the other party):

If to Authority, to:    Christine Gouig
Executive Director
Housing Authority of the City of Dublin
c/o Housing Authority of the County of Alameda
22941 Atherton Street
Hayward, California 94541
FAX: 510-727-8554

J460\02\435574.9

50

000080

62B'01

| | |
|---|---|
| and a copy to: | Robert C. Mills<br>Goldfarb & Lipman LLP<br>1300 Clay Street, 9th Floor<br>Oakland, California  94612<br>FAX:  510-836-6336 |
| If to City, to: | Richard C. Ambrose<br>City Manager<br>City of Dublin<br>100 Civic Plaza<br>Dublin, California  94568<br>FAX: 925-833-6651 |
| and a copy to: | Elizabeth Silver, Esq.<br>Meyers Nave Riback Silver & Wilson<br>555 12th Street, Suite 1500<br>Oakland, California 94607<br>FAX: 510-444-1108 |
| If Developer, to: | Linda Mandolini<br>Executive Director<br>Eden Housing, Inc.<br>409 Jackson Street<br>Hayward, California  94544<br>FAX:  510-582-6523 |
| and to: | Charles G. McKeag<br>Vice President, Land Acquisition and Development<br>Citation Homes Central<br>404 Saratoga Avenue, Suite 100<br>Santa Clara, CA  95050<br>FAX: 408-985-6071 |

All such notices and other communications shall be deemed given on the date of personal or local courier delivery, telecopy transmission, delivery to overnight courier or express delivery service, or deposit in the United States Mail, and shall be deemed to have been received (i) in the case of personal or local courier delivery, on the date of such delivery, (ii) in the case of telecopy, upon receipt of electronic confirmation thereof, (iii) in the case of delivery by overnight courier or express delivery service, on the date following dispatch, and (iv) in the case of mailing, on the date specified in the return receipt therefor.

Section 19.4   Representatives.  To facilitate communication, the parties to this Agreement shall designate a representative with responsibility for the routine administration of

000081

63‑7‑101

each party's obligations under this Agreement. The parties initially appoint the following as representatives:

| | |
|---|---|
| Authority: | Christine Gouig, Executive Director, Authority |
| City: | Joni Pattillo, Assistant City Manager, City |
| HACA: | Christine Gouig, Executive Director, HACA |
| Developer: | Kathy Schmidt, Senior Project Developer, Eden |
| | Charles McKeag, Vice President, Citation |

Section 19.5  Further Assurances. Each party shall execute such other and further documents as may be reasonably necessary or proper for the consummation of the transaction contemplated by this Agreement.

Section 19.6    Restrictions on Transfers and Assignments.

(a)    As used in this Section, the term "Transfer" means:

(1)    Any total or partial sale, assignment or conveyance, or any trust or power, or any transfer in any other mode or form, of or with respect to this Agreement or any aspect of the Development or any part thereof or any interest therein or any contract or agreement to do any of the same; or

(2)    Any total or partial sale, assignment or conveyance, or any trust or power, or any transfer in any other mode or form, of or with respect to any ownership interest in the Developer or any contract or agreement to do any of the same; or

(3)    Any merger, consolidation, sale or lease of all or substantially all of the assets of Developer.

(b)    Purpose of Restrictions on Transfer. The Developer recognizes that the qualifications and identity of Developer, including Affiliates of the Developer (all of which are included in the definition of "Developer" as set forth in Article 1), are of particular concern to the Authority and the City, in view of:

(1)    The importance of the Revitalization to the general welfare of the community; and

(2)    The financial assistance and other public aids that have been made available by law and by the government for the purpose of making such Revitalization possible; and

(3)    The reliance by the Authority and the City upon the unique qualifications and ability of the Developer to construct the Development and, after Construction Completion, upon the continuing interest which the Developer will have in the

1460\02\435574.9

52

000082

Property to assure the quality of the use, operation and maintenance deemed critical by the Authority and the City for the Development; and

(4)    The fact that the Property is not to be acquired or used for speculation, but only for development and operation by the Developer in accordance with the Agreement; and

(5)    The importance to the Authority, the City and the community of the standards of use, operation and maintenance of the Development.

The Developer further recognizes that it is because of such qualifications and identity that the Authority and the City is entering into this Agreement with the Developer and that Transfers are permitted only as provided in this Agreement.

(c)    Prohibited Transfers. Except as expressly permitted in this Agreement, the Developer represents and agrees that the Developer has not made or created, and will not make or create or suffer to be made or created, any Transfer, either voluntarily or by operation of law without the prior written approval of the Authority and the City. Any Transfer made in contravention of this Section shall be void and shall be deemed to be a default under this Agreement whether or not the Developer knew of or participated in such Transfer unless such Transfer is rescinded by the Developer within thirty (30) days following written notice by the Authority to the Developer to rescind such Transfer.

Section 19.7    Permitted Transfers. Notwithstanding the provisions of Section 19.6, the following Transfers shall be permitted and are hereby approved by the Authority and the City:

(a)    Any Transfer creating a Security Financing Interest permitted pursuant to the approved Financing Plan;

(b)    After the issuance of the Certificates of Occupancy or the equivalent by the City, a Transfer of one of the For Sale units to the purchasers of such units.

(c)    Any Transfer directly resulting from the foreclosure of a Security Financing Interest or the granting of a deed in lieu of foreclosure of a Security Financing Interest or as otherwise permitted under Article 17.

(d)    Any Transfer by a mortgagee, trustee, beneficiary or assignee under a mortgage, deed of trust or such other reasonable security interest following foreclosure, trustee's sale or the obtaining of title by deed or assignment in lieu of foreclosure or sale, provided that the identity of the transferee is approved by Authority and the City, which approval shall not unreasonably be withheld and shall be deemed given if not denied by Authority's and City's notice to the transferring entity, accompanied by the reasons for such denial, given within thirty (30) days of the request to Authority and the City for such approval.

000083

(e)    Any Transfer: (i) to an entity in which either Eden or Citation, as applicable, holds a controlling interest, defined for the purpose of this subparagraph as a 51% or greater ownership interest or having control by means of a common board or the right to appoint or approve the appointment of a majority of the directors, (ii) to an institutional investor which has provided funds for the Development, or (iii) to an entity in which such institutional investor holds a controlling interest; provided that in any such instance there is no change in the ultimate management of Developer. With respect to the Affordable Family Rental Housing and Affordable Senior Rental Housing components, any Transfer to an Affiliate of Eden or to a limited partnership of which Eden or an Affiliate of Eden is the sole managing general partner.

Section 19.8    Transfers with Authority, City Consent.

The Authority and the City may, in their sole discretion, approve in writing other Transfers as requested by the Developer. In connection with such request, there shall be submitted to the Authority and the City for review all instruments and other legal documents proposed to effect any such Transfer. If a requested Transfer is approved by the Authority and the City such approval shall be indicated to the Developer in writing. Such approval shall be granted or denied by the Authority and the City within thirty (30) days of receipt by the Authority and the City of Developer's request for approval of a Transfer. Consent to Transfers requested by investors, such as the removal of a general partner for default under a limited partnership agreement, shall not be unreasonably withheld, and shall be provided for with respect to each Development Component in the documentation for such Component.

Section 19.9    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed original, but all of which, together, shall constitute one instrument.

Section 19.10 Interpretation and Governing Law. This Agreement shall not be construed against the party who prepared it but shall be construed as though prepared by both parties. This Agreement shall be construed, interpreted, and governed by the laws of California without regard to the choice of law provisions thereof.

Section 19.11 Severability. If any portion of this Agreement is declared by a court of competent jurisdiction to be invalid or unenforceable such portion shall be deemed severed from this Agreement and the remaining parts shall continue in full force as though such invalid or unenforceable provision had not been part of this Agreement.

Section 19.12 Final Agreement. Unless otherwise provided herein, this Agreement constitutes the final understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations, understandings and agreements between the parties, whether written or oral. This Agreement may be amended, supplemented or changed only by a writing signed or authorized by or on behalf of the party to be bound thereby.

1460\02\435574.9

54

Section 19.13 <u>Non-Recourse</u>. No member, official, employee, agent, or consultant of the Authority, the City, or of any Affiliate of the Authority or the City, shall be personally liable to Developer, or any successor in interest or person claiming by, through or under Developer, in the event of any default or breach, or for or on account of any amount which may be or become due, or in any claim, cause or obligation whatsoever under the terms of this Agreement. No officer, director, shareholder (which is an individual), principal (which is an individual), employee, agent or consultant of the Developer or of any Affiliate of the Developer shall be personally liable to the Authority or the City or any successor in interest or person claiming by, through or under the Authority or the City, in the event of any default or breach, or for or on account of any amount which may be or become due, or in any claim, cause or obligation whatsoever under the terms of this Agreement.

Section 19.14 <u>Developer Employees and Liabilities</u>. It is understood that persons engaged or employed by Developer as employees, agents, or independent contractors shall be engaged or employed by Developer and not by the Authority or the City. Developer alone is responsible for their work, direction, compensation and personal conduct. Nothing included in any provision of this Agreement shall impose any liability or duty upon the Authority or the City to persons, firms, or corporations employed or engaged by Developer in any capacity whatsoever, or make the Authority or City liable to any such persons, firms, or corporations, or to any government, for the acts, omissions, liabilities, obligations, and taxes, of whatsoever nature, of Developer or of its employees, agents, or independent contractors.

Section 19.15 <u>Developer Not an Agent</u>. Nothing in this Agreement shall be deemed to appoint Developer as an agent for or representative of the Authority or the City, and Developer is not authorized to act on behalf of the Authority or the City with respect to any matters except those specifically set forth in this Agreement. The Authority and the City shall not have any liability or duty to any person, firm, corporation, or governmental body for any act of omission or commission, liability, or obligation of Developer, whether arising from actions under this Agreement or otherwise. Nothing contained in this Agreement nor any act of the Authority or the City, shall be deemed or construed to create any relationship of third-party beneficiary, principal and agent, limited or general partnership, joint venture, or any association or relationship between Developer and the City or the Authority.

Section 19.16 <u>Conflict of Interest</u>. Developer covenants that neither it nor any of its directors, officers, partners or employees has any interest, nor shall acquire any interest, directly or indirectly, which would conflict in any manner or degree with the performance of the services hereunder. Developer further covenants that in the performance of this Agreement, no person having such interest shall be employed by it. Notwithstanding the foregoing, nothing herein shall prevent Developer or any of its members or affiliates from (1) engaging in other development projects in the Dublin area or elsewhere, or (2) competing for or undertaking any other similar project in any other city.

Section 19.17 <u>Waivers</u>. The failure of either party to insist in any one or more cases

upon the strict performance of any of the other party's obligations under this Agreement or to exercise any right or remedy herein contained shall not be construed as a waiver or a relinquishment for the future of such obligation, right or remedy. No waiver by either party of any provision of this Agreement shall be deemed to have been made unless set forth in writing and signed by that party.

Section 19.18 Successors. The terms, covenants, agreements, provisions, and conditions contained herein shall bind and inure to the benefit of the parties hereto, their successors and assigns. In the event that the Authority consolidates its functions, or otherwise merges with HACA or other housing authority following execution of this Agreement, the rights and obligations of the Authority under this Agreement shall be binding and inure to the benefit of such successor entity.

Section 19.19 Headings: Exhibits. The headings in this Agreement are inserted for convenience only and shall not be used to define, limit or describe the scope of this Agreement or any of the obligations herein. All attachments that are labeled Exhibits are attached hereto and incorporated herein by reference thereto.

Section 19.20 Construction. Whenever in this Agreement a pronoun is used, it shall be construed to represent either the singular or the plural, either the masculine or the feminine, as the case shall demand.

Section 19.21 Cumulative Rights. Except as expressly limited by the terms of this Agreement, all rights, powers and privileges conferred hereunder shall be cumulative and not restrictive of those provided at law or in equity.

000086

68056101

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement by their duly authorized signatories effective on or as of the date written at the commencement of this Agreement.

**AUTHORITY:**

Housing Authority of the City of Dublin, a public body, corporate and politic

By: _____
     Christine Gouig, Executive Director

**CITY:**

City of Dublin, a municipal corporation

By: _____
     Richard C. Ambrose
     City Manager

**HACA:**

By: _____
     Christine Gouig
     Executive Director

**DEVELOPER:**

Eden Housing, Inc., a California non-profit public benefit corporation

By: _____
     Linda Mandolini
     Executive Director

SCS Development Corporation, a California corporation, dba Citation Homes Central

By: _____
Its: _____

1460\02\435574.9

000087

690 101

# EXHIBIT A
## LEGAL DESCRIPTION

000088

70 of 101

Title No. 05-59100025-JK
Locate No. CACTI7701-7701-5591-0059100025

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF DUBLIN, COUNTY OF ALAMEDA, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

Commencing at the point of intersection of the center line of Dougherty Road (also known as County Road No. 4038) and the Northeasterly line of the Southern Pacific Railroad Company right-of-way (300 feet wide), said point of commencement also being at the Southwesterly corner of Camp Parks, a 3636.1212 acre parcel of land acquired by the United States of America; thence running north 01° 13' 02" East, along the center line of Dougherty Road 69.47 feet to the True Point of Beginning of the parcel of land to be described; thence from said True Point of Beginning, Northwesterly along the arc of an 11,259.19 foot radius curve, concave northerly (radially distant 50 feet Northeasterly from the Northeasterly curved right-of-way line of said Southern Pacific Railroad Company), whose center bears north 45° 16' 12.2" east through a central angle of 8° 11' 34.6" an arc distance of 1609.99 feet to a point on the Northerly bank of Alamo Creek; thence along said northerly, westerly and easterly banks of Alamo Creek, the following courses and distances: north 64° 32' 46" east, 41.20 feet; south 88° 57' 14" east, 198.00 feet; north 81° 32' 46" east, 174.90 feet; north 19° 57' 14" west 66.00 feet; north 57° 57' 14" west, 122.10 feet; north 17° 02' 46" east, crossing said Alamo Creek, a distance of 455.40 feet to a point on the easterly bank of said Alamo Creek thence south 88° 27' 14" east, 33.00 feet; thence North 45° 02' 46" east, along the easterly bank of Alamo Creek, 112.20 feet; thence north 22° 32' 46" east 158.40 feet; thence north 8° 47' 46" east, 244.20 feet; thence north 49° 27' 14" west 155.10 feet; thence north 19° 27' 14" west, 56.89 feet; thence south 89° 16' 58" east, 609.36 feet to a point in the center line of said Dougherty Road; thence from said point south 01° 13' 02" west, along the said center line 2436.80 feet to the True Point of Beginning.

