**DECLARATION OF LISA GREIF**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 10**

000223



**CITY CLERK**

File # ☐ 6 0 0 - 6 0

---

## AGENDA STATEMENT
## CITY COUNCIL MEETING DATE: December 18, 2007

| | |
|---|---|
| **SUBJECT:** | A Predevelopment Loan to Eden Housing, Inc. for the Arroyo Vista Project<br>*Report Prepared by: Joni Pattillo, Assistant City Manager, Sue Bloch, City Attorney's Office, Sabrina Wolfson, City Attorney's Office* |
| **ATTACHMENTS:** | Resolution with Attachment 1 Predevelopment Loan Agreement, Attachment 2 Promissory Note, and Attachment 3 Assignment Agreement |
| **RECOMMENDATION:** | 1) Receive Staff Report<br>2) Deliberate<br>3) Adopt a Resolution approving a) a Predevelopment Loan to Eden Housing, Inc. in the amount of up to $325,000 for predevelopment expenses for the Arroyo Vista project; and approving the Predevelopment Loan Agreement, Promissory Note, and Assignment Agreement; and b) Authorizing the City Manager to sign the Predevelopment Loan Agreement and the Assignment Agreement on behalf of the City of Dublin. |
| **FINANCIAL STATEMENT:** | A predevelopment loan in the amount of up to $325,000 will be made to Eden for predevelopment activities. Because Inclusionary Zoning In Lieu Fee Funds have already been set aside to finance a future construction loan to Eden in the amount of $1,500,000, and the predevelopment loan is an advance on the construction loan, no additional funds are necessary. |

**DESCRIPTION:**

On July 17, 2007, the City Council approved execution of a Disposition and Development Agreement ("DDA") with the Housing Authority of the County of Alameda ("HACA"), the Housing Authority of the City of Dublin ("Authority"), SCS Development Corporation, dba Citation Central Homes ("Citation"), and Eden Housing, Inc. ("Eden"). Pursuant to the terms of the DDA, (i) Eden will acquire a portion of real property (the "Property") currently owned by the Authority and commonly known as Arroyo Vista; (ii) Eden will construct on its portion of the Property affordable multi-family and senior rental housing with related improvements (the "Project"); the (iii) the City will provide a loan to Eden in the sum of One Million Five Hundred Thousand Dollars ($1,500,000) to assist in financing the

---

**COPY TO: Eden Housing, Inc.**

1036767.2

ITEM NO. 4.9

000224

construction of the Project (the "Construction Loan"); and (iv) Citation will develop additional housing on the remainder of the Property.

Because Arroyo Vista is a federal public housing development, the Authority must obtain approval from the U.S. Department of Housing and Urban Development ("HUD") to convey the Property. In order to obtain HUD's approval, the City and Authority must conduct significant environmental review in accordance with the California Environmental Quality Act and the National Environmental Policy Act.

The DDA requires Eden and Citation to pay for the costs incurred by the City and Authority for such environmental review ("Environmental Review Costs"). Eden has already deposited $87,000 into City's cost recovery account to cover Eden's initial share of such costs ("Initial Deposit"). In addition, the DDA requires Eden and Citation to pay for the transactional costs (legal, consulting, and other costs) incurred by the City and the Authority in connection with the DDA and application to HUD for approval of the disposition of the Property ("Transactional Costs").

## DISCUSSION AND ANALYSIS:

To cover predevelopment costs for the Project, including the Environmental Review Costs and the Transactional Costs, Eden has requested the City to provide an advance on the Construction Loan in the amount of $325,000 ("Predevelopment Loan"). Eden and City Staff have negotiated the terms and conditions of the predevelopment loan documents, which include: a predevelopment loan agreement ("Loan Agreement"); a promissory note in the amount of the Predevelopment Loan ("Note"); and an Assignment of Agreements Plans and Specifications ("Assignment Agreement"), which provides the City with a security interest in the plans, specifications and studies financed by the Predevelopment Loan. These loan documents are very similar to the predevelopment loan documents the City executed with Eden in 2003 for the Wicklow Square low-income senior project.

The essential terms of the Predevelopment Loan are as follows:

1. City will provide a Predevelopment Loan of up to $325,000 to pay for Environmental Review Costs, the Transactional Costs, and other predevelopment costs incurred by Eden, such as architect, legal, and consultant fees.

2. The term of the Predevelopment Loan is 3 years; provided however, if the City disburses the Construction Loan prior to the end of the 3-year term, the outstanding balance of the Predevelopment Loan will be paid with the proceeds of the Construction Loan. Together, the amount of the Construction Loan and the Predevelopment Loan will not exceed the originally authorized amount of $1.5 million. The Construction Loan will be secured by a deed of trust recorded against the portion of the Property acquired by Eden.

3. Provided there is no default under the Loan Agreement, if the parties mutually agree to terminate the Loan Agreement, or if Eden terminates the Loan Agreement due to Project infeasibility (for example due to failure of the Dublin Housing Authority and City to obtain HUD approval for the disposition of the Property), the City will forgive the Predevelopment Loan upon Eden's delivery to the City of all architectural contracts, plans, specifications, reports, and studies to which City is entitled pursuant to the Assignment Agreement.

4. Provided there is no default under the Loan Agreement, upon termination of the Loan Agreement by mutual agreement or if Eden terminates the Loan Agreement due to Project infeasibility,

000225

the City will reimburse Eden for (i) predevelopment costs incurred prior to the termination date for which the City has not yet been invoiced, and (ii) the unspent portion of Eden's share of the Initial Deposit as of October 15, 2007 (approximately $64,000), in an aggregate amount up to the undisbursed balance of the Predevelopment Loan as of the termination date. In no event will the City be obligated to disburse more than the $325,000 Predevelopment Loan amount.

## RECOMMENDATION:

Staff recommends that the City Council adopt a Resolution approving a) A predevelopment loan to Eden Housing, Inc. in the amount of up to $325,000 for predevelopment expenses for the Arroyo Vista project; and approving the Predevelopment Loan Agreement, Promissory Note, and Assignment Agreement; and b) Authorizing the City Manager to sign the Predevelopment Loan Agreement and the Assignment Agreement on behalf of the City of Dublin.

000226

## RESOLUTION NO. XX - 07

### A RESOLUTION OF THE CITY COUNCIL
### OF THE CITY OF DUBLIN
**\* \* \* \* \* \* \* \* \***

### APPROVING A PREDEVELOPMENT LOAN TO EDEN HOUSING, INC.

**WHEREAS,** on July 17, 2007, the City Council of the City of Dublin ("City Council") approved execution of a Disposition and Development Agreement ("DDA") with the Housing Authority of the County of Alameda ("HACA"), the Housing Authority of the City of Dublin ("Authority"), SCS Development Corporation, dba Citation Central Homes ("Citation"), and Eden Housing, Inc. ("Eden"); and

**WHEREAS,** pursuant to the terms of the DDA, (i) Eden will acquire a portion of real property (the "Property") currently owned by the Authority and commonly known as Arroyo Vista; (ii) Eden will construct on its portion of the Property affordable multi-family and senior rental housing with related improvements (the "Project"); and the (iii) the City will provide a loan to Eden in the sum of One Million Five Hundred Thousand Dollars ($1,500,000) to assist in financing the construction of the Project (the "Construction Loan"); and

**WHEREAS,** Eden has requested, and City has agreed, to provide an advance on the Construction Loan in the amount of $325,000 ("Predevelopment Loan") for the purpose of financing predevelopment activities for the Project; and

**WHEREAS,** Eden and City Staff have negotiated the terms and conditions of the predevelopment loan documents, which include: a predevelopment loan agreement ("Loan Agreement") attached hereto as **Attachment 1**; a promissory note in the amount of the Predevelopment Loan ("Note") attached hereto as **Attachment 2**; and an Assignment of Agreements Plans and Specifications ("Assignment Agreement")attached hereto as **Attachment 3**, which provides the City with a security interest in the plans, specifications and studies financed by the Predevelopment Loan.

**NOW, THEREFORE, BE IT RESOLVED THAT** the City Council of the City of Dublin, does hereby approve a predevelopment loan to Eden Housing, Inc. in the amount of up to $325,000 for predevelopment expenses for the Project.

**BE IT FURTHER RESOLVED THAT,** the City Council approves the Loan Agreement, the Note, and the Assignment Agreement and authorizes and directs the City Manager to execute such documents substantially in the form attached hereto and to undertake such further action as may be necessary and desirable to carry out the intent of this resolution.

Item# 4.9 12/8/07mtg

000227

**PASSED, APPROVED AND ADOPTED** this 4th day of December, 2007.

**AYES:**

**NOES:**

**ABSENT:**

**ABSTAIN:**

_____
                                          Mayor

ATTEST:


_____
        Interim City Clerk

3cb31

## PREDEVELOPMENT LOAN AGREEMENT

This Predevelopment Loan Agreement (this **"Agreement"**) is entered into effective as of _____,2007 (**"Effective Date"**) by and between the City of Dublin, a municipal corporation (the **"City"**) and Eden Housing, Inc , a California nonprofit public benefit corporation (the **"Borrower"**)  City and Borrower are hereinafter collectively referred to as the **"Parties "**

**WHEREAS,** the City and Borrower, together with the Housing Authority of the City of Dublin (**"Authority"**), the Housing Authority of the County of Alameda (**"HACA"**) and SCS Development Corporation, dba Citation Central Homes (**"Citation"**) have executed that certain Disposition and Development Agreement (**"DDA"**) dated as of July 25, 2007 pursuant to which Borrower (i) will acquire a portion of the real property known as Alameda County Assessor's Parcel Number 941-0007-001-07 (the **"Property"**) currently owned by the Authority, and (ii)  will construct on its portion of the Property affordable multi-family and senior rental housing with related improvements (the **"Project"**)  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the DDA

**WHEREAS,** pursuant to the DDA, the City agreed to provide a loan to Borrower in the sum of One Million Five Hundred Thousand Dollars ($1,500,000) to assist in financing the construction of the Project (the **"Construction Loan"**)

**WHEREAS,** Borrower has requested, and the City has agreed to provide, an advance on the Construction Loan (the **"Predevelopment Loan"**) pursuant to the terms and conditions set forth herein for the purpose of providing financing for predevelopment activities which are necessary for environmental approval of the proposed development of the Property and to obtain HUD approval of the disposition application (the **"Disposition Application"**), as more particularly described in the predevelopment budget attached hereto as Exhibit A (the **"Predevelopment Budget"**) ,

**WHEREAS,** the proceeds of the Predevelopment Loan (**"Predevelopment Loan Proceeds"**) will be disbursed from the City's Inclusionary Zoning In-Lieu Fee Fund (the **"Fund"**) established pursuant to Section 8 68 080 of the Dublin Municipal Code, and the use of the Predevelopment Loan Proceeds pursuant to this Agreement will serve the purposes of the Fund by increasing the City's supply of affordable low-income housing, and

**WHEREAS,** concurrently herewith Borrower shall execute (i) a promissory note in the amount of the Predevelopment Loan, and (ii) an assignment agreement (the **"Assignment Agreement"**) which shall provide City with a security interest in the plans, specifications and studies financed by the Predevelopment Loan

**NOW THEREFORE,** in consideration of their mutual undertakings and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged,

1

**Attachment 1 to Resolution**
000229

the Parties agree as follows

## 1    THE PREDEVELOPMENT LOAN AND DISBURSEMENT OF PREDEVELOPMENT LOAN PROCEEDS

1 1    Predevelopment Loan and Note   City agrees to loan to Borrower, and Borrower agrees to borrow from and repay to City, a sum in the maximum principal amount of Three Hundred Twenty-Five Thousand Dollars ($325,000) (the "**Predevelopment Loan**") upon the terms and conditions and for the purposes set forth herein   The Predevelopment Loan shall be evidenced by a promissory note dated as of the Effective Date and executed by Borrower substantially in the form, **Attachment 2** to the Resolution (the "**Promissory Note**")   Provided that Borrower has complied with all conditions set forth in Section 1 6, the Predevelopment Loan Proceeds shall be disbursed in accordance with Section 1 5 hereof

The Parties acknowledge and agree that (i) Borrower's predevelopment costs for the environmental review and obtaining HUD approval of the Disposition Application may exceed the aggregate of the Predevelopment Loan and Borrower's share of the $175,000 deposit in the cost recovery account established with City pursuant to Section 2 10 of the DDA (the "**Initial Deposit**"), (ii) the environmental review and HUD approval of the Disposition Application may not be obtained by the time the City has disbursed all of the Predevelopment Loan Proceeds to Borrower, (iii) City shall have no obligation to disburse any funds in excess of the Predevelopment Loan, and (iv) any funds in excess of the Predevelopment Loan and the Initial Deposit necessary to complete the environmental review and to obtain HUD approval of the Disposition Application shall be the sole responsibility of Borrower as and to the extent set forth in the DDA

1 2    Interest, Maturity Date   Provided that Borrower is not in default under the terms of this Agreement, no interest shall accrue on the Predevelopment Loan   The outstanding principal balance of the Predevelopment Loan and any other sums due under the Promissory Note shall be payable in full on the third (3rd) anniversary of the Predevelopment Loan origination date ("**Maturity Date**") unless the term of the Predevelopment Loan is extended by mutual written agreement of the Parties or the Predevelopment Loan is forgiven pursuant to the terms hereof , provided however, the Parties agree that if the City disburses the Construction Loan, or a portion thereof, prior to the Maturity Date, the outstanding balance of the Predevelopment Loan shall be repaid with such financing on the date such financing is provided

1 3    Security for the Loan   The Promissory Note shall be secured by Borrower's assignment to the City of Borrower's rights to any and all architectural contracts, plans, specifications, reports, and studies relating to the Property or the Project which have been financed with Predevelopment Loan Proceeds   Borrower shall execute the Assignment Agreement substantially in the form, **Attachment 3** to the Resolution Upon Borrower's acquisition of title to a portion of the Property for the Project, the Promissory Note shall be secured by a deed of trust (the "**Deed of Trust**") executed by

000230

Borrower in favor of the City as beneficiary and recorded against Borrower's portion of the Property  The Promissory Note shall provide that upon recordation of the Deed of Trust, the Promissory Note shall be nonrecourse

1 4    Use of Predevelopment Loan Proceeds  The Predevelopment Loan Proceeds shall be used solely and exclusively for predevelopment costs for the Project as set forth in the Predevelopment Budget and such other costs related to the Project as the City may approve in writing  Funds for item (1) of the Predevelopment Budget shall be credited against Borrower's obligation to pay for (i) all costs incurred by City, HACA and Authority in connection with environmental review pursuant to Section 2 10 of the DDA and (ii) City's and Authority's Transactional Costs (as such term is defined in the DDA) pursuant to Section 2 11 of the DDA  Funds for item (2) of the Predevelopment Budget shall be disbursed to Borrower on a cost reimbursement basis in accordance with Section 1 5

1 5    Disbursement of Proceeds  Upon Borrower's satisfaction of the conditions set forth in Section 1 6, provided that Borrower has provided City with a written requisition specifying the amount and use of the requested Predevelopment Loan Proceeds accompanied by copies of third-party invoices for services rendered in connection with the Project, and such other documentation as City may reasonably require, the City shall disburse the Predevelopment Loan Proceeds to Borrower for Borrower's predevelopment costs in the amounts and for the items set forth in the Predevelopment Budget  Notwithstanding the preceding sentence, funds for item (1) of the Predevelopment Budget shall be credited against Borrower's obligation to pay for (i) all costs incurred by City, HACA and Authority in connection with environmental review pursuant to Section 2 10 of the DDA, and (ii) City's and Authority's Transactional Costs pursuant to Section 2 11 of the DDA

