LEE C. ROSENTHAL, State Bar #58778
lrosenthal@goldfarblipman.com
ROBERT C. MILLS, State Bar #158097
rmills@goldfarblipman.com
JULIET E. COX, State Bar #214401
jcox@goldfarblipman.com

GOLDFARB & LIPMAN LLP
1300 Clay Street, Ninth Floor
Oakland, California 94612
Telephone: (510) 836-6336
Facsimile: (510) 836-1035

Attorneys for Respondents and Real Parties in
Interest DUBLIN HOUSING AUTHORITY;
HOUSING AUTHORITY OF THE COUNTY OF
ALAMEDA; SCS DEVELOPMENT COMPANY;
and EDEN HOUSING, INC.

JOSEPH M. QUINN, State Bar #171898
jquinn@meyersnave.com
ARIANA MOHIT, State Bar #211407
amohit@meyersnave.com

MEYERS, NAVE, RIBACK, SILVER & WILSON
575 Market Street, Suite 2600
San Francisco, California 94105
Telephone: (415) 421-3711
Facsimile: (415) 421-3767

Attorneys for Respondent CITY OF DUBLIN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARROYO VISTA TENANTS ASS'N *et al.*,<br><br>Petitioners,<br><br>v.<br><br>CITY OF DUBLIN *et al.*,<br><br>Respondents,<br><br>SCS DEVELOPMENT COMPANY *et al.*<br><br>Real Parties in Interest. | Case No.: Case No.: 3:07-cv-05794-MHP<br><br>**DECLARATIONS IN OPPOSITION TO MOTION BY PETITIONERS FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF MOTION BY RESPONDENTS FOR SUMMARY JUDGMENT**<br><br>Dates:       March 3/March 31, 2008<br>Time:        2:00 p.m.<br>Location:   Courtroom 15, United States District Court, Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102 |

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

Respondents submit the attached testimony in opposition to Petitioners' motion for Preliminary Injunction and in support of Respondents' Motion for Summary Judgment.

| Item | Page |
|------|------|
| Declaration of Christine Gouig | 2 |
| Declaration of Mary Rizzo-Shuman | 13 |
| Declaration of Marilyn Meade | 17 |
| Declaration of David Richman | 19 |
| Declaration of John Morris | 23 |
| Declaration of Teresa Laverde | 27 |

DATED:  February 11, 2008                    GOLDFARB & LIPMAN LLP


By:    /s/ Juliet E. Cox
       JULIET E. COX
       Attorneys for Respondents and Real Parties in
       Interest DUBLIN HOUSING AUTHORITY;
       HOUSING AUTHORITY OF THE COUNTY
       OF ALAMEDA; SCS DEVELOPMENT
       COMPANY; and EDEN HOUSING, INC.

Goldfarb &

Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

**DECLARATION OF CHRISTINE GOUIG**

I, Christine Gouig, declare:

1.    I am the Executive Director of the Housing Authority of the County of Alameda ("HACA"). I have been the Executive Director of HACA since March 26, 2006. Immediately prior to joining HACA I was the Executive Director of the Marin County Housing Authority for 1½ years.

2.    My entire professional career has been in affordable housing and community development. I was the Executive Director of the Sonoma County Housing Authority/Community Development Commission for five years. After that, I was the Housing and Community Development Director for San Mateo County; subsequently I was appointed the County's Planning Director.

3.    For the 14 years prior to my tenure with the Marin County Housing Authority I was Senior Vice President for CSG Advisors, a national financial advisory firm, working with housing authorities, cities, counties and states in financing affordable housing. During my time with CSG Advisors I provided consulting services to housing authorities that were demolishing distressed public housing and redeveloping the cleared property into new mixed income communities. My housing authority clients in this regard included Oakland, Richmond, Phoenix, Portland, Tacoma and Los Angeles.

4.    I have personal knowledge of all matters stated in this declaration, and if called as a witness I could and would testify competently to these matters.

5.    By contract between the two authorities, HACA administers the Dublin Housing Authority ("DHA"). I serve therefore as DHA's Executive Director as well as HACA's Executive Director. Several HACA employees have responsibility for managing aspects of Arroyo Vista, in addition to their responsibilities for other HACA projects and activities elsewhere in Alameda County.

6.    DHA owns and operates a single public housing complex in the city of Dublin known as Arroyo Vista. Arroyo Vista has 150 housing units, ranging in size from one to four bedrooms, on about 23 acres. The complex is located on Dougherty Road across from the

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

Army's Camp Parks military reservation. In 1982, the City of Pleasanton Housing Authority constructed Arroyo Vista in the unincorporated area of Alameda County using funding provided by the United States Department of Housing and Urban Development ("HUD"). When the city of Dublin incorporated, Arroyo Vista was included within its boundaries and the project was transferred from the Pleasanton Housing Authority to DHA. The project is subject to a recorded declaration of trust requiring DHA to operate it as public housing in conformity with the United States Housing Act.

7.      Time has shown that the Arroyo Vista project was poorly constructed, with design flaws that have proven difficult to address. For example, water main breaks are common, and about 100,000 gallons spilled in August 2007. Trees are planted over the water lines, making it difficult to access the lines for repairs. Likewise, trees are planted over the sewer lines, which has made it difficult for DHA to clean out roots and debris that get into the lines and laterals. Because the building roofs have no gutters or downspouts, water sheets down the exterior walls, and some units have developed mildew as a likely result. Compounding this problem, the buildings are constructed approximately 30 inches apart, so their side walls are in constant shadow and dry slowly after rain. Most of the bathrooms in the residences have no fans, further exacerbating interior moisture problems, and leading to rusting of the metal bathroom door frames. The ceilings in the single story units regularly crack due to the technique used at the time of construction. The layout of the buildings results in "dead zones" between the building clusters, which can be safety hazards, and there are serious drainage problems in certain areas leading to standing water.

8.      A household is eligible to live at Arroyo Vista if its annual household income does not exceed limits set by HUD. Each household's rent depends on that household's annual income. For most households at Arroyo Vista, rent at Arroyo Vista is 30% of that household's adjusted monthly income. Monthly rents at Arroyo Vista average less than $500 per household per month.