Excepting therefrom that portion deeded to the County of Alameda by deed dated March 12, 1981 and recorded April 15, 1981, Series No. 81-60663, Alameda County Records.

Also excepting therefrom that portion deeded to the City of Dublin by deed dated October 24, 1982 and recorded December 19, 1983, Series No. 83-237916, Alameda County Records.

Also excepting therefrom all uranium, thorium, and all other materials determined pursuant to Section 5(b)(1) of the Atomic Energy Act of 1946 (60 Stat. 761) to be peculiarly essential to the production of fissionable material, contained, in whatever concentration, in deposits in the lands as reserved in the deed by United States of America recorded April 28, 1954, Series No. AJ 35346, Book 7307 OR, Page 437, Alameda County Records.

Also excepting therefrom, that portion deeded to Park Sierra LLC, a California limited liability company, by Deed dated June 15, 1998 and recorded June 16, 1998, Instrument No. 98202956, Alameda County Records.

Also excepting therefrom, that portion deeded to Alameda County Flood Control and Water Conservation District, by Deed dated October 24, 2003 and recorded November 26, 2003, Series No. 2003698997, Alameda County Records.

APN: 941-0007-001-007

2

CLTA Preliminary Report Form (11/17/04)

460\02\435574.9

A-2

000089

7/05/01

# EXHIBIT B
## FINANCING PLAN/DEVELOPMENT BUDGET

A. Developers shall use their own funds to pay for all costs prior to conveyance of the Property. Following conveyance, Eden will finance its share of costs with the following:

1. Interim loans from funding sources such as Low Income Housing Fund (LIHF), Local Initiative Support Corporation (LISC), and Lenders for Community Development (LCD);
2. Proceeds from a portion of the Agency's $8 million Financing, and
3. Eden's own funds or line of credit.

Citation will use its own funds for its share of costs both prior to and following conveyance.

B. In order to fund construction of the Development, Eden intends to apply for or use the following financing:

1. Affordable Family Rental Housing
   a. Conventional construction/permanent loan from a private institutional lender;
   b. CDBG, HOME or other loan financing from the County of Alameda;
   c. Federal Home Loan Bank's Affordable Housing Program;
   d. Other affordable housing programs;
   e. Either:
      i.  9% Low-Income Housing Tax Credits or
      ii. Tax-exempt Bonds with 4% Low-Income Housing Tax-Credits and a California Department of Housing and Community Development (HCD) Multifamily Housing Program (MHP) loan
   f. A portion of the City's $1.5 million Loan;
   g. And a portion of the Authority's $8 million Financing

2. Affordable Senior Rental Housing
   a. Either:
      i.  HUD Section 202 Capital Grant and 4% Low-Income Housing Tax-Credits (Mixed Financing); or
      ii. 9% Low Income Housing Tax Credits
   b. CDBG, HOME or other loan financing from the County of Alameda;
   c. Federal Home Loan Bank's Affordable Housing Program;
   d. Other affordable housing programs;
   e. A portion of the City's $1.5 million Loan;
   f. And a portion of the Authority's $8 million Financing

Citation will use its own funds to finance all construction activity at the site, including demolition, infrastructure improvements, and vertical construction. Citation does not intend to use any third party capital (debt, equity, or otherwise) to finance this project.

000090

72 of 101

**ARROYO VISTA**
Family Housing
Preliminary Financing Plan

| ARROYO VISTA | SITE DATA | | | | | | |
|---|---|---|---|---|---|---|---|
| Dublin, CA | | | | | | | |
| 9% Tax Credits~129 Units | 142,275 Unit Building Area (excl. circulation) | | | 454,331 Site Sq. Ft. | | 42,615 Parking | |
| CONCEPTUAL DEVELOPMENT PROFORMA | 6,000 Community Room, laundry, Child care, etc. | | | 10.43 Total Acres | | 27,685 Open Space (Equivalent) | |
| | 3,000 Nonassis Square Footage (Child Care) | | | 12 D.U./Acre | | 171.49% Basis as % of 221 (d)(3) Limit | |
| 4-Jul-07 | 1.95% Nonbasis % | | | 129 D.U. (actual) | | H/O is adjusted Basis below the bootied cap? | |

| FUNDING SOURCES | Per Unit | TOTAL | Assumptions | Acq./Predev. | Construction | Permanent | % of Total | TERMS |
|---|---|---|---|---|---|---|---|---|
| Other Contribution | | 0 | | 0 | 0 | 0 | 0.00% | |
| City of Dublin Financing (31.8 million x 72%) | 8,372 | 1,080,000 | | 847,040 | 132,341 | 0 | 0.00% | |
| DHA Financing (Citation) ($5 million x 72%) | 44,651 | 5,760,000 | | 2,093,319 | 3,177,740 | 466,941 | 14.13% | |
| Construction Financing | | 0 | 7.5000% | 0 | 32,009,831 | (32,010,851) | 0.00% Construction Loan @ | 7.50% int | 18 Months |
| Other Contribution Source (AHP) | 7,750 | 999,730 | 18 Months | 0 | 999,750 | 0 | 2.45% None | |
| LIH Tax Credit-LP (9% Credit) | 214,160 | 27,626,233 | 8.10% | 0 | 0 | 27,626,233 | 67.75% Tax Credit Limited Partner Capital Contribution | |
| LIH Tax Credit-GP | 214 | 27,629 | .990 cents | 0 | 0 | 26,451 | 0.07% Tax Credit General Partner Capital Contribution | |
| Permanent Financing | 33,511 | 4,067,954 | | 0 | 1,178 | 4,067,960 | 12.19% Permanent loan | 7.50% int |
| Deferred Developer Fee | 2,326 | 300,000 | | 0 | 0 | 300,000 | 0.74% | |
| | 63,023 | | | | | | | |
| **TOTAL SOURCES:** | 316,004 | 40,764,520 | | 3,040,978 | 36,350,730 | 1,372,862 | 100.00% | |
| **Surplus/(Deficit)** | | (0) | | (0) | (1) | (0) | | |

| DEVELOPMENT BUDGET | TOTAL | Assumptions | Acq./Predev. | Construction | Permanent | TOTAL COST | Tax Credit 9% Basis | Cost/Unit | Cost/Sq.Ft | % Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **LAND & IMPROVEMENTS:** | | | | | | | | | | |
| Site Acquisition | | | 0 | 0 | | 0 | 0 | 0.00 | 0.00 | 0.00% |
| Permanent Relocation | | | 0 | 0 | | 0 | 0 | 0.00 | 0.00 | 0.00% |
| Demolition (pro rata) | | | 0 | 0 | | 0 | 0 | 0.00 | 0.00 | 0.00% |
| Site Maintenance (i.e. Security, Clean-Up) | 336,848 | | 336,848 | 0 | | 336,848 | 0 | 2,610 | 2.20 | 0.83% |
| | 10,000 | | 10,000 | 0 | | 10,000 | 0 | 0 | 0.00 | 0.00% |
| **Total Land & Improv.** | 348,848 | | 348,848 | 0 | | 348,848 | 10,000 | 2,687 | 2.26 | 0.83% |
| **CONSTRUCTION CONSULTANTS:** | | | | | | | | | | |
| Architect & Engineering | 1,809,964 | 0.26% | 1,274,238 | 424,746 | | 1,699,984 | 1,695,731 | 13,170 | 11.08 | 4.17% |
| Construction Estimating/Management Services | 90,000 | | 25,567 | 64,318 | | 90,000 | 85,236 | 698 | 0.59 | 0.22% |
| Engineering Reports (i.e. Survey, Noise, Solis, Traffic) | 60,000 | | 50,197 | 9,603 | | 60,000 | 58,628 | 465 | 0.39 | 0.15% |
| Joint Trench Design | 25,000 | | 19,670 | 5,330 | | 25,000 | 24,511 | 194 | 0.16 | 0.06% |
| Environmental Reports, incl Asbi,BP survey | 30,000 | | 17,034 | 12,965 | | 30,000 | 28,613 | 233 | 0.20 | 0.07% |
| Testing & Inspection | 60,000 | | | 60,000 | | 60,000 | 58,628 | 465 | 0.39 | 0.15% |
| **Total Constr Consult** | 1,953,994 | | 1,368,225 | 576,769 | | 1,953,994 | 1,925,544 | 15,229 | 12.81 | 4.82% |
| **CONSTRUCTION:** | | | | | | | | | | |
| Off-site work (paid by Citation) | | $0.00 | 0 | 0 | | 0 | 0 | 0.00 | 0.00 | 0.00% |
| Site work (pro rata) | 4,192,500 | $9.23 | 0 | 4,192,500 | | 4,192,500 | 4,110,442 | 32,500 | 27.35 | 10.28% |
| Additional infrastructure allowance | 0 | | 0 | 0 | | 0 | 0 | 0 | 0.00 | 0.00% |
| Joint trench (incl in site work) | 0 | | 0 | 0 | | 0 | 0 | 0 | 0.00 | 0.00% |
| Structures | 22,991,260 | $160.00 | 0 | 22,991,260 | | 22,991,260 | 22,541,080 | 178,227 | 160.00 | 56.40% |
| Personal Property in GC Contract (cabinets, blinds) | 0 | | 0 | 0 | | 0 | 0 | 0 | 0.00 | 0.00% |
| General Requirements | 0 | | 0 | 0 | | 0 | 0 | 0 | 0.00 | 0.00% |
| Contractors Bond & GL Insurance | 0 | | 0 | 0 | | 0 | 0 | 0 | 0.00 | 0.00% |
| Furniture, Fixtures & Equipment (common area) | 70,000 | allowance | 0 | 70,000 | | 70,000 | 68,630 | 543 | 0.49 | 0.17% |
| Pricing Escalation, Design & Estimating Contingency | 2,718,375 | 10% | 0 | 2,718,375 | | 2,718,375 | 2,865,168 | 21,073 | 17.34 | 6.67% |
| Construction Contingency | 1,309,188 | 5.00% | 0 | 1,309,188 | | 1,309,188 | 1,332,685 | 10,535 | 8.67 | 3.33% |
| **Total Constr** | 31,331,313 | | 0 | 31,331,313 | | 31,331,313 | 30,718,075 | 242,878 | 204.41 | 77% |
| **INDIRECT COSTS:** | | | | | | | | | | |
| Permits & Fees | 1,846,430 | | 36,67 | 1,396,373 | | 1,846,430 | 1,810,290 | 14,313 | 12.05 | 4.53% |
| Legal Fees | 60,000 | | | 50,000 | 10,000 | 60,000 | | 465 | 0.39 | 0.15% |
| Audit Fees | 22,000 | | | 0 | 22,000 | 22,000 | | 171 | 0.14 | 0.05% |
| Developer Fee | 1,400,000 | | 200,000 | 250,000 | 1,000,000 | 1,400,000 | 1,372,565 | 10,853 | 9.14 | 3.43% |
| Initial Land Appraisal | 10,000 | | 10,000 | 0 | | 10,000 | | 76 | 0.07 | 0.02% |
| Market Study | 10,000 | | 10,000 | 0 | | 10,000 | | 0 | 0.00 | 0.00% |
| City Consulting and Legal | 258,000 | | 258,000 | 0 | | 258,000 | | 124 | 0.10 | 0.04% |
| Consultant Allowance - Prevailing Wage | 25,000 | | 630 | 24,370 | | 25,000 | 24,511 | 2,078 | 1.75 | 0.64% |
| Services Reserve | 100,000 | | 0 | 0 | 100,000 | 100,000 | | 194 | 0.16 | 0.06% |
| Leasing and Other Reserves | | | | | | | | 776 | 0.65 | 0.25% |
| Rent-Up Marketing | 77,600 | 500 | 0 | 77,600 | | 77,600 | | 600 | 0.50 | 0.19% |
| Initial Project Operating Reserve | 294,672 | 3 mo op. expenses | 0 | 294,672 | | 294,672 | | 2,285 | 1.92 | 0.72% |
| Soft Cost Contingency | 50,000 | | 5,037 | 44,963 | | 50,000 | 49,021 | 388 | 0.33 | 0.12% |
| **Total Indirect Costs** | 4,193,702 | | 999,734 | 1,743,106 | 1,425,872 | 4,168,702 | 3,256,421 | 32,323 | 27.20 | 10.33% |
| **FINANCE & CARRYING COSTS:** | | | | | | | | | | |
| Liability/CCP Insurance | 429,170 | | 146,311 | 282,869 | | 429,170 | 420,770 | 3,327 | 2.80 | 1.05% |
| Taxes | 195,563 | | | 195,663 | | 195,563 | 191,735 | 1,516 | 1.28 | 0.48% |
| Construction Loan Points | 160,195 | 0.50% | 160,195 | 0 | | 160,195 | 157,063 | 1,242 | 1.05 | 0.39% |
| Permanent Financing Points | 24,640 | 0.60% | 24,640 | 0 | | 24,640 | | 193 | 0.16 | 0.06% |
| Permanent Financing Rate Lock | 0 | | 0 | 0 | | 0 | | 0 | 0.00 | 0.00% |
| Perm Financing Fees | 0 | | 0 | 0 | | 0 | | 0 | 0.00 | 0.00% |
| Title, Escrow & Other Financing Fees | 60,000 | | 50,000 | 0 | 10,000 | 60,000 | | 465 | 0.39 | 0.15% |
| Lender-Appraisal, Legal & Consulting | 40,000 | | 19,870 | 20,130 | | 40,000 | 39,217 | 310 | 0.26 | 0.10% |
| Construction Loan Interest | 0 | | 0 | 0 | | 0 | | 0 | 0.00 | 0.00% |
| **Total Fin & Carry Costs** | 1,902,223 | 60.0% ACB | 0 | 1,802,223 | | 1,902,223 | 1,780,068 | 13,071 | 11.70 | 4.42% |
| **TAX CREDIT/SYNDICATION EXPENSES:** | 2,712,603 | | 401,127 | 2,560,876 | 10,000 | 2,712,603 | 2,378,743 | 21,029 | 17.66 | 6.65% |
| Tax Credit Expense: | | | | | | | | | | |
| TCAC Application Fee | 2,000 | | 2,000 | 0 | | 2,000 | | 16 | 0.01 | 0.00% |
| TCAC Allocation Fee | 116,480 | 4% | 116,480 | 0 | | 116,480 | | 903 | 0.76 | 0.29% |
| TCAC Monitoring Deposit | 116,480 | 4% | 116,480 | 0 | | 116,480 | | 903 | 0.76 | 0.29% |
| TCAC Deposit Refund | 62,488 | 4% | 0 | 62,488 | | 62,488 | | 407 | 0.34 | 0.13% |
| Syndication Consultant | (116,480) | | (116,480) | 0 | | (116,480) | | (903) | (0.76) | (0.29%) |
| Syndication Legal Fees | 35,000 | | 20,000 | 15,000 | | 35,000 | | 271 | 0.23 | 0.09% |
| Syndication-Investor Legal | 35,000 | | 35,000 | 0 | | 35,000 | | 271 | 0.23 | 0.09% |
| Syndication Other: Bridge Loan Fees | 0 | | 0 | 0 | | 0 | | 0 | 0.00 | 0.00% |
| Syndication Other: Bridge Loan/Dev Fee Interest | 0 | | 0 | 0 | | 0 | | 0 | 0.00 | 0.00% |
| **Total TCAC/Synd** | 249,930 | | 264,900 | 92,000 | (61,97) | 240,930 | | 1,863 | 1.57 | 0.58% |
| **TOTAL DEVELOPMENT EXPENSES** | 40,764,520 | | 3,040,978 | 36,350,721 | 1,372,862 | 40,764,520 | 38,485,753 | 315,004 | 265.96 | 100.00% |