1 6    Conditions Precedent to Disbursement of Funds

        (a)  City's obligation to disburse the Predevelopment Loan Proceeds is conditioned upon satisfaction of all of the following conditions

            (i)  Borrower's execution and delivery to the City of this Agreement, the Promissory Note, and the Assignment Agreement,

            (ii)  Reserved

            (iii)  Borrower's delivery to the City of evidence of insurance coverage in the form and in such amounts as may be reasonably required by City, and

            (iv)  Borrower's delivery to City of each of the following  (i) certificate of good standing, certified by the Secretary of State indicating that Borrower is properly organized and authorized to do business in the State of California, (ii) a certified resolution indicating that Borrower has authorized this transaction and that the persons executing this Agreement, the Promissory Note, and the Assignment Agreement on

000231

behalf of Borrower have been duly authorized to do so, and (III) certified copies of Borrower's articles of incorporation, bylaws, and I R S tax-exemption determination letter

(b) Except as specified in <u>Paragraph 1 7 (b),</u> the City shall have no obligation to disburse any portion of the Predevelopment Loan Proceeds to Borrower following

      (I)     termination of this Agreement,

      (II)    the failure of any of Borrower's representations and warranties set forth in this Agreement to be true and correct in all material respects, or

      (III)   the occurrence of an Event of Default under this Agreement, the Promissory Note, the Assignment Agreement or the DDA

## 1 7    <u>Termination of Agreement</u>

(a) <u>Termination by Borrower</u>   Provided that Borrower is not in default under this Agreement, the Promissory Note, the Assignment Agreement, or the DDA, Borrower may terminate this Agreement for any of the following reasons by providing written notice of such termination to City

      (I)    Despite Borrower's commercially reasonable efforts, the development contingencies set forth in <u>Section 15 1</u> of the DDA are not performed by the time required for such performance and the parties to the DDA are unable or unwilling to agree upon extensions for such performance,  or

      (II)   An action or threatened action against the City, the Authority, and/or HACA prevents the City, Authority and/or HACA, within the timeframes set forth in the DDA, from performing their obligations under the DDA or proceeding with actions necessary for the transfer of the Property to Borrower, or

      (III)   Borrower does not receive all governmental approvals (including, without limitation, land use approvals) required for development of the Property or construction of the Project, despite Borrower's commercially reasonable efforts to obtain such approvals, or

      (IV)   Borrower determines, in its commercially reasonable discretion, that any (I) remediation work with respect to hazardous materials, or (II) construction costs relating to the physical condition of the Property or to the proposed or required improvements thereon are so expensive or burdensome as to make the Project, or a required part thereof, financially infeasible, or

000232

(v)    Borrower does not receive commitments for all financing necessary for the development, construction and operation of the Project, despite Borrower's commercially reasonable efforts to obtain such financing

(b) Reimbursement  If this Agreement is terminated (i) by Borrower pursuant to paragraph (a) above, (ii) by mutual agreement of the Parties as a result of any pending or threatened litigation against the City, the Authority and/or HACA which may adversely affect Borrower's and City's ability to perform under this Agreement and the DDA, or (iii) by mutual agreement of the Parties for any other reason, City shall reimburse Borrower for the following costs in an aggregate amount not to exceed the undisbursed balance of the Predevelopment Loan on the date of termination

> (i)    Predevelopment costs incurred by Borrower prior to the date of termination of this Agreement provided that (1) such costs and fees are identified in the Predevelopment Budget or have otherwise been approved by City in writing, and (2) Borrower has provided City with a written requisition specifying the amount and use of the requested Predevelopment Loan Proceeds accompanied by copies of third-party invoices for services rendered in connection with the Project, and such other documentation as City may reasonably require
>
> (ii)   The unspent portion of Borrower's share of the Initial Deposit as of October 15, 2007   (The Parties agree that such amount is equal to $64,000 as indicated in item (3) of the Predevelopment Budget)

(c) Forgiveness of the Predevelopment Loan   If this Agreement is terminated   (i) by Borrower pursuant to paragraph (a) above, (ii) by mutual agreement of the Parties as a result of any pending or threatened litigation against the City, the Authority and/or HACA which may adversely affect Borrower's, City's, Authority's and/or HACA's ability to perform under this Agreement and/or the DDA, or (iii) by mutual agreement of the Parties for any other reason, City shall forgive the outstanding balance of the Predevelopment Loan (including any amounts reimbursed to Borrower pursuant to paragraph (b) above) upon Borrower's delivery of all architectural contracts, plans, specifications, reports, and studies to which City is entitled pursuant to the Assignment Agreement   Upon delivery of such documents, City shall deliver to Borrower the original Promissory Note marked "Cancelled" and this Agreement shall be terminated, provided however, Borrower's obligation to indemnify City pursuant to Section 3 2 of this Agreement shall survive termination of this Agreement

Notwithstanding the foregoing, the City shall have no obligation to forgive Borrower's obligation to repay the Predevelopment Loan and cancel the Promissory

000233

Note if, after the applicable notice and cure period, the City has declared Borrower in default under this Agreement or the DDA and such default remains uncured at the time of Borrower's request for forgiveness of the Predevelopment Loan

## 2    USE RESTRICTIONS

2 1    Non-Discrimination    Borrower covenants by and for itself and its successors and assigns that there shall be no discrimination against or segregation of a person or of a group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926 1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955 2 of the Government Code in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Project or the Property, nor shall Borrower or any person claiming under or through Borrower establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees in the Project

2 2    Mandatory Language in All Subsequent Deeds, Leases and Contracts    All deeds, leases or contracts made or entered into by Borrower, its successors or assigns, as to any portion of the Property or the Project shall contain therein the following language

(a) In Deeds    ,

"Grantee herein covenants by and for itself, its successors and assigns that there shall be no discrimination against or segregation of a person or of a group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926 1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955 2 of the Government Code in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the property herein conveyed nor shall the grantee or any person claiming under or through the grantee establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees in the property herein conveyed The foregoing covenant shall run with the land "

(b) In Leases

"The lessee herein covenants by and for the lessee and lessee's heirs, personal representatives and assigns and all persons claiming under the lessee or through the lessee that this lease is made subject to the condition that there shall be no discrimination against or segregation of any person or of a group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926,

000234

12926 1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955 2 of the Government Code in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the land herein leased nor shall the lessee or any person claiming under or through the lessee establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants, or vendees in the land herein leased "

(c) In Contracts

"There shall be no discrimination against or segregation of any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926 1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955 2 of the Government Code in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the property nor shall the transferee or any person claiming under or through the transferee establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees of the land "

## 3    ADDITIONAL COVENANTS, REPRESENTATIONS AND WARRANTIES OF BORROWER

3 1    Representations of Borrower    Borrower represents and warrants to the City as follows

a        Organization of the Borrower, Tax-exempt Status    Borrower is a duly organized nonprofit public benefit corporation, validly existing and in good standing under the laws of the State of California    Borrower has all requisite power and authority in the State of California to purchase the Property, to develop, own and operate the Project, to carry on its business as now conducted, and to execute, deliver and perform its obligations under this Agreement, the Promissory Note, and the Assignment Agreement    Borrower has received a determination from the Internal Revenue Service that it is exempt from federal tax under Section 501(c)(3) of the Internal Revenue Code of 1986 as amended and such determination is in full force and effect as of the Effective Date

b        Authorization of the Predevelopment Loan, No Violation    The execution, delivery and performance of this Agreement, the Promissory Note, and the Assignment Agreement have been duly authorized by Borrower, and this Agreement, the Promissory Note and the Assignment Agreement, when duly executed and delivered will constitute the valid and binding obligations of Borrower enforceable in accordance with their respective terms    Borrower's execution of this Agreement, the Promissory Note and the Assignment Agreement and performance thereunder will not result in a breach of or constitute a default under any agreement, indenture or other instrument to

7

000235

10 of 31

which Borrower is a party or by which Borrower may be bound

c    Litigation   Except for that action filed by Arroyo Vista Tenants Association, et al , in the Superior Court of California, County of Alameda, Case No RG07351015, there are no pending or threatened actions or proceedings before any court or administrative agency which may adversely affect the financial condition or operation of Borrower or its ability to carry out the obligations of Borrower under this Agreement, the Promissory Note, the Assignment Agreement or the DDA   Borrower is not the subject of an action under federal or state Bankruptcy Law (as defined below)

3 2    Indemnification   Borrower shall indemnify, defend and hold the City, its elected and appointed officials, employees, contractors and agents (collectively "**Indemnitees**") harmless from and against any and all demands, claims, suits, costs (including reasonable attorneys' fees), losses, damage, causes of action, fines, judgments, penalties, deficiencies, or liabilities of any kind (collectively "**Claims**") arising directly or indirectly in any manner in connection with or resulting from (a) any and all  predevelopment, development or construction activities conducted in connection with the Property or the Project, including without limitation, site investigations conducted by or for Borrower, (b) any failure of any of Borrower's representations or warranties set forth in this Agreement, or made by Borrower in connection with the execution and delivery of this Agreement or in any certificate furnished pursuant hereto, or in connection with any request for disbursement of Predevelopment Loan Proceeds to be correct in all material respects, (c) any Claim, whether meritorious or not, brought or asserted against any Indemnitee which relates to or arises in connection with the Predevelopment Loan, the Promissory Note, the Assignment Agreement, or any transaction contemplated thereby, or the relationship between Borrower and City   Borrower's obligations under this Section shall survive the making and repayment of the Predevelopment Loan and the expiration or termination of this Agreement   Borrower's indemnity obligations shall not apply to any Claims arising as a result of the willful misconduct or gross negligence of the City, its officers, employees or agents   This Section is subject to, and shall not modify the relative rights and obligations of the parties, set forth in Section 3 2 (f) of the DDA

3 3    Books and Records   The City shall have the right, during business hours and after reasonable notice to Borrower, to inspect and copy Borrower's books and records with respect to the Property, the Project and the Predevelopment Loan

3 4    Other Documents   Upon the City's reasonable request, Borrower shall deliver to the City a copy of documents related to the Project, including without limitation, construction contracts, consulting agreements, architects' agreements, loan and financing documents, studies, reports, management plans, and property management agreements

000236

## 4    DEFAULT AND REMEDIES

**4 1**    Events of Default   The occurrence of any one or more of the following events shall constitute an event of default hereunder ("**Event of Default**")

(a)    Borrower fails to pay when due the principal payable under the Promissory Note, and such failure continues for ten (10) days after City notifies Borrower thereof in writing

(b)    An Event of Default is declared under the DDA, the Promissory Note or the Assignment Agreement, and such failure continues after expiration of the applicable notice and cure periods set forth in such documents

(c)    Any of Borrower's representations or warranties contained in this Agreement, or made by Borrower in connection with the execution and delivery of this Agreement or in any certificate furnished pursuant hereto, or in connection with any request for disbursement of Predevelopment Loan Proceeds shall prove to have been incorrect when made in any material respect

(d)    Pursuant to or within the meaning of the United States Bankruptcy Code or any other federal or state law relating to insolvency or relief of debtors ("**Bankruptcy Law**"), Borrower (i) commences a voluntary case or proceeding, (ii) consents to the entry of an order for relief against Borrower in an involuntary case, (iii) consents to the appointment of a trustee, receiver, assignee, liquidator or similar official for Borrower, (iv) makes an assignment for the benefit of its creditors, or (v) admits in writing its inability to pay its debts as they become due

(e)    A court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Borrower in an involuntary case, (ii) appoints a trustee, receiver, assignee, liquidator or similar official for Borrower or substantially all of such entity's assets, (iii) orders the liquidation of Borrower, or (iv) issues or levies a judgment, writ, warrant of attachment or similar process against the Property or the Project, and in each case the order or decree is not released, vacated, dismissed or fully bonded within 60 days after its issuance

(f)    Borrower fails to maintain insurance as required pursuant to this Agreement, and Borrower fails to cure such default within 10 days

(g)    Borrower fails to use Predevelopment Loan Proceeds in accordance with this Agreement or fails to use Predevelopment Loan Proceeds in accordance with Borrower's request for disbursement

(h)    Borrower defaults in the performance of any term, provision, covenant or agreement contained in this Agreement other than an obligation enumerated in this Section 4 1, and unless such a shorter cure period is specified for such default, the default continues for ten (10) days in the event of a monetary default or thirty (30) days in the event of a nonmonetary default after

9

000237

the date upon which City shall have given written notice of the default to Borrower, provided that in the case of a nonmonetary default that is not susceptible of cure within thirty (30) days, an Event of Default shall not arise hereunder if Borrower commences to cure the default within thirty (30) days and thereafter prosecutes the curing of such default to completion with due diligence and in good faith, but in no event longer than 120 days from the receipt of notice of default

4 2    Remedies   Upon the occurrence of an Event of Default, the City shall have the following rights, in addition to any other rights and remedies provided by law

(a) The City may declare the entire outstanding principal balance of the Predevelopment Loan immediately due and payable,

(b) The City may exercise any and all rights and remedies granted to the City pursuant to the Assignment Agreement,

(c) The City may seek an order of specific performance, and

(d) The City may terminate this Agreement

Each of the remedies provided herein is cumulative and not exclusive of, and shall not prejudice any other remedy provided herein, in the Promissory Note or the Assignment Agreement   The City may exercise any rights and remedies available under applicable law, in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement

4 3    No Waiver   No failure or delay by City at any time to require performance by Borrower of any provision of this Agreement or to exercise any right, power or remedy hereunder shall be construed as a waiver of any other provision or any succeeding breach of the same or any other provision hereof   The failure of City to insist upon the strict performance of any provision of this Agreement, or to exercise any election contained herein shall not be construed as a waiver or relinquishment for the future of such provision or election nor shall it constitute a waiver of the City's right to assert any future remedy provided for in this Agreement  the Promissory Note or the Assignment Agreement on the basis of the same or a similar breach of a covenant or warranty or other event of default

5    MISCELLANEOUS

5 1    Assignment   This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns   Notwithstanding the foregoing, City's obligation to make the Predevelopment Loan is personal to Borrower, and shall not be assignable by Borrower by operation of law or otherwise absent the express written consent of City, and any such assignment by operation of law or otherwise shall be void   This Section shall not apply to an assignment to a wholly-controlled affiliate of Borrower or a limited partnership whose general partner is a

10

wholly-controlled affiliate of Borrower

5 2    Insurance   Borrower shall maintain and keep in force, at Borrower's expense, the insurance required pursuant to this Agreement  For each of Borrower's insurance policies,  Borrower shall provide to City within ten (10) days following execution of this Agreement, but in no event later than the initial disbursement of Predevelopment Loan Proceeds,  a certificate of insurance and an endorsement which provides that no cancellation, major change in coverage or expiration will be effective during the term of this Agreement without 30 days written notice to the City prior to the effective date of such cancellation, change in coverage or expiration  Upon request by the City from time to time, Borrower shall deliver to the City originals or copies of all such insurance policies and certificates evidencing such policies

5 3    Notices   Except as otherwise specified herein, all notices to be sent pursuant to this Agreement shall be made in writing, and sent to the Parties at their respective addresses specified below or to such other address as a Party may designate by written notice delivered to the other parties in accordance with this Section   All such notices shall be sent by

(i)  personal delivery, in which case notice is effective upon delivery,

(ii)  certified or registered mail, return receipt requested, in which case notice shall be deemed delivered on receipt if delivery is confirmed by a return receipt,

(iii) nationally recognized overnight courier, with charges prepaid or charged to the sender's account, in which case notice is effective on delivery if delivery is confirmed by the delivery service,