9.      Because the rent collected from the tenants does not cover the operating costs of the project, HUD provides "operating subsidies" to housing authorities to (theoretically) make up

Goldfarb &
Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

the difference. In 2007, Arroyo Vista received only $233,411 in operating subsidy from HUD. HUD has devised a formula to calculate the amount of operating subsidy each housing authority is entitled to, but since 2003 has funded only a percentage of the formula amount. In 2003, HUD gave Arroyo Vista 94.7% of the operating subsidy HUD's own formula would have required; in 2004, 98.1%; in 2005, 88.8%; in 2006, 86%; and in 2007, 83.4%. DHA has had to use reserves and its Capital Fund (described below) to make up the shortfall.

10.    In addition to operating subsidy, housing authorities receive Capital Funds from HUD. Capital Funds are targeted to larger capital improvements such as street, sewer and water repairs; installation of major systems such as roofs and fencing; and complete remodels of units at turnover. The annual Capital Fund has been continuously cut over the last five years, despite the fact that Arroyo Vista is getting older and needs more capital improvements rather than less. DHA has received the following amounts: in 2003, $362,962; in 2004, $350,668; in 2005, $286,185; in 2006, $282,072; in 2007, $278,032. The President's budget just submitted to Congress proposes a 17% cut for 2008.

11.    DHA has no other source of revenue aside from tenant rents and charges, HUD contributions, and modest amounts earned on funds invested. Because HUD contributions have been inadequate to cover the total difference between DHA's cost to operate Arroyo Vista and the rents paid by Arroyo Vista's tenants, DHA has been unable to address some of Arroyo Vista's growing maintenance and capital needs. In addition, because of Arroyo Vista's design flaws, DHA anticipates that capital and maintenance needs will increase in the future as the complex continues to age.

12.    In recent years, Arroyo Vista tenants have frequently attended meetings of the DHA Commission to register complaints about the maintenance and appearance of the property. Due to federal budget cuts, DHA has been unable to resolve these problems to the satisfaction of either the residents or DHA's staff and commissioners.

13.    DHA's Commissioners decided in 2003 to study the possibilities for Arroyo Vista's future. DHA's staff members were aware of a similar project in Contra Costa County, and learned that the housing authority there was working with a non-profit developer to redevelop

Goldfarb &
Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

the site. Although redevelopment presented one possibility for Arroyo Vista, DHA was not convinced that it was the best course. Accordingly, DHA embarked on a parallel approach: it studied rehabilitating the property and, at the same time, analyzed whether redevelopment would be feasible.

14.     To study rehabilitation, DHA hired an engineer to develop a scope of work and cost estimates for repairs and upgrades to the housing units and another engineer to determine needed pavement and parking lot improvements and their associated costs. DHA also updated the costs contained in a landscape reconstruction plan that a landscape firm had prepared in 2001, using the RS Means Assemblies Cost Data, a standard in the industry. Based on these studies, staff developed a financing plan that reflected a total rehabilitation cost of $20.3 million but DHA could identify only $10.4 million potentially available to cover these costs, leaving a shortfall of about $9.9 million. At the DHA Commission's June 20, 2006, meeting DHA staff presented the costs and financing approach to the DHA Commissioners, who received the report but took no action pending a subsequent report on the redevelopment approach at its next meeting.

15.     To study redevelopment, DHA retained the services of the National Equity Fund ("NEF"), an affiliate of the Local Initiatives Support Corporation, a non-profit organization having extensive experience in mixed income and mixed finance public housing redevelopment. NEF found redevelopment to be feasible and in November 2005 the DHA Commission authorized issuance of a Request for Qualifications ("RFQ") to developers to ascertain whether there was developer interest in the project. The RFQ was issued in January 2006.

16.     Eight developers or developer teams responded to the RFQ. A panel appointed by DHA's Commission evaluated the proposals against scoring criteria contained in the RFQ. The panel narrowed down the eight to three and interviewed the three, giving each a final score. These three, with the panel's recommendation, were forwarded to the Commission for further interviews at its meeting on July 24, 2006. One developer team dropped out prior to the DHA Commission's meeting so two firms were interviewed. Both firms presented viable proposals and indicated confidence that financing could be secured.

Goldfarb &
Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

1460\03\528385.2

17.    Arroyo Vista residents were involved in the redevelopment decision-making process from the beginning. In 2004 the City of Dublin hired a community facilitator to meet with residents and obtain their comments and questions about a possible redevelopment of Arroyo Vista. DHA incorporated comments and suggestions from residents who attended two community-wide meetings in 2005, and from the Arroyo Vista Resident Council, into the RFQ. The DHA Commission directed that the acting president of the Arroyo Vista Resident Council be included on the panel charged with evaluating the developer proposals in response to the RFQ, but the acting president resigned before the panel convened.

18.    DHA staff invited all last-known members of the Arroyo Vista Resident Council to a meeting on May 10, 2006, to review the three highest scoring developer proposals. I was present at this meeting, and only two Resident Council members attended. We also held meetings open to all Arroyo Vista residents on May 11 and May 17, 2006, to review the three highest scoring developer proposals. I was present at these meetings as well. We recorded questions that the residents had about the proposals and incorporated those questions into the interview questions the evaluation panel posed to the developers.

19.    At the conclusion of the developer interviews at its July 24, 2006, meeting the Commission discussed the two approaches. It determined that rehabilitation would not be feasible due to the financing shortfall and selected the redevelopment option, memorializing this decision in DHA Resolution 11-06. A true, correct, and complete copy of DHA Resolution 11-06 accompanies this Declaration as Exhibit A.

20.    The DHA Commission also decided that the redevelopment proposal from the Eden Housing/Citation Homes Central team was superior to the proposal from the other team. Eden Housing is a nonprofit corporation based in Hayward, California, that has developed over 4,600 affordable housing units in Alameda County and surrounding areas during its 40 year history. Citation Homes Central is based in Santa Clara, California. It and its predecessor companies have built more than 50,000 homes in California over the past 50 years.

21.    The Commission adopted DHA Resolution 12-06, directing DHA staff members to pursue negotiations with the Eden/Citation team with the intent of developing a detailed

Goldfarb &

Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

1460\03\528385.2

redevelopment plan. A true, correct, and complete copy of DHA Resolution 12-06 accompanies this Declaration as Exhibit B.

22.    When DHA staff members commenced negotiations with Eden and Citation, we knew that they had developed a proposal that DHA's Commission found attractive. We did not know, however, whether or not we could reach agreement on a redevelopment plan that staff members could recommend to the DHA Commission as satisfying DHA's legal responsibilities and policy objectives. Over the next several months, we discussed and eventually agreed to recommend to the DHA Commission an Exclusive Negotiating Rights Agreement (ENRA). The ENRA committed DHA to negotiating only with Eden and Citation for Arroyo Vista's redevelopment, and included terms that all parties would agree to in a final project agreement if and when one occurred.