Eden Housing, Inc.
409 Jackson Street
Hayward, CA  94544
(510) 582-1460

B-2

\Family 9% tx cred orig- DDA update 7-6-07

73 of 101

**ARROYO VISTA**
Family Housing
Preliminary Financing Plan

| ARROYO VISTA | SITE DATA | | Total | | | Based on 2/2006 Alameda Co TCAC Income Limits | | | |
|---|---|---|---|---|---|---|---|---|---|
| Dublin, CA | | | 454,331 Site SF | | | HH Size | 50% AMI | 55% AMI | 60% AMI |
| 9% Tax Credits--129 Units | | | 10.43 Acres | 12 D.U./Acre | | One Bedroom - 1.5 Person | 31,425 | 34,568 | 37,710 |
| RENT ROLL | | | 129 D.U. (max) | | | Two Bedrooms - 3 Person | 37,700 | 41,470 | 45,240 |
| | | | 129 D.U. (actual) | | | Three Bedrooms - 4.5 Persons | 43,575 | 47,933 | 52,290 |
| 16-Jul-07 | | | 147,275 Residential SF | | | Four Bedroom - 6 Persons | 48,600 | 53,460 | 58,320 |
| | | | 6,000 Community/Dev Care SF | | | | | | |

| Residential Unit Mix | # Units | % | | $/Sq Ft (per rent) | Gross Rent | Utility Allowance | Net Rent/Month | Net Scheduled Income YEAR 1 | Avg Unit Sq Ft | Total Sq Ft | Parking Spaces |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | TCAC pts | | | | | | | | |
| **Extremely Low Income (30% AMI)** | | | | | | | | | | | |
| One Bedroom | 3 | 2% | | $0.57 | 471 | 44 | 427 | 15,372 | 750 | 2,250 | 5.40 |
| Two Bedroom | 3 | 2% | | $0.45 | 665 | 55 | 610 | 16,367 | 1,100 | 3,300 | 5.40 |
| Three Bedroom | 3 | 2% | | $0.48 | 653 | 67 | 586 | 21,110 | 1,225 | 3,675 | 5.40 |
| Four Bedrooms | 4 | 3% | | $0.47 | 720 | 75 | 654 | 31,392 | 1,400 | 5,600 | 7.20 |
| Total @ 30% | 13 | 10% | 15.0 | | | | | | | | |
| | | | | | | | | | | | |
| **Very Low Income (40% AMI)** | | | | | | | | | | | |
| One Bedroom | 2 | 2% | | $0.78 | 628 | 44 | 584 | 14,016 | 750 | 1,500 | 3.60 |
| Two Bedroom | 27 | 21% | | $0.64 | 754 | 55 | 699 | 226,348 | 1,100 | 29,700 | 48.60 |
| Three Bedroom | 11 | 9% | | $0.68 | 871 | 67 | 804 | 106,154 | 1,225 | 13,475 | 19.80 |
| Four Bedroom | 6 | 5% | | $0.54 | 872 | 75 | 797 | 64,564 | 1,400 | 8,400 | 10.80 |
| Total @ 40% | 46 | 36% | 22.5 | | | | | | | | |
| | | | | | | | | | | | |
| **Very Low Income (50% AMI)** | | | | | | | | | | | |
| One Bedroom | 3 | 2% | | $0.93 | 744 | 44 | 700 | 25,200 | 750 | 2,250 | 5.40 |
| Two Bedroom | 33 | 26% | | $0.81 | 942 | 55 | 887 | 351,252 | 1,100 | 36,300 | 59.40 |
| Three Bedroom | 15 | 12% | | $0.83 | 1,089 | 67 | 1,022 | 183,960 | 1,225 | 18,375 | 27.00 |
| Four Bedroom | 5 | 4% | | $0.81 | 1,215 | 75 | 1,140 | 68,400 | 1,400 | 7,000 | 9.00 |
| Total @ 50% | 56 | 44% | 22.5 | | | | | | | | |
| | | | | | | | | | | | |
| **Low Income (60% AMI)** | | | | | | | | | | | |
| One Bedroom | 2 | 2% | | $0.93 | 744 | 44 | 700 | 16,800 | 750 | 1,500 | 3.60 |
| Two Bedroom | 6 | 5% | | $0.98 | 1,130 | 55 | 1,075 | 77,420 | 1,100 | 6,600 | 10.80 |
| Three Bedroom | 5 | 4% | | $1.01 | 1,307 | 67 | 1,240 | 74,386 | 1,225 | 6,125 | 9.00 |
| Four Bedroom | 0 | 0% | | $0.99 | 1,456 | 75 | 1,383 | 0 | 1,400 | 0 | 0.00 |
| 60% | 13 | 10% | 60.0 | | | | | | | | |
| | | | 50 | | | | | | | | |
| **Low Income (80% AMI)** | | | | | | | | | | | |
| One Bedroom | 0 | 0% | | $1.82 | 1,256 | 44 | 1,212 | 0 | 750 | 0 | 0.00 |
| Two Bedroom | 0 | 0% | | $1.32 | 1,507 | 55 | 1,452 | 0 | 1,100 | 0 | 0.00 |
| Three Bedroom | 0 | 0% | | $1.37 | 1,742 | 67 | 1,675 | 0 | 1,225 | 0 | 0.00 |
| Four Bedroom | 0 | 0% | | $1.34 | 1,944 | 75 | 1,869 | 0 | 1,400 | 0 | 0.00 |
| 80% | | | 2 | | | | | | | | |
| | | | | | | | | | | | |
| Three Bdrm - Manager's Unit | 1 | 1% | | $0.00 | 0 | 0 | 0 | 0 | 1,225 | 1,225 | 1.80 |
| | | | | | | | | | | | |
| TOTAL RESIDENTIAL | 129 | 100% | 82 | | | | | | $1,294,771 | | 147,375 | 232 |
| | | | | | | | | | comm building | 3,000 | |
| | | | | | | | | | child care | 3,000 | |
| | | | | | | | | | | | | |
| GRAND TOTAL | | | | | | | | | $1,294,771 | | 153,276 | 232 |
| | | | | | | | | | | | |
| AVERAGE AFFORDABILITY | | | | | | | | 44.45% | | | |

| Total Unit Count | | | | | Pkg/unit | Total Parking | | parking type | spaces | s.f. per space | total s.f. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| One Bedrooms | 10 | 8% | | | 1.80 | | | tuckunder | 0 | 290 | 0 |
| Two Bedrooms | 69 | 53% | | | 1.50 | 124 | | surface | | | |
| Three Bedrooms* | 35 | 27.13% | 39% | GOAL=30% | 1.60 | 83 | | podium | 237 | 180.5 | 42,815 |
| Four Bedrooms* | 15 | 12% | | | 1 :mi | 27 | | | 0 | 315 | 0 |
| Total Unit Count | 129 | 100% | | | Total Req | 232 | | | 237 | total s.f. pkg | 42,815 |
| * TCAC goal >= 30% | | | | | | | | | | |

B-3

Eden Housing, Inc.
409 Jackson Street
Hayward, CA 94544
(510) 582-1460

Family 9% tx cred ofip- DDA update 7-8-07

000092

740 B101

## ARROYO VISTA
## Family Housing
## Preliminary Financing Plan

**ARROYO VISTA**
Dublin, CA
9% Tax Credits—129 Units
5-Jul-07

454,331 lbs SF
18.43 Acres
12 BU/Acre
147,275 Restored SF
5,000 Cmservable SF

Annual Escalation:
Res Income 2.00%
Cmn Income 3.00%
Expense 3.00%

per annum
per 5 year
per annum

| | %ECU | Per Unit | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | YEAR 11 | YEAR 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | | | |
| Annual Residential Rental Income | | 412 | 1,294,771 | 1,320,667 | 1,347,080 | 1,374,022 | 1,401,502 | 1,429,532 | 1,458,123 | 1,487,285 | 1,517,031 | 1,547,371 | 1,578,319 | 1,609,886 |
| Vacancy @ | 5.00% | | (64,739) | (66,033) | (67,354) | (68,701) | (70,075) | (71,477) | (72,906) | (74,364) | (75,852) | (77,369) | (78,916) | (80,493) |
| Laundry Income | | | 7,740 | 7,975 | 8,053 | 8,323 | 8,378 | 8,648 | 8,715 | 8,881 | 9,009 | 9,250 | 9,455 | 9,630 |
| Permit from Reserve | $5 per unit per month | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL EFFECTIVE GROSS INCOME** | | | 1,237,773 | 1,262,528 | 1,287,779 | 1,313,534 | 1,339,855 | 1,366,691 | 1,393,953 | 1,421,812 | 1,450,248 | 1,479,252 | 1,508,838 | 1,539,001 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | |
| Admin SBC | 4.50% | 412 | 53,210 | 54,806 | 56,450 | 58,144 | 59,888 | 61,685 | 63,536 | 65,442 | 67,405 | 69,427 | 71,510 | 73,655 |
| Manager Payroll | 2.79% | 257 | 34,530 | | | | | | | | | | | |
| Asst Mgr Payroll | 4.20% | 403 | 52,000 | 53,560 | 55,167 | 56,822 | 58,526 | 60,282 | 62,091 | 63,953 | 65,872 | 67,848 | 69,884 | 71,980 |
| Maintenance Janitor Payroll | 2.46% | 238 | 30,738 | 31,660 | 32,606 | 33,588 | 34,595 | 35,633 | 36,702 | 37,803 | 38,937 | 40,105 | 41,308 | 42,548 |
| Payroll Taxes/Workers' Comp | 1.53% | 129 | 16,663 | 17,163 | 17,678 | 18,208 | 18,754 | 19,317 | 19,896 | 20,493 | 21,108 | 21,741 | 22,394 | 23,066 |
| Employee Health and Pension Bnew | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| General Maintenance | | 233 | 30,000 | 30,900 | 31,827 | 32,782 | 33,765 | 34,778 | 35,822 | 36,896 | 38,003 | 39,143 | 40,317 | 41,527 |
| Decorating Contract & Supplies | 0.32% | 31 | 4,000 | 4,120 | 4,244 | 4,371 | 4,502 | 4,637 | 4,776 | 4,910 | 5,067 | 5,218 | 5,376 | 5,535 |
| Grounds Contract & Supplies | 2.50% | 240 | 31,000 | 31,930 | 32,888 | 33,875 | 34,891 | 35,937 | 37,016 | 38,126 | 39,270 | 40,448 | 41,661 | 42,911 |
| Annual Decorating Supplies | 0.81% | 78 | 10,000 | 10,300 | 10,609 | 10,927 | 11,255 | 11,593 | 11,941 | 12,299 | 13,668 | 13,048 | 13,438 | 13,840 |
| Trash Collection | 0.52% | 465 | 60,000 | 61,800 | 63,654 | 65,564 | 67,531 | 69,556 | 71,643 | 73,792 | 76,006 | 78,286 | 80,635 | 83,054 |
| Gas/Electric | 0.27% | 25 | 3,300 | 3,399 | 3,501 | 3,606 | 3,714 | 3,825 | 3,940 | 4,058 | 4,180 | 4,398 | 4,455 | 4,556 |
| Elevator | 0.00% | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Administrative/Management | | | | | | | | | | | | | | |
| Management Fee | 6.53% | 540 | 69,890 | 71,790 | 73,982 | 76,119 | 78,403 | 80,755 | 83,178 | 85,673 | 88,243 | 90,890 | 93,617 | 96,425 |
| General Administration | 4.44% | 426 | 55,000 | 56,678 | 58,350 | 60,100 | 61,903 | 63,760 | 65,673 | 67,643 | 69,572 | 71,793 | 73,915 | 76,133 |
| Legal/Acctg | 2.32% | 184 | 25,000 | 25,750 | 26,523 | 27,318 | 28,138 | 28,982 | 29,851 | 30,747 | 31,669 | 32,619 | 33,598 | 34,606 |
| Utilities | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Telephone/Security | 0.61% | 78 | 10,000 | 10,300 | 10,609 | 10,927 | 11,255 | 11,593 | 11,941 | 12,299 | 12,668 | 13,048 | 13,439 | 13,841 |
| P&E Common Areas & Cable | 4.12% | 395 | 51,000 | 52,530 | 54,106 | 55,729 | 57,401 | 59,123 | 60,897 | 62,724 | 64,605 | 66,544 | 68,540 | 70,596 |
| Water & Insurance | 2.97% | 275 | 35,536 | 36,602 | 37,700 | 38,831 | 39,996 | 41,196 | 42,432 | 43,705 | 45,016 | 46,366 | 47,757 | 49,190 |
| Taxes & Insurance | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Real Estate Taxes | 0.81% | 78 | 10,000 | 10,300 | 10,609 | 10,927 | 11,255 | 11,593 | 11,941 | 12,299 | 12,668 | 13,048 | 13,438 | 13,840 |
| Property & Liab Insurance | 5.43% | 521 | 67,248 | 69,265 | 71,343 | 73,484 | 75,688 | 77,959 | 80,298 | 82,707 | 85,188 | 87,743 | 90,376 | 93,088 |
| Other Fees | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| License & Other Fees | 0.17% | 17 | 2,145 | 2,209 | 2,276 | 2,344 | 2,414 | 2,487 | 2,561 | 2,638 | 2,717 | 2,799 | 2,883 | 2,996 |
| Resident Services | 2.42% | 233 | 30,000 | 30,900 | 31,827 | 32,782 | 33,765 | 34,778 | 35,822 | 36,896 | 38,003 | 39,143 | 40,317 | 41,527 |
| **TOTAL OPER EXP** | 66.58% | 6,379 | 691,050 | 701,458 | 722,474 | 744,153 | 768,478 | 789,472 | 813,156 | 837,551 | 862,677 | 884,558 | 915,214 | 943,827 |
| **RESERVES** | | | | | | | | | | | | | | |
| Annual Reserve Deposit | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **NET OPER INCOME** | 2.40% | 800 | 476,347 | 483,253 | 487,360 | 491,581 | 495,337 | 499,723 | 503,277 | 508,171 | 510,572 | 516,224 | 519,285 | 519,374 |
| Permanent New First Loan | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CHFA Interest Payment | 0.0% | | 416,841 | 416,841 | 416,841 | 416,841 | 416,841 | 416,841 | 416,841 | 416,841 | 416,841 | 416,841 | 416,841 | 416,34 |
| Debt Service Coverage Ratio | | | 1.15 | 1.16 | 1.17 | 1.18 | 1.19 | 1.20 | 1.21 | 1.22 | 1.22 | 1.23 | 1.24 | 1.2 |
| **ANNUAL CASH FLOW FROM PROPERTY** | | | 62,528 | 66,552 | 71,059 | 75,140 | 78,965 | 82,888 | 86,536 | 90,020 | 93,330 | 96,454 | 99,383 | 102,12 |