(iv) facsimile transmission, in which case notice shall be deemed delivered upon transmittal, provided that (a) a duplicate copy of the notice is promptly delivered by first-class or certified mail or by overnight delivery, or (b) a transmission report is generated reflecting the accurate transmission thereof  Any notice given by facsimile shall be considered to have been received on the next business day if it is received after 5 00 p m  recipient's time or on a nonbusiness day

### CITY

City of Dublin
100 Civic Plaza
Dublin, CA 94568
Attention  City Manager
Fax No  (925) 829-9248

000239

14ₒ31

**BORROWER**

Eden Housing, Inc
409 Jackson Street
Hayward, CA 94544-1567
Attention  Executive Director
Fax No  (510) 582-6523

5 4    Waiver, Modification and Amendment    No modification or waiver of any
provision of this Agreement, nor any consent to any departure by Borrower therefrom,
shall in any event be effective unless the same shall be in writing, and then such waiver
or consent shall be effective only in the specific instance and for the specific purpose
for which given  No notice to or demand on the Borrower in any case shall entitle the
Borrower to any other or further notice or demand in similar or other circumstances  No
amendment to or modification of this Agreement shall be effective unless and until such
amendment or modification is in writing, properly approved in accordance with
applicable procedures, and executed by the Parties

5 5    Further Assurances    The Parties shall execute, acknowledge and deliver to the
other such other documents and instruments, and take such other actions, as either
shall reasonably request as may be necessary to carry out the intent of this Agreement

5 6    Parties Not Co-Venturers    Nothing in this Agreement is intended to or shall
establish the Parties as partners, co-venturers, or principal and agent with one another

5 7    Action by the City    Except as may be otherwise specifically provided herein,
whenever any approval, notice, direction, consent or request by the City is required or
permitted under this Agreement, such action shall be in writing, and such action may be
given, made or taken by the City Manager or by any person who shall have been
designated by the City Manager, without further approval by the City Council

5 8    Non-Liability of City, City Officials, Directors, Employees and Agents    No
member, official, employee or agent of the City shall be personally liable to Borrower, or
any successor in interest, in the event of any default or breach by the City, or for any
amount of money which may become due to Borrower or its successor or for any
obligation of City under this Agreement  No director, officer, employee or agent of
Borrower shall be personally liable to the City, or any successor in interest, in the event
of any default or breach by Borrower, or for any amount of money which may become
due to City or its successor or for any obligation of Borrower under this Agreement

5 9    No Third Party Beneficiaries    There shall be no third party beneficiaries to this
Agreement

5 10    Captions, Construction    The headings of the sections and paragraphs of this
Agreement have been inserted for convenience only and shall not be used to construe
this Agreement    The language of this Agreement shall be construed as a whole

000240

according to its fair meaning and not strictly for or against any Party    Time is of the essence in the performance of this Agreement

5 11    Governing Law, Venue    This Agreement, the Promissory Note and the Assignment Agreement shall be construed and enforced in accordance with the laws of the State of California without regard to principles of conflicts of law    The Parties consent to the jurisdiction of any federal or state court in the jurisdiction in which the Property is located (the "**Property Jurisdiction**")    Borrower agrees that any controversy arising under or in relation to this Agreement, the Promissory Note or the Assignment Agreement shall be litigated exclusively in courts having jurisdiction in the Property Jurisdiction    Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise

5 12    Attorneys' Fees    In the event any legal action is commenced to interpret or to enforce the terms of this Agreement or to collect damages as a result of any breach thereof, the Party prevailing in any such action shall be entitled to recover against the other Party all reasonable attorneys' fees and costs incurred in such action

5 13    Severability    If any term of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall continue in full force and effect unless the rights and obligations of the Parties are materially altered or abridged by such invalidation, voiding or unenforceability

5 14    Entire Agreement, Exhibits    This Agreement, together with the Promissory Note, the Assignment Agreement, and the additional documents referenced herein contains the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all prior oral or written agreements between the Parties with respect thereto    Exhibits A through C attached hereto are incorporated herein by this reference

5 15    Counterparts    This Agreement may be executed in multiple counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument

5 16    City Status    Borrower recognizes and agrees that City is not a commercial lending institution, but a municipal corporation exercising its authority to protect the public health, safety and welfare    Any duties or obligations which a commercial lending institution may have to Borrower shall not apply to this transaction except as set forth herein or in the Promissory Note or as otherwise required by law

*SIGNATURES ON FOLLOWING PAGE*

13

000241



IN WITNESS WHEREOF, the Parties have executed this Agreement as of the
date first written above

DEVELOPER

EDEN HOUSING, INC , a California nonprofit
public benefit corporation

By  _____
        Linda Mandolini, Executive Director

CITY

CITY OF DUBLIN,
a municipal corporation

By _____
        Richard C  Ambrose
        City Manager

ATTEST

By  _____
            City Clerk

APPROVED AS TO FORM

By  _____
            City Attorney

14

000242

Exhibit A

## PREDEVELOPMENT BUDGET

Predevelopment Loan Proceeds shall be disbursed to Borrower for Borrower's share of the following costs incurred after October 15, 2007, (the filing date of the Arroyo Vista Tenant Association lawsuit (Case No RG07351015)), and which are necessary to secure HUD approval of the Disposition Application and environmental approval

(1) $186,000 Costs incurred by the City and the Authority (i) in connection with environmental review pursuant to Sections 2 10 of the DDA, but only after Borrower's 50% share of the $175,000 deposit has been spent and (ii) Transactional Costs (as defined in Section 2 11 of the DDA) incurred by the City and the Authority pursuant to Section 2 11 of the DDA,

(2) $ 75,000 Costs incurred by Borrower for predevelopment activities for the Project, including but not limited to, fees for
   ○ Architects
   ○ Civil Engineers
   ○ Landscape Architects
   ○ Appraisals
   ○ Dublin San Ramon Services District Fees
   ○ Borrower's Legal Counsel

(3) $64,000    Reimbursement of the unspent portion of Borrower's share of the Initial Deposit as of October 15, 2007, provided, however, that this line item shall only be disbursed if the Project does not proceed due, in whole or in part, to the Arroyo Vista Tenant Association lawsuit   In the event such lawsuit is dismissed with prejudice, the funds allocated for this line item may be used for items (1) and (2)

---

$325,000    Maximum Predevelopment Loan Amount (total of (1)-(3))

1      000243

# PROMISSORY NOTE

$325,000

Dublin, California
_____, 2007

**FOR VALUE RECEIVED**, Eden Housing, Inc., a California nonprofit public benefit corporation ("**Borrower**"), promises to pay to the City of Dublin, a municipal corporation ("**City**"), in lawful money of the United States of America, the principal sum of Three Hundred Twenty-Five Thousand Dollars ($325,000) or so much thereof as may be advanced by City from time to time pursuant to the Predevelopment Loan Agreement referred to below in the manner provided below.

This promissory note (this "**Note**") has been executed and delivered pursuant to and in accordance with the terms and conditions of the Predevelopment Loan Agreement, dated as of the date hereof, by and between Borrower and City (the "**Loan Agreement**"), and is subject to the terms and conditions of the Loan Agreement, which are by this reference incorporated herein and made a part hereof. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Loan Agreement.

This Note is secured by an assignment of agreements, reports, plans, specifications and approvals pursuant to that certain Assignment Agreement dated as of the date hereof, executed by Borrower as Assignor in favor of City. City shall be entitled to the benefits of the security provided by the Assignment Agreement and shall have the right to enforce the covenants and agreements of Borrower contained in the Loan Agreement. Upon Borrower's acquisition of title to a portion of the Property ("**Borrower's Property**") for the Project, this Note shall be secured by a deed of trust executed by Borrower in favor of the City as beneficiary and recorded against Borrower's Property (the "**Deed of Trust**").

1.    PAYMENTS

1.1    MATURITY DATE; INTEREST. The entire principal balance outstanding under this Note shall be due and payable in full on the third (3rd) anniversary of the date first written above ("**Maturity Date**") unless the term of this Note is extended by mutual written agreement of the Parties or City forgives this Note pursuant to the terms and conditions set forth in Section 1.7 of the Loan Agreement; provided however, the Parties agree that if the City provides construction and/or permanent financing for the Project prior to the Maturity Date, the outstanding balance of the Predevelopment Loan shall be repaid with the proceeds of such financing on the date such financing is provided. Provided that Borrower is not in default under the Loan Agreement, the DDA, or the Assignment Agreement, no interest shall accrue on the outstanding principal balance due under this Note.

1.2    PREPAYMENT. Borrower may, without premium or penalty, at any time and from time to time, prepay all or any portion of the outstanding principal

**Attachment 2 to the Resolution**    000244

19 of 31

balance due under this Note. Prepayments shall be applied first to any unpaid late charges and other costs and fees then due and then to principal. In no event shall any amount due under this Note become subject to any rights of offset, deduction or counterclaim on the part of Borrower.

1.3    MANNER OF PAYMENT. All payments of principal on this Note shall be made by certified or bank cashier's check to City at 100 Civic Plaza, Dublin, California 94568 or such other place as City shall designate to Borrower in writing, or by wire transfer of immediately available funds to an account designated by City in writing.

2.    DEFAULTS

2.1.    EVENTS OF DEFAULT. The occurrence of any one or more of the following events shall constitute an event of default hereunder ("**Event of Default**"):

(a)    Borrower fails to pay when due the principal and interest payable hereunder and such failure continues for ten (10) days after City notifies Borrower thereof in writing.

(b)    Pursuant to or within the meaning of the United States Bankruptcy Code or any other federal or state law relating to insolvency or relief of debtors ("**Bankruptcy Law**"), Borrower shall (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) consent to the appointment of a trustee, receiver, assignee, liquidator or similar official; (iv) make an assignment for the benefit of its creditors; or (v) admit in writing its inability to pay its debts as they become due.

(c)    A court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Borrower in an involuntary case, (ii) appoints a trustee, receiver, assignee, liquidator or similar official for Borrower or substantially all of Borrower's assets, or (iii) orders the liquidation of Borrower, and in each case the order or decree is not dismissed within 60 days.

(d)    An Event of Default is declared under the DDA, the Loan Agreement, or the Assignment Agreement after expiration of the applicable notice and cure periods provided in such documents.

(e)    Borrower fails to use Predevelopment Loan Proceeds in accordance with the Loan Agreement or Borrower's request for disbursement.

2.2.    REMEDIES. Upon the occurrence of an Event of Default hereunder, City may, at its option (i) by written notice to Borrower, declare the entire unpaid principal balance of this Note, together with all accrued interest thereon, immediately due and payable regardless of any prior forbearance, (ii) exercise any and all rights and remedies available to it under applicable law, and (iii) exercise any and all rights and remedies available to City pursuant to the Loan Agreement or the Assignment Agreement. Borrower shall pay all reasonable costs and expenses incurred by or on behalf of City including, without limitation, reasonable attorneys'

2

000245



fees, incurred in connection with City's enforcement of this Note and the exercise of any or all of its rights and remedies hereunder.

2.3.   DEFAULT RATE.  During any time that Borrower is in default under this Note, interest shall accrue on the outstanding principal balance at the rate of ten percent (10%) per annum (the "**Default Rate**").  When Borrower is no longer in default, the Default Rate shall no longer apply.  Notwithstanding the foregoing provisions, if the interest rate charged exceeds the maximum legal rate of interest, the rate shall be the maximum rate permitted by law.  The imposition or acceptance of the Default Rate shall in no event constitute a waiver of a default under this Note or prevent City from exercising any of its other rights or remedies.

3.   MISCELLANEOUS

3.1.   WAIVER; AMENDMENT.  The rights and remedies of City under this Note shall be cumulative and not alternative.  No waiver by City of any right or remedy under this Note shall be effective unless in a writing signed by City.  Neither the failure nor any delay in exercising any right, power or privilege under this Note will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege by City will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  No notice to or demand on Borrower will be deemed to be a waiver of any obligation of Borrower or of the right of City to take further action without notice or demand as provided in this Note.  Borrower hereby waives presentment, demand, protest, notices of dishonor and of protest and all defenses and pleas on the grounds of any extension or extensions of the time of payment or of any due date under this Note, in whole or in part, whether before or after maturity and with or without notice.  There shall be no amendment to or modification of this Note except by written instrument executed by Borrower and City.

3.2.   NOTICES.  Any notice required or permitted to be given hereunder shall be given in accordance with Section 5.3 of the Loan Agreement.

3.3.   SEVERABILITY.  If any provision in this Note is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Note will remain in full force and effect.  Any provision of this Note held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

3.4.   GOVERNING LAW.  This Note shall be construed and enforced in accordance with the laws of the State of California without regard to principles of conflicts of laws.  The Parties consent to the jurisdiction of any federal or state court in the jurisdiction in which the Property is located (the "**Property Jurisdiction**").  Borrower agrees that any controversy arising under or in relation to this Note shall be litigated exclusively in courts having jurisdiction in the Property Jurisdiction.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

3

000246

21 of 31

3.5     PARTIES IN INTEREST.  This Note shall bind Borrower and its successors and assigns and shall accrue to the benefit of City and its successors and assigns.

3.6     SECTION HEADINGS, CONSTRUCTION.  The headings of Sections in this Note are provided for convenience only and will not affect its construction or interpretation.

3.7     RELATIONSHIP OF THE PARTIES. The relationship of Borrower and City under this Note is solely that of borrower and lender, and the loan evidenced by this Note and secured by the Assignment Agreement will in no manner make City the partner or joint venturer of Borrower.

3.8     TIME IS OF THE ESSENCE.  Time is of the essence with respect to every provision of this Note.

3.9     NONRECOURSE.

(a)     Prior to recordation of the Deed of Trust against Borrower's Property, this Note shall be fully recourse against the Borrower and any judgment or execution thereof entered in any action, legal or equitable, on this Note may be enforced personally against the Borrower

(b)     Following the recordation of the Deed of Trust against Borrower's Property, except as expressly provided in this Section 3.9, neither Borrower nor its partners, if any, shall have personal liability for payment of the principal of, or interest on, this Note, and the sole recourse of City with respect to the payment of the principal of, and interest on, this Note shall be to the Project and Borrower's Property and any other collateral held by City as security for this Note; provided however, nothing contained in the foregoing limitation of liability shall:

(A) impair the enforcement against all such security for the Predevelopment Loan of all the rights and remedies of the City under the Deed of Trust and any financing statements City files in connection with the Predevelopment Loan as each of the foregoing may be amended, modified, or restated from time to time;

(B) impair the right of City to bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable City to enforce and realize upon the Deed of Trust, the interest in the Project and Borrower's Property created thereby and any other collateral given to City in connection with the indebtedness evidenced hereby and to name the Borrower as party defendant in any such action;

(C) be deemed in any way to impair the right of the City to assert the unpaid principal amount of the Predevelopment Loan as a demand for money within the meaning of Section 431.70 of the California Code of Civil Procedure or any successor provision thereto;

(D) constitute a waiver of any right which City may have under any bankruptcy law to file a claim for the full amount of the indebtedness owed to City hereunder or to require that the Project and Borrower's Property shall continue to secure all of the

4

000247

indebtedness owed to City hereunder in accordance with this Note and the Deed of Trust; or

(E) limit or restrict the ability of City to seek or obtain a judgment against Borrower to enforce against Borrower and its general partners, if any, to:

(1) recover under Section 3.2 of the Loan Agreement (pertaining to Borrower's indemnification obligations), or

(2) recover from Borrower and its general partners, if any, compensatory damages as well as other costs and expenses incurred by City (including without limitation attorney's fees and expenses) arising as a result of the occurrence of any of the following:

(a) any fraud or material misrepresentation on the part of the Borrower or any general partner thereof, or any officer, director or authorized representative of Borrower in connection with the request for or creation of the Predevelopment Loan, or in any Predevelopment Loan document, or in connection with any request for any action or consent by City in connection with the Predevelopment Loan;

(b) any failure to maintain insurance on Borrower's Property and the Project as required pursuant to the Predevelopment Loan documents;

(c) failure to pay taxes, assessments or other charges which may become liens on Borrower's Property or the Project;

(d) the presence of hazardous or toxic material or waste on Borrower's Property or the Project or other violation of the Borrower's obligations under of the Loan Agreement, the DDA or the Deed of Trust pertaining to environmental matters;

(e) the occurrence of any act or omission of Borrower that results in waste to or of the Borrower's Property or the Project and which has a material adverse effect on the value of the Project or Borrower's Property;

(f) the material misapplication of the Predevelopment Loan Proceeds;

(g) the removal or disposal of any personal property or fixtures or the retention of rents, insurance proceeds, or condemnation awards in violation of the Deed of Trust; and

(h) the material misapplication of the proceeds of any insurance policy or award resulting from condemnation or the exercise of the power of eminent domain or by reason of damage, loss or destruction to any portion of the Project or Borrower's Property.