23.    At its meeting of April 3, 2007, DHA's Commissioners considered whether or not to enter into the ENRA. This agenda item appeared on the meeting agenda posted in advance in accordance with the Ralph M. Brown Act, and posted at the Arroyo Vista management office, and discussion occurred in open session in the Council Chambers at the Dublin City Hall. No member of the public spoke at the meeting in opposition to approval of the ENRA, or submitted any written comments on the item to the Commission. The Commission approved the ENRA, committing DHA to further exclusive negotiations with Eden and Citation and setting out key terms for Arroyo Vista's redevelopment, by adopting DHA Resolution 05-07. A true, correct, and complete copy of DHA Resolution 05-07 accompanies this Declaration as Exhibit C, and a true, correct, complete, and fully executed copy of the ENRA approved by Resolution 05-07 accompanies this Declaration as Exhibit D.

24.    Following approval of the ENRA, negotiations began in earnest. At the meeting of the DHA Commission on July 17, 2007, I recommended to the Commission that it approve a Disposition and Development Agreement (the "DDA") with Eden, Citation, the City of Dublin, and the Housing Authority of the County of Alameda, describing in detail a program for redeveloping Arroyo Vista. This agenda item appeared on the meeting agenda posted in advance in accordance with the Ralph M. Brown Act, and posted at the Arroyo Vista management office,

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

RESPONDENTS' DECLARATIONS (3:07-cv-05794 MHP)
1460\03\528385.2

and discussion occurred in open session in the Council Chambers at the Dublin City Hall. No member of the public spoke at the meeting in opposition to approval of the DDA, or submitted any written comments on the item to the Commission. At the conclusion of its discussion, the Commission adopted DHA Resolution 10-07, approving execution of the DDA on DHA's behalf. A true, correct, and complete copy of DHA Resolution 10-07 accompanies this Declaration as Exhibit E, and a true, correct, complete, and fully executed copy of the DDA approved by Resolution 10-07 accompanies this Declaration as Exhibit F.

25.    At its November 2006 meeting, by approving DHA Resolution 18-06, the DHA Commission authorized submittal of an application to HUD for permission to dispose of Arroyo Vista, as would be necessary for redevelopment. DHA submitted its Disposition Application to the Special Applications Center of HUD in Chicago, electronically, on August 14, 2007; the HUD confirmation shows August 15 because the Application arrived in Chicago after the close of business in Chicago. A true, correct, and complete printout of DHA's Disposition Application appears at pages 000123 to 000154 of Exhibit 3 to the Declaration of Lisa Greif submitted with Petitioners' motion seeking a preliminary injunction.

26.    DHA's Disposition Application for Arroyo Vista did not include either an appraisal or an environmental review, and the cover letter to the Application indicated that these documents would be forthcoming. I had checked with HUD to determine whether DHA should wait to submit its application until these documents were ready, but HUD told us to submit the application without them. We understood from HUD that submitting an application before completion of an appraisal or an environmental review was not unusual, and that HUD would begin reviewing the rest of the application while it waited for those necessary documents to be complete. We understood as well that HUD could not and would not approve DHA's Application until the appraisal and environmental review had been submitted.

27.    DHA submitted its appraisal to HUD on January 3, 2008. As of the date of this declaration, DHA had not submitted an environmental review. HUD has asked DHA for additional information regarding DHA's consultation with Arroyo Vista residents, and DHA has

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

supplied that information. HUD has not approved or disapproved DHA's application to dispose of Arroyo Vista.

28.    Planning for relocation of Arroyo Vista's residents began early during negotiations for the project. At its meeting on March 6, 2007, the DHA Commission approved DHA Resolution 02-07, authorizing DHA to contract with the firm of Overland, Pacific & Cutler ("OPC") to provide relocation services in connection with Arroyo Vista's proposed redevelopment. A true, correct, and complete copy of DHA Resolution 02-07 accompanies this Declaration as Exhibit G, and a true, correct, complete, and fully executed copy of DHA's written agreement with OPC accompanies this Declaration as Exhibit H.

29.    The Housing Choice Voucher ("Section 8") program imposes "payment standards" that effectively cap the rent that a participating housing authority may support for a housing authority client with a Section 8 voucher. With a higher payment standard, it is easier for clients with Section 8 vouchers to find a housing unit that can be rented using the voucher. On OPC's recommendation, HACA sought and received HUD's approval to increase its Section 8 payment standard for the cities of Dublin and Pleasanton, so that Arroyo Vista tenants would be more likely to succeed in finding comparable replacement housing that they could afford using Section 8 vouchers.

30.    Since 2006, DHA's monthly newsletters have included regular updates regarding the proposed redevelopment planning. The newsletters described actions related to the proposed redevelopment that had taken place at DHA Commission meetings, announced upcoming community meetings and described the presentations made at the community meetings. True, correct, and complete copies of some of these newsletters are attached as Exhibits 7 and 11 to the Declaration of Lisa Greif submitted with Petitioners' motion seeking a preliminary injunction.

31.    In April 2007, after the DHA Commission approved the ENRA, DHA sent each Arroyo Vista resident a General Information Notice ("GIN") about the proposed redevelopment. DHA mailed this notice to all residents by first-class mail and posted a copy on the front door of every residence. The GIN was also translated into Spanish. A true, correct, and complete copy of the English-language GIN accompanies this Declaration as Exhibit I.

Goldfarb &
Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

1460\03\528385.2

32.     DHA staff members conducted two informational meetings for tenants on April 24, 2007, one during the day and the other in the evening, to explain the redevelopment plan and introduce the developers and OPC. I was present at those meetings, along with Mary Rizzo-Shuman from HACA, other HACA staff, and David Richman from OPC. The agenda included an overview of recent redevelopment-related actions, including the fact that the ENRA had been executed; a summary of actions still to be taken, such as approval of the DDA and submittal of the Disposition Application to HUD; a description of the proposed project from Eden Housing; a description of the general relocation services of OPC and information about the Section 8 Voucher program, including Section 8 homeownership opportunities. At the meeting, we explained to residents that they did not have to move and would be required to do so only *after* HUD approval and only if all parties signed the DDA and if the project proceeded. Several residents had questions about Section 8 vouchers, and Ms. Rizzo-Shuman generally described that program. In addition, Mr. Richman described generally the relocation services that OPC would provide.