## AMORTIZATION TABLES

| | Year 1 |
|---|---|
| Permanent New First Loan | 4,667,088 |
| Interest Rate | 7.50% |
| Term | 30 |
| Annual Debt Service | 416,841 |
| Debt Service Coverage Ratio | 1.15 |

Family 9% trend b/p-DDA update 7.5-07

Eden Housing, Inc.
409 Jackson Street
Hayward, CA 94544
(510) 582-1460

B-4

000093

75 of 101

**ARROYO VISTA**
**Senior Housing**
**Preliminary Financing Plan**

| ARROYO VISTA | SITE DATA | | | |
|---|---|---|---|---|
| Dublin, CA | 32,050 Unit Building Area (exc. circulation) | 43,560 Site Sq. Ft. | | 5,957 Parking |
| 4% Tx Cred + HUD 202–50 Units | 11,250 Community Room, laundry, etc. | 1.00 Total Acres | | 27,508 Open Space (Equivalent) |
| CONCEPTUAL DEVELOPMENT PROFORMA | 0 Nonbasor Square Footage (Civil Care) | 50 D.U./Acre | | 221.66% Basis as % of 221 (d) (3) Limit |
| | 0.00% Nonbasis % | 100.00% Basis % | 50 D.U. factual | YES Is adjusted Basis below the federal cap? |

6-Jul-07

| FUNDING SOURCES | Per Unit | TOTAL | Assumptions | Acq./Predev. | Construction | Permanent | % of Total | TERSAS |
|---|---|---|---|---|---|---|---|---|
| HUD Capital Advance (202) | 131,225 | 6,561,174 | | 420,000 | | 6,561,174 | 41.10% | |
| City of Dublin Financing ($1.5 million x 20%) | 8,400 | 420,000 | | 1,281,018 | | 893,294 | 14.03% | 85,888 |
| DHA Financing (Casloin) ($8 million x 20%) | 44,800 | 2,240,000 | | 0 | | 0 | 0.00% | |
| Other Sources | 0 | 0 | 7.000% | 0 | 11,600,988 | (11,600,988) | 0.00% | Construction Loan @ | 7.50% int | 18 Months |
| Construction Financing | 0 | 0 | 18 Months | 0 | 387,500 | 0 | 2.43% | None |
| Other Contribution Source (AHP) | 7,750 | 387,500 | 3.50% | 0 | | 6,339,844 | 39.71% | Tax Credit Limited Partner Capital Contribution |
| LIH Tax Credit-LP (4% Credit) | 126,797 | 6,339,844 | .970 cents | 0 | | 6,340 | 0.04% | Tax Credit General Partner Capital Contribution |
| LIH Tax Credit-GP | 127 | 6,340 | | 0 | | 10,000 | 0.06% | |
| HUD Maximum Capital Investment | 200 | 10,000 | | 0 | | 0 | 0.00% | Permanent Loan | 7.50% int |
| Permanent Financing | 184,423 | | | | | | | |
| **TOTAL SOURCES** | 319,297 | 15,964,857 | | 1,701,018 | 12,980,782 | 1,283,057 | 100.00% | |
| Surplus/(Deficit) | | (0) | | (0) | (0) | (0) | | |

| DEVELOPMENT BUDGET | TOTAL | Assumptions | Acq./Predev. | Construction | Permanent | TOTAL COST | Tax Credit 4% Basis | Cost/Unit | Cost/SqFt | % Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **LAND & IMPROVEMENT:** | | | | | | | | 0.00 | 0.00% |
| Site Acquisition | 0 | | 0 | | 0 | 0 | | 0.00 | 0.00 | 0.00% |
| Permanent Relocation | 0 | | 0 | | 0 | 0 | | 0.00 | 2.76 | 0.76% |
| Demolition | 121,970 | | 121,970 | | 0 | 121,670 | 0 | 2,430 | 0.23 | 0.06% |
| Site Maintenance (i.e. Secure, Clean-Up) | 10,000 | | 10,000 | | 0 | 10,000 | 10,000 | 200 | 2.99 | 0.83% |
| **Total Land & Improv.** | 131,970 | | 131,970 | | 0 | 131,670 | 10,000 | 2,632 | | |
| **CONSTRUCTION CONSULTANTS:** | | | | | | | | 12,197 | 13.60 | 3.82% |
| Architect & Engineering | 609,837 | 8.50% | 457,377 | 122,459 | 0 | 809,837 | 809,837 | 1,400 | 1.56 | 0.44% |
| Construction Estimating/Management Services | 70,000 | | 25,687 | 44,313 | 0 | 70,000 | 70,000 | 1,200 | 1.36 | 0.39% |
| Engineering Reports | 80,197 | | 80,197 | 9,803 | 0 | 60,000 | 60,000 | 200 | 0.56 | 0.06% |
| Joint Trench Design | 10,000 | | 18,270 | (8,070) | 0 | 10,000 | 10,000 | 200 | 0.90 | 0.25% |
| Environmental Reports | 40,000 | | 17,034 | 22,966 | 0 | 40,000 | 40,000 | 800 | 0.92 | 0.22% |
| Testing & Inspection | 35,000 | | | 35,000 | 0 | 35,000 | 35,000 | 700 | | |
| **Total Constr. Consult.** | 824,837 | | 648,565 | 226,471 | 0 | 824,837 | 824,837 | 16,497 | 18.45 | 5.17% |
| **CONSTRUCTION:** | | | | | | | | 0.00 | 0.00% |
| Off-Site work (paid by Casloin) | 0 | $0.00 | 0 | 0 | 0 | 0 | 0 | 0.00 | 30.78 | 0.18% |
| Site work | 1,825,000 | $37.30 | 0 | 1,825,000 | 0 | 1,825,000 | 1,825,000 | 32,500 | 0.00 | 0.02% |
| Joint trench (incl in site work) | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 48.50 | 48.50% |
| Structures | 7,757,100 | $175.50 | 0 | 7,757,100 | 0 | 7,757,100 | 7,757,100 | 155,142 | 175.50 | 0.34% |
| Furniture, Fixtures & Equipment (common area) | 55,000 | allowance | 0 | 55,000 | 0 | 55,000 | 55,000 | 1,100 | 1.24 | 8.82% |
| Pricing Escalation, Design & Estimating Contingency | 1,407,315 | 15% | 0 | 1,407,315 | 0 | 1,407,315 | 1,407,315 | 28,146 | 31.84 | 2.94% |
| Construction Contingency | 469,105 | 5.00% | 0 | 469,105 | 0 | 469,105 | 469,105 | 9,382 | 10.81 | |
| **Total Constr.** | 11,513,520 | | | 11,513,520 | 0 | 11,513,520 | 11,313,520 | 226,270 | 253.86 | 71% |
| **INDIRECT COSTS:** | | | | | | | | | 15.97 | 4.70% |
| Permits & Fees | 750,000 | | | 299,945 | 20,000 | 759,000 | 750,000 | 15,000 | 1.24 | 0.34% |
| Legal Fees | 55,000 | | 35,000 | | 22,000 | 22,000 | 0 | 1,100 | 0.50 | 0.14% |
| Audit Fees | 22,000 | | | | 500,000 | 800,000 | 800,000 | 18,000 | 19.10 | 5.01% |
| Developer Fee | 800,000 | | 150,000 | 150,000 | 0 | 10,000 | 0 | 200 | 0.23 | 0.06% |
| Initial Land Appraisal | 10,000 | | 10,000 | | 0 | 10,000 | 0 | 320 | 0.36 | 0.10% |
| Market Study | 16,000 | | 18,000 | | 0 | 16,000 | 0 | 2,840 | 0.90 | 0.03% |
| City Consulting and Legal | 132,000 | | 132,000 | | 0 | 132,000 | 26,000 | 500 | 0.57 | 0.18% |
| Consultant Allowance - Prevailing Wage | 25,000 | | 530 | 24,370 | 0 | 26,000 | 25,000 | 2,000 | 2.26 | 0.63% |
| Service Reserve | 100,000 | | | | 100,000 | 100,000 | 0 | | | |
| Leasing and Other Reserves: | | | | | | | | 800 | 0.84 | 0.19% |
| Rent-Up Marketing | 30,000 | 800 | | 30,000 | 0 | 30,000 | 0 | 0 | 0.00 | 0.00% |
| Marketing & Bond Reserve | 0 | | | | | 0 | 0 | 1,727 | 1.95 | 0.54% |
| Initial Project Operating Reserve | 86,335 | 3 mo op. expenses | 0 | | 86,335 | 86,335 | 0 | 7,500 | 8.49 | 2.35% |
| Partnership Management Reserve | 375,000 | | 0 | | 375,000 | 375,000 | 0 | 1,050 | 1.16 | 0.33% |
| Investor Services Fee Reserve | 52,500 | | 0 | | 52,500 | 52,500 | 0 | 900 | 1.02 | 0.28% |
| Issuer Annual Fee Reserve | 45,000 | | 0 | | 45,000 | 45,000 | 0 | 1,366 | 1.56 | 0.43% |
| TCAC Operating Reserve | 80,302 | | 0 | | 80,302 | 80,302 | 50,000 | 1,000 | 1.13 | 0.31% |
| SoA Cost Contingency | 50,000 | | 0 | 44,003 | | 50,000 | 1,825,000 | | | |
| **Total Indirect Costs** | 2,611,137 | | 796,724 | 648,315 | 1,260,137 | 2,611,137 | 1,825,000 | 52,343 | 58.77 | 16.36% |
| **FINANCE & CARRYING COSTS:** | | | | | | | | 2,476 | 2.80 | 0.78% |
| Liability/OCC Insurance | 123,760 | | 146,211 | (22,451) | | 123,760 | 123,760 | 375 | 0.42 | 0.12% |
| Taxes | 18,750 | | 18,750 | | | 18,750 | 16,750 | 1,170 | 1.32 | 0.37% |
| Construction Loan Points | 58,500 | 0.50% | 58,500 | | 10,000 | 58,500 | 58,500 | 200 | 0.23 | 0.06% |
| HUD Minimum Capital Investment | 10,000 | | | | | 10,000 | 0 | 0 | 0.00 | 0.00% |
| Permanent Financing Points | 0 | 0.50% | | 40,000 | 10,000 | 50,000 | 0 | 1,000 | 1.12 | 0.31% |
| Title, Escrow & Other Financing Fees | 50,000 | | 40,000 | | | 50,000 | 40,000 | 800 | 0.90 | 0.25% |
| Lender-Appraisal, Legal & Consulting | 40,000 | | 19,578 | 20,122 | | 656,124 | 658,124 | 800 | 14.89 | 4.12% |
| Construction Loan Interest | 656,124 | 50.0% AOB | 658,124 | 874,045 | 20,000 | 656,124 | 658,124 | 13,182 | | |
| **Total Fin & Carry Costs** | 956,134 | | 264,589 | | | 956,134 | 899,134 | 19,183 | 21.70 | 6.01% |
| **TAX CREDIT/SYNDICATION EXPENSES:** | | | | | | | | | 0.06 | 0.01% |
| Tax Credit Expenses: | 2,000 | 4% | 2,000 | | | 2,000 | 0 | 40 | 0.60 | 0.18% |
| TCAC Application Fee | 26,170 | 4% | 26,170 | | | 26,170 | 0 | 523 | 0.59 | 0.16% |
| TCAC Allocation Fee | 26,170 | 419 | 26,170 | | | 26,170 | 0 | 523 | 0.45 | 0.13% |
| TCAC Performance Deposit | 20,960 | | | | 20,000 | 20,890 | 0 | (623) | (0.56) | (0.00) |
| TCAC Monitoring Fee | (26,170) | | | | (20,170) | (26,170) | 0 | 700 | 0.70 | 0.22% |
| TCAC Deposit Refund | 35,000 | | 15,000 | 20,000 | | 35,000 | 0 | 700 | 0.79 | 0.22% |
| Syndication Consultant | 35,000 | | | 35,000 | | 35,000 | 0 | 2,365 | 2.68 | 0.74% |
| Syndication Legal Fees | 118,280 | | 69,340 | 55,000 | 1(),000 | 118,280 | 0 | | | |
| **Total TCAC/Synd.** | 118,280 | | 69,340 | 55,000 | 1(),000 | 118,280 | | | | |
| **TOTAL DEVELOPMENT EXPENSES** | 15,964,258 | | 1,701,018 | 12,980,781 | 1,283,057 | 15,964,558 | 14,672,491 | 319,297 | 361.30 | 100.00% |