5

000248

IN WITNESS WHEREOF, Borrower has executed and delivered this Note as of the date first written above.

**BORROWER**

Eden Housing, Inc., a California nonprofit public benefit corporation

By: _____
        Linda Mandolini
        Executive Director

000249

*24 of 31*

## ASSIGNMENT OF AGREEMENTS, PLANS AND SPECIFICATIONS

FOR VALUE RECEIVED, effective as of _____, 2007 (the "**Effective Date**"), Eden Housing, Inc., a California nonprofit public benefit corporation ("**Assignor**") hereby assigns and grants to the City of Dublin, a municipal corporation (the "**City**") all of its right, title and interest in and to all of the following but (i) only as to the following documents that have been paid for with Predevelopment Loan Proceeds, or if only a portion of a document has been paid for with Predevelopment Loan Proceeds then only that portion of such document  paid for with Predevelopment Loan Proceeds; and (ii) only for those contracts and agreements in which Assignor as the developer and the Contractor (other than Citation) are the sole parties (all of which hereafter shall collectively be referred to as the "**Assigned Documents**").

(A)     All architectural, design, engineering, consulting and construction contracts, and any and all amendments, modifications, supplements, addenda and general conditions thereto (collectively "**Agreements**"), heretofore or hereafter entered into by Assignor and any architect, engineer, analyst, contractor or other person or entity ("**Contractor**") in connection with the preparation of plans, specifications, studies, analyses, drawings or any other similar service related to the Property, the Project, or the improvements existing or to be installed or constructed on the Property (the "**Improvements**"); and

(B)     All reports, analyses, studies, plans and specifications, shop drawings, working drawings, amendments, modifications, changes, supplements, general conditions and addenda thereto (collectively "**Reports, Plans and Specifications**") heretofore or hereafter prepared by or for Assignor or its agents, employees or any Contractor with respect to the Property, the Project or the Improvements.

In addition, the parties hereto agree as follows:

1.     This Assignment of Agreements, Plans, and Specifications (this "**Assignment Agreement**") is made pursuant to that certain Predevelopment Loan Agreement executed by and between Assignor and City dated as of the date hereof (the "**Loan Agreement**"). Capitalized terms used without definition herein shall have the meaning ascribed to such terms in the Loan Agreement.

2.     This Assignment Agreement is made to secure: (a) payment to the City of all sums now or hereafter owing under the Promissory Note dated as of the date hereof made by Assignor for the benefit of City, and any and all additional advances, modifications, extensions, renewals and amendments thereof; and (b) payment and performance by Assignor of all its obligations under the Loan Agreement.

**Attachment 3 to the Resolution**

000250

3.    Assignor hereby irrevocably appoints City as its attorney-in-fact (which agency is coupled with an interest) upon the occurrence of an Event of Default by Assignor under the Loan Agreement, to demand, receive, and enforce any and all of Assignor's rights with respect to the Assigned Documents, and to perform any and all acts in the name of Assignor or in the name of the City with the same force and effect as if performed by Assignor in the absence of this Assignment Agreement.

4.    Assignor agrees to obtain from each Contractor and deliver to City a duly executed Consent substantially in the form attached hereto as Exhibit A.  Assignor represents and warrants to City that no previous assignment of its respective rights or interest in or to any of the Assigned Documents has been made. So long as the City holds or retains any interest under the Loan Agreement or the Promissory Note, Assignor agrees not to assign, sell, pledge, transfer, mortgage, or hypothecate its rights or interest in any of the Assigned Documents without prior written approval of the City. The City shall be deemed to have approved any assignment of the Assigned Documents to a senior lender provided that City has approved such senior lender.

5.    This Assignment Agreement shall be binding upon and inure to the benefit of the heirs, legal representatives, assigns, and successors-in-interest of Assignor and the City; provided, however, this shall not be construed and is not intended to waive the restrictions on assignment, sale, transfer, mortgage, pledge, hypothecation or encumbrance by Assignor contained in the Loan Agreement or the DDA.

6.    Unless an Event of Default (as defined in the Loan Agreement) shall have occurred, Assignor shall be entitled (subject to the provisions of Section 4 above) to enjoy and enforce all of its rights under the Assigned Documents. If such an Event of Default occurs and City gives written notice to any Contractor who is a party to any Assigned Document referring to this Assignment Agreement and stating that such an Event of Default has occurred and that City intends to exercise its rights hereunder (an "**Exercise Notice**"), then City shall be entitled thereafter to enjoy and enforce all of the rights of Assignor under such Assigned Document and shall become bound to perform all future obligations of Assignor thereunder, it being understood that in no event shall City be liable for payments or costs relating to any work which any Contractor has performed prior to the date of City's delivery of such Exercise Notice. Unless and until such Exercise Notice is given, City shall not be obliged to perform any of the obligations of Assignor under the Assigned Documents.

7.    Assignor represents and warrants that to the best of its knowledge after reasonable inquiry, there are no defaults under any Assigned Document by any party thereto.

8.    Assignor further represents and warrants that all sums due and owing to any Contractor to date under any Assigned Document have been duly paid in full, except to the extent deferral of such sums is allowed pursuant to such Assigned Document.

9.    City may assign its rights under this Assignment Agreement, and the Assigned Documents, and the rights and obligations of any assignee of City shall be the

2

000251

26 of 31

same as provided herein as to City and Contractor.  City may, in its discretion, make any such assignment to a third party, with the consent of the Contractor who is a party to such Assigned Documents, provided such consent shall not be unreasonably withheld, conditioned or delayed.

10.    This Assignment Agreement shall not be deemed to release or affect in any way the obligations of Assignor to any Contractor under the Assigned Documents.

11.    Assignor is executing this Assignment Agreement to induce City to enter into and disburse funds pursuant to the Loan Agreement, and Assignor understands that City would not do so but for the execution and delivery of this Assignment Agreement by Assignor.

12.    Notices.  Except as otherwise specified herein, all notices to be sent pursuant to this Assignment Agreement shall be made in writing, and sent to the parties at their respective addresses specified below (or in the case of Contractor, to the address specified in the Consent attached hereto) or to such other address as a party may designate by written notice delivered to the other parties in accordance with this Section.  All such notices shall be sent by:

(i)  personal delivery, in which case notice is effective upon delivery;

(ii) certified or registered mail, return receipt requested, in which case notice shall be deemed delivered on receipt if delivery is confirmed by a return receipt;

(iii) nationally recognized overnight courier, with charges prepaid or charged to the sender's account, in which case notice is effective on delivery if delivery is confirmed by the delivery service;

(iv) facsimile transmission, in which case notice shall be deemed delivered upon transmittal, provided that (a) a duplicate copy of the notice is promptly delivered by first-class or certified mail or by overnight delivery, or (b) a transmission report is generated reflecting the accurate transmission thereof.  Any notice given by facsimile shall be considered to have been received on the next business day if it is received after 5:00 p.m. recipient's time or on a nonbusiness day.

**CITY:**
City of Dublin
100 Civic Plaza
Dublin, CA 94568
Attention:  City Manager

3

27 of 31

**ASSIGNOR:**

Eden Housing, Inc.
409 Jackson Street
Hayward, CA 94544-1567
Attention: Executive Director

13. Amendments. This Assignment Agreement may be modified only by a written instrument signed by the Parties.

14. Further Assurances. The Parties shall execute, acknowledge and deliver to the other such other documents and instruments, and take such other actions, as either shall reasonably request as may be necessary to carry out the intent of this Assignment Agreement.

15. Parties Not Co-Venturers. Nothing in this Assignment Agreement is intended to or shall establish the Parties as partners, co-venturers, or principal and agent with one another.

16. Action by the City. Except as may be otherwise specifically provided herein, whenever any approval, notice, direction, consent or request by the City is required or permitted under this Assignment Agreement, such action shall be in writing, and such action may be given, made or taken by the City Manager or by any person who shall have been designated by the City Manager, without further approval by the City Council unless the City Manager determines that such matter requires the consent of the City Council.

17. Non-Liability of City and City Officials, Employees and Agents. No member, official, employee or agent of the City shall be personally liable to Assignor, or any successor in interest, in the event of any default or breach by the City, or for any amount of money which may become due to Assignor or its successor or for any obligation of City under this Assignment Agreement.

18. No Third Party Beneficiaries. There shall be no third party beneficiaries to this Assignment Agreement.

19. Headings; Construction. The headings of the sections and paragraphs of this Assignment Agreement have been inserted for convenience only and shall not be used to construe this Assignment Agreement. The language of this Assignment Agreement shall be construed as a whole according to its fair meaning and not strictly for or against any Party. Time is of the essence in the performance of this Assignment Agreement.

20. Governing Law; Venue. This Assignment Agreement shall be construed in accordance with the laws of the State of California without regard to principles of conflicts of law. The Parties consent to the jurisdiction of any federal or state court in the jurisdiction in which the Property is located (the "**Property Jurisdiction**"). Assignor agrees that any controversy arising under or in relation to this Agreement shall be

4

litigated exclusively in courts having jurisdiction in the Property Jurisdiction. Assignor irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

21.  Attorneys' Fees. If any claim, at law or otherwise is made by either Party, the prevailing party or the nondefaulting party, as the case may be, shall be entitled to its costs and reasonable attorneys' fees.

22.  Severability. If any term of this Assignment Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall continue in full force and effect unless the rights and obligations of the Parties are materially altered or abridged by such invalidation, voiding or unenforceability.

23.  Counterparts.  This Assignment Agreement may be executed in multiple counterparts, each of which shall be an original and all of which together shall constitute one agreement.

**SIGNATURES ON FOLLOWING PAGE.**

5

IN WITNESS WHEREOF, Assignor and City have duly executed this Assignment Agreement effective as of the date first above written.

**CITY:**

**CITY OF DUBLIN,**
a municipal corporation

By: _____

Name:_____
         City Manager

ATTEST:

By: _____
         City Clerk

APPROVED AS TO FORM:

By: _____
         City Attorney

**ASSIGNOR:**

**EDEN HOUSING, INC.,**
a California nonprofit public benefit corporation

By:_____

Its:_____

6

000255

30 of 31

## Exhibit A

## CONSENT

This Consent ("**Consent**") is executed effective as of _____, 20__, pursuant to that certain Assignment of Agreements, Plans and Specifications ("**Assignment Agreement**") executed by and between Eden Housing, Inc., a California nonprofit public benefit corporation ("**Assignor**") and the City of Dublin, a municipal corporation (the "**City**") dated as of _____, 2007. Unless otherwise defined herein, capitalized terms used in this Consent shall have the meanings given them in the Assignment Agreement.

The undersigned architect, engineer, contractor and/or Contractor ("**Contractor**") hereby consents to the Assignment Agreement and the assignments contemplated thereby, and hereby waives all provisions in the Assigned Documents to which Contractor is a party which would impair, hinder or prevent the making of any such assignment by Assignor to City or the enforcement thereof by City.

Contractor agrees that if, at any time, the City shall, pursuant to its rights under the Assignment Agreement deliver an Exercise Notice to Contractor, then provided that Contractor has received, receives or continues to receive the compensation called for under the Assigned Documents to which Contractor is a party, the City may, at its option, use and rely upon the Reports, Plans and Specifications for the purposes for which they were prepared, and Contractor will continue to perform its obligations under the Assigned Documents to which Contractor is a party  for the benefit and account of the City in the same manner as if performed for the benefit or account of Assignor in the absence of the Assignment Agreement.  Contractor agrees that it shall rely conclusively upon any Exercise Notice given to Contractor by City, and Contractor agrees to be bound by such Exercise Notice.

By its execution of this Consent, Contractor agrees to look solely to Assignor and its successors in interest for performance of Assignor's obligations under the Assigned Documents to which Contractor is a party unless and until Contractor shall have received an Exercise Notice from City.

Contractor agrees that, after the occurrence of an Event of Default under the Loan Agreement and the giving of an Exercise Notice by City, Contractor will perform all of its obligations under the Assigned Documents to which Contractor is a party, City being liable to pay the costs thereof relating to any services performed at the direction of City after the giving of the Exercise Notice.  However, City is not and will in no event become liable for any costs, charges, expenses and liabilities incurred under the Assigned Documents or otherwise unless it has given the Exercise Notice (and, if it has given the Exercise Notice, City will not become liable for any such costs, charges or expenses incurred prior to the giving of such Exercise Notice), and the fact that Assignor may not have paid and/or may be unable to pay any such costs, charges, expenses or liabilities may not be asserted by Contractor as a defense to its obligations to perform services for City as set forth herein.

Contractor agrees that, notwithstanding anything hereinabove contained or contained in the Assigned Documents to the contrary, City will have the right to receive and to use (without cost to City) any and all Reports, Plans and Specifications relating to the Property, the Project or the Improvements, as the same may be amended or modified from time to time, which

1                    **Exhibit A to Attachment 3**

*3 of 31*

Contractor may own or have the right to use and to grant others the right to use. Contractor further agrees that, upon the written request of City (whether or not any Event of Default has occurred), it will execute and deliver a certification confirming City's rights with respect to such Reports, Plans, and Specifications as City from time to time may reasonably request.

Contractor agrees that for so long as the Assignment Agreement is effective, if Assignor defaults in making any required payment or in performing any other obligation under any Assigned Document to which Contractor is a party, Contractor shall give prompt written notice thereof to City. Unless and until such notice is given to City, and for a period of 15 business days thereafter, Contractor shall not exercise any of its rights or remedies against Assignor under the Assigned Documents (including, without limitation, the right to terminate any Assigned Document or to stop work thereunder). After such notice is given and for a period of 15 business days thereafter, City may, at its option, cure (but shall have no obligation to cure) any such default by Assignor and, if such default is so cured during such notice period, Contractor shall continue performance under the Assigned Documents to which such Contractor is a party.

Contractor represents and warrants that (i) the Assigned Documents to which Contractor is a party are in full force and effect, and to Contractor's knowledge there are no defaults thereunder by any party thereto; (ii) Contractor has made no assignment of any Assigned Document to which Contractor is a party or of its rights thereunder (other than to City); and (iii) there presently exists no unpaid claims presently due to Contractor, except as disclosed in writing to the City, arising in connection with the performance of Contractor's obligations under the Assigned Documents to which Contractor is a party. Contractor agrees that for so long as the Assignment Agreement is effective, Contractor shall not assign its rights or interest in any of the Assigned Documents (absent the prior written consent of City) to any entity other than a lender whose loan is secured by the Property, the Project or the Improvements with the prior written approval of the City.