33.     On the evening of June 6, 2007, a follow-up meeting with residents was held. I was present at the meeting. The agenda included more specific information about the Section 8 program, relocation, inclusionary homeownership opportunities in the city of Dublin and Section 8 homeownership, and credit counseling services. Because residents had many detailed questions about Section 8 Vouchers, some of which involved personal information, we determined that a large meeting format was not appropriate for individual questions. We announced at that meeting that DHA staff would begin holding small group meetings and individual briefings at Arroyo Vista for any interested residents. We again reiterated that no one was required to move at this point but that if a resident wanted to move we could provide him or her with relocation assistance after and if the DDA was signed. In response to residents' questions, we said that we expected the DDA to be signed in July.

34.     I have directed HACA staff members to be clear with residents that no resident is required to move at this time but that we will assist those who want to move. I have directed staff members not to pressure any resident to move, or to imply—directly or indirectly—that any

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

resident should or must move at this time. I have told HACA staff members that the DDA contemplated a transfer of the project to the developer team in November 2008 if HUD had approved DHA's application to dispose of Arroyo Vista, but that all residents had to be relocated in accordance with the law before this transfer could occur.

35.     I have told HACA staff and Arroyo Vista tenants that HUD approval of the Disposition Application is likely once the appraisal and environmental review document are submitted. The HUD approval is not a competition; it is a fairly straightforward procedure, and approval is granted once the statutory and regulatory standards for disposition are met. The eight public housing redevelopment projects that I worked on during my consulting career all received such approvals, and I had no reason to believe Arroyo Vista would be any different. I did not think it appropriate to cause confusion among Arroyo Vista residents by vacillating on the possibility of HUD's approval.

36.     DHA staff began their small group meetings to discuss relocation assistance in June and July 2007. Since August 2007, more than 45 households have moved out of Arroyo Vista using relocation assistance provided by DHA. DHA has not re-rented these units.

37.     DHA's relocation assistance consists of a Section 8 voucher, additional rental assistance payments if necessary, payment or reimbursement of moving costs, and advisory services from OPC. In addition, DHA will reimburse credit check fees up to $75; will pay the security deposit required by the tenant's new landlord, up to $2,400; and will refund the household's current Arroyo Vista security deposit in full, even if the tenant has damaged the unit, as long as the household leaves the unit empty and swept clean of debris. If any household proves eligible for relocation assistance but ineligible for Section 8, DHA would provide cash moving assistance in order to ensure that a comparable replacement residence is affordable to that household for up to 42 months.

38.     OPC has developed a relocation plan for Arroyo Vista, and I have approved circulation of that plan for public comment. The draft plan provides for DHA to give tenants at least 150 days' advance notice of any deadline for them to move. Circulation of the plan will occur within a week after the date of this Declaration, and the 30-day public comment period on

Goldfarb &
Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

the Plan will close on or around March 15. The DHA Commission will consider adoption of the Plan at a special meeting on April 15, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct and that I executed this declaration on February 11, 2008, at Hayward, California.

/s/ Christine Gouig
CHRISTINE GOUIG

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

**DECLARATION OF MARY RIZZO-SHUMAN**

I, Mary Rizzo-Shuman, declare:

1.    I am an employee of the Housing Authority of the County of Alameda ("HACA"). I have personal knowledge of all matters stated in this declaration, and if called as a witness I could and would testify competently to these matters.

2.    I am the Manager of the Housing Assistance and Housing Management Unit of HACA. I took my present job title and duties in July 2007. I am currently responsible for overseeing the management of approximately half of HACA's available Housing Choice Voucher ("Section 8") tenant-based housing assistance, amounting to about 3600 vouchers used within the communities of Fremont, Newark, Pleasanton, Dublin, San Leandro, and San Lorenzo. I also oversee management of HACA's public housing in Alameda County, including the Arroyo Vista public housing complex in Dublin. HACA administers the Arroyo Vista complex on behalf of the Dublin Housing Authority ("DHA"). I started working for HACA in its Section 8 program more than eleven years ago.

3.    Because I am responsible for overseeing Arroyo Vista's on-site property manager, I am aware that Arroyo Vista tenants have complained for many years about the maintenance and appearance of the property. HACA has attempted to address these concerns, but some are impossible to solve because they relate to the design of the complex itself. For example, the landscape irrigation systems work sporadically, making it difficult to keep plants and turf alive.

4.    On April 24, 2007, I participated in two informational meetings at Dublin City Hall to explain to Arroyo Vista residents DHA's plan to redevelop Arroyo Vista and to assist them in relocating from the complex. Some people at the meetings asked whether or not they could move right away. HACA's and DHA's executive director, Christine Gouig, told residents that they did not have to move now, and that they would have to move only if DHA made an agreement for redeveloping Arroyo Vista and if HUD approved that agreement. We also explained to tenants that Section 8 vouchers and other relocation assistance would be available to them if and when they wanted to move. Several attendees asked about Section 8 vouchers, and I described that program for them.

Goldfarb &

Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

RESPONDENTS' DECLARATIONS (3:07-cv-05794 MHP)

1460\03\528385.2

5. We held another meeting with residents at Dublin City Hall on June 6, 2007. Residents had many questions about the Section 8 program, and some of those questions involved potentially sensitive personal circumstances. We determined that small-group or individual meetings would be more appropriate, and announced that DHA staff would hold such meetings on request at Arroyo Vista for interested residents. We asked residents to sign up for a personal or small-group orientation to the Section 8 program if they were interested in one.

6. At that June 2007 meeting, I told residents again that no one was required to move. In response to residents' questions, I said that I expected the redevelopment agreement to be signed in July and that I expected HUD to approve the redevelopment.

7. Beginning in June 2007, Marilyn Meade and I held Section 8 orientation meetings every week. I conducted one general informational meeting each week and Ms. Meade followed up with a personalized briefing for those who wanted to move. Over time there has been less demand for these meetings from the Arroyo Vista tenants. Because no tenant has requested one, I have not held a general informational meeting about Section 8 since October 2007.

8. I have continued to meet with Arroyo Vista tenants and to answer questions from them by telephone on a one-on-one basis.

9. Some tenants have come to our meetings with significant misunderstandings about the Section 8 program. For instance, some tenants have told me that they have heard that the vouchers they would receive if they relocated from Arroyo Vista would be inferior to "regular" Section 8 vouchers. I have explained to those tenants that the Section 8 vouchers HACA is offering to them are identical to all other Section 8 vouchers.