Eden Housing, Inc.
409 Jackson Street
Hayward, CA 94544
(510) 582-1460

B–5

\Senior Mixed Fin 4% tx cred HUD - DOA update 7-5-07

ARROYO VISTA
Senior Housing
Preliminary Financing Plan

76 B 101

| ARROYO VISTA | SITE DATA | | Total | | Based on 2/2006 Alameda Co TCAC Income Limits | | |
|---|---|---|---|---|---|---|---|
| Dublin, CA | | | 43,560 Site SF | | HH Size | 50% AMI | 55% AMI | 60% AMI |
| 4% Tx Cred + HUD 202—50 Units | | | 1.00 Acres | 50 D.U./Acre | One Bedroom - 1.5 Person | 31,425 | 34,569 | 37,716 |
| RENT ROLL | | | 50 D.U. (max) | | Two Bedroom - 3 Person | 37,700 | 41,470 | 45,240 |
| | | | 50 D.U. (actual) | | Three Bedroom - 4.5 Persons | 43,675 | 47,933 | 52,290 |
| 6-Jul-07 | | | 32,950 Residential SF | | Four Bedroom - 6 Persons | 48,800 | 53,460 | 58,320 |
| | | | 11,250 Community/Circulation SF | | | | | |

Residential Unit Mix

| | # Units | % | $/Sq Ft (per res) | Gross Rent | Utility Allowance | Net Rent/Month | Net Scheduled Income YEAR 1 | Avg Unit Sq Ft | Total Sq Ft | Parking Spaces |
|---|---|---|---|---|---|---|---|---|---|---|
| Extremely Low Income (30% AMI) | | | TCAC pts | | | | | | | |
| One Bedroom | 49 | 100% | $0.69 | 471 | 24 | 447 | 262,836 | 650 | 31,850 | 29.40 |
| Two Bedrooms | 0 | 0% | $0.46 | 655 | 33 | 532 | 0 | 1,100 | 0 | 0.00 |
| Three Bedrooms | 0 | 0% | $0.50 | 653 | 41 | 612 | 0 | 1,225 | 0 | 0.00 |
| Four Bedrooms | 0 | 0% | $0.49 | 729 | 48 | 681 | 0 | 1,400 | 0 | 0.00 |
| Total @ 30% | 49 | 100% | 35.6 | | | | | | | |
| | | | | | | | | | | |
| Very Low Income (40% AMI) | | | | | | | | | | |
| One Bedroom | 0 | 0% | $0.93 | 628 | 24 | 604 | 0 | 650 | 0 | 0.00 |
| Two Bedrooms | 0 | 0% | $0.66 | 754 | 33 | 721 | 0 | 1,100 | 0 | 0.00 |
| Three Bedrooms | 0 | 0% | $0.66 | 871 | 41 | 830 | 0 | 1,225 | 0 | 0.00 |
| Four Bedrooms | 0 | 0% | $0.69 | 972 | 48 | 924 | 0 | 1,400 | 0 | 0.00 |
| Total @40% | 0 | 0% | 22.5 | | | | | | | |
| | | | | | | | | | | |
| Very Low Income (50% AMI) | | | | | | | | | | |
| One Bedroom | 0 | 0% | $1.08 | 724 | 24 | 700 | 0 | 650 | 0 | 0.00 |
| Two Bedrooms | 0 | 0% | $0.83 | 942 | 33 | 909 | 0 | 1,100 | 0 | 0.00 |
| Three Bedrooms | 0 | 0% | $0.89 | 1,089 | 41 | 1,048 | 0 | 1,225 | 0 | 0.00 |
| Four Bedrooms | 0 | 0% | $0.83 | 1,215 | 48 | 1,167 | 0 | 1,400 | 0 | 0.00 |
| Total @50% | 0 | 0% | 22.5 | | | | | | | |
| | | | | | | | | | | |
| Low Income (60% AMI) | | | | | | | | | | |
| One Bedroom | 0 | 0% | $1.08 | 724 | 24 | 700 | 0 | 650 | 0 | 0.00 |
| Two Bedrooms | 0 | 0% | $1.00 | 1,130 | 33 | 1,097 | 0 | 1,100 | 0 | 0.00 |
| Three Bedrooms | 0 | 0% | $1.03 | 1,307 | 41 | 1,266 | 0 | 1,225 | 0 | 0.00 |
| Four Bedrooms | 0 | 0% | $1.01 | 1,456 | 48 | 1,410 | 0 | 1,400 | 0 | 0.00 |
| 60% | | 0% | 80.6 | | | | | | | |
| | | | | 60 | | | | | | |
| Two Bdrm - Manager's Unit | 1 | 2% | $0.00 | 0 | 0 | 0 | 0 | 1,100 | 1,100 | 0.80 |
| | | | | | | | | | | |
| TOTAL RESIDENTIAL | 50 | 100% | 82 | | | | 262,836 | | 32,950 | 30 |
| | | | | | | | | common area | 2,750 | |
| | | | | | | | | circulation | 8,500 | |
| GRAND TOTAL | | | | | | | | | | |
| AVERAGE AFFORDABILITY | | | | | 30.00% | | 262,836 | | 44,200 | 30 |

| Total Unit Count | | | | | Pkg/unit | Total Parking | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| One Bedrooms | 49 | 98% | | | 0.60 | | 29 parking type | spaces | s.f. per space | total s.f. |
| Two Bedrooms | 1 | 2% | | | 0.80 | | 0 tuck-under | | 200 | |
| Three Bedrooms* | 0 | 0.00% | | | 0.80 | | 0 surface | 33 | 180.5 | 5,957 |
| Four Bedrooms* | 0 | 0% | 0% | GOAL=30% | 0.80 | | 0 podium | 0 | 315 | 0 |
| Total Unit Count | 50 | 100% | | | | Total Req | 30 | 33 | total s.f. pkg | 5,957 |
| * TCAC goal >= 30% | | | | | | | | | | |

Eden Housing, Inc.
409 Jackson Street
Hayward, CA  94544
(510) 582-1460

B–6

000095

77/6/01

**ARROYO VISTA**
**Senior Housing**
**Preliminary Financing Plan**

| ARROYO VISTA | 42,599 sre sf | Annual Escalation: | | | |
| Dublin, CA | 1.00 Acre | Res Income | 2.00% | per annum | |
| 4% Tx Cred + HUD 202-56 | 80 d.u./Acre | Com Income | 0.00% | per 5 year | |
| | 80 d.u. total | Expense | 3.50% | per annum | |
| 6-Jul-07 | 32,599 Residential sf | | | | |
| | 11,259 Commercial sf | | | | |

| | %EGI | Per Unit | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | YEAR 11 | YY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | | | |
| Annual Residential Rental Income | | 655 | 262,836 | 268,093 | 273,455 | 278,924 | 284,502 | 290,192 | 295,996 | 301,916 | 307,954 | 314,113 | 320,396 | 320.4 |
| Vacancy @ | 5.00% | | (15,142) | (15,405) | (13,673) | (13,946) | (14,225) | (14,510) | (14,800) | (15,096) | (15,398) | (15,706) | (16,020) | (16.0 |
| Laundry Income | $5 per unit per month | | 3,000 | 3,060 | 3,121 | 3,184 | 3,247 | 3,312 | 3,378 | 3,446 | 3,515 | 3,585 | 3,657 | 3.7 |
| Commercial Rent Income | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL EFFECTIVE GROSS INCOME** | | 190 | 252,694 | 257,748 | 262,903 | 268,161 | 273,524 | 278,995 | 284,575 | 290,266 | 296,072 | 301,993 | 308,033 | 314. |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | |
| Direct Staff | | | | | | | | | | | | | | |
| Manager Payroll | 12.90% | 655 | 32,759 | 33,733 | 34,744 | 35,787 | 36,860 | 37,995 | 39,105 | 40,278 | 41,487 | 42,731 | 44,013 | 43. |
| Maintenance Payroll | 11.94% | 578 | 28,900 | 29,767 | 30,660 | 31,580 | 32,527 | 33,503 | 34,508 | 35,543 | 36,610 | 37,708 | 38,839 | 40. |
| Payroll Taxes/Workers Comp | 4.90% | 248 | 12,360 | 12,731 | 13,134 | 13,528 | 13,934 | 14,352 | 14,782 | 15,226 | 15,683 | 16,153 | 16,638 | 17. |
| Employer Health and Pension | 3.76% | 190 | 9,500 | 9,785 | 10,079 | 10,381 | 10,692 | 11,013 | 11,343 | 11,684 | 12,034 | 12,395 | 12,767 | 13. |
| Expenses | | | | | | | | | | | | | | |
| Repairs Contract & Materials | 1.93% | 100 | 5,000 | 5,150 | 5,305 | 5,464 | 5,628 | 5,795 | 5,970 | 6,149 | 6,334 | 6,524 | 6,720 | 6: |
| Decorating Contract & Supplies | 0.97% | 50 | 2,500 | 2,575 | 2,652 | 2,732 | 2,814 | 2,898 | 2,985 | 3,075 | 3,167 | 3,262 | 3,360 | 5: |
| Grounds Contract | 1.93% | 100 | 5,000 | 5,150 | 5,305 | 5,464 | 5,628 | 5,796 | 5,970 | 6,149 | 6,334 | 6,524 | 6,720 | 9. |
| Maintenance/Cleaning Supplies | 2.77% | 140 | 7,000 | 7,210 | 7,426 | 7,649 | 7,879 | 8,115 | 8,358 | 8,609 | 8,847 | 9,133 | 9,407 | 13. |
| Trash Collection | 3.99% | 200 | 10,000 | 10,300 | 10,609 | 10,927 | 11,255 | 11,593 | 11,941 | 12,299 | 12,668 | 13,048 | 13,439 | 13. |
| Extermination | 0.77% | 40 | 2,000 | 2,060 | 2,122 | 2,185 | 2,251 | 2,319 | 2,388 | 2,460 | 2,534 | 2,610 | 2,688 | 2: |
| Elevator | 0.79% | 40 | 2,000 | 2,060 | 2,122 | 2,185 | 2,251 | 2,319 | 2,388 | 2,460 | 2,534 | 2,610 | 2,688 | 2: |
| Administrative/Management | | | | | | | | | | | | | | |
| Management Fee | 9.50% | 495 | 24,000 | 24,720 | 25,462 | 26,225 | 27,012 | 27,823 | 28,657 | 29,402 | 30,492 | 31,315 | 32,254 | 33. |
| General Administration | 8.95% | 306 | 15,300 | 15,759 | 16,232 | 16,719 | 17,220 | 17,737 | 18,269 | 18,817 | 19,382 | 19,963 | 20,562 | 21. |
| Audit/Legal | 4.75% | 240 | 12,000 | 12,360 | 12,731 | 13,113 | 13,506 | 13,911 | 14,329 | 14,758 | 15,201 | 15,657 | 16,127 | 16. |
| Utilities | | | | | | | | | | | | | | |
| Telephone/Security | 2.37% | 549 | 6,900 | 6,100 | 6,365 | 6,556 | 6,753 | 6,956 | 7,164 | 7,379 | 7,601 | 7,829 | 8,063 | 8. |
| PG&E Common Areas | 10.90% | 551 | 27,550 | 28,377 | 29,228 | 30,105 | 31,008 | 31,938 | 32,896 | 33,883 | 34,900 | 35,947 | 37,025 | 38. |
| Water & Sewer | 3.20% | 162 | 8,078 | 8,320 | 8,570 | 8,827 | 9,092 | 9,365 | 9,646 | 9,935 | 10,233 | 10,540 | 10,856 | 11. |
| Taxes & Insurance | | | | | | | | | | | | | | |
| Real Estate Taxes | 1.93% | 100 | 5,000 | 5,150 | 5,305 | 5,464 | 5,628 | 5,796 | 5,970 | 6,149 | 6,334 | 6,524 | 6,720 | 6. |
| Property & Liab. Insurance | 6.83% | 345 | 17,250 | 17,768 | 18,301 | 18,850 | 19,415 | 19,997 | 20,597 | 21,215 | 21,852 | 22,507 | 23,183 | 23. |
| Other Exp | | | | | | | | | | | | | | |
| License and Other Fees | 8.40% | 20 | 1,000 | 1,020 | 1,061 | 1,093 | 1,126 | 1,159 | 1,194 | 1,230 | 1,267 | 1,305 | 1,344 | 1: |
| Resident Services | 0.00% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL OPER EXP** | 92.33% | 4,664 | 233,298 | 205,294 | 247,410 | 254,833 | 262,478 | 270,352 | 278,463 | 286,816 | 295,421 | 304,284 | 313,412 | 322. |
| **RESERVES** | | | | | | | | | | | | | | |
| Annual Reserve Deposit | 0.40% | 600 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30. |
| **NET OPER INCOME** | | | (19,604) | (12,456) | (14,507) | (16,671) | (18,953) | (21,357) | (23,888) | (26,550) | (29,349) | (32,290) | (35,379) | (38. |
| Service Coordinator | | Capitalized R | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5. |
| HUD Proc Reimbursement | | | 16,514 | 12,456 | 14,507 | 16,671 | 18,953 | 21,357 | 23,888 | 26,550 | 29,349 | 32,290 | 35,379 | 38. |
| **ANNUAL CASH FLOW FROM PROP.** | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Permanent New First Loan | 0.0% | | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| CHFA Interest Payment | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Debt Service Coverage Ratio | | | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| less Deferred Developer Fee | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| less Partnership Management fee $375,000 | | Capitalized R | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25. |
| less Investor Services Fee $52,500 | | Capitalized R | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3: |

| AMORTIZATION TABLES | | Year 1 |
|---|---|---|
| Permanent New First Loan | | (108,061) |
| Interest Rate | 7.50% | |
| Term | 30 | |
| Annual Debt Service | | (9,142) |
| Debt Service Coverage Ratio | | 1.15 |

Service Mixed Pan els to cred HUD - DDA update 7-5-07

Eden Housing, Inc.
409 Jackson Street
Hayward, CA 94544
(510) 582-1460

B-7

000096

780ḏ 101

# EXHIBIT C
## SCOPE OF DEVELOPMENT
### (Preliminary)

The proposed Arroyo Vista development will be a community of families and individuals in market-rate and affordable homeownership units and affordable rental units for seniors and families. At the center of the development, the Village Center will include recreation space and a community building and a child care center which will be developed as part of the family rental housing project. Additional smaller play and landscaped areas will be scattered throughout the development.