IN WITNESS WHEREOF, Contractor has duly executed this Consent as of the date first written above.

**CONTRACTOR**

By: _____          Contractor's Address:

Its: _____          Telephone:
                                         Facsimile:

**Exhibit A to Attachment 3**

000257

**DECLARATION OF LISA GREIF**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 11**

000258

# ARROYO VISTA NEWSLETTER
## May, 2006
## Special Update on Redevelopment

In the April newsletter we explained that eight submittals were received in response to the Authority's Request for Qualifications for possible redevelopment of Arroyo Vista. An evaluation panel reviewed and scored the submittals and narrowed the eight down to three. In the April newsletter we also indicated that a meeting with the Resident Council and two meetings with Arroyo Vista residents were going to be held to describe these "top three." Those meetings have occurred and we wanted to describe what was discussed and the questions raised by residents.



### But First...

It is important to remember that the Housing Commission has not yet made a decision about redeveloping Arroyo Vista. The Commission may decide to rehabilitate the existing project instead. At the June 20 Commission meeting staff will present an analysis of the estimated total rehabilitation costs and potential sources of funding. The Commission will likely decide at that time whether to proceed with rehabilitation or redevelop the property.

### And Furthermore...

The Housing Commission has stated that any redevelopment is contingent on the Housing Authority obtaining from HUD Section 8 vouchers so that Arroyo Vista residents will have affordable housing if they have to move. Competition for such vouchers is keen and it is not known if the Authority would be successful in obtaining them. *For this reason in particular it is difficult to predict if and when redevelopment will occur.*

### Questions from Residents

Residents had many questions about the likelihood of redevelopment occurring and if so, when it would happen. There were also many questions about the Section 8 program and how it works. The Housing Authority is working on a list of *Frequently Asked Questions* (FAQ) that will address these questions. The FAQ will be distributed to all Arroyo Vista households. However, we want to make clear now that *all households will be assisted in relocation, *Section 8 vouchers can be used in any city where a housing authority operates a Section 8 program, *the vouchers will not expire, *families can keep their vouchers as long as they remain eligible for the Section 8 program, and * there is not a 60-day limit on finding relocation housing.

### Questions for Developers Asked by Residents

The Housing Authority distributed written summaries of the "top three" submittals and discussed them with residents. There were general questions asked about all three as well as questions specific to individual submittals.

000259

# ARROYO VISTA NEWSLETTER
## May, 2006
### Special Update on Redevelopment

The evaluation panel developed its list of questions that it will send out to the developers before the end of May. The questions posed by residents will be added to the panel's list. The panel expects to interview developers in late June so it can make a recommendation to the Housing Commission in late July.

Below are the residents' questions that the top three developers will be asked to respond to:

1. Will there be a washer/dryer hook-up in each apartment?

2. If there is a hook-up in each apartment, will you also provide the washer and dryer or does the tenant provide the washer and dryer?

3. Is there a laundry room in addition to washers and dryers in the apartments?

4. What percentage of units will be for the disabled?

5. Will the apartments have air conditioning?

6. Will any part of the development be gated or secured in some way?

7. There are currently more 4-bedroom homes than you propose to build. How do you plan to address the needs of large families? Are you open to building more 4-bedroom units?

8. Describe the types of social service programs you will provide.

9. List the project amenities (e.g., will there be a computer lab, pool, etc.)

10. Are there any opportunities for residents to be employed, either during construction or in property management after the project is built?

11. How can you assist with relocation? Will you assist residents to move back to Arroyo Vista after the project is built?

12. Will residents be able to wash their cars at Arroyo Vista?

13. Some residents earn between 60%-80% of the median income, which makes them over-income for the Low Income Housing Tax Credit program. Are you willing to set aside some units for non-tax credit residents and, if so, how many?

### And Finally...

THANK YOU to all residents who attended the meetings. The Housing Authority will have more meetings as new information becomes available. The Housing Commission wants to be sure that all residents are informed as things progress and have the opportunity to ask questions. In the meantime, watch for the *Frequently Asked Questions* that should be distributed within the next two weeks.

**Arroyo Vista**
**6700 Dougherty Road, #151**
**Dublin, CA 94568**
**Phone (925) 828-3132**
**Eddie Ortiz, Manager**

000260

# ARROYO VISTA NEWSLETTER
## July, 2006
### Special Update on Redevelopment

In previous newsletters and at meetings we've explained that the Dublin Housing Commission was looking at the costs of rehabilitating Arroyo Vista as well as the possibility of demolishing the project and redeveloping the property. At its meeting on July 24, the Commission decided to redevelop the property and chose a developer team, Eden Housing and Citation Homes.

## Two Meetings

At its June 20 meeting the Housing Commission heard a report from staff on the potential *rehabilitation* of Arroyo Vista. Staff described the rehabilitation work that was needed, the estimated cost and possible sources of financing. Staff reported that the full cost of rehabilitation was about $20 million but only $10 million in sources could be identified.

At its July 24 meeting the Housing Commission interviewed two developer teams for *redevelopment*: 1) Eden Housing and Citation Homes and 2) Mid-peninsula Housing Coalition, Sun Valley Land Development Co. and R.W. Hertel. These were the top scoring two teams (out of eight) that responded in March to the Housing Authority's Request for Qualifications.

## Two Decisions

Both developer teams indicated that redevelopment was feasible and that sufficient financing sources were available. On the other hand, there were not enough resources to accomplish the rehabilitation. After considering all the information and after both the Commission and the residents asked questions of the developers the Commission made two decisions: 1) to redevelop the property and 2) to select Eden Housing, a non-profit corporation based in Hayward, and Citation Homes, a for-profit developer with offices in Santa Clara, as the development team. Their proposal is *very preliminary* at this time but, in general, Eden estimates it would build 179 rental units (29 more than the 150 units now at Arroyo Vista) and Citation estimates it would build 216 for-sale homes, 15 of which would be affordable.

## But Remember...

**No resident should worry about having to move right away or wonder if they will be able to afford new housing.** The Housing Commission has stated that redevelopment is contingent on the Housing Authority obtaining from HUD Section 8 vouchers so that Arroyo Vista residents will have affordable housing when they have to move. Competition for such vouchers is keen and we do not know if the Authority will be successful in obtaining them. *For this reason in particular it is difficult to predict if and when redevelopment will occur—it could take a couple of years.*

## And Finally...

The Housing Authority and the Eden Housing/Citation Homes developer team will have more meetings with residents as new information becomes available. Notice of these meetings will be provided.

000261

# ARROYO VISTA NEWSLETTER

## July, 2006

### Special Update on Redevelopment

**ARROYO VISTA REDEVELOPMENT: FREQUENTLY ASKED QUESTIONS**

**What is a Section 8 Housing Choice Voucher?**
A Section 8 Housing Choice Voucher is a federal subsidy that allows eligible families to rent in the private market and pay approximately 30% to 40% of their income toward rent. The local housing authority pays the remainder of the rent directly to the landlord.

**How soon will Vouchers be given to Arroyo Vista residents?** Vouchers are not currently available. However, now that the Housing Commission has decided to move forward with redeveloping Arroyo Vista, the Housing Authority will prepare an application HUD for 150 Vouchers, enough for every eligible family at Arroyo Vista. Redevelopment will not occur unless there are Vouchers for all eligible families. It will likely take a year or more to obtain HUD approval.

**Where can I use my Section 8 Voucher?**
Vouchers can be used to rent apartments, duplexes, condominiums, and single family homes in any city in the U.S. covered by a housing authority. For example, a Voucher can be used in Hayward, Castro Valley, Dublin, Pleasanton, San Ramon, or Livermore or far away, including out of state.

**Will I get help in finding a new home and with moving?** Yes, relocation assistance will be given so that families will be successful in finding a rental unit. The Alameda County Housing Authority, as well as every other housing authority operating a Section 8 program, provides listings of owners who are willing to rent to persons with a Voucher. Our rental listing can be found on the internet at www.haca.net (click on Landlord Listings). In addition, we will pay for your reasonable moving costs.

**How much would my rent be under the Voucher program?** Section 8 participants generally pay about 30% of their total household income for rent. Assuming your income remains unchanged when you get a Voucher, your rent will be about the same as what you currently pay to live at Arroyo Vista.

**Can I use my Voucher to move back to the new rental units at Arroyo Vista?** Yes.

**Is there a time limit on finding a new home?**
Because this project involves relocation, the normal time limits for searching for a rental unit (generally 60 to 120 days) would not apply. However, you would want to be moved by the time the demolition is ready to start.

**Are there time limits on the Section 8 Voucher program?** Current program rules allow you to continue to receive Voucher assistance as long as you are income-eligible and as long as you fulfill the program obligations established by HUD. You will lose your Voucher assistance when your income rises to the point that your portion of the rent matches or exceeds the full amount of the rent.

**Do landlords do background checks and what if I have poor credit history?** Landlords are encouraged to screen prospective tenants under the Section 8 program. If contacted, the Dublin Housing Authority would respond to questions regarding the timeliness of an Arroyo Vista resident's rent payment history and other questions about fulfilling lease obligations. When you moved into Arroyo Vista, a similar background check was conducted by the Housing Authority. If you have poor credit, you may have to explain your personal situation to the prospective landlord.

**What happens if my income or family composition changes after I get a Voucher?** Like now, whenever your income changes or you have a change in family composition (persons moving in or out of your household) you are required to report the change to the local housing authority administering your Voucher. A determination would then be made if and when a change in rent is required.

**The developer proposed that 51 units would remain occupied during construction. Which units are these?** That was only a PROPOSAL and we do not know if this will happen. More studies and planning are required before we know.

000262

# June 2007

## *Arroyo Vista*

6700 Dougherty Rd.
Dublin, CA 94568
Phone: (925) 828-3132



---

**Dublin Housing Authority
Arroyo Vista Staff**

*Margie Newman*
**Dublin Area Manager**

*Carol Alves*
**Administrative Services**

**Maintenance Staff**
*Lee Alejandro
Manny Gutierrez
Charles Hughes*

**Office Hours**
**Monday - Friday**
8:30am - 3:00pm

**Saturday & Sunday**
Closed

**Closed Every Other Friday**

**Important Numbers**

Office: (925) 828-3132
Fax: (925) 828-5450



---

# REDEVELOPMENT UPDATE

In April all of you received the General Information Notice about the redevelopment of Arroyo Vista and the relocation that will be required. The Notice announced two meetings for April 24 that would be held to discuss the project. Some of you were able to attend those meetings. Representatives of the developers, Eden Housing and Citation Homes were present and described their plans for the project. They presented a slide show and pictures of the proposed layout of the new units and community building. Representatives of the relocation consultant retained by the Housing Authority, Overland Pacific & Cutler, also were present. They described the relocation process and answered a number of questions about timing and relocation benefits. Staff from the Housing Authority were present to answer questions about Section 8 Housing Choice Vouchers

At the meeting Housing Authority staff said there would be a meeting on May 23 to discuss the Section 8 homeownership program. THIS MEETING HAS BEEN CHANGED TO JUNE 6. The meeting is called: Introduction to Family Stability and Section 8 Rental and Homeownership, and will include information on the Section 8 program (both rental and homeownership) and ways of improving your credit to prepare for homeownership or renting in the private market. The meeting will take place at Dublin City Hall in the Regional Meeting Room from 6-8 PM. Watch for the flyer in the mail that announces this meeting.

Do not feel you have to move or begin looking for a new home now. Beginning next year, the relocation consultant will meet with each family individually to ascertain their relocation needs and explain the assistance that is available. In the meantime, if you have any questions about relocation, please call Overland Pacific & Cutler at 877-972-8908 (toll free) and ask for either Teresa Laverde or John Morris.

000263

## SCHOLARSHIP
## FOR A.V. STUDENTS

Dublin Housing Authority 2007
Scholarship Fund has been approved
and offers (1) **$500.00** scholarship for
Arroyo Vista students who meet the
necessary requirements:

1. Current and continued residency
2. In compliance with Housing rules
3. Financial need
4. Scholastic record
5. Character and leadership qualities

The recipients will be those who best
demonstrate need and leadership potential
for education and career advancement.
**DON'T MISS OUT!! APPLY NOW!!**
Applications are available at the Arroyo Vista
office. Applications and any required supporting
documentation must be submitted by
**5:00 p.m. June 14, 2007.** Questions about
the program may be directed to Vicki Brown
at (510) 727-8511.

## EMPLOYEE AWARD

Dublin Housing Authority employee,
Carol Alves, began her employment in
1972 with Alameda County Social Services
Agency at age 18. She transferred to Alameda
County Housing Authority in 1977 and is
celebrating her **"30 years of service"** with
the Housing Authority. She will be recognized
and honored at the June 2007 Housing
Authority Commission meeting in Hayward.
We congratulate Carol and appreciate all
her years of service.

## Zucchini Fries

*• 2 thin zucchini (1" diameter) •2 thin
yellow squash (1" diameter) • ½ tsp. oil
• 1 tsp. minced basil*
Cut the zucchini and squash into french
fry shapes about 2" long and ½" thick. In
a large no-stick frying pan over medium-
high heat, sauté the vegetables in the oil
about 5 minutes or until lightly browned.
Sprinkle with the basil.

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 RentIsDue Office Closed | 2 |
| 3 | 4 | 5 | 6 Late Fees Posted | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 Flag Day | 15 Office Closed | 16 |
| 17 Father's Day | 18 | 19 | 20 | 21 Summer Begins | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 Office Closed | 30 |

June

# *Arroyo Vista*

**July 2007**



6700 Dougherty Rd.
Dublin, CA 94568
Phone: (925) 828-3132

---

**Dublin Housing Authority
Arroyo Vista Staff**

*Margie Newman*
**Dublin Area Manager**

*Carol Alves*
**Administrative Services**

**Maintenance Staff**
*Lee Alejandro
Manny Gutierrez
Charles Hughes*

**Office Hours**
**Monday - Friday**
8:30am - 3:00pm

**Saturday & Sunday**
Closed

**Closed Every Other Friday**

**Important Numbers**
Office: (925) 828-3132
Fax: (925) 828-5450



---

# REDEVELOPMENT UPDATE

We had a great turn out at the meeting held at Dublin City Hall on June 6! Thank you to everyone who attended. A lot of information was covered at the meeting:

• The application to HUD to sell the property will be submitted in June. It will take about one year before it is approved.
• The property cannot be demolished until AFTER the application is approved.
• YOU DO NOT HAVE TO MOVE NOW. We anticipate starting relocation activities early next year.
• If you WANT to move before next year, you can.
• The Section 8 vouchers for all eligible households are available after July 25 (let's say, August 1).
• We have Section 8 vouchers for all eligible households—we will not "run out" if you decide to move next year instead of now.
• Housing Authority staff and the Housing Authority's relocation consultant will begin holding small group meetings (about 5 families at a time) at Arroyo Vista to more fully explain the Section 8 program and relocation benefits. We will contact you to schedule your meeting.