10. All my communication with Arroyo Vista tenants about the rehabilitation process and available relocation assistance has been and continues to be client-driven. If a tenant wants to talk to me, I talk to them. If a tenant has not expressed any interest in information about Section 8, I have not pushed the information on them. I have consistently told Arroyo Vista tenants that they should move when they could, told them what their options were, and advised them to weigh their options when making their decision. I have advised tenants that their odds of finding a new home that they really like will be higher the longer they give themselves to look,

Goldfarb &
Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

but I have not told any tenant that relocation assistance would stop being available or that any tenant needed to search for a new home now if that tenant did not want to.

11.     I deny having ever told any Arroyo Vista tenant that his or her home would be "bulldozed" or that he or she would "see bulldozers coming through." I would not be so disrespectful to the people who have been living at Arroyo Vista, some for as long as twenty years. I did not say any such thing.

12.     I have not instructed any tenant to give a thirty-day notice of tenancy termination. I have informed Arroyo Vista tenants that if they were ready to move, they should give notice of at least thirty days to the management so that HACA staff would have time to prepare their Section 8 case. I also informed tenants that they could revoke or amend that notice at any time, and that they did not have to apply for a Section 8 voucher now because a Section 8 voucher would be made available to them if and when they decided to move.

13.     HUD's regulations require that DHA certify a household's eligibility to live at Arroyo Vista before renting a unit to that household, and that DHA recertify that household's income each year. In addition, for most Arroyo Vista households, HUD's regulations require DHA to calculate the household's rent based on the household's monthly income, and to change the rent annually if income changes. HACA employees who report to me are responsible for collecting income and expense information from households in order to conduct that certification and to perform those calculations. On DHA's behalf, HACA maintains files regarding each household at Arroyo Vista showing the data upon which DHA relied to determine that household's eligibility and rent.

14.     Until I received a copy of Gretta Evans's Declaration in Support of Plaintiffs' Motion for Preliminary Injunction, I did not know that Ms. Evans intended to terminate, or believed that she had terminated, her tenancy at Arroyo Vista.

15.     HACA reexamined Ms. Evans's household's income in late 2007 and determined, based on certifications they submitted to HACA, that their household income had risen. If Ms. Evans had remained at Arroyo Vista with the same household members she had immediately before her move to Patterson, her rent would have risen.

Goldfarb &
Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

1460\03\528385.2

16.    HACA's tenant file regarding Rhenae Keyes includes a request by Ms. Keyes in August 2007 for an "extra bedroom" as an accommodation for a family member's alleged disability. As required by HUD regulations, HACA attempted to confirm with the professional Ms. Keyes had designated that the accommodation she had requested was reasonable, but the person declined to give that confirmation.

17.    Under HACA's occupancy standards for public housing, Carolyn Evans and her three children would qualify, as a household, for a three-bedroom unit. No three-bedroom units at Arroyo Vista became vacant between March 2006 and August 2007. Since August 2007, DHA has not re-rented any unit at Arroyo Vista that has become vacant after the tenant has moved. Instead, we have arranged to have those units boarded for safety, to discourage squatting and vandalism.

18.    Some households moving away from Arroyo Vista have left trash and debris behind. HACA has arranged for large bins to be available for discarded items, and we have contracted with a landscaping vendor to police the grounds in general and the vacant units in particular. We have also arranged for additional police patrols at the site.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct and that I executed this declaration on February 11, 2008, at Hayward, California.

/s/ Mary Rizzo-Shuman
MARY RIZZO-SHUMAN

Goldfarb &
Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

1460\03\528385.2

**DECLARATION OF MARILYN MEADE**

I, Marilyn Meade, declare:

1.     I am an employee of the Housing Authority of the County of Alameda ("HACA"). I have personal knowledge of all matters stated in this declaration, and if called as a witness I could and would testify competently to these matters.

2.     I am an Eligibility Lead Worker for the Housing Assistance and Housing Management Unit of HACA. In 2004 or 2005, I was promoted from Eligibility Technician to Eligibility Lead Worker. I am responsible for reviewing the eligibility of prospective and current tenants for HACA's Housing Choice Voucher ("Section 8") Program. My duties include verifying the income, assets, and expenses of prospective and current tenants in order to determine the amount of rent they must pay. I have nearly twelve years' total experience working with HACA, all in the Section 8 program.

3.     Beginning in June 2007, Mary Rizzo-Shuman, Beth Nguyen, Leinchi Le and I held regular small-group orientations at the Arroyo Vista housing complex in Dublin to explain the Section 8 program to tenants who had signed up for an orientation. We explained how the Section 8 program works and answered tenant questions.

4.     When HACA received notice from an Arroyo Vista tenant that the tenant was ready to move, I arranged a personal meeting with the tenant at the office at Arroyo Vista. At these meetings, I gave the tenant a briefing packet about the Section 8 program. True, correct, and complete copies of the documents in a briefing packet accompany this Declaration as Exhibit J. The documents I gave tenants were assembled in folders.

5.     If the tenant had identified a new home in a jurisdiction that HACA does not serve, or if the tenant asked about moving to a different jurisdiction, I explained the Section 8 "portability" procedures to that tenant. Otherwise, I did not address them, because I did not want to confuse the tenant with too much information all at the same time.

6.     I held a Section 8 meeting with Gretta Evans in late September or early October. At that meeting, Ms. Evans told me that she had already found a home in the city of Patterson, in Stanislaus County.

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

17

7.     Ms. Evans signed up for a voucher on October 4, 2007. I prepared materials for Ms. Evans to transfer her Section 8 voucher to Stanislaus County. A few weeks later, someone from Stanislaus County called me and said the Evans family would not qualify for assistance at that particular unit because based on their income and the requested rent the Housing Assistance Payment would be $0.

8.     I told Ms. Evans that she and her family could use the HACA Section 8 voucher instead to relocate to another four-bedroom residence in Alameda County if and when she found one. I also told Ms. Evans that HACA could extend her Section 8 voucher if she did not find a unit she liked before it expired in December. Ms. Evans did not ask HACA to extend her voucher.

9.     Elise Veal has arranged at least three appointments with me for a one-on-one meeting to discuss the Section 8 program, but has cancelled or failed to attend each of those meetings.