A central main street will link the various community elements and create a pedestrian-friendly development. The affordable family and senior rental housing will be located near the heart of the site while the for-sale units will be split into two areas, one on either side of the affordable rental housing. The affordable for-sale units will be geographically dispersed among the market-rate for-sale units.

The Property will be subdivided into separate legal parcels for the development and construction of up to 405 housing units.

1. <u>Replacement Units</u>. Eden Housing, Inc. will construct, own and operate 150 affordable rental housing units (the "Replacement Units") that will replace the Existing Housing. The Replacement Units will include one hundred (100) multifamily rental units and fifty (50) senior rental apartments.

2. <u>Additional Affordable Units</u>. Approximately Forty-five (45) additional affordable units (the "Additional Affordable Units") will be developed, of which approximately sixteen (16) will be for-sale units constructed by Citation Homes Central (the "Affordable For-Sale Units"), and approximately twenty-nine (29) will be multifamily rental units constructed, owned and operated by Eden.

3. <u>For-Sale Units</u>. Citation Homes Central will construct up to 210 market-rate for-sale units (the "Market Rate For-Sale Units") and 16 Affordable For-Sale Units.

The Preliminary Site Plan/Conceptual Design (Exhibit D) includes the following unit breakdown:

| Hsng Type | Affordable Family Units | Affordable Senior Units | Market Rate For –Sale Units | Affordable For-Sale Units | Total Units |
|---|---|---|---|---|---|
| Unit Type | 10 1-Bdrm Flats | 50 1-Bdrm Flats | | | |
| | 70 2-Bdrm Townhomes | | | | |
| | 34 3-Bdrm Townhomes | | 210  3&4-Bdrm Townhomes | 16 3-Bdrm Townhomes | |
| | 15 4-Bdrm Townhomes | | | | |
| Sub-total | 129 Units | 50 Units | 210 Units | 16 Units | 405 Units |
| Prkg | 237 spaces | 33 spaces | 468 spaces | | 738 spaces |

The Development and the Development Components described herein are preliminary and remain subject to change as more detailed plans are formulated during the formal planning process.

1460\02\435574.9

000097

79Ь 101

**EXHIBIT D**
**PRELIMINARY SITE PLAN/SCHEMATIC DESIGN**

000098



SITE PLAN

| | OPEN SPACE |
|---|---|
| 1 Village Center | A Tot Lot |
| 2 Community Building | B Open Space |
| 3 Child Care Center | C Riparian Landscape |
| 4 Senior Housing | D Creek |
| 5 Entry Drive with Median | E Existing Redwoods |
| 6 Affordable Housing | |
| 7 Market Rate Housing | |
| 8 Main Street | |

ARROYO VISTA HOUSING

Dublin Housing Authority
Dublin, California

Eden Housing
PARAARCHITECTS

SITE PLAN

DOUGHERTY ROAD

AMADOR VALLEY ROAD

8|5|101

# EXHIBIT E
## SCHEDULE OF PERFORMANCE

(All dates set forth below are preliminary and are subject to change as the planning, entitlement, and relocation process moves forward. Each performance deadline is conditioned upon all prior performance deadlines being met in a timely manner.)

Abbreviations:

CDLAC -       California Debt Limit Allocation Committee (allocates tax-exempt bonds)
CEQA, NEPA -  California Environmental Quality Act, National Environmental Policy Act
DHA -         Dublin Housing Authority
ENRA -        Exclusive Negotiating Right Agreement
HACA -        Housing Authority of the County of Alameda
HUD -         U.S. Department of Housing and Urban Development
HUD 202 -     HUD Section 202 Supportive Housing for the Elderly Program
PD -          Planned Development Zoning
TCAC -        California Tax Credit Allocation Committee (allocates tax credits)

| PREDEVELOPMENT PHASE: | | | |
|---|---|---|---|
| Project Milestone | Est. Target Date | Performance Deadline | Notes |
| 1. DHA Approves Contract for Relocation Consultant | March 6, 2007 | [Completed] | |
| 2. DHA and Dublin City Council Approve ENRA<br><br>Dublin City Council Approves Contract for Environmental Consultant<br><br>DHA Authorizes Developer to Commence Planning Applications and Access the Site for Planning and Feasibility Studies | April 3, 2007 | [Completed] | |
| 3. HACA Approves ENRA | April 11, 2007 | [Completed] | |
| 4. Execution of ENRA by all Parties | April 12, 2007 | [Completed] | *City to establish cost recovery account using $50,000 Initial Deposit from Developer to cover ongoing legal and consulting costs of City and DHA ("Transactional Costs").* |

000100

82 o3 101

| | | | |
|---|---|---|---|
| 5. Developers make Planning Deposit to City | May 23, 2007 | [Completed] | *Developers to establish separate cost recovery account with Planning Department to cover ongoing costs associated with planning, entitlement, and environmental review for the project ("Planning Costs).* |
| 6. City issues Notice to Proceed for preparation of CEQA & NEPA Clearance Documents (anticipate 6-8 months for completion of environmental review process) | May 24, 2007 | [Completed] | *City/Authority to bill Eden as costs are incurred.* |
| 7. Begin Arroyo Vista Resident and Neighbor Information Meetings | May 1, 2007 | [First meeting held on May 24, 2007] | |
| 8. DHA Submits Disposition Application to HUD | July 1, 2007 | No later than July 31, 2007 | *City/Authority to bill Eden as costs are incurred.* |
| 9. City, DHA, and HACA Approval and Execution of DDA | July 17, 2007 | No later than July 31, 2007 | *City/Authority to bill Eden as costs are incurred.* |
| 10. Initial submission of Pre-Application Form by Developer to the City of Dublin to commence entitlement approvals process. | May, 2007 | [Completed] | |
| 11. Developer to Submit Remainder of Application for entitlement approvals | October 1, 2007 | NA | |
| 12. City of Dublin Approval of Tentative Maps, PD zoning, General Plan Amendment, CEQA & NEPA documents, and other entitlements for the project | May 23, 2008 | NA | *Citation to pay Second Purchase Deposit of $1.75 million (to be credited against purchase price at COE)* |
| 13. HUD Approval of Disposition Application | 90 days after certification of CEQA & NEPA documents | NA | *Citation to pay Third Purchase Deposit of $2.2 million (to be credited against purchase price at COE)* |
| 14. Developers to Submit Improvement Plans/Final Map to City (Site Plan, Grading Plan, Drainage Plan, Utilities, Landscape Plan) | 90 days after Tentative Map approval | NA | *Developers to pay all required Plan Check Fees & other costs associated w/processing Final Maps & Improvement Plans* |

1460\02\435574.9

E-2

835 101

| | | | |
|---|---|---|---|
| 15. DHA/HACA to Commence Resident Relocation | August 2007 | NA | |
| 16. Eden to Submit HUD 202 Application | June 2008 | First funding cycle following 3 months after #13 (Site Control) | *Eden shall have the right to reapply for 202 financing for not less than three funding cycles based on current HUD funding levels, subject to site control* |
| 17. DHA/HACA Complete Resident Relocation | November 2008 | NA | |
| 18. City to Approve Improvement Plans & Final Maps | October/ November 2008 | Not later than 6 months following #14 (Submittal of Improvement Plans) | *Developers to post improvement bonds; pay all regular plan check fees and other costs associated w/final map approval & recordation* |
| 19. Release of Declaration of Trust by HUD | October/ November 2008 | NA | *Citation to deliver Final Payment of $8 million into escrow (later of #18 or #19)* |
| 20. Authority records Final Map. | October/ November 2008 | Not later than 30 days following #19 (HUD Release of Declaration of Trust) | |
| **CONVEYANCE AND SITE IMPROVEMENT PHASE** Commences after Items 1-20 have been completed or Performance Deadlines met | | | |
| 21. Authority conveys Property to Eden and Citation | November 2008 | Within 10 days of recording of Final Map | *Citation's $8 million in escrow to be released to Authority upon conveyance; Developer to reimburse City/DHA for balance of Transactional Costs above initial $250,000 (if any) up to aggregate $500,000 maximum.* |
| 22. Developers Start Site Demolition & Grading | November 2008 | Not later than 60 days of #21 (Conveyance), subject to weather conditions. | |

000102

84ㄷㅎ 101

| | | | |
|---|---|---|---|
| 23. Developer completes Site Demolition | Within 2 months of Commencement, Jan. 2009 | Within 4 months of commencement, subject to weather conditions. | |
| 24. Developers Substantial Completion Preliminary Site Improvements | Within 5 months of commencement / July 2009 | NA | *Subject to weather conditions and Regulatory constraints and approvals* |
| 25. Eden to Submit Tax Exempt Bond and/or Tax Credit Application(s) | May/June 2009 | Not later than first funding cycle following substantial completion of Preliminary Site Improvements, provided first round application date is not less than 3 months after the completion date | *Eden shall have the right to reapply to TCAC not less than four additional funding cycles.* |
| **CONSTRUCTION PHASE:** *Commences after Items 19-23 have been completed or Performance Deadlines met* | | | |
| 26. Citation to Begin Model Home Construction (Market Units) | Summer 2009 | NA | |
| 27. Eden to Close on Construction Loan(s) for Affordable Housing and Start Construction:<br><br>(A) Senior Project: HUD 202 Construction Loan Closing. | Fall 2009<br><br>(A) Within 24 months of HUD 202 Allocation. | (A)Within time frame required by HUD 202 Program. | |
| (B) Senior or Family Project: With TCAC Financing | (B) Within 150 days of receipt of Preliminary Reservation | (B) Within the time frame required by the TCAC Program. | |
| (C) Family Project: With CDLAC bond Closing. | (C) Within 90 days of CDLAC Allocation. | (C) Within the time frame required by the CDLAC Program. | |
| 28. Substantial Completion of HUD 202 Project | Within 24 months of start of construction | NA | |
| 29. Substantial Completion of Family Project (TCAC or CDLAC) | Within 24 months of start of construction. | NA | |

000103

85 of 101

## EXHIBIT F
### INSURANCE REQUIREMENTS

# Authority's General Requirements

Developer shall procure and maintain for the duration of the contract insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of or failure to perform the work hereunder by the Developer, its agents, representatives, employees or sub-contractors.

## MINIMUM SCOPE OF INSURANCE
Coverage shall be at least as broad as:
1. Insurance Services Office Commercial General Liability coverage *(occurrence form CG 0 01 10 01)*.
2. Insurance Services Office Additional Insured form *(CG 20 37 or CG 20 26)*.
3. Insurance Services Office form number CA 00 01 06 92 covering Automobile Liability Code 1 *(any auto)*, *[require if scope of work includes driving on Authority property]*.
4. Workers' Compensation insurance as required by state law and Employer's Liability Insurance.

## MINIMUM LIMITS OF INSURANCE
Developer shall maintain limits no less than:
1. General Liability: $1,000,000 per occurrence for Bodily Injury, Personal Injury, and Property Damage. If Commercial General Liability Insurance or other form with a general aggregate limit is used, either the general aggregate limit shall apply separately to the project/location or the general aggregate limit shall be twice the required occurrence limit.
2. Automobile Liability: $1,000,000 per accident for Bodily Injury and Property Damage.
3. Workers' Compensation *(statutory)* and Employer's Liability: $1,000,000 per accident for Bodily Injury or Disease.

NOTE: These limits can be attained by individual policies or by combining primary and umbrella policies.

## DEDUCTIBLES AND SELF–INSURED RETENTIONS
Any deductibles or self-insured retentions must be declared to and approved by the Authority. At the option of the Authority, either: the insurer shall reduce or eliminate such deductibles or self-insured retentions as respects the Authority, its officers, officials, employees, and volunteers; or the Developer shall provide a financial guarantee satisfactory to the Authority guaranteeing payment of losses and related investigations, claim administration, and defense expenses.

## OTHER INSURANCE PROVISIONS
The General Liability and Automobile Liability policies are to contain, or be endorsed to contain, the following provisions:
1. The Authority, its officers, officials, employees, and volunteers are to be covered as additional insured with respect to liability on behalf of the Developer including materials, parts or equipment furnished in connection with such work or operations and with respect to liability arising out of work or operations performed by the Developer; or arising out of automobiles owned, leased, hired or borrowed by or on behalf of the Developer. General Liability coverage can be provided in the form of an appropriate endorsement to the Developer's insurance or as a separate Owner's policy.
2. For any claims related to this contract, the Developer's insurance coverage shall be primary insurance as respects the Authority, its officers, officials, employees, and volunteers. Any insurance or self-insurance maintained by the Authority, its officers, officials, employees, or volunteers shall be excess of the Developer's

insurance.

3. Each insurance policy required by these specifications shall be endorsed to state that coverage shall not be cancelled or materially changed, except after thirty (30) days prior written notice by certified mail, return receipt requested, has been given to the Authority.

4. Maintenance of the proper insurance for the duration of the contract is a material element of the contract. Material changes in the required coverage or cancellation of the coverage shall constitute a material breach of the contract by the Developer.

000105

8705101

# City of Dublin's General Requirements

Developer shall procure and maintain for the duration of the contract insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of or failure to perform the work hereunder by the Developer, its agents, representatives, employees or sub-contractors.

## MINIMUM SCOPE OF INSURANCE
Coverage shall be at least as broad as:
1. Insurance Services Office Commercial General Liability coverage *(occurrence form CG 0 01 10 01)*.
2. Insurance Services Office Additional Insured form *(CG 20 37 or CG 20 26)*.
3. Insurance Services Office form number CA 00 01 06 92 covering Automobile Liability Code 1 *(any auto)*,
4. Workers' Compensation insurance as required by state law and Employer's Liability Insurance.