At the June 6th meeting a variety of benefits were described including payment of moving assistance, Section 8 voucher program rules, classes and counseling from the Tri Valley Housing Opportunities Center and inclusionary home ownership opportunities in the City of Dublin. You will hear more about all of these during the relocation process.
In the meantime, for questions please call the following:

| | |
|---|---|
| **Homeownership/Credit Counseling:** | Jorge Ramirez **925-373-3930** |
| **Relocation:** | John Morris/Teresa Laverde **877-972-8908 (toll free)** |
| **Section 8 Voucher Rules:** | Mary Rizzo Shuman **510-727-8570** |
| **Section 8 Homeownership:** | Betsy Safine **510-727-8585** |

000265

# July At The Movies

## Leave Fireworks in the Hands of the Professionals

### Transformers
Introduced in 1984, the Transformers brand took the world by storm with its compelling saga of the Autobots versus the Decepticons. The innovative "Robots in Disguise" resulted in a tremendously successful toy line from Hasbro and Takara, comic book series, television program and an animated feature film. More than 20 years later, a new generation has discovered the excitement of the Transformers brand and its legendary characters, including the two leaders of the opposing sides: Optimus Prime and Megatron. Starring: Shia LaBeouf, Megan Fox, Josh Duhamel, Jon Voight, Bernie Mac.



### Harry Potter And The Order Of The Phoenix
In "Harry Potter and the Order of the Phoenix," Harry returns for his fifth year of study at Hogwarts and discovers that much of the wizarding community is in denial about the teenager's recent encounter with the evil Lord Voldemort, preferring to turn a blind eye to the news that Voldemort has returned. Starring: Daniel Radcliffe, Rupert Grint, Emma Watson, Helena Bonham Carter, Gary Oldman, Ralph Fiennes.

### The Bourne Ultimatum
Matt Damon returns as the trained assassin Jason Bourne for the latest showdown in "The Bourne Ultimatum." All he wanted was to disappear. Instead, Jason Bourne is now hunted by the people who made him what he is. Having lost his memory and the one person he loved, he is undeterred by the barrage of bullets and a new generation of highly-trained killers. Bourne has only one objective: to go back to the beginning and find out who he was. Starring: Matt Damon, Julia Stiles, Joan Allen, David Strathairn, Paddy Considine, Edgar Ramirez.





### Underdog
"There's no need to fear. Underdog is here!" The superhero canine with a gift for rhyme returns in an all new live-action re-imagination of the classic cartoon, "Underdog." After an accident in the mysterious lab of maniacal scientist Dr. Simon Barsinister (Peter Dinklage), an ordinary beagle unexpectedly finds himself with unimaginable powers and the ability to speak. Starring: Jim Belushi, Peter Dinklage, Patrick Warburton, Brad Garrett, Jason Lee.

*Hot dogs, barbecues and get-togethers are how many Americans will plan to enjoy Independence Day this year. But no one plans a trip to the emergency room for the holiday. Unfortunately, that's what 6,500 people did in 2005 due to accidents caused by fireworks during the Fourth of July holiday weekend, according to the latest data from the U.S. Consumer Product Safety Commission. There were 10,800 firework-related injuries for the entire year, an increase of 1,200 injuries from 2004.*

Sadly, many of those injured were children. In fact, 45 percent of all fireworks injuries are to those aged 15 and younger. Most injuries are to the hands and fingers, but 1,400 were eye injuries, including contusions and lacerations, debris in the eye and burns. Eye injuries can take a very long time to heal, and some result in permanent vision loss.

Firecrackers and rockets are unpredictable. Some explode prematurely and rockets can take off on different flight paths than expected.

Even devices considered to be "safe and sane" fireworks are dangerous. In 2005, there were 500 children under the age of 5 that were hurt by sparklers. In fact, sparklers accounted for half of all fireworks injuries to children in that age group. Sparklers can burn up to 1,800 degrees Fahrenheit, while their sparks can ignite surrounding objects including clothing and shoes, causing terrible and painful burns.

Prevent Blindness America, the nation's oldest eye health and safety organization, urges everyone to leave fireworks to the professionals this year. Many communities offer spectacular displays to the public, free of charge. The group also offers a free brochure, "Safe Summer Celebrations" with creative ideas on how to celebrate the holiday without fireworks.

### Prevent Blindness America has these tips to help prevent fireworks-related injuries:

- ☆ Do not purchase, use or store fireworks of any type
- ☆ Be aware that even sparklers are dangerous and cause one half of fireworks injuries in children 5 and younger
- ☆ Protect yourself, your family and your friends by avoiding fireworks
- ☆ Attend only authorized public fireworks displays conducted by licensed operators
- ☆ Support legislation that restricts the importation, general sale and indiscriminate usage of fireworks by children and adults

### If someone's eye is injured in a fireworks accident, do the following:
If there are specks in the eye:
- ☆ DO NOT rub the eye
- ☆ Lift the upper eyelid outward and down over the lower lid
- ☆ Try to let tears wash out specks or particles
- ☆ If the speck doesn't wash out, keep the eye closed, bandage tightly and see a doctor or go to the emergency room

For a free copy of the Safe Summer Celebrations brochure or more tips on fireworks safety, visit Prevent Blindness America at www.preventblindness.org or call 800-331-2020.

000266

# Secrets of Smart Summer Snacking

*As you head outdoors to take advantage of the warmer weather, there are a number of easy ways to jump-start a healthy, active lifestyle and kick the couch potato routine.*

While it's great that you're getting more exercise, don't forget to consider smart eating habits along with increased activity. Fueling your body with healthy snack choices helps keep energy levels high. But many snacks we consider as sources of energy and nutrition are actually loaded with sugar and preservatives. Another common pitfall is to avoid snacking altogether, and rely on two to three big meals to provide all the nutrients and sustainable energy you need for the day.

"Smart snacking is a very important part of our daily diet," says registered dietitian and health educator Allegra Burton, MPH, RD. "By eating small portions balanced with protein and complex carbohydrates throughout the day, we continually fuel our bodies with the nutrients we need to stay healthy and energized."

Burton says picking the right snacks can be challenging, especially when you're hungry or on the go. She shares five easy tips to carry through your next trip or outdoor adventure.

◯ Plan ahead. Before you head to the lake for the weekend or a family road trip, plan on a variety of snacking options to satisfy everyone. Burton recommends fresh fruit, a mixture of nuts and dried fruit, low-fat string cheese, and plenty of bottled water.

◯ Snack small and snack often. Whether you're going to the gym, on a walk, or to the amusement park or beach, throw some treats in the car or your backpack. All-natural products like SOYJOY, a baked nutrition bar made with whole soy and real fruit, are great because they are just the right



size, taste great and provide even sustained energy. Keep a variety of flavors on-hand since more options will keep you more likely to come back for more of what's good for you.

◯ Mix it up. There are many smart snacking options to choose from every day. One day you could have fruit and nuts, the next day yogurt or veggies with a low fat bean dip. Variety will keep your taste buds from getting bored and will encourage you to keep reaching for healthier snacks.

◯ Give in, not up. It's hard to resist a cold, sweet treat on a warm day at the beach or family barbecue. Rather than avoiding moderate indulgences, flex your snack smarts. Choose low-fat frozen yogurt and

lean toward dark chocolate over milk or white chocolate since it has antioxidants that are good for your heart. And remember, it's all about portion control – a little goes a long way!

◯ Match snack with activity. Make sure to pack snacks appropriate for your activity. For example, perishable or bulky foods don't make sense if you're embarking on a hike. Instead pack all-natural snacks placed in baggies such as trail mix, and cut-up veggies that are easy to carry and stash in your backpack. Conversely, if you are going to be at the park or on a boat, items that can be stored in a cooler allow for more diverse snacking options.

To learn more about smart snacking or to ask Allegra Burton your own nutrition questions, visit www.SOYJOY.com.

# The 4th of July
## A Brief History

The Fourth of July is the day that we celebrate the independence of our great country from English rule. Americans traditionally celebrate with patriotic events, parades, fireworks and picnics with family and friends.

What actually happened on July 4th, 1776? This date marks neither the beginning nor the end of the American Revolution. The Declaration of Independence was finalized on this date, but only two people signed the document that day, with most appending their names to the document the following day. In fact, while most had signed by August, Thomas McKean of Delaware did not sign the Declaration until 1781.

The British considered the 56 signers to be traitors, and in the following years they took some retribution. Five were captured, tortured and killed. Twelve had their homes destroyed. Nine of them were killed fighting in the revolution, two lost sons in combat, and two of them had sons captured.

Of all the secular holidays, the Fourth of July is the only one whose celebration date resists change. Suggestions to alter the day of the celebration to fall on weekends, like all other national holidays, have been fiercely protested.

Americans today, as in the past, celebrate our independence from Britain without any apparent rancor towards our former oppressors. In fact, most Americans consider Britain to be our greatest ally as well as our parent country. And, many British consider the American Revolution to be one of the biggest mistakes in their country's history.

We share our British heritage with a large part of the free world; other former British colonies include Canada, Australia, and India.

The founding fathers believed that the Fourth of July (our country's acknowledged birthday) would be the greatest celebration of freedom and independence. The Virginia Gazette on July 18th, 1777 summed it up: "Thus may the 4th of July, that glorious and ever memorable day, be celebrated through America, by the sons of freedom, from age to age till time shall be no more. Amen and Amen."

# TIPS FOR A FUN, FESTIVE & SAFE 4TH OF JULY

People everywhere are fascinated by fireworks. But as dazzling as fireworks can be, they can be harmful if used improperly. The Dublin Housing Authority urges all residents to put safety first when celebrating this Fourth of July at Arroyo Vista. Only use legal fireworks. Legal fireworks show the name of the item, the name of the manufacturer or distributor and easy-to-read cautionary labeling/instructions for proper use. Commonly used fireworks include *cones, fountains, and sparklers*. Illegal devices include *M80s, M100s and silver salutes*. Illegal devices will usually be "unlabeled, will not bear a caution statement and will not list the manufacturer.

If you choose to use consumer fireworks to celebrate this year's Fourth of July festivities, remember the following safety tips from the National Council on Fireworks Safety:

-A responsible adult should supervise all fireworks
-Never give fireworks to young children
-Always purchase fireworks from reliable sources
-Follow label directions carefully
-Never point/throw fireworks at another person
-Use fireworks outdoors clearly away from buildings
-Never carry fireworks in your pocket or shoot them in metal/glass containers
-Light them one at a time and move back quickly
-Don't experiment with homemade fireworks
-Observe local laws and use common sense
-If attending a community display, leave your own fireworks at home

## Dublin Housing Authority Employee Recognition

Dublin Housing Authority employee, Lee Alejandro, began his employment with Alameda County Housing Authority in 1988 as Maintenance Worker I. He transferred to the Dublin Housing office in 1990 and has been working in the position of Maintenance Worker II since that time. We wish to thank Lee for his years of service with the Housing Authority and all the assistance he has provided to our residents.

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1<br>Rent Is Due | 2 | 3 | 4<br>Independence Day | 5 | 6<br>Late Fees Posted | 7 |
| 8 | 9 | 10 | 11 | 12 | 13<br>Office Closed | 14 |
| 15 | 16 | 17<br>Special Commission Meeting 6:00 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27<br>Office Closed | 28 |
| 29 | 30 | 31 | | | July | |

000268




## September 2007





6700 Dougherty Rd.
Dublin, CA 94568
Phone: (925) 828-3132



**Dublin Housing Authority
Arroyo Vista Staff**

*Margie Newman*
**Dublin Area Manager**

*Carol Alves*
**Administrative Services**

**Maintenance Staff**
*Lee Alejandro*
*Manny Gutierrez*

**Office Hours**
**Monday - Friday**
8:30am - 3:00pm

**Saturday & Sunday**
Closed

**Closed Every Other Friday**

**Important Numbers**

Office: (925) 828-3132
Fax: (925) 828-5450



# REDEVELOPMENT UPDATE

In the August newsletter we reported that on July 17 the Dublin Housing Commission approved the Disposition and Development Agreement (DDA) with the City of Dublin and the Alameda County Housing Authority, and the project developers, Eden Housing and Citation Homes. The Agreement commits each party to certain actions to allow the redevelopment to begin. At the time of the August newsletter the Alameda County Housing Authority had not yet approved the DDA. However, they did so on July 25 and now all parties have signed it.

In addition, the Housing Authority submitted the Disposition Application to HUD on August 14. The Application isn't considered complete until the environmental review is submitted to HUD, but we wanted to have HUD begin to review the Application and give us feedback while the environmental review being prepared.

Housing Authority staff and the relocation consultants have been holding small group meetings at Arroyo Vista to more fully explain the Section 8 program and relocation benefits. IF YOU WOULD LIKE TO ATTEND ONE OF THESE MEETINGS PLEASE SIGN UP AT THE OFFICE.

In the meantime, for questions please call the following:

| | |
|---|---|
| **Homeownership/Credit Counseling:** | Jorge Ramirez **(925)-373-3930** |
| **Relocation:** | John Morris/Teresa Laverde **(877)-972-8908 (toll free)** |
| **Section 8 Voucher Rules:** | Mary Rizzo-Shuman **(510)-727-8570** |
| **Section 8 Homeownership:** | Betsy Safine **(510)-727-8585** |

000269

## Arroyo Vista Residents Vacate

You may have noticed, some of your neighbors are missing. Several of our residents have chosen to vacate early to get a head start on available properties in the Dublin area. To be exact, (14) families have received Section 8 vouchers.

For security purposes, all vacant units will be boarded up as residents move. If you notice any problems with the boarded up units, such as graffiti or break-ins, please report them to Margie or Carol at the office. We need your help to make sure Arroyo Vista community remains safe during the relocation period.

The Housing Authority has stated many times that the redevelopment process is lengthy, and that YOU DO NOT HAVE TO MOVE NOW. We anticipate starting relocation activities early next year so that everyone can be moved by November 2008.

The Dublin Housing Authority wishes all our residents success in locating new housing.

## Dublin Housing Authority Employee Recognition

Dublin Housing Authority employee, Manny Gutierrez, began his employment as Groundsworker at Arroyo Vista in March of 2003. Manny would like to thank the residents who have helped maintain the common areas at Arroyo Vista through the years and hopes this will continue until the close of the property. Manny's favorite hobbies are cooking and playing softball. Thank you Manny for your years of service.

## Mango Strawberry Smoothie

*1 Cup Ice Cubes • 1 Ripe Mango, peeled, pitted and cubed • 9 Large Strawberries, hulled and halved • ½ Cup Plain Yogurt • ½ Cup Orange Juice • 2 Tbsp. Honey • 2 Tbsp. Lime Juice* - Crush ice in blender. Add remaining ingredients (minus one strawberry) and blend briefly until frothy. Serve cold over more ice. Slice the last strawberry and slide onto rim of glass. Makes 2 to 4 cups.

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 Rent Is Due |
| 2 | 3 Labor Day | 4 | 5 | 6 Late Fees Posted | 7 Office Closed | 8 |
| 9 Grandparent's Day | 10 Admission's Day | 11 Patriot Day | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 Office Closed | 22 |
| 23 Autumn Begins | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | | | | | | |

*September*

000270



**October 2007**

# Arroyo Vista

6700 Dougherty Rd.
Dublin, CA 94568
Phone: (925) 828-3132



---

**Dublin Housing Authority
Arroyo Vista Staff**

*Margie Newman*
**Dublin Area Manager**

*Carol Alves*
**Administrative Services**

**Maintenance Staff**
*Lee Alejandro*
*Manny Gutierrez*

**Office Hours**
**Monday - Friday**
8:30am - 3:00pm

**Saturday & Sunday**
Closed

**Closed Every Other Friday**

**Important Numbers**

Office: (925) 828-3132
Fax: (925) 828-5450



---

# WISHING YOU A HAPPY HALLOWEEN

It's a time for ghost and goblins to appear again and the staff would like to wish everyone a safe and happy Halloween. If you are out and about on this spooky night, please observe some safety rules.