10.    I have met on several occasions with Rhenae Keyes regarding her household's application for the Section 8 program. In August 2007 I told Ms. Keyes that her household qualified under HACA's occupancy standards for a voucher good for a two-bedroom unit. She then requested a voucher good for a larger unit as a reasonable accommodation for disability. In September 2007, I stopped work on Ms. Keyes's Section 8 application because I learned that she was not interested in moving at this time. If Ms. Keyes decides to move, I can restart her application at that time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct and that I have executed this declaration on February 11, 2008, at Hayward, California.

/s/ Marilyn Meade
MARILYN MEADE

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

**DECLARATION OF DAVID RICHMAN**

I, David Richman, declare:

1.      I am the Northern California Regional Director for Overland, Pacific & Cutler, Inc. ("OPC"). I have full management, scheduling and fiscal responsibilities for operations in Oakland and Sacramento. I am responsible for the preparation of Replacement Housing Plans, Relocation Plans and replacement housing needs analyses, cost studies, relocation impact studies and general informational brochures. I also act as a Project Manager on large-scale acquisition and relocation projects involving both residential and business occupants. I maintain schedules, budgets, manpower requirements and provide relocation assistance services. These projects have involved a variety of funding sources that require compliance with the Federal Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("URA"), as well as State of California relocation assistance laws and guidelines. I have been employed by OPC since early 2000. During that time I have been project manager on hundreds of projects resulting in the displacement of thousands of residential and business occupants.

2.      I have personal knowledge of all matters stated in this declaration, and if called as a witness I could and would testify competently to these matters.

3.      The Dublin Housing Authority ("DHA") retained OPC in March 2007 to assist it in planning for relocation of the residents at the Arroyo Vista housing complex in Dublin, in preparation for redevelopment of that complex.

4.      One of OPC's first steps was to conduct an initial housing resource study. We determined that sufficient replacement housing seemed to be available, but that the Section 8 payment limits for the Housing Authority of the County of Alameda ("HACA") might not be high enough to permit all Arroyo Vista residents to find comparable replacement housing using Section 8 vouchers from HACA. We recommended that HACA request HUD approval to increase its Section 8 limit to address this concern combined with rental assistance payments, which they did.

5.      Along with Christine Gouig and Mary Rizzo-Shuman from HACA, I attended two informational meetings with Arroyo Vista residents on April 24, 2007. My role at these

Goldfarb &

Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

meetings was to introduce OPC as the relocation consultants who would be available to help Arroyo Vista tenants find new housing. I gave a general explanation of the services that would be available, including financial and advisory assistance. I also recall stating that OPC would provide referrals to potential replacement housing and would even drive residents to view potential homes if necessary.

6.    Some people attending the April 2007 meetings expressed their wish to move out right away. Ms. Gouig and I stressed to them that they did not need to move yet, and that in fact if they did move immediately they would not be able to receive any relocation benefits since the project had not even been approved. We also said that if residents did want to move early, DHA would assist them after approval of an agreement for the redevelopment, and that DHA expected that agreement to be approved around August 1, 2007. We said that if everything went as planned, we expected Arroyo Vista to be vacated by the last quarter of 2008.

7.    In June 2007, I attended another community meeting with Arroyo Vista residents. The focus of that meeting was on presenting resources that would assist people in taking advantage of relocation assistance, including information about Family Self-Sufficiency and the Section 8 program, credit repair, and homeownership opportunities along with answering questions and addressing any concerns that the residents might have.

8.    Since approval of the Arroyo Vista Disposition and Development Agreement in July 2007, OPC has been working only with those households that have requested our services to help them move. These services have included issuing individual Notices of Eligibility; discussing relocation benefits and the Section 8 program and providing them with an informational brochure; providing referrals to potential replacement homes; driving residents to look at homes; speaking with potential landlords; assisting with the completion of credit applications; submitting and processing claims for security deposits and credit checks; arranging for the assistance of movers or processing claims for self-moves; assisting with utility hookups and other utility issues; monitoring the move and even assisting with post-move problems.

9.    Since August 2007, 48 Arroyo Vista households have moved to new homes. Each of these households has received relocation advice from OPC. 47 of these households received a

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

RESPONDENTS' DECLARATIONS (3:07-cv-05794 MHP)
1460\03\528385.2

Section 8 voucher. The one household that did not receive a Section 8 voucher was over-income for subsidized housing and received cash rental assistance instead. Each household received up to $2400 as reimbursement for the security deposit their new landlord required; each received reimbursement of up to $75 for credit checks; and each received either payment directly to a mover of their moving expenses or reimbursement to them of expenses for moves they conducted themselves.

10.    I spoke by telephone on January 25, 2008, with a woman who identified herself to me as Gretta Evans. Ms. Evans told me that she and her sister had found a replacement home, and that Ms. Evans, Ms. Evans's sister, and Ms. Evans's daughter Carolyn, who had lived together at Arroyo Vista, had all agreed to divide their household's relocation benefits. Ms. Evans and her sister would receive the cash aid for relocation—moving allowance, security deposit and credit check—and Carolyn Evans would receive their household's Section 8 voucher. OPC's file regarding Ms. Evans includes a written assignment that is consistent with Ms. Evans's oral representation to me, a true, correct, and complete copy of which accompanies this Declaration as Exhibit K.

11.    I advised Ms. Evans that before leaving the household, she should confirm that Carolyn Evans qualifies for a Section 8 voucher, because HACA would not be able to issue one to Carolyn Evans simply because Gretta Evans asked them to. I also advised Ms. Evans to consider with her daughter how her daughter would pay for a security deposit, a credit check, or movers if Ms. Evans used their household's entitlement to these benefits before Carolyn Evans was ready to move. Ms. Evans informed me that there was "no way" her daughter would be able to come up with the necessary funds.

12.    In September 2007, OPC sent out a letter to all Arroyo Vista residents to begin the interview process for DHA's tenant relocation plan. A true, correct, and complete example of that letter accompanies this Declaration as Exhibit L.

13.    In September and October 2007, OPC employees John Morris, Chris Budwine, Jessica Garliepp, Faye Turner, and Teresa Laverde conducted interviews for the plan. Some residents refused to be interviewed, which we accepted without question.

RESPONDENTS' DECLARATIONS (3:07-cv-05794 MHP)

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

14.    We anticipate that notification will be sent out next week to all residents, both present and those who have moved since August, of the availability of the draft relocation plan for their comment.