## MINIMUM LIMITS OF INSURANCE
Developer shall maintain limits no less than:
1. General Liability: $3,000,000 per occurrence for Bodily Injury, Personal Injury, and Property Damage (including operations, products and completed operations). If Commercial General Liability Insurance or other form with a general aggregate limit is used, either the general aggregate limit shall apply separately to the project/location or the general aggregate limit shall be twice the required occurrence limit.
2. Automobile Liability: $1,000,000 per accident for Bodily Injury and Property Damage.
3. Workers' Compensation *(statutory)* and Employer's Liability: $1,000,000 per accident for Bodily Injury or Disease.

NOTE: These limits can be attained by individual policies or by combining primary and umbrella policies.

## DEDUCTIBLES AND SELF-INSURED RETENTIONS
Any deductibles or self-insured retentions must be declared to and approved by the City. At the option of the City, either: the insurer shall reduce or eliminate such deductibles or self-insured retentions as respects the City, its officers, officials, employees, and volunteers; or the Developer shall provide a financial guarantee satisfactory to the City guaranteeing payment of losses and related investigations, claim administration, and defense expenses.

## OTHER INSURANCE PROVISIONS
The General Liability and Automobile Liability policies are to contain, or be endorsed to contain, the following provisions:
1. The City, its officers, officials, employees, and volunteers are to be covered as additional insured with respect to liability on behalf of the Developer including materials, parts or equipment furnished in connection with such work or operations and with respect to liability arising out of work or operations performed by the Developer; or arising out of automobiles owned, leased, hired or borrowed by or on behalf of the Developer. General Liability coverage can be provided in the form of an appropriate endorsement to the Developer's insurance or as a separate Owner's policy.
2. For any claims related to this contract, the Developer's insurance coverage shall be primary insurance as respects the City, its officers, officials, employees, and volunteers. Any insurance or self-insurance maintained by the City, its officers, officials, employees, or volunteers shall be excess

000106

88of101

of the Developer's insurance.

3. Each insurance policy required by these specifications shall be endorsed to state that coverage shall not be cancelled or materially changed, except after thirty (30) days prior written notice by certified mail, return receipt requested, has been given to the City.

4. Maintenance of the proper insurance for the duration of the contract is a material element of the contract. Material changes in the required coverage or cancellation of the coverage shall constitute a material breach of the contract by the Developer.

1460\02\435574.9

F-4

000107

89ロゟ101

# EXHIBIT G
## EQUAL OPPORTUNITY/NON-DISCRIMINATION POLICIES

During the performance of this contract, the Developer agrees as follows:

(a)    The Developer shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin, or handicap.

(b)    The Developer shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, national origin, or handicap. Such action shall include, but not be limited to, (1) employment, (2) upgrading, (3) demotion, (4) transfer, (5) recruitment or recruitment advertising, (6) layoff or termination, (7) rates of pay or other forms of compensation, and (8) selection for training, including apprenticeship.

(c)    The Developer shall post in conspicuous places available to employees and applicants for employment the notices to be provided by the Contracting Officer that explain this clause.

(d)    The Developer shall, in all solicitations or advertisements for employees placed by or on behalf of the Developer, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, national origin, or handicap.

(e)    The Developer shall send, to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, the notice to be provided by the Contracting Officer advising the labor union or workers' representative of the Developer's commitments under this clause, and post copies of the notice in conspicuous places available to employees and applicants for employment.

(f)    The Developer shall comply with Executive Order 11246, as amended, and the rules, regulations, and orders of the Secretary of Labor.

(g)    The Developer shall furnish all information and reports required by Executive Order 11246, as amended, Section 503 of the Rehabilitation Act of 1973, as amended, and by rules, regulations, and orders of the Secretary of Labor, or pursuant thereto. The Developer shall permit access to its books, records, and accounts by the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(h)    In the event of a determination that the Developer is not in compliance with this clause or any rule, regulation, or order of the Secretary of Labor, this contract may be canceled, terminated, or suspended in whole or in part, and the Developer may be declared ineligible for further Government contracts, or Federally assisted construction contracts under the procedures authorized in Executive Order 11246, as amended. In addition, sanctions may be imposed and remedies invoked against the Developer as provided in Executive Order 11246, as amended, the rules, regulations, and orders of the Secretary of Labor, or as otherwise provided by law.

(i)    The Developer shall include the terms and conditions of this clause in every subcontract or purchase order unless exempted by the rules, regulations, or orders of the Secretary of Labor issued under Executive Order 11246, as amended, so that these terms and conditions will be binding upon each subcontractor or vendor. The Developer shall take such action with respect to any subcontract or purchase order as the Secretary of HUD or the Secretary of Labor may direct as a means of enforcing such provisions, including

000108

90☐ 101

sanctions for noncompliance; provided that if the Developer becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the Developer may request the United States to enter into the litigation to protect the interests of the United States.

000109

9 IB 101

# EXHIBIT H
## ESCROW TERMS

1.    <u>Property Conveyance; Conditions Precedent; Close of Escrow.</u>  In accordance with the DDA, when all conditions precedent to the close of escrow have been satisfied or waived, escrows shall close to conveyance the Property to Citation and to Eden.

2.    <u>Escrow and Closing.</u>  The recording of the Final Subdivision Maps and the conveyance of the Property shall be completed through escrows established with the following title company (referred to herein as "Escrow," "Escrow Holder," or "Title Company"): For the transfer to Eden: North American Title Company located at 21060 Redwood Road, Suite 110, Castro Valley, CA 94546, Attn: Suzanne Smith, 510-537-8300. For the sale to Citation: North American Title Company located at 21060 Redwood Road, Suite 110, Castro Valley, CA 94546, Attn: Suzanne Smith, 510-537-8300, provided that the title insurance policy shall be issued by First American Title Insurance Company. Each party shall promptly deposit all funds and documents as required by the Escrow Holder to complete each transaction. The City, Authority, HACA, Citation and Eden shall prepare and deposit into Escrow such supplemental escrow instructions as each party may deem appropriate and are not inconsistent with the DDA or this Exhibit H.

3.    <u>Purchase Price; Escrow of Funds.</u>

3.1    The Purchase Price for the portion of the Property to be sold to Citation is $12,000,000 as set forth in Section 2.2(a) of the DDA. The balance of the Property will be transferred to Eden for One Dollar ($1) as more fully set forth in Section 2.2(b) of the DDA.

3.2    In accordance with Section 2.8(b)(1), (2) and (3) of the DDA, Citation's first three payments toward the Purchase Price (1st of $50,000, 2nd of $1,750,000, and 3rd of $2,200,000) shall be paid outside of Escrow, directly to the Authority or its order as specified therein.

3.3    In accordance with Section 2.8(b)(4) of the DDA, Citation shall deposit the 4th payment of $8,000,000 of the Purchase Price into Escrow which shall be held in an interest-bearing account in Escrow until released to the Authority or its order upon the Close of Escrow for the conveyance of the Property to Citation and Eden, or released back to Citation in accordance with the DDA.

4.    <u>Closing Costs and Prorations.</u>  For each Escrow, closing costs shall be divided between the seller/transferor and the buyer/transferee in accordance with the standard customary practice for Alameda County. Real property taxes and assessments, and other expenses of the Property shall be prorated as of the date of recordation of the grant deeds.

5.    <u>Closing Documents.</u>

5.1    <u>Authority Documents for Closing with Citation.</u>  Authority shall execute in escrow, or deliver to Escrow Holder for delivery to Citation at the close of escrow, each of the following:

5.1.1  Grant Deed, executed by Authority;

5.1.2  Regulatory agreements and/or resale restrictions for the property transferred to Citation, as provided in the DDA; and

000110

92 of 101

5.1.3  Any other document required by the DDA which is to be recorded upon the conveyance of the Property by the Authority.

5.1.4  The Authority and the City shall also deposit into escrow, the amount of any prorations and other costs as required by the DDA or this Exhibit H.

5.2    Citation Documents.  Citation shall execute in escrow, or deliver to Escrow Holder for delivery to the Authority or the City at the close if escrow, each of the following:

5.2.1  Affordable Housing Agreement, as provided in the DDA; and

5.2.2  Any other document required by the DDA which is to be recorded upon the acquisition of the Property by Citation.

5.2.3  Citation shall also deposit into escrow the amount of the title and escrow costs and expenses and prorations required by this Exhibit H or the DDA.

5.3    Authority and City Documents for Closing with Eden.  Authority and City shall execute in escrow, or deliver to Escrow Holder for delivery to Eden at the Close of Escrow, each of the following:

5.3.1  Grant Deed, executed by Authority;

5.3.2  Regulatory Agreements for property transferred to Eden, as provided in the DDA; and

5.3.3  Proceeds of the Authority Financing, if any, as set forth in the documents evidencing the Authority Financing.

5.3.4  Proceeds of the City Loan, if any, as set forth in the documents evidencing the City Loan.

5.3.5  Any other document required by the DDA which is to be recorded upon the conveyance of the Property.

5.3.6  The Authority and the City shall also deposit into escrow, the amount of any prorations and other costs as required by the DDA or this Exhibit H.

5.4    Eden Documents.  Eden shall execute in escrow, or deliver to Escrow Holder for delivery to Authority and/or the City at the close of escrow, each of the following:

5.4.1  The Regulatory Agreements, as provided in the DDA;

5.4.2  Note(s), Grant Agreements, and/or Deeds of Trust evidencing and securing the City Loan and the Authority Financing; and

5.4.3  Any other document required by the DDA which is to be recorded upon the acquisition of the Property by Developer.

5.4.4  Eden shall also deposit into escrow, the amount of the title and escrow costs and expenses and prorations required by this Exhibit H.

000111

430 101

6.    Title.

6.1.    Conveyance of Title.  Authority shall convey title to the Property subject only to real estate taxes not yet due, and covenants, conditions, restrictions, rights of way taxes prorated as of closing; and easements of record approved by Developer.

6.2    Developer's Approval of Title.  Developer shall obtain at its sole cost and expense a preliminary report of title for the Property ("Preliminary Report") within thirty (30) days after the execution of the DDA.  Developer shall notify Authority in writing within thirty (30) days after receipt of the Preliminary Report and copies of all recorded exceptions.  All other exceptions in the Report shall be referred to as "Approved Exceptions," except for liens of deeds of trust or other monetary liens or encumbrances to be paid upon close of escrow and all HUD documents including without limitation any Declaration of Trusts to be reconveyed or terminated prior to the close of escrow.  Authority shall have thirty (30) days after such notice to advise Developer of any disapproved exceptions which will not be removed by Authority prior to the Closing.  If Authority indicates that it will not correct any of the disapproved exceptions, the parties shall proceed in accordance with provisions set forth in the DDA.

6.3.    Evidence of Title.  Authority shall transfer title to the Property by Grant Deed.  Title insurance, in the form of a California Land Title Association or American Land Title Association policy of title insurance; shall be issued by the title companies specified above by Citation and Eden.

6.4.    Bonds and Assessment.  In the event there is a bond or assessment which has an outstanding principal balance and is a lien upon the Property, such principal shall be assumed by Developer.  Such assumption shall not be credited against the Purchase Price.

6.5.    Vested Title.  Citation and Eden shall each specify he manner of taking title prior to the close of escrow.

7.    Withholding.  Authority is neither a "foreign person" under FIRPTA nor a non-resident under California Revenue and Taxation Code, Section 18662.

8.    Commissions.  Each party represents and warrants to the other party that no broker or finder or other real estate agent is entitled to any commission, finder's fee or other compensation resulting from any action on its part.  Developer and Authority each agree to indemnify the other and defend and hold harmless the other party from and against any loss, cost, or expense, including attorneys fees, incurred by such party, and against any claims, causes of action or the like brought by any broker, finder or similar agent for a commission or fee on account of this Agreement.

000112

9407 101

## CHAPTER 8.68     INCLUSIONARY ZONING REGULATIONS

**8.68.010.  Purpose.** The purpose of this chapter is to:

A.     enhance the public welfare and assure that further housing development contributes to the attainment of the City's housing goals by increasing the production of residential units affordable by households of very low, low, and moderate income.

B.     assure that the limited remaining developable land in the City's planning area is utilized in a manner consistent with the City's housing policies and needs.

**8.68.020.  Definitions.** As used in this chapter, each of the following terms shall be defined as follows:

A.     "Affordable Unit" means an ownership or rental-housing unit, including senior housing, affordable to households with very-low, low, or moderate incomes as defined in this chapter.

    1.     Rental units are deemed affordable units if the annual rent does not exceed 30% of maximum income level for very-low-, low-, and moderate-income households, adjusted for household size and as defined below.

    2.     Owner-occupied units are deemed affordable units if the sales price results in annual housing expenses that do not exceed 35% of income level for very-low-, low-, and moderate-income households, adjusted for household size and as defined below.  For a very low-income owner-occupied units, the unit shall be deemed an affordable unit if the sales price results in annual housing expenses that do not exceed 35% of the maximum in the very low-income level, adjusted for household size and as defined below.

B.     "Applicant" means any person, firm, partnership, association, joint venture, corporation, or any entity or combination of entities that seeks city real property development permits or approvals.

C.     "Dwelling unit" means a dwelling designed and intended for occupancy by one household.

D.      "Very-low-, low-, and moderate-income levels" means those income and eligibility levels determined periodically by the California Department of Housing and Community Development based on Alameda County median income levels adjusted for family size.  Such levels shall be calculated on the basis of gross annual household income considering household size and number of dependents, income of all wage earners, elderly or disabled family members, and all other sources of household income and will be recertified as set forth by local standards, and state and federal housing law.

    1.     "Very-low income" means 50% or less of the median income, adjusted for actual household size.

    2.     "Low income" means more than 50% to 80% of the median income, adjusted for actual household size.

    3.     "Moderate income" means more than 80% to 120% of the median income, adjusted for actual household size.

ATTACHMENT 3

000113

95오101

E.   "Resale controls and/or rent restrictions" means legal restrictions by which the affordable units shall be restricted to ensure that the unit remains affordable to very-low-, low-, or moderate-income households, as applicable, for a period of not less than 55 years. With respect to rental units, such rent restrictions shall be in the form of a regulatory agreement recorded against the applicable property. With respect to owner-occupied units, such resale controls shall be in the form of resale restrictions, deeds of trust, and/or other similar documents recorded against the applicable property.