• Drive carefully, sometimes in all of the excitement, small creatures of the night forget to look both ways before crossing a street or parking lot.
• Parents of "trick or treaters" should always accompany their children.
• Costumes with reflective material are a good idea to make them visible in the early evening.
• Please check your children's "bag of goodies" for tampered packages or unwrapped items and discard anything that looks suspicious.
• If you decorate with Jack-o-Lanterns, please avoid using candles as this is a fire hazard.
• Please respect the privacy of your neighbors who do not participate in Halloween and only knock on doors during the posted hours for trick-or-treating.

## REDEVELOPMENT UPDATE

The Dublin Housing Commission did not meet in the month of September so there is no Commission action to report on. Residents continue to move from Arroyo Vista and we have heard that many are very pleased with their new homes. Next week staff will bid out the contract for boarding up the homes as residents continue to move out. We expect the Commission to award that contract at its October meeting. **Note that the October meeting has been moved to October 16, same time and place.**

In the last newsletter we told you that we have submitted the Disposition Application to HUD. HUD has told us that the Application is under review.

Please report to the office any suspicious activity you may notice at the boarded up units, including graffiti. We need your help to make sure Arroyo Vista remains a safe place to live during the transition.

## Your Birthstone and Flower for October



Opal (Hope, Innocence, Purity), Opals are made up of a non-crystalline form of the mineral silica. The flowers for October are Calendula and Cosmos.

## Parmesan Pork Chops

• 8 pork chops • 1 cup seasoned bread crumbs • 3 Tbsp. grated Parmesan cheese • ½ tsp. salt • ¼ tsp. pepper • 1 egg • 2 Tbsp. milk • ½ Tbsp. butter

Combine bread crumbs, Parmesan cheese, salt and pepper. Beat egg and milk in flat dish. Dip chops in crumbs, then egg mixture, then again in crumbs. Melt butter in baking dish. Place chops in dish. Bake at 325° for one hour, turning after 30 minutes.

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 Rent Is Due | 2 | 3 | 4 | 5 Office Closed | 6 |
| 7 | 8 Columbus Day | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 National Boss Day Commission Mtg | 17 | 18 | 19 Office Closed | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 Halloween | | | |

## OCTOBER



# *Arroyo Vista*

**November 2007**



6700 Dougherty Rd.
Dublin, CA 94568
Phone: (925) 828-3132

---

## Dublin Housing Authority
## Arroyo Vista Staff

*Margie Newman*
**Dublin Area Manager**

*Carol Alves*
**Administrative Services**

**Maintenance Staff**
*Lee Alejandro*
*Manny Gutierrez*

### Office Hours
**Monday - Friday**
8:30am - 3:00pm

**Saturday & Sunday**
Closed

**Closed Every Other Friday**

### Important Numbers
Office: (925) 828-3132
Fax: (925) 828-5450



---

# REDEVELOPMENT UPDATE

Eden Housing and Citation Homes, the developer for Arroyo Vista, have been busy developing the design plans for the redevelopment of Arroyo Vista to submit to the City of Dublin Planning Department. They plan to host a meeting before the end of the year to discuss the plans and answer questions that residents may have about the new project. Watch for an announcement of this meeting.

Your neighbors are continuing to move. As of mid-October the Alameda County Housing Authority has issued Section 8 vouchers to 24 families and the Dublin Housing Authority has provided relocation benefits to those families. A private contractor has been awarded the contract for boarding up the vacant units. On that subject, if you notice any problems with the boarded up units such as graffiti or break-ins, please report them to Margie or Carol at the office. We need your help to assure that Arroyo Vista community remains safe during the relocation period.

The Housing Authority has stated many times that the redevelopment process is lengthy and that **YOU DO NOT NEED TO MOVE NOW.** We anticipate starting relocation activities early next year so that everyone can be moved by November 2008. Housing Authority staff and the relocation consultants have been holding small group meetings at Arroyo Vista to fully explain the Section 8 program and relocation benefits. IF **YOU WOULD LIKE TO ATTEND THESE MEETINGS PLEASE SIGN UP AT THE OFFICE.**

For questions, please call:

Homeownership/Credit Counseling: Jorge Ramirez
925-373-3930
Relocation: John Morris/Teresa Laverde
877-972-8908
Section 8 Voucher Rules: Mary Rizzo-Shuman
510-727-8570
Section 8 Homeownership: Betsy Safine
510-727-8585

000273



## Services Provided By Dublin Police

In addition to the traditional services, Dublin Police also offers the following:

**Fingerprinting:** Monday & Wednesday 1:00-4:00pm. Please call 925-833-6670 for an appointment.

**Security Assessments:** police personnel will review your home or business' security level and provide recommendations. Contact Crime Preventation at 925-833-6677 for an appointment.

**Child Safety Seat Inspections:**
A nationally certified technician is available to educate and assist parents and/or care-givers on correct car seat installation. Please call 925-833-6670 for an appointment.

**Hotline numbers to call:**
Crime Tip Hotline:      925-833-6638
Graffiti Hotline:      925-833-6638
Abandoned Vehicles:   510-452-2121
Code Enforcement:    925-833-4559
Animal Control:       510-667-7763

## Herb Crusted Turkey Breast

- *3 to 3 ½ lb. fresh turkey breast half*
- *2 Tbsp. margarine, melted*
- *1 tsp. lemon and pepper seasoning*
- *1 tsp. Italian seasoning*

Remove turkey skin completely. Wash turkey & pat dry. Mix margarine & seasonings, then brush over turkey breast. Place turkey on rack in baking pan, cover with tent of aluminum foil. Roast in 350º oven for 2 ½ to 3 hours or until meat thermometer registers 160ºF. Remove foil, cook for an additional 30 minutes or until meat thermometer reads 170ºF. Let stand for 10 minutes before carving.



You can easily judge the character of a man by how he treats those who can do nothing for him.

~ James D. Miles

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **November** | | | | *1* Rent Is Due | *2* Office Closed | *3* |
| *4* Daylight Savings Time Ends | *5* | *6* Election Day ✓OTE | *7* | *8* | *9* | *10* |
| *11* Veteran's Day | *12* Office Closed | *13* | *14* | *15* | *16* Office Closed | *17* |
| *18* | *19* | *20* | *21* | *22* Happy Thanksgiving | *23* Office Closed | *24* |
| *25* | *26* | *27* | *28* | *29* | *30* Office Closed | |

000274

**DECLARATION OF LISA GREIF**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 12**

000275

Ramón P. Arias
Executive Director

 **BAY AREA LEGAL AID**

**WORKING TOGETHER FOR JUSTICE**

November 2, 2007

Alphonso Jackson
Department of Housing and Urban Development
451 7th Street S.W.
Washington D.C. 20410
By fax (202) 708-2476

Ainars Rodins
Department of Housing and Urban Development
Special Applications Center
77 W. Jackson Blvd., Room 2401
Chicago, IL 60604-3507
By fax (312) 886-6413 and email Ainars.Rodins@hud.gov

Kim Kendrick
Fair Housing and Equal Opportunity
Department of Housing and Urban Development
451 7th Street S.W.,
Washington, DC 20410

> Re:    Disposition Application from Dublin Housing Authority for Arroyo Vista,
> Submitted to HUD Special Applications Center on August 15, 2007

Dear Mr. Jackson, Mr. Rodins, and Ms. Kendrick:

We represent Rhenae Keyes, Andres Arroyo, Darlene Brown and Elise Veal, low-income tenants who currently reside in the Arroyo Vista public housing development operated by the Dublin Housing Authority (DHA). We also represent the Arroyo Vista Tenants Association.

We request that HUD consider the following comments regarding the Dublin Housing Authority's application for the demolition or disposition of units located at the Arroyo Vista housing development.

The Dublin Housing Authority's disposition application suffers from many shortcomings and is not in the best interest of the residents or the Dublin Housing Authority. These shortcomings include prematurely entering into transactions with developers, conflicting with DHA's own annual and five-year plans, not creating a relocation plan, failing to consult properly with residents, and not submitting an appraisal or environmental review. DHA's

Alameda County Regional Office
405 14th Street, 11th Floor
Oakland, CA 94612

Phone: 510.663.4744
Toll Free: 800.551.5554
Fax: 510.663.4740

www.baylegal.org

⌐LSC

000276

application for demolition/disposition should be denied because:

       (a) DHA failed to satisfy statutory requirements for disposition,
       (b) DHA failed to submit a complete disposition application to HUD, and
       (c) DHA failed to comply with its obligations and certification with respect to civil rights
       laws by failing to affirmatively further fair housing and by proposing to take actions
       which would disparately impact African Americans, Hispanics, and Asian Americans and
       families with children.

Based upon these short comings and the additional data provided below, HUD should not
approve DHA's application for disposition of Arroyo Vista. 42 U.S.C. §1437p(b).

BACKGROUND

Arroyo Vista consists of 150, well maintained detached single family homes in Dublin,
California, a city of about 35,581 in the San Francisco Bay Area.[1]  Over 300 residents live in the
development which consists of numerous tree-lined cul-de-sacs covering 22.9 acres.  The units
themselves are a mix of 16 one-bedroom, 78 two-bedroom, 32 three-bedroom, and 24 four-
bedroom homes.  Each of these homes has a lawn and backyard.  Catering to the predominance
of families with children, the center of the complex contains a community center with day care
center, a playground, and basketball courts.[2]

DHA proposes to remove these 150 units of occupied public housing to replace them with 405
residential units - 210 market rate "for sale" homes, 16 affordable "for sale" homes, and 179
rental units, 49 of which are proposed to be reserved, with Section 202 funding, for seniors.
These new rental units have proposed rents starting at $471 for 52 extremely low-income one-
bedroom units and range to $1307 per month for five low-income three bedroom units, set
according to the Low Income Housing Tax Credit program.

On July 17, 2007 DHA prematurely entered into a binding Development Agreement for Arroyo
Vista with developers of the proposed new housing development. Without any prior approval,
DHA has relocated between 15-20 families from Arroyo Vista, and boarded up their now-vacant
units making them unavailable for occupancy.  We have been informed that the relocated
residents are mainly elderly residents who have moved to senior housing in Dublin.  Relocation
has begun prior to completing a relocation plan or even a survey of residents' relocation needs.

DHA claims that Housing Authority of the County of Alameda (HACA) has set aside 150
Section 8 vouchers for families who will be forced to leave Arroyo Vista.  It is not clear what
authority, if any, HACA has to allocate its vouchers for the purpose of relocation of Arroyo Vista
Residents. HACA's current Administrative Plan makes no provision for such priority use of
vouchers over current waitlist applicants.[3]

The application for disposition was developed by DHA without consultation of the residents of

---

[1] Arroyo Vista is described in the Alameda County HOME Consortium's FY05-09 Consolidated Plan; viewed at
http://www.acgov.org/cda/hcd/consolidated.htm.
[2] Photos of the development will be sent via email and under separate cover in hard copy.
[3] HACA's Administrative can be found at http://www.haca.net/haca/pdf/adminplan.pdf.

Page 3                                                         November 2, 2007

Arroyo Vista. No offer of sale was made to the resident organization or other eligible
organizations that might preserve the property.

According to DHA's Five-Year Plan, there are 267 families on the waiting list for housing at
Arroyo Vista.[4] Of these families, 73.8% (197 families) have extremely low incomes, and 89.1%
(or 238) have children, while only 3.7% (or 10) are elderly. The proposed development to
replace Arroyo Vista does not match the needs of the residents on the waiting list or current
residents.

HUD SHOULD NOT APPROVE DHA'S APPLICATION FOR DISPOSITION OF ARROYA VISTA BECAUSE
DHA CANNOT ESTABLISH THAT THE DISPOSITION IS IN THE BEST INTEREST OF THE RESIDENTS AND
THE PHA

The laws governing the disposition of public housing lay out the standards for approving an
application. In this case, DHA may only dispose of Arroyo Vista when it has determined that the
disposition is:

   ...

> (i) in the best interests of the residents and the public housing agency; (ii) consistent with
> the goals of the public housing agency and the public housing agency plan; and (iii)
> otherwise consistent with this subchapter. . .

42 U.S.C. §1437p(2)(B). DHA's application to HUD for disposition fails to point to any official
act of the agency making such a determination, other than the application itself. The proposed
disposition should be denied because it is not in the best interest of the residents or DHA, and
therefore is inconsistent with the statute.

### Disposition is not in the Best Interest of the Residents

DHA's application is not in the best interest of residents. As proposed, disposition will eliminate
the residents' long-term, stable tenancies. While the application states that families will receive
vouchers to relocate, the application and supporting documents do not provide for the use of
vouchers in the Dublin area. This problem must be addressed in any disposition plan or the
relocation plan.

Furthermore, the redevelopment plans for Arroyo Vista include Low Income Housing Tax
Credits (LIHTC) units, but those units, at best, are only required to be affordable to people who
earn no more than 60% of the area median income (AMI). In fact, 64% of Arroyo Vista's
current residents make less than 30% AMI. Thus the replacement units will not be affordable to
the current residents.[5]

---

[4] DHA's Five Year Plan is available at http://www.haca.net/haca/pdf/2005-2009_5-YearPlanVersion2007_
dublin.pdf.
[5] LIHTC housing is not an easy replacement for public housing. On the one hand, residents of public housing may
be too poor to reside in LIHTC properties as their income is so low that rents set at 30% of 60% of AMI is not
affordable. On the other side, LIHTC housing is not targeted to those higher income public housing residents, those
who earn more than 60% of AMI.

000278

The application does not indicate that there would be appropriate unit sizes available to current Arroyo Vista residents or families on the waiting list. For example, 83% of current Arroyo Vista residents are composed of families of 2 or more; 56%, 3 or more. And for those on the waitlist for public housing, 36% need a four bedroom apartment. The proposed redevelopment will not meet the needs of the current residents. It proposes to increase one bedroom units by 430%, *decrease* two bedroom units by 11%, increase three bedroom units by only 5%, and *decrease* four bedroom units by 60%. Furthermore, while only 13 current Arroyo Vista residents are elderly, and there are only ten elderly persons on the waitlist, DHA proposes to replace 49 units with housing restricted to senior occupancy only. Simply put, without assurance that a redevelopment plan will commit to units that are the appropriate size for the needs of the current residents, disposition is not in their best interests.

Current residents will also suffer if they are forced to relocate using vouchers because housing affordable to extremely low income families is not available in Dublin. According to the city's Housing Element plan, the average rent in Dublin ranges from $1350 for a one-bedroom apartment to $2495 for a four-bedroom home. The fact that this is an expensive rental area is confirmed by the payment standard for the area which is set at 120% of the fair market rent.[6] According to the City of Dublin itself, only 3% of its housing is potentially affordable to very low-income families and as of October 24, 2007, the Housing Authority of the County of Alameda's internet rental listings search found only two available apartments in Dublin.

### *Disposition is not in the Best Interest of the Dublin Housing Authority*

The application fails to establish that the disposition is in the best interest of DHA. DHA justifies its application for disposition by claiming that the upkeep for Arroyo Vista is too expensive. DHA has shown no evidence that maintenance is an unmanageable burden or that the current operating subsidies fail to allow for adequate management and maintenance. In fact, the most recent Consolidated Plan describes the property as "well-maintained." While DHA notes that it operates with an annual Capital Fund grant of $273,978, DHA does not demonstrate that the amount is insufficient to maintain the premises, or that there are not other cost effective ways to increase the funds available to make capital improvements to the existing buildings. It continues to say it does not have the funds itself to redevelop the property, but never explains why the property needs to be completely redeveloped. In fact, as recently as in its 2006 Annual Plan, DHA discussed making regular improvements such as energy efficient sliding glass doors, installing ceiling fans, and parking maintenance. In the past years, DHA has used capital funds to improve sidewalks, repair landscaping, renovate kitchens, and perform other routine

---

[6] Generally, payment standards are set at between 90-110% of fair market rent. In order to set the payment standard at 120%, a PHA must get special approval from HUD. 24 C.F.R. §§ 982.503(c)(4) states that HUD will only approve this higher payment standard: "(A) To help families find housing outside areas of high poverty, or (B) Because voucher holders have trouble finding housing for lease under the program within the term of the voucher." Thus, the fact that Dublin has a payment standard at 120% of the fair market rate is significant because it demonstrates that voucher holders have demonstrated difficulty leasing up in the area or that a higher payment standard is necessary to allow for deconcentration of poverty. Thus, we can expect Arroyo Vista residents to have the problems leasing up in the area or that disposition of their homes will reduce housing opportunities in areas outside of high poverty.

maintenance. Thus, there is no evidence that disposition would be in the best interest of DHA.