15.    If HUD approves DHA's application to redevelop Arroyo Vista, OPC will attempt again to interview those households who declined to be interviewed for the relocation plan, so that we may identify their needs in order to issue a Notice of Eligibility and give them advisory assistance for relocation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct and that I have executed this declaration on February 11, 2008, at Oakland, California.

/s/ David Richman
DAVID RICHMAN

Goldfarb &

Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

RESPONDENTS' DECLARATIONS (3:07-cv-05794 MHP)

1460\03\528385.2

### DECLARATION OF JOHN MORRIS

I, John Morris, declare:

1.     I am a Senior Consultant with Overland, Pacific & Cutler, Inc. ("OPC"). I am currently assigned to assist residents at the Arroyo Vista housing complex in Dublin who are looking for replacement housing.

2.     In October 2007, several colleagues and I attempted to conduct personal interviews with all Arroyo Vista residents in order to ascertain their relocation needs. Our goal was to use this information in developing a relocation plan for all Arroyo Vista's tenants.

3.     I have never met Andres Arroyo, the tenant in unit 61 at Arroyo Vista. I visited Mr. Arroyo's apartment on October 11, 2007, so that I could interview him and his wife to find out what special relocation needs their household might have. A man who said that he was Mr. Arroyo's son was there, and said that Mr. Arroyo was out and would not be home until later. I left a business card, but no one called me.

4.     I visited unit 84 at Arroyo Vista on October 19, 2007, to interview Shirley Sanders for the relocation plan. Ms. Sanders was at home, but she said that she was not available for an interview. Ms. Sanders later called me to ask about relocation assistance. I made an appointment to meet with her at her home on December 10, 2007, and prepared a Notice of Eligibility for her household. I went to Ms. Sanders's home on December 10 at the appointment time but Ms. Sanders was not there and did not answer her telephone. I left my business card at the door and have not received any further contact from her.

5.     On January 17, 2008, I received a telephone call from a man who identified himself as Shawn Costello. Mr. Costello made an appointment with me for me to meet him at his home on January 22 to discuss his needs for special accommodations in his home.

6.     I went to Mr. Costello's home, unit 118 at Arroyo Vista, on January 22. Mr. Costello gave me a tour and explained many of the special construction features that make his home especially suitable for him. For instance, Mr. Costello's home has a large bathroom and a small bedroom, and the majority of light switches have been lowered so that he can reach them from a wheelchair. He likes the large backyard patio accessible from the kitchen, and the kitchen

Goldfarb &

Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

RESPONDENTS' DECLARATIONS (3:07-cv-05794 MHP)

1460\03\528385.2

itself is arranged so that he can reach the sink. Mr. Costello would like to have similar modifications and amenities if he moves to another residence.

7.    Mr. Costello also described his needs and preferences as to the location of his home. He uses the bus, BART, and the Iron Horse Trail to get around, and he can get to work, his medical providers, and shopping without assistance. He especially would like to remain close to BART, and he wants to remain in Dublin.

8.    I spoke on April 30, 2007, and May 31, 2007, by telephone to a woman who identified herself as Rhenae Keyes. Ms. Keyes told me in May that her son is disabled and she would like to request a separate Section 8 voucher for him. I told Ms. Keyes that I understood that HACA would issue only one voucher per Arroyo Vista household. On August 21, 2007, upon Ms. Keyes's request, I mailed referrals to her for three-bedroom rental units.

9.    I first heard from Gretta Evans on September 24, 2007, when she left a voice mail message for me asking me to call the owner of a house in Patterson that she was interested in renting. I spoke with Ms. Evans on September 25, and she said that although she lived in a four-bedroom unit at Arroyo Vista she was looking at a six-bedroom home in Patterson. I prepared a claim for the security deposit and recommended that she attend a Section 8 briefing to obtain her voucher and clarify what voucher size her household qualified for.

10.    On October 4, 2007, I met Ms. Evans and her son Antone at her home at Arroyo Vista. They said that they intended to look in other areas because the rental subsidy they could get with a four-bedroom Section 8 voucher would not be high enough for them to afford a six-bedroom home in Patterson.

11.    On October 17, I spoke by telephone with Ms. Evans. She had located a five-bedroom house in Dublin that she was interested in, but she said that the owner had concerns about the modifications that might be necessary to make the unit accessible to her. I called the owner to discuss those concerns but the owner said that the unit had already been rented. I called Ms. Evans again and she said that she would continue looking for four- or five-bedroom houses renting for less than $2400 per month.

Goldfarb &
Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

1460\03\528385.2

12.    On October 18, 2007, I gave Ms. Evans referrals for a five-bedroom and a four-bedroom home in Pleasanton.

13.    On October 22, 2007, Ms. Evans called me by telephone and said that she had located a four-bedroom home in Patterson. I spoke to the owner of that home on October 31. I prepared a Notice of Eligibility for Ms. Evans's household and a claim for the $2000 security deposit. I delivered that $2000 check to Ms. Evans on November 2, and she said that the property owner had signed a Request for Tenancy Approval for the Section 8 program.

14.    On November 20, 2007, Ms. Evans and I again discussed her moving options, because the four-bedroom house she proposed to rent in Patterson was also more expensive than the maximum amount they could afford in Stanislaus County with a four-bedroom Section 8 voucher. I explained that Ms. Evans's family could stay in Dublin and use their four-bedroom voucher, or move to a less expensive area where they would be responsible for paying the rent with no housing subsidy. She said that she would talk with other family members and get back to me about their decision.

15.    On November 26 Ms. Evans called me to say that she had a lead on a different home offered at lower rent, but admitted that she would also consider a four-bedroom in Dublin if it had one ground-floor bedroom and bathroom.

16.    On January 2, 2008, Ms. Evans called to request the return of the security deposit she had paid in November for the four-bedroom house in Patterson, as she decided not to rent his property. She wanted to apply the deposit toward a different property. I told her that I could not pay any other deposit until I had received a refund of the first deposit.

17.    Ms. Evans also told me that she intended to make a change in her household composition so that her daughter Carolyn could use their household's Section 8 voucher. I advised her to contact HACA before making any decisions.