F.   "Residential development" includes, without limitation, detached single-family dwellings, multiple-dwelling structures, groups of dwellings, condominium or townhouse developments, condominium conversions, cooperative developments, mixed use developments that include housing units, and residential land subdivisions intended to be sold to the general public.

## 8.68.030.  General Requirements

A.   **12.5% Affordability Requirement.**  All new residential development projects of 20 units or more designed and intended for permanent occupancy shall construct 12.5% of the total number of dwelling units within the development as affordable units, except as otherwise provided by this chapter. The foregoing requirement shall be applied no more than once to an approved development (and generally at the tentative map stage), regardless of the changes in the character or ownership of the development, provided the total number of units does not change. In applying and calculating the affordability requirement, any decimal fraction less than or equal to 0.50 may be disregarded, and any decimal fraction greater than 0.50 shall be construed as one unit.

B.   **Allocation of Units to Income Levels.**  Affordable units provided pursuant to this section shall be allocated to households with very-low-, low-, and moderate-income levels as follows:

| | |
|---|---|
| Very-low-income households | 30% |
| Low-income households | 20% |
| Moderate-income households | 50% |

Where the calculation of the allocation results in fewer units that would otherwise be required pursuant to subdivision A above, one additional unit should be allocated to the income level with a decimal fraction closest to 0.50.

C.   **Conditions of Approval:**  Any tentative map, conditional use permit, or site development review approving residential development projects subject to this chapter shall contain conditions sufficient to ensure compliance with the provisions of this chapter. Such conditions shall detail the number of affordable units required, specify the schedule of construction of affordable units, set forth the applicant's manner of compliance with this chapter, and require the execution of an agreement imposing appropriate resale controls and/or rental restrictions on the affordable units.

D.   **Concurrent Construction.**  All affordable units in a project or phase of a project shall be constructed concurrently with market-rate units, unless the City Manager determines in writing that extenuating circumstances exist that make concurrent construction infeasible or impractical.

E.   **Design and Distribution of Affordable Units.**  All affordable units shall reflect the range of numbers of bedrooms provided in the project as a whole and shall not be distinguished by exterior

000114

96 ₰ 101

design, construction, or materials. Affordable units may be of smaller size than the units in the project and may have fewer amenities than the market rate units in the project. All affordable units shall be reasonably dispersed throughout the project.

**8.68.040.    Exceptions to 12.5% Affordability Requirement.**  Developers of projects subject to 8.68.030A shall construct 12.5% of the total number of dwelling units within the development as affordable units, unless subject to an exception set forth in this section. All exceptions require City Council approval, which shall be obtained at or prior to the last discretionary approval for the project.

A.    **Payment of Fees In Lieu of Creation of Affordable Units.**  Upon request of the applicant, the City Council shall permit the applicant to pay a fee in lieu of constructing up to 40% of the affordable units that the developer would otherwise be required to construct pursuant to Section 8.68.030A. The amount of the fee shall be as set forth in a resolution of the City Council, which may be amended from time to time to reflect inflation and changed conditions in the City and the region. In lieu fees shall be paid at the time and in the amount set forth in the in lieu fee resolution in effect at the time of issuance of the building permit.

B.    **Off-Site Projects.**  An applicant may construct the affordable units not physically within the development in lieu of constructing some or all of the affordable units within the development, with the approval of the City Council, if the City Council finds:

1.    that construction of the units off-site in lieu of constructing units on-site is consistent with the chapter's goal of creating, preserving, maintaining, and protecting housing for very low-, low- and moderate-income households.

2.    that the units to be constructed off site are consistent with Section 8.68.030E above.

3.    that it would be infeasible or impractical to construct affordable units on-site.

4.    that conditions of approval for the project require that the off-site affordable units would be governed by the terms of a deed restriction and, if applicable, rental restrictions similar to that used for the on-site affordable units.

5.    that the conditions of approval for the project, or other security such as a cash deposit, bond, or letter of credit, are adequate to require the construction of the off-site affordable units concurrently with the completion of the construction of the residential development or within a reasonable period (not to exceed 5 years).

C.    **Land Dedication.**  An applicant may dedicate land to the City or city-designated local non-profit housing developer in lieu of construction of some or all of the required affordable units, if the Council finds that:

1.    that dedication of land in lieu of constructing units is consistent with the chapter's goal of creating, preserving, maintaining, and protecting housing for very-low, low- and moderate-income households.

2.    that the dedicated land is useable for its intended purpose, is free of toxic substances and contaminated soils, and is fully improved, with infrastructure, adjacent utilities, grading, and all development-impact fees paid excluding any inclusionary zoning ordinance fees.

000115

*97ᵇ 101*

3.    that the proposed land dedication is of sufficient size to meet the following requirements:

    a.    the dedication includes land sufficient to construct the number of units that the applicant would otherwise be required to construct by Section 8.68.030.A, based on the size of lots in the subdivision for which the applicant is meeting its obligation; and

    b.    in addition, the dedication includes such additional land the market value for which is equal to or exceeds the difference between the value of a market-rate, 1200-square foot unit and the price at which such a unit could be sold as an Affordable Unit (which amount shall be set forth in a resolution adopted from time to time by the City Council) times the number of units required.

D.    **Credit transfers.** An applicant may fully or partially satisfy the requirements of Section 8.68.030A through the use of transfer credits created pursuant to Section 8.68.060. Credit certificates shall be presented to the Community Development Director, who shall note at the time of project approval the credit certificate by number. Credit certificates may only be used to satisfy the requirements for Inclusionary Units for the income category (i.e., very low, low, or moderate) and number of bedrooms for which they are issued.

E.    **Waiver of Requirements.** The City Council, at its discretion, may waive, wholly or partially, the requirements of this ordinance and approve alternate methods of compliance with this Chapter if the applicant demonstrates, and the City Council finds, that such alternate methods meet the purposes of this Chapter.

## 8.68.050.  General Procedures for Implementing Inclusionary Zoning Requirements

A.    **Agreements.** Prior to the issuance of a building permit for an affordable unit, resale restrictions or rental controls, or both, as the case may be, shall be set forth in an agreement between the City and the developer, in a form consistent with the City Council-adopted form agreement, which agreement shall be recorded against the property containing the affordable units. The agreement shall be executed by the City Manager, and its requirements shall run with the land and bind the applicant's successors.

B.    **Rental Units; Occupancy; Annual Report.** Agreements involving rental units shall require the owner of the affordable units to ensure that the units are occupied by tenants whose monthly income levels do not exceed very low-, low-,or moderate income levels, as the case may be, and shall preclude tenants from subletting or subleasing the unit. The agreement shall also require the owner of the affordable unit to submit an annual report to the City Manager, in a format approved by the City. The report shall include, but not be limited to the following information: an identification of the affordable units within the project; the monthly rents charged and proposed to be charged; vacancy information for the prior year; and the monthly income for tenants of each affordable unit throughout the prior year.

C.    **Ownership Units; Occupancy; City's Right of First Refusal.** Agreements for ownership units shall specify that the inclusionary units must be occupied by the owner or owners and may not be leased or rented without the written approval of the City. The resale restrictions shall provide that in the event of the sale of an affordable unit, the City shall have the right to purchase any affordable owner-occupant unit at the maximum price that could be charged to an eligible household.

000116

98 03 101

D.    **Selection Criteria.** No household shall be permitted to occupy a unit that is required under this chapter to be affordable unless the City or its designee has approved the household's eligibility. Eligible potential occupants of affordable units will be qualified on the basis of household income, the median combined household income statistics for Alameda County published periodically by the California Department of Housing and Community Development, all sources of household income and assets, the relationship between household size and the size of available units, and any further criteria required by law. The developer shall use an equitable selection method established in conformance with the terms of this chapter. The selection criteria may not distinguish between adults and children. Selection of qualified person should be based on priorities established using the point system described below:

- Employed within the boundaries of the City of Dublin (3 points, one per household)

- Public Service employee working in the City of Dublin (1 additional point)

- Dublin resident (3 points, one per household)

- Seniors (1 point, one per household)

- Permanently disabled (1 point, one per household)

- Immediate family member of Dublin resident (1 point, one per household)

- Required to relocate from current Dublin residence due to demolition of dwelling or conversion of dwelling from rental to for-sale unit (1 point, one per household)

To qualify as a "Public Service Employee", the person shall be employed by a Public Agency.

To qualify as "Employed within the boundaries of the City of Dublin", the person shall have been employed within the City of Dublin for at least six months.

To qualify as a "Dublin resident," the person shall have been a resident of the City of Dublin for at least a one-year period prior to the eligibility determination.

**8.68.060.  Affordable Unit Credits.**

A.    **Creation.** Affordable unit credits may be created by the City Council. One affordable unit credit certificate shall be issued for each affordable unit constructed in excess of the number of affordable units required to be constructed for the project by Section 8.68.030A. The certificate shall designate a specific income category (i.e., very-low, low, or moderate income) and number of bedrooms for which they are issued.

B.    **Ownership and use of credits.** Affordable unit credit certificates are issued to and become the possession of the project owner, who may then use them to satisfy the requirements of this chapter for another project in the City. If a project owner proposes to sell credit certificates, the parties shall first obtain the consent of the Community Development Director, who will document the transfer by certificate number.

000117

99 b 101

INCLUSIONARY ZONING REGULATIONS
Chapter 8.68

**8.68.070. Incentives to Encourage On-Site Construction of Affordable Units.** The City may, but shall not be required to, offer incentives or financial assistance to encourage the on-site construction of affordable units in excess of 12.5% of the total number of units in the project to the extent resources for this purpose are available and approved for such use by the City Council or City Manager. Such incentives may include, but shall not be limited to, the following:

A.   **Fee Deferral.**

    1.   **Development Processing Fees.** The City Manager may approve deferred payment of City processing fees applicable to the review and processing of the project. The terms and payment schedule of the deferred fees shall be subject to the approval of the City Manager.

    2.   **Development Impact Fees.** The City Council may authorize the deferred payment of development impact fees applicable to the affordable units. Approval of this incentive requires demonstration by the Applicant that the deferral increases the project's feasibility. The applicant must provide appropriate security to ensure future payment of such fees.

B.   **Design Modifications.** The City Council may approve design modifications to affordable units that increase the feasibility of the construction of affordable units, including but not limited to, the following:

    1.   Reduced lot size.

    2.   Reduced setback requirements.

    3.   Reduced open space requirements.

    4.   Reduced landscaping requirements.

    5.   Reduced interior or exterior amenities.

    6.   Reduction in parking requirements.

    7.   Height restriction waivers.

**8.68.080. Inclusionary Zoning In Lieu Fee Fund.** In Lieu Fees shall be deposited into a fund known as the "Inclusionary Zoning In Lieu Fees Fund" ("Fund").

A.   **Use.** All monies in the Fund, together with any interest earnings on such monies less reasonable administrative charges, shall be used or committed to use by the City for the purpose of providing very-low, low-, and moderate-income ownership or rental housing in the City of Dublin.

B.   **Annual report.** The City Manager shall prepare an annual report to the City Council identifying the balance of monies in the Fund and the affordable units provided and any monies committed to providing very-low-, low-, and moderate-income housing. The annual report shall also include a review of administrative charges.

**8.68.090. Violations.** It shall be unlawful for any person, firm, corporation, partnership or other entity that is subject to this ordinance pursuant to section 8.68.030A to violate any provision or to fail to

000118

100 & 101

comply with any of the requirements of this chapter. A violation of any of the provisions or failing to comply with any of the requirements of this Chapter shall constitute a misdemeanor; except that notwithstanding any other provisions of this Code, any such violation constituting a misdemeanor under this chapter, may in the discretion of the enforcing authority, be charged and prosecuted as an infraction. Any person convicted of an infraction under the provisions of this Code shall be punishable as provided by the Government Code of the State of California.

**8.68.100. Enforcement.**

A.   **General.** The City Manager shall enforce this chapter, and its provisions shall be binding on all agents, successors, and assigns of an applicant. The City Manager may suspend or revoke any building permit or approval upon finding a violation of any provision of this chapter. No land-use approval, building permit, or certificate of occupancy shall be issued for any residential development unless exempt from or in compliance with this chapter. The City may institute any appropriate legal actions or proceedings necessary to ensure compliance herewith, including, but not limited to, actions to revoke, deny, or suspend any permit or development approval.

B.   **Excessive rents/legal action.** If the City Manager determines that rents in excess of those allowed by operation of this chapter have been charged to a tenant residing in an affordable unit, the City may take appropriate legal action to recover, and the project owner shall be obligated to pay to the tenant, or to the City in the event the tenant cannot be located, any excess rents charged.

**8.68.110. Appeals.** Decisions of the City Manager under this Chapter may be appealed as provided in Chapter 8.136.

000119

# CITY OF DUBLIN
## BUDGET CHANGE FORM

10|0<sub>B</sub>|0|

CHANGE FORM # _____

**New Appropriations (City Council Approval Required):**

___X___  From Unappropriated Reserves (Fund)

_____  From New Revenues

**Budget Transfers:**

_____  From Budgeted Contingent Reserve (1080-799.000)
_____  Within Same Department Activity
_____  Between Departments (City Council Approval Required)
_____  Other

| DECREASE BUDGET ACCOUNT | AMOUNT | INCREASE BUDGET ACCOUNT | AMOUNT |
|---|---|---|---|
| Name:<br><br>Account #: | $ | Name: Affordable Housing Fund – Housing Programs – Contract Services<br><br>Account #: 380-50500-740-000 | $1,500,000 |
| Name:<br><br>Account #: | $ | Name:<br><br>Account #: | $ |
| Name:<br><br>Account #: | | Name:<br><br>Account #: | |
| Name:<br><br>Account #: | | Name:<br><br>Account #: | |

Fin Mgr/ASD: _____    Date: _____

_____
Signature

REASON FOR BUDGET CHANGE ENTRY: A contribution to the Dublin Housing Authority to be used with other funding sources for costs incurred with tenant relocation as a result of the redevelopment of the Arroyo Vista Affordable Housing Project.

City Manager: _____    Date: _____

_____
Signature

As Approved at the City Council Meeting on:  Date:  7/17/2007

Mayor: _____    Date: _____

_____
Signature

Posted By: _____    Date: _____

_____
Signature

H:\CC-MTGS\BUDGETCHANGE_AV_reloc.DOC

ATTACHMENT # 4

000120