## HUD SHOULD NOT APPROVE DHA'S APPLICATION FOR DISPOSITION OF ARROYA VISTA BECAUSE DHA HAS FAILED TO SUBMIT A COMPLETE APPLICATION FOR DISPOSITION

In order for HUD to approve a disposition, the PHA must meet a number of criteria, as listed in both 42 U.S.C. §1437p and agency regulations at 24 C.F.R. §970.7. DHA has failed to meet a number of these criteria.

### *DHA prematurely entered into a Development Agreement with Citation Homes and Eden Housing*

The first section of the regulation forbids any transaction on a disposition without prior written approval of HUD. If a PHA violates that rule, they will not receive any funds from HUD for the disposition of the property. DHA admits that it has taken action inconsistent with this regulation in their application, line 13, where the agency explains that it has already signed a disposition sales contract where that step is not permissible until *after* HUD approval of the application. In this case, DHA entered into a Development Agreement, not only without written permission to do so, but without even having completed basic components of its application for disposition. This action violates 24 C.F.R. §970.7(a).

### *The disposition application is inconsistent with PHA annual and five-year plan, or Alameda County's consolidated plan*

The regulations at 24 C.F.R. §970.7(a)(1) also require that the disposition application "is identical" with the PHA annual plan. DHA's 2007 Annual Plan provides:

> As set forth in the PHA's 5-Year Plan for Fiscal Years 2005-2009, the PHA plans to submit an application to HUD, by April, 2007, to dispose of the entire 150 unit Arroyo Vista Project . . . Eden Housing and Citation Homes, a non-profit and for-profit developer, respectively, have been selected as the development team to develop 179 affordable rental units and 26 for-sale units, 15 of which will be affordable, on the site. . .

This statement varies considerably from the proposed disposition. First, the Development Agreement for Arroyo Vista states that 210 for-sale units will be built, not just 26. Second, the Annual Plan is unclear, in that only the amended 5-year plan discusses disposition; in the original plan, staff assured residents that they were not seeking disposition. These regulations are meant to ensure a fair process in a prospective disposition and these inconsistencies highlight the lack of candor by DHA.

Each housing authority must also certify each year, according to 24 C.F.R. § 903.15, that its Annual Plan is in accordance with its Consolidated Plan. DHA in its 2007 Annual Plan statement of consistency with the Consolidated Plan, claims that its actions increase the availability of affordable rental housing for extremely low income, low income, and moderate income households. The housing authority claims that it is promoting new construction of units by non-profit developers, a goal articulated in the Consolidated Plan. However, the Consolidated Plan

000280

itself provides more context. The section to which DHA refers, Part I of the Strategic Plan, states, "[o]ver 75% of extremely low income renters have difficulty finding housing that they can afford. Almost all (95%) extremely low income renters with large families have problems finding affordable housing."[7]   The majority of proposed rentals will be LIHTC or senior units so these units will not serve extremely low income renters or renters with large families. Thus, DHA's certification that it is in compliance with the Consolidated Plan is false because the proposed Arroyo Vista redevelopment will not increase housing opportunities for families in extreme need of low income housing.

### DHA has not created a relocation plan for current Arroyo Vista residents

A PHA is required to create a relocation plan for current residents of the development proposed for disposition. DHA acknowledges in its application that it has yet to submit a relocation plan, as it has contracted with the consultants, Overland, Pacific & Cutler to create one. Despite the lack of relocation plan, DHA has already started relocating residents. While DHA says that it has told those residents that they do not yet have to move, but may choose to do so, there is no evidence that they have complied with 42 U.S.C. §1437p(4), which sets forth a minimum number of relocation requirements. For example, DHA must give residents 90 day notice prior to displacement, offer comparable housing that meets housing quality standards and is located in an equally desirable area, and provide relocation expenses and assistance. Moreover, DHA has not complied with the more stringent relocation requirements of state law, the California Relocation Assistance Act (Govt. C. §§7260 et seq.).

### DHA did not properly consult with residents with regard to proposed disposition

When considering disposition of a development, 24 C.F.R. §970.9 requires the local housing authority to develop the plan in consultation with residents. DHA claims that it has consulted with residents by mailing newsletters and holding public meetings. None of DHA's supporting documents suggest that there was actual consultation, but instead show that it simply disseminated information. For example, the newsletters attached to the application for disposition describe residents asking whether or not they must move immediately, but do not suggest that any actual input was requested from the residents. When residents inquired about redevelopment during comments to the 2006 Annual Plan, DHA staff told them that there were no plans for disposition and demolition and that no decision could be made without an amendment to the Annual Plan and "public hearing on the matter." Merriam-Webster dictionary defines consultation as asking the advice or opinion of someone.[8] The definition does not contemplate the mere act of informing tenants of what DHA is doing. DHA has not properly consulted with current residents of Arroyo Vista, many of whom will be left struggling to find appropriate housing if disposition is approved.

Residents have a right of first refusal to purchase any property that a PHA would like to dispose of. DHA never even took the first step to provide residents with notice that Arroyo Vista was for sale. It argues that the resident council disbanded in mid-2006. However, prior to this time that

---

[7] Alameda County FY 05-09 Urban County Strategic Plan can be viewed at
http://www.acgov.org/cda/hcd/documents/Urban%20County%20Stategic%20Plan%202005.pdf
[8] Merriam-Webster Dictionary, available at http://www.m-w.com/dictionary/consult.

the council disbanded, DHA was already requesting bids from developers as it simultaneously researched rehabilitation. While the application does not note the date that the request was sent out, it does note that residents were shown the proposals from various developers, suggesting that the DHA had every opportunity to offer Arroyo Vista to residents, but did not. Nor did DHA inform the resident council that it should continue meeting because of the pending decision on disposition. Moreover, DHA's board officially recognized the resident organization pursuant to 24 C.F.R. part 964, as an eligible resident organization. There is no exception in 24 C.F.R. §970.11 that allows DHA to fail to give notice of the proposed sale of the property because DHA unilaterally determined that the tenant association no longer exists. DHA failed to provide notice to the officers of the resident association in violation of the regulations.

### DHA has not completed the required reviews for disposition

DHA also fails to submit either an appraisal or an environmental review. Yet, the premature Development Agreement provides for the sale of Arroyo Vista for about $12 million. With no appraisal, setting the sale price of the development is illogical and violates HUD's regulations. DHA's application for disposition contains serious deficiencies that forsake the notice and process required for something as final and serious as disposition of a property.

### Disposition of Arroyo Vista is contrary to public policy and Congressional intent

Finally, DHA's application for disposition of Arroyo Vista is contrary to Congressional and HUD policy promoting the deconcentration of poverty and creating more family choice in housing. 42 U.S.C. §1437c-1(d)(3); 42 U.S.C. 1437f(a); 24 C.F.R. §982.353. In fact, a case study commissioned by HUD specifically lauds the movement of low-income people into suburban Alameda County from more urban areas such as Oakland and Berkeley.[9] By displacing residents in Arroyo Vista who will not be able to find adequate housing in the City of Dublin, a suburb with a high median income, DHA's proposal is contrary to the intent of the voucher program and legislation such as the Quality Housing and Work Responsibility Act ("QWHRA"). Thus, for all of the aforementioned reasons, HUD should deny the DHA's application for disposition of the Arroyo Vista development.

### HUD SHOULD DENY DHA'S APPLICATION FOR DISPOSITION OF ARROYO VISTA BECAUSE DHA FAILED TO COMPLY WITH ITS OBLIGATIONS WITH RESPECT TO CIVIL RIGHTS LAWS BY FAILING TO AFFIRMATIVELY FURTHER FAIR HOUSING AND BY PROPOSING TO TAKE ACTIONS WHICH WOULD DISPARATELY IMPACT AFRICAN AMERICANS HISPANICS, AND ASIAN AMERICANS AND FAMILIES WITH CHILDREN

### DHA's Actions have a Discriminatory Effect

In addition to lacking a basis for disposition of Arroyo Vista and failing to follow statutory and regulatory guidelines, DHA would violate Fair Housing laws if disposition is to proceed as planned. Title VIII of the Civil Rights Act, also known as the Fair Housing Act, prohibits actions that have a harmful discriminatory effect on members of minority groups, even where there is no

---

[9] Center for Urban Policy Research, Case Study of Section 8 Rental Vouchers and Rental Certificates in Alameda County, California, *available at* http://www.huduser.org/Publications/pdf/alameda.pdf

discriminatory purpose present. There will be a discriminatory effect if there is a disparate impact on members of a protected class, such as race. In this situation, the residents of Arroyo Vista constitute a much a larger of percentage of people of color than are residing in the city of Dublin. The racial breakdown of Arroyo Vista residents is as follows:

1   Black/African American: 28%
2   White/Caucasian: 52%
3   American Indian/Alaskan Native: 1%
4   Asian: 15%
5   Native Hawaiian/Other Pacific Islander:4 %
6   Latino/Hispanic: 21 %

This must be compared with the racial breakdown of Dublin as a whole:
1   Black/African American: 10%
2   White/Caucasian: 69.4%
3   American Indian/Alaskan Native: .7%
4   Asian: 10.3%
5   Native Hawaiian/Other Pacific Islander: 0.3%
6   Latino/Hispanic: 13.5%

For every category, a greater percentage of minorities reside in Arroyo Vista than in the general population of Dublin. Additionally, Arroyo Vista's redevelopment would disproportionately impact people of color on the waiting list for public housing. According to DHA's five-year plan, approved in 2005, over 48% of people waiting for public housing are African American and there are also disproportionate numbers of Asian and Native American people on the waitlist when compared to the race of the those families residing in non-subsidized housing in Dublin. These demographics make it clear that by getting rid of public housing in Dublin, that people of color will be adversely affected by the disposition. Given the low numbers of minorities in Dublin, it is likely that the minority residents of Arroyo Vista will not find housing and be forced to move elsewhere, and thus DHA violates the Fair Housing Act. Also, because it will be difficult for displaced residents to find housing in the Dublin area, disposition will have the effect of furthering segregation.

Families with children will also be significantly impacted by the disposition of Arroyo Vista. Sixty-three percent of the households in the development are families with children. In fact, 46% of the people living in Arroyo Vista are under 18, with 57% of households composed of 3 or more members. On DHA's waitlist, 89% are families with children; 36.6% of families requested 4 bedroom units. In comparison, Census data shows that only 43% of households in the City of Dublin are composed of three or more members. Only 15% of the city's housing has 4 bedrooms and the Development Agreement for Arroyo Vista proposes a 60% reduction in such units. The City of Dublin can not absorb large families with Section 8 vouchers and they will be forced to look elsewhere for housing. It is clear that there will be a disparate impact on minorities and families with children if the disposition application is approved and thus, DHA, at a minimum, must prevent such discriminatory effects.

Page 9                                                         November 2, 2007

### *DHA has failed to affirmatively further fair housing*

DHA has a duty not just to avoid discriminatory effect, but also to affirmatively further fair housing. Section 808 of the Fair Housing Act requires that "the Secretary of Housing and Urban Development shall [...] administer the program and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. §3608(e). PHAs share this duty with HUD, as provided by and Executive Order 11063 and its implementing regulations. The regulations say that all participants in HUD housing program must "take all action necessary and proper to prevent discrimination on the basis of race." E.O. 11063 at Part I, §101  At a minimum this means that DHA must gather information about potential racial and socioeconomic effects so that it may make informed decisions. 24 C.F.R. § 903.7(o).[10]  QWHRA also requires that PHAs certify that they will affirmatively further fair housing. 42 U.S.C. §1437c-1(d)(15).[11]

Despite its duty to affirmatively further fair housing, DHA has not obtained any analysis of the housing market in Dublin. DHA has not determined the racial and class breakdowns of the residents of Arroyo Vista and compared that to the figures for the City of Dublin; it has not addressed the fact that the disposition will reduce opportunities for racial and ethnic minorities and families with children to reside in the Dublin area; it has failed to determine if the loss of these units will cause the displaced racial and ethnic minorities to re-segregate; and it has not determined whether it is possible for voucher holders who are minority families or families with children to find and maintain homes in the city of Dublin.  It does not appear that DHA has not in any way engaged in affirmatively furthering fair housing.

CONCLUSION

DHA's application for disposition of Arroyo Vista should be denied for the aforementioned reasons.  There is an acknowledged need for extremely low-income housing in the City of Dublin and it is necessary to preserve housing affordable for such families in Dublin.

Thank you for your consideration of these comments.  Please contact us with any questions.  We also ask that you provide us with a response to our concerns and copy us on any communication

---

[10] The basic duties of the obligation to affirmatively further fair housing are as follows. "Civil rights certification. (1) . . . The PHA also must certify that it will affirmatively further fair housing . . (3) A PHA shall be considered in compliance with the certification requirement to affirmatively further fair housing if the PHA . . (i) Examines its programs or proposed programs; (ii) Identifies any impediments to fair housing choice within those program; (iii) Addresses those impediments in a reasonable fashion in view of the resources available; (iv) Works with local jurisdictions to implement any of the jurisdiction's initiatives to affirmatively further fair housing that require the PHA's involvement; and (v) Maintains records reflecting these analyses and actions."

[11] In addition to statutory guidance, a number of cases have addressed HUD and PHAs duty to affirmatively further housing. *See, e.g., NAACP, Boston Chapter v. Sec'y of HUD*, 817 F.2d 149, 154 (1st Cir. 1987)(rejecting HUD's argument that it only had a duty to avoid discrimination and noting that this duty includes, among other things, such actions such as determining whether a redevelopment will lead to increased segregation); *Darst-Webbe Tenant Ass'n Bd. V. St. Louis Hous. Auth.*, 339 F.3d 702, 713 (8th Cir. 2003)(remanding a case challenging a Hope VI development on the basis that the District Court did not appropriately consider whether the housing authority had fulfilled its obligation to affirmatively further fair housing; *Shannon v. HUD*, 436 F.2d 809, 816 (3rd Cir. 1970); *Langlois v. Abington Hous. Auth.*, 234 F. Supp. 2d 33 (D. Mass. 2002)(discussing in detail, a PHA's duties under both Title VIII and the QHWRA).

000284

Page 10                                    November 2, 2007

to DHA on this matter.


Sincerely,

BAY AREA LEGAL AID
Phillip Morgan
Lisa Greif
Naomi Young

THE CALIFORNIA AFFORDABLE HOUSING LAW
PROJECT OF THE PUBLIC INTEREST LAW PROJECT
Craig Castellanet
Deborah Collins
Mike Rawson

NATIONAL HOUSING LAW PROJECT
Catherine Bishop
Navneet Grewal


cc:

Stephen Schneller
Regional Director
San Francisco Regional Office
600 Harrison St. 3rd Floor
San Francisco, CA 94107-1300

Chuck Hauptman
Fair Housing Director
San Francisco Regional Office
600 Harrison St. 3rd Floor
San Francisco, CA 94107-1300