18.    On December 10, 2007, I met Mrs. Elise Veal at her home at Arroyo Vista to deliver her household's Notice of Eligibility. Mrs. Veal had already located a home that she wanted to move to. I explained that a moving advance is available when a tenant has been accepted to move and the remainder is payable after a move out inspection. Mrs. Veal said that

Goldfarb &
Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

RESPONDENTS' DECLARATIONS (3:07-cv-05794 MHP)

1460\03\528385.2

she needed $2400 for a security deposit and had already paid the owner $100 of her own funds to hold the unit. Because the home she had expressed interest in was in Antioch, and because she also said she would consider houses in Tracy, I explained that the maximum Section 8 rent differs from one geographic area to another but that the voucher is able to be transferred. I also explained that the cost of comparable housing was based on the Dublin Pleasanton and Alameda County jurisdictions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct and that I have executed this declaration on February 11, 2008, at Oakland, California.

/s/ John Morris
JOHN MORRIS

Goldfarb &

Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

1460\03\528385.2

# DECLARATION OF TERESA LAVERDE

I, Teresa Laverde, declare:

1.    I am a Senior Consultant with Overland, Pacific & Cutler, Inc. ("OPC"). I am currently assigned to assist residents at the Arroyo Vista housing complex in Dublin who are looking for replacement housing.

2.    In October 2007, several colleagues and I attempted to conduct personal interviews with all Arroyo Vista residents in order to ascertain their relocation needs. Our goal was to use this information in developing a relocation plan for all Arroyo Vista's tenants.

3.    I conducted an interview on October 9, 2007, with Mrs. Elise Veal, Mr. Quincy Veal, and Mrs. Veal's oldest daughter Alexis Griffin. I asked the Veals during the interview about any handicaps, disabilities, or special needs that anyone in their household had. Mrs. Veal did not mention any disabled child that needed to be in a special program in Dublin. At the time of the interview we did not discuss what OPC would do if potential landlords would not take Section 8.

4.    I asked Mrs. Veal what areas she would be interested in relocating to, and if she wanted to receive referrals within these areas. She said that she did want to receive rental referrals. I did not tell her that *all* OPC would do is send her referrals. Rather, I explained to her that this is *one* of the benefits.

5.    Mrs. Veal called me on November 29, 2007, and informed me that she had found a five-bedroom home to rent in Antioch. Mrs. Veal said the new landlord required a $2,300 security deposit and that the monthly rent was $2,300. She said that in order to hold the property the new landlord required the security deposit. I explained to her that I needed to prepare the household's Notice of Eligibility and the appropriate claims for her signature. I told her that I also needed to call the potential new landlord so that he or she could verify the monthly rent, the security deposit and the name and address where the check should be sent. I prepared those documents promptly and scheduled a meeting between Mrs. Veal and my colleague John Morris so that he could explain the relocation process and benefits more fully.

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

1460\03\528385.2

6.     After her meeting with John Morris, Mrs. Veal told me that she wanted to rent a five-bedroom house in Tracy. I explained to Mrs. Veal that based on a preliminary calculation by HACA, according to their records of her income and the particulars she had provided about the replacement property she was interested in, she did not qualify to rent the property in Tracy. Her income was too low and the rent for the house was too high, compared to the rent she could pay in San Joaquin County with her four-bedroom Section 8 voucher.

7.     I have never participated in any three-way conference call with Gretta Evans and Carolyn Evans. I did meet with Carolyn Evans in person on January 23, 2008, to explain the division of household relocation benefits that her mother had proposed. I explained to Ms. Evans that DHA wanted their household's unit to be completely vacant before issuing reimbursement to their household for the remainder of its fixed moving payment ($825) and the security deposit ($2,400) and the credit check reimbursement of $75. Because Gretta Evans had already moved out and had decided to give Carolyn Evans the Section 8 voucher benefit, she would need to apply for the voucher and move before DHA would issue the moving reimbursements. I told Ms. Evans that the only rush to apply for a Section 8 voucher was that her mother wanted the remainder of her benefits. I explained to Ms. Evans that she could remain in the unit until DHA asked her to vacate; however, her mother would not be able to receive any remaining benefits until Ms. Evans moved.

8.     On October 4, 2007, I knocked on the door of unit 61 with my colleague Jessica Garliepp. We intended to conduct an interview for the relocation plan. The tenants were not at home, and we left a contact card with my name, phone number and the reason for the visit in Spanish.

9.     On October 5, 2007, Ms. Garliepp and I knocked again at unit 61 to attempt to conduct the plan interview. A man who said that he was the tenant's son answered the door. He explained that his father, Andres Arroyo, was not home. I gave a contact card to the son to give to his father so that his father could call us to schedule an appointment for a plan interview.

10.     On October 10, 2007, I knocked again at unit 61 to attempt to conduct a plan interview. A woman who said that she was Mrs. Arroyo answered the door and told me that her

Goldfarb &
Lipman LLP
1300 Clay Street
Ninth Floor
Oakland
California
94612
510 836-6336
510 836-1035 FAX

husband was not home. I explained to her in Spanish the reasons for the interview and asked her if she wanted to do the interview herself. She declined and said that she would rather have her husband present. I left her my business card and she said that her husband would be back on October 11 between 2:30 pm and 3 pm and to come back then.

11.    On October 11, as requested, I came back for the plan interview. The tenant's son answered the door and said that his father was not home. I left another business card and asked his son to ask his father to call for an appointment.

12.    Jessica Garliepp and I met with Mrs. Darlene Brown on October 10, 2007, for a relocation plan interview. Mrs. Brown was not pleased to see us and she let us know it, but she agreed to the interview. I explained to her the reasons for the plan interview. I also explained the relocation benefits that DHA is offering to tenants, which include referrals to available units for rent not just referrals. I told her that we could also drive her to view units and help her complete applications. I told her that some Arroyo Vista residents are moving out early, but that she did not have to move out until she receives a notice to vacate. However, any time that she wanted to start the process of moving out of Arroyo Vista she could and we could help her. At the end of the interview she said she would not move out unless she gets a notice to vacate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct and that I have executed this declaration on February 11, 2008, at Oakland, California.

/s/ Teresa Laverde
TERESA LAVERDE

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this efiled document.

DATED: February 11, 2008                    GOLDFARB & LIPMAN LLP

By:    /s/ Juliet E. Cox
JULIET E. COX
Attorneys for Respondents and Real Parties in Interest DUBLIN HOUSING AUTHORITY; HOUSING AUTHORITY OF THE COUNTY OF ALAMEDA; SCS DEVELOPMENT COMPANY; and EDEN HOUSING, INC.

Goldfarb &

Lipman LLP

1300 Clay Street

Ninth Floor

Oakland

California

94612

510 836-6336

510 836-1035 FAX

1460\03\528385.2