1
2
3
4
5
6
7          **Exhibit F: Disposition and Development Agreement**
8
9
10
11
12
13
14
15
16
17
18
19
Goldfarb &      20
Lipman LLP      21
1300 Clay Street  22
Ninth Floor     23
Oakland         24
California      25
94612           26
510 836-6336    27
510 836-1035 FAX  28

RESPONDENTS' EXHIBITS (3:07-cv-05794 MHP)
1460\03\528384.1

# DISPOSITION AND DEVELOPMENT AGREEMENT FOR THE REDEVELOPMENT OF ARROYO VISTA

By and among

## HOUSING AUTHORITY OF THE CITY OF DUBLIN,

## THE CITY OF DUBLIN,

## THE HOUSING AUTHORITY OF THE COUNTY OF ALAMEDA,

## EDEN HOUSING, INC.

and

## CITATION HOMES CENTRAL

1460\02\435574.9

## TABLE OF CONTENTS

Page

ARTICLE 1. DEFINITIONS ....................................................................................2

    Section 1.1 Definitions...........................................................................2
    Section 1.2 List of Exhibits....................................................................7

ARTICLE 2. REVITALIZATION PLAN; DEVELOPMENT COMPONENTS;
    FINANCING....................................................................................7

    Section 2.1 Revitalization Objectives....................................................7
    Section 2.2 Authority Disposition of Property to Developer ................7
    Section 2.3 Scope of Development........................................................8
    Section 2.4 Revisions to Scope of Development ...................................8
    Section 2.5 Affordability Requirements ...............................................9
    Section 2.6 Commencement and Completion of Construction of the
        Development ...................................................................11
    Section 2.7 Schedule of Performance .................................................11
    Section 2.8 Financing Terms................................................................11
    Section 2.9 Development Costs; Design Review ................................14
    Section 2.10 Planning and Entitlement Costs; Environmental Review ...........14
    Section 2.11 Expenses ........................................................................14
    Section 2.12 Revitalization Plan Evolution. .......................................15
    Section 2.13 Budgetary Controls. .......................................................16

ARTICLE 3. GENERAL DUTIES OF PARTIES .................................................16

    Section 3.1 Developer's Obligations...................................................16
    Section 3.2 Authority Obligations ......................................................18
    Section 3.3 City Obligations ...............................................................20
    Section 3.4 HACA Obligations...........................................................20
    Section 3.5 Mutual Obligations. .........................................................20

ARTICLE 4. PREDEVELOPMENT REQUIREMENTS .....................................21

    Section 4.1 Disposition Approval .......................................................21
    Section 4.2 Relocation and Rehousing. ..............................................21
    Section 4.3 Tenant and Homebuyer Selection ...................................23
    Section 4.4 Demolition .......................................................................23

ARTICLE 5. DEVELOPER PREDEVELOPMENT COMPONENT .....................23

    Section 5.1 Developer Responsibility and Management ....................23
    Section 5.2 License ............................................................................24
    Section 5.3 Master Planning ..............................................................24
    Section 5.4 Infrastructure and Site Improvements.............................24

TABLE OF CONTENTS
(continued)

Page

Section 5.5 Timing of Subdivision and Conveyance ........................................24

ARTICLE 6. CONDITIONS PRECEDENT TO AUTHORITY ..............................25

CONVEYANCE OF PROPERTY TO DEVELOPER ............................................25

    Section 6.1 Conditions Precedent to Authority Performance. ..........................25
    Section 6.2 Financing Plans and Commitments ..............................................25
    Section 6.3 Construction Documents.................................................................26
    Section 6.4 Permits and Approvals....................................................................26
    Section 6.5 Affiliate............................................................................................26
    Section 6.6 HUD Approval ................................................................................27
    Section 6.7 Environmental Review and Approval.............................................27
    Section 6.8 Approval Process ............................................................................27

ARTICLE 7. DESIGN ............................................................................................28

    Section 7.1 Design in Conformance with Scope of Development and
        Conceptual Design ..................................................................................28
    Section 7.2 City Entitlement Procedures and Submittal Requirements.............28
    Section 7.3 Design Documents..........................................................................28
    Section 7.4 Submittal and Review of Documents .............................................28
    Section 7.5 Project Approvals............................................................................29
    Section 7.6 Approval Process ............................................................................29
    Section 7.7 Additional Permits and Approvals..................................................29
    Section 7.8 Authority Review ............................................................................29

ARTICLE 8. CONSTRUCTION ............................................................................30

    Section 8.1 Commencement of Construction ....................................................30
    Section 8.2 Completion of Construction............................................................30
    Section 8.3 Construction Pursuant to Plans ......................................................30
    Section 8.4 Construction Bonds.........................................................................30
    Section 8.5 Compliance with Applicable Law...................................................30
    Section 8.6 Non-Discrimination During Construction ......................................30
    Section 8.7 Equal Opportunity/Non-Discrimination in Employment and
        Contracting Procedures, Including Utilization of Minority and
        Women Businesses. .................................................................................31
    Section 8.8 Prevailing Wages ............................................................................31
    Section 8.9 Progress Reports .............................................................................32
    Section 8.10 Entry by the Authority and the City ..............................................32
    Section 8.11 Taxes; Fees....................................................................................32
    Section 8.12 Hazardous Materials. ....................................................................32

TABLE OF CONTENTS
(continued)

Page

Section 8.13 As-Is Conveyance. .................................................................34
Section 8.14 Environmental Work ...............................................................35
Section 8.15 City and Other Governmental Authority Permits ...................35
Section 8.16 Zoning of the Property ............................................................36
Section 8.17 Mitigation Requirements ........................................................36
Section 8.18 Certificates of Occupancy.......................................................36
Section 8.19 City Requirements...................................................................36

ARTICLE 9. OWNERSHIP, OPERATION AND DISPOSITION OF RENTAL
DEVELOPMENT .......................................................................................37

Section 9.1 Ownership .................................................................................37
Section 9.2 Regulatory Restrictions.............................................................37
Section 9.3 Property Management ................................................................38

ARTICLE 10. OBLIGATIONS WHICH CONTINUE THROUGH AND
BEYOND THE COMPLETION OF CONSTRUCTION..............................38

Section 10.1 Maintenance.............................................................................38
Section 10.2 Mechanics' Liens.....................................................................38
Section 10.3 Developer To Indemnify Authority, City.................................38
Section 10.4 Non-Discrimination .................................................................39
Section 10.5 Mandatory Language in All Subsequent Deeds, Leases and
Contracts ...............................................................................................39
Section 10.6 Employment Opportunity.........................................................40

ARTICLE 11. NON-DISCRIMINATION AND OTHER FEDERAL AND
STATE REQUIREMENTS ..........................................................................40

Section 11.1 Certain Requirements...............................................................40
Section 11.2 Access to Records....................................................................41
Section 11.3 Interest of Members of Congress.............................................41
Section 11.4 Interest of Member, Officer, or Employee and Former
Member, Officer, or Employee of Authority ........................................41
Section 11.5 Lobbying Activities.................................................................41

ARTICLE 12. ROLE OF HUD.................................................................................42

Section 12.1 HUD Approval.........................................................................42
Section 12.2 No Relationship Created .........................................................42

ARTICLE 13. INSURANCE.....................................................................................42

Section 13.1 Developer.................................................................................42

## TABLE OF CONTENTS
(continued)

Page

ARTICLE 14. TERMINATION FOR CAUSE ..................................................................43

Section 14.1 Events of Default by the Developer. ...........................................43
Section 14.2 Events of Default by the Authority, City. ...................................44
Section 14.3 Procedure for Termination For Cause.........................................44
Section 14.4 Continuing Obligations ..............................................................45

ARTICLE 15. DEVELOPER TERMINATION WITHOUT FAULT...........................45

Section 15.1 Development Contingencies ........................................................45
Section 15.2 Revision or Termination .............................................................46
Section 15.3 No Liability ................................................................................46

ARTICLE 16. PARTIES' DISPUTES .........................................................................46

Section 16.1 Definition of Claim Governed by Dispute Clause .......................46
Section 16.2 Applicability of Dispute Clause..................................................46
Section 16.3 Written Claims to be Submitted to Contracting Officer ..............46
Section 16.4 Notice of Decision or Decision Date ..........................................46
Section 16.5 Effect of Contracting Officer's Decision.....................................47
Section 16.6 Developer's Duty to Perform Pending Claim Resolution ............47
Section 16.7 Identification of Contracting Officer ..........................................47

ARTICLE 17. SECURITY FINANCING AND RIGHTS OF HOLDERS ..................47

Section 17.1 Holder Not Obligated to Construct ..............................................47
Section 17.2 Additional Mortgagee Protections ..............................................47

ARTICLE 18. REPRESENTATIONS AND WARRANTIES .....................................48

Section 18.1 Developer's Warranty of Good Standing and Authority ..............48
Section 18.2 Authority's Warranty of Good Standing and Authority ...............49
Section 18.3 City's Warranty of Good Standing and Authority........................49

ARTICLE 19. MISCELLANEOUS.............................................................................49

Section 19.1 Term...........................................................................................49
Section 19.2 Decision Standards.....................................................................50
Section 19.3 Notices.......................................................................................50
Section 19.4 Representatives ..........................................................................51
Section 19.5 Further Assurances.....................................................................52
Section 19.6 Restrictions on Transfers and Assignments. ...............................52
Section 19.7 Permitted Transfers....................................................................53
Section 19.8 Transfers with Authority, City Consent.......................................54
Section 19.9 Counterparts...............................................................................54

## TABLE OF CONTENTS
### (continued)

Page

Section 19.10 Interpretation and Governing Law ...................................................54
Section 19.11 Severability ......................................................................................54
Section 19.12 Final Agreement ...............................................................................54
Section 19.13 Non-Recourse ..................................................................................55
Section 19.14 Developer Employees and Liabilities ..............................................55
Section 19.15 Developer Not an Agent ..................................................................55
Section 19.16 Conflict of Interest ..........................................................................55
Section 19.17 Waivers ............................................................................................55
Section 19.18 Successors ........................................................................................56
Section 19.19 Headings; Exhibits ..........................................................................56
Section 19.20 Construction .....................................................................................56
Section 19.21 Cumulative Rights ...........................................................................56

| | |
|---|---|
| Exhibit A | Legal Description |
| Exhibit B | Financing Plan and Development Budget |
| Exhibit C | Scope of Development |
| Exhibit D | Preliminary Site Plan/Schematic Design |
| Exhibit E | Schedule of Performance |
| Exhibit F | Insurance |
| Exhibit G | Equal Opportunity/Non-Discrimination Policies |
| Exhibit H | Escrow Terms |

## DISPOSITION AND DEVELOPMENT AGREEMENT
## FOR THE REDEVELOPMENT OF ARROYO VISTA

This Disposition and Development Agreement ("Agreement") is entered into as of the 25th day of July, 2007 among the HOUSING AUTHORITY OF THE CITY OF DUBLIN, a public body, corporate and politic organized under the laws of California (the "Authority"), the CITY OF DUBLIN, a municipal corporation (the "CITY"), the HOUSING AUTHORITY OF THE COUNTY OF ALAMEDA, a public body, corporate and politic ("HACA"), EDEN HOUSING, INC., a California nonprofit public benefit corporation ("Eden") and SCS DEVELOPMENT COMPANY, a California corporation, dba Citation Homes Central ("Citation")(Eden and Citation, collectively, the "Developer").

### RECITALS

A.     Arroyo Vista is currently an Authority-owned public housing development on approximately 22.9 acres of land located at 6700 Dougherty Road in the City of Dublin, known as Alameda County Assessor's Parcel Nos. 941-0007-001-07, and more particularly described on Exhibit A attached hereto (the "Property").

B.     The Property is currently developed with 150 public housing units and a children's day care center (collectively, the "Existing Housing"). The Authority has determined that in order to ensure that the Existing Housing meets current standards, substantial rehabilitation is necessary and that it is economically infeasible to undertake such rehabilitation given the limited revenue generated by tenant rents and subsidies provided to the Authority by the United States Department of Housing and Urban Development ("HUD"). Accordingly, the Authority issued a Request for Qualifications ("RFQ") inviting submissions from developers interested in redeveloping the site with rental and ownership housing affordable to households with a range of income levels.

C.     In response to the Authority's RFQ, Developer submitted a proposal to develop the Property as a mixed-income development consisting of multi-family rental and ownership housing and senior housing and community facilities and amenities (the "Development"). The Authority selected the Developer through a competitive selection process to assist it in developing an enhanced revitalization plan for Arroyo Vista that includes a long-term commitment to high-quality, affordable housing.

D.     The Authority entered into an Exclusive Negotiating Rights Agreement ("ENRA") with the Developer, as well as with the City and HACA, dated as of April 11, 2007, and pursuant to direction from the Authority's Commission (the "Commission") has been negotiating with the Developer for the purpose of reaching agreement on this disposition and development agreement ("DDA") whose terms and conditions would govern the conveyance of the Property and the development of the Development.

E.     The City has agreed to provide financial assistance, as described in more detail

1460\02\435574.9

1

below, to help with the relocation costs of the residents of the Existing Housing, and to help with the construction cost of the Affordable Family Rental Housing and/or Affordable Senior Rental Housing.

     F.     HACA has agreed to provide Section 8 Housing Choice Vouchers to eligible residents of the Existing Housing in order to ensure that existing residents who are eligible have the opportunity to relocate to new housing with an affordable rent.

     G.     The Development to be constructed on the Property will consist of approximately 405 housing units, including approximately 179 affordable rental units, approximately 50 of which will be reserved for seniors, approximately 16 affordable for-sale units, approximately 210 market-rate for-sale units, a community center and a child care facility.

     H.     Pursuant to the California Environmental Quality Act ("CEQA") and the National Environmental Policy Act ("NEPA") and their respective implementing regulations, the City is conducting a study pursuant to CEQA and NEPA of the environmental impacts of the Development. Approval and certification of the environmental documentation for the Development by the City and HUD is a precondition to the Authority's agreement to convey the Property under this Agreement.

     I.     Notwithstanding anything in this Agreement to the contrary, the Authority has not nor will it approve the sale of the Property, and the City has not nor will it approve the use of the Property for the Development until all required environmental reviews under CEQA and NEPA have been completed.

     In consideration of the foregoing recitals and underlying promises, which all parties agree to be good and valuable consideration, the parties agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

     Section 1.1  <u>Definitions</u>.

     (a)     "Act" shall mean the United States Housing Act of 1937, as amended from time to time, and any successor legislation.

     (b)     "Additional Affordable Units" shall mean the approximately 29 affordable rental units to be constructed, owned and operated by Eden in addition to the Replacement Units, and the Affordable For-Sale Housing units being developed by Citation.

     (c)     "Affiliate" shall mean, with respect to either party constituting Developer, (1) any entity which has the power to direct Developer's management and

operation, or any entity whose management and operation is controlled by Developer; or (2) any entity in which an entity described in (1) has a controlling interest; or (3) any entity a majority of whose voting equity is owned by Developer, or for which Developer serves as the managing member or general partner; or (4) any entity in which, or with which, Developer, its successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions for merger or consolidation, so long as the liabilities of the entities participating in such merger or consolidation are assumed by the entity surviving such merger or created by such consolidation.

(d)    "Affordable Family Rental Housing" shall mean the Development Component to be developed by Eden consisting of approximately 129 units for low-, very low-, and extremely low-income families, a community center, childcare facility and open space.

(e)    "Affordable For-Sale Housing" shall mean the affordable units to be developed by Citation which shall be offered to households whose incomes do not exceed Moderate Income (as defined herein).

(f)    "Affordable Senior Rental Housing" shall mean the Development Component to be developed by Eden consisting of approximately 50 rental units for low-income seniors.

(g)    "Affordable Units" shall refer collectively to the 150 Replacement Units and approximately 45 Additional Affordable Units.

(h)    "Agreement" shall mean this Agreement (including all Exhibits attached hereto and made a part hereof).

(i)    "Applicable Requirements" shall mean applicable Federal, State, and local laws, rules and regulations, including without limitation, all applicable provisions of California Labor Code Section 1720 et seq. and the regulations adopted in connection therewith.

(j)    "Authority" shall mean the Housing Authority of the City of Dublin, organized pursuant to Section 34200, et seq. of the California Health and Safety Code, as amended, including any successor in interest or assigns by act of the Authority, or by operation of law, or otherwise.

(k)    "Authority Financing" shall mean the loan, forgivable loan and/or grant to be made by the Authority to Eden to develop the Affordable Units.

(l)    "CEQA" shall mean the California Environmental Quality Act (Public Resources Code Section 21000 et. seq.).

(m)    "Citation" shall mean SCS Development Company, a California corporation, dba Citation Homes Central, or its Affiliate.

(n)    "City" shall mean the City of Dublin, California.

(o)    "City Loan" shall mean the loan to be made by the City to Eden to assist in the development of the Affordable Family Rental Housing and/or the Affordable Senior Rental Housing components.

(p)    "Closing" or "Close of Escrow" shall mean, (1) with regard to the Property, the date on which the grant deed conveying the Property by the Authority is recorded; and (ii) with regard to any Development Component, the date on which the deed(s) of trust securing the loan(s) or grant(s) for a Development Component is recorded.

(q)    "Closing Documents" shall mean such Authority and City documents as may be necessary to close the Authority Financing and the City Loan.

(r)    "Commission" shall mean the Board of Commissioners of the Authority.

(s)    "Construction Completion" shall mean the dates on which the Certificates of Occupancy or the equivalent are issued by the appropriate local authority.

(t)    "Construction Documents" shall include, or incorporate as they come into existence, (a) the construction contract(s) and the general, special, and supplemental conditions to such contract(s); (b) site surveys, soil boring tests and any other tests, examinations or documents prepared from time to time in connection with the Development, (c) the plans and (d) all written or graphic interpretations, clarifications, amendments, shop drawings and changes of any of the foregoing.

(u)    "DDA" shall refer to this Disposition and Development Agreement.

(v)    "Declaration of Trust" shall refer to the Declaration of Trust by the Authority in favor of HUD, currently recorded against the Property in connection with the Existing Housing.

(w)    "Developer" shall refer to Eden and Citation until the conveyance of the Property, as described in Section 2.2; thereafter, "Developer" shall refer to either Eden or Citation with respect to the portion of the Property conveyed to Eden or Citation, as applicable.

(x)    "Developer Proposal" shall mean the Response to the RFQ submitted by the Developer to the Authority on March 22, 2006 which proposal is incorporated herein by reference.

1460\02\435574.9                                      4

(y)    "Development" shall refer to the improvements to be constructed hereunder or, as the context may require, to those improvements to be constructed in a particular Development Component.

(z)    "Development Budget" shall refer, as the context may require, to the budget for the Development Component specified thereon (attached hereto as <u>Exhibit B</u>), as they may be amended.

(aa)    "Development Components" shall mean the (A) Affordable Family Rental Housing, (B) Affordable Senior Rental Housing, (C) For-Sale Housing.

(bb)    "Development Contingencies" shall have the meaning described in Section 15.1.

(cc)    "Eden" shall mean Eden Housing, Inc., or its Affiliate.

(dd)    "Environmental Law" shall mean any present or future federal, State or local law, ordinance, rule, regulation, permit, license or binding determination of any governmental authority relating to, imposing liability or standards concerning, or otherwise addressing Hazardous Materials, the environment, health or safety, including, but not limited to: the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 <u>et seq</u>. ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 <u>et seq</u>. ("RCRA"); the Toxic Substances Control Act, 15 U.S.C. Section 2601 <u>et seq</u>. ("TOSCA"); the Clean Air Act, 42 U.S.C. Section 7401 <u>et seq</u>.; and the Clean Water Act, 33 U.S.C. Section 1251 <u>et seq</u>. and any so-called "Superfund" or "Superlien" law; and the Occupational Safety and Health Act, 29 U.S.C. Section 651 <u>et seq</u>. ("OSHA"), as each is from time to time amended and hereafter in effect.

(ee)    "Existing Housing" shall mean the 150 units of public housing (HUD Project No. CA-142-1) commonly known as Arroyo Vista, located on the Property.

(ff)    "Final Map" shall mean any and all final maps and parcel maps to be filed by the Developer.

(gg)    "Financing Plan" shall have the meaning given in Section 6.2.

(hh)    "For-Sale Housing Component" shall mean the Market Rate For-Sale Housing" and the Affordable For-Sale Housing, collectively.

(ii)    "HACA" shall mean the Housing Authority of the County of Alameda.

(jj)    "Hazardous Materials" shall mean "hazardous substances" as defined by CERCLA, "hazardous wastes" as defined by RCRA, any hazardous, dangerous or toxic chemical, waste, pollutant, contaminant or substance ("pollutant") within the meaning of any

Environmental Law prohibiting, limited or otherwise regulating the use, exposure, release, emission, discharge, generation, manufacture, sale, transport, handling, storage, treatment, reuse, presence, disposal or recycling of such pollutant, petroleum crude oil or fraction thereof, any radioactive material, including any source, special nuclear or by-product material as defined in 42 U.S.C. Section 2011 et seq. and amendments thereto and reauthorizations thereof, asbestos-containing materials in any form or condition, or polychlorinated biphenyls in any form or condition.

(kk)    "HUD" shall mean the U.S. Department of Housing and Urban Development.

(ll)    "Low-Income Housing Tax Credit" or "LIHTC" shall refer to the credit available under Section 42 of the Internal Revenue Code of 1986, as amended.

(mm)    "Market Rate For-Sale Housing" shall mean up to 210 market rate for-sale units to be developed by Citation.

(nn)    "NEPA" shall mean the National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321-4347).

(oo)    "Prior Resident" shall have the meaning given in Section 4.2.

(pp)    "Property" shall refer to the real estate described in Exhibit A on which the Development will be constructed.

(qq)    "Relocation Plan" shall mean the Relocation Plan approved by HUD.

(rr)    "Replacement Units" shall mean the 150 affordable rental housing units that will replace the Existing Housing units.

(ss)    "Revitalized Community" shall mean the Development or any portion thereof, after it is placed in service.

(tt)    "Revitalization" shall mean the totality of activities and tasks described in the Revitalization Plan.

(uu)    "Revitalization Plan" shall mean this Agreement and the Disposition Application, as amended or supplemented, as the parties may agree and as HUD may approve.

(vv)    "RFQ" shall mean the Request for Qualifications for Real Estate Developer issued by the Authority on January 11, 2006, as supplemented with addenda, which is incorporated herein by reference.

(ww)    "Schedule of Performance" shall mean the development schedule

attached hereto as <u>Exhibit E</u>, as the parties may revise from time to time.

(xx)     "Scope of Development" means the description of the improvements to be constructed as part of the Development attached hereto as <u>Exhibit C</u>, as the parties may revise from time to time.

(yy)     "TCAC" shall refer to the California Tax Credit Allocation Committee.

(zz)     "Term" shall mean the period for which this Agreement is effective, and shall commence with the execution hereof and shall terminate upon Construction Completion, as such period is more fully described in Section 19.1.

(aaa)     "Transfer" shall have the meaning given in Section 19.6.

Section 1.2 <u>List of Exhibits</u>.

| | |
|---|---|
| Exhibit A | Legal Description |
| Exhibit B | Financing Plan and Development Budget |
| Exhibit C | Scope of Development |
| Exhibit D | Preliminary Site Plan/Conceptual Design |
| Exhibit E | Schedule of Performance |
| Exhibit F | Insurance |
| Exhibit G | Equal Opportunity/Non-Discrimination Policies |
| Exhibit H | Escrow Terms |

## ARTICLE 2.
## REVITALIZATION PLAN; DEVELOPMENT COMPONENTS; FINANCING

Section 2.1     <u>Revitalization Objectives</u>.  The parties are entering into this Agreement in order to effect the Revitalization of the Property.  The Revitalization is intended to cause the demolition of the Existing Housing, improvement of the existing infrastructure, and redevelopment of the Property with a mixed-income housing development, as more particularly described below. As of the date hereof, the Revitalization shall be defined as the totality of activities, tasks and other matters detailed in the Revitalization Plan (which is incorporated herein by reference as if attached as an exhibit), as the Revitalization Plan may be amended from time to time as provided herein.

Section 2.2     <u>Authority Disposition of Property to Developer</u>.  The Authority agrees to convey the Property to Developer, and Developer agrees to accept the conveyance of the Property for development, all in accordance with and subject to all terms, conditions and covenants set forth in this Agreement and the Escrow Terms set forth in <u>Exhibit H</u> attached hereto and incorporated herein.

(a)     After the Property is divided into separate legal parcels, the Authority shall sell to Citation approximately one-half of the Property for a Purchase Price equal to Twelve Million Dollars ($12,000,000) in cash as described in Section 2.8 below. Additionally, Citation shall pay for the pro-rata share of common offsite infrastructure and site improvement costs associated with or attributed to the Affordable Senior Rental Housing to be developed by Eden and not less than half of the Transactional Expense Payment as defined in this Agreement.

(b)     Concurrently with the sale of approximately one-half of the Property to Citation, the Authority shall transfer the remaining portion of the Property to Eden for the purpose of developing the Replacement Units and other affordable rental housing for very low to lower income households in accordance with this Agreement. The portion of the property conveyed to Eden shall be conveyed to Eden for One Dollar ($1), plus Eden's share of all escrow costs as set forth in the Exhibit H and Eden's development obligations with respect to the affordable rental housing units set forth in this Agreement.

Section 2.3     Scope of Development.  Subject to Section 2.4 below, the Property shall be subdivided into separate legal parcels for the development and construction of approximately 405 housing units described below, open space, a community center and childcare facility.

(a)     Replacement Units.  Eden shall construct, own and operate 150 affordable rental housing units (the "Replacement Units") that will replace the Existing Housing. The Replacement Units will include one hundred (100) multifamily rental units and fifty (50) senior rental apartments.

(b)     Additional Affordable Units.  Approximately Forty-five (45) additional affordable units (the "Additional Affordable Units") shall be developed, of which approximately sixteen (16) shall be for-sale units constructed by Citation, and approximately twenty-nine (29) shall be multifamily rental units constructed, owned and operated by Eden.

(c)     Market Rate For-Sale Units.  Citation shall construct up to 210 market-rate for-sale units (the "Market Rate For-Sale Units").

Section 2.4     Revisions to Scope of Development.  The Parties acknowledge that the Development and the Development Components described herein are preliminary and remain subject to change as more detailed plans are formulated during the formal planning process. Notwithstanding anything to the contrary contained herein, the construction of the Development is conditioned upon compliance with the CEQA and NEPA. No physical activity, not otherwise exempt from CEQA and NEPA, shall commence on the Property without CEQA and NEPA compliance. In addition, the Development as described in Section 2.3 is also conditioned upon, subject to and/or may be modified for any of the following: (i) HUD approval and compliance with NEPA; (ii) the City's application process for discretionary land use entitlements and building requirements; (iii) availability of utilities; (iv) availability of

funding under affordable rental housing programs; (v) site constraints; and (vi) changes necessary to make the Development or portions of it more competitive for financing and financially feasible.

Section 2.5    Affordability Requirements.  The Affordable Units will be subject to recorded regulatory restrictions.  The regulatory agreements for the rental Affordable Units will require the rental units to be offered for rent and occupancy by extremely low-, very low-, and low-income households for a term of at least fifty-five (55) years.  The recorded restrictions on the Affordable For-Sale Housing units will impose household income eligibility and resale price restrictions for a term of at least fifty-five (55) years.  The affordability requirements for the Development shall, at minimum, meet the requirements of the City's Inclusionary Zoning Ordinance, as specified more particularly in Section 8.19.

The City and Authority agree to execute, and record at Eden's cost, subordination agreements to subordinate the City's Regulatory Agreement and Authority's Regulatory Agreement to Eden's construction and/or permanent loans for the affordable rental housing component if (A) such construction and/or permanent financing is provided by (i) the Department of Housing and Community Development ("HCD"), the California Housing Financing Agency ("CalHFA"), HUD, or other public senior lender that requires by statute or regulation that regulatory agreements with local public entities be subordinated, or (ii) in the case of tax-exempt bond financing, subordination of the Regulatory Agreements is required by such financing or Bond Counsel, or (B) (1) the affordable rental component is financed in part by HUD, Low-Income Housing Tax Credits, or tax-exempt bond financing and is subject to a recorded regulatory agreement in connection with such financing, and (2) Eden demonstrates to the City and Authority that, compared to financing available to Eden if the Regulatory Agreements are subordinated, financing without such subordination will be offered on materially less favorable terms.  In all cases, the City and Authority shall each be entitled to receive notice of default and shall each be entitled to cure defaults arising under the senior documents.

Within the time-frame specified in the Schedule of Performance, the Developer shall provide a breakdown of the Affordable Housing Rental Units and Affordable Housing For-Sale Units by number of units, unit size, and targeted AMI levels.  Subject to the availability of sufficient financing and other conditions set forth in Section 2.4, the targeted breakdown of the units is as follows:

## SENIOR RENTAL HOUSING

Estimated Number of Units by Unit Size and Targeted Area Median Income (AMI) Levels

| | 30% AMI | 40% AMI | 50% AMI | Sub-Total | Manager's Unit | Total |
|---|---|---|---|---|---|---|
| 1-Bedroom | 5 | 8 | 36 | 49 | 1 | 50 |

TOTAL:   50 Senior Housing Rental Units

FAMILY RENTAL HOUSING

Estimated Number of Units by Unit Size and Targeted Area Median Income (AMI) Levels

|  | 30% AMI | 40% AMI | 50% AMI | 60% AMI | Sub-Total | Manager's Unit | Total |
|---|---|---|---|---|---|---|---|
| 1-Bedroom | 3 | 2 | 3 | 2 | 10 | N/A | 10 |
| 2-Bedroom | 3 | 27 | 33 | 6 | 69 | 1 | 70 |
| 3-Bedroom | 3 | 11 | 15 | 5 | 34 | N/A | 34 |
| 4-Bedroom | 4 | 6 | 5 | 0 | 15 | N/A | 15 |
| Total | 13 | 46 | 56 | 13 | 128 | 1 | 129 |

TOTAL:  129 Family Rental Units

In accordance with the RFQ and Developer's response thereto, not less than six (6) rental units (i.e., 20% of 12.5% of the total number of projected units (405) less the Replacement Units) will be affordable to families who have household incomes between 50% and 80% of AMI.  Eden agrees to make six (6) rental units (or 20% of 12.5% of the total number of projected units (405) in the Development excluding the Replacement Units, whichever is greater) available for rent to returning residents of the Existing Housing ("Prior Residents") who are eligible and who have household incomes between 60% and 80% of AMI.  If some of the six units reserved for Prior Residents at incomes between 60% and 80% of AMI are not leased to such Prior Residents because less than six Prior Residents fail to apply, qualify or are ineligible, then Eden may rent those units to qualified families whose household incomes do not exceed 60%* of AMI so that such units qualify as LIHTC-eligible units.  The calculation of household incomes shall be in conformance with LIHTC regulations.

*NOTE:  In the event the applicable LIHTC regulations which restrict LIHTC-eligible units to 60% of AMI increase to a higher income level, the 60% income restriction set forth in the preceding sentence shall increase to the higher LIHTC-eligible level.

RESIDENTIAL FOR-SALE UNITS

Estimated Number of Units by Unit Size and Targeted
Area Median Income (AMI) Levels

|  | 80-120% AMI | Market-Rate | Total |
|---|---|---|---|

50

| 3-Bedroom | 16** | N/A | 16 |
| 3 & 4-Bedroom | N/A | 210 | 210 |
| Total | 16** | 210 | 226 |

TOTAL:  Up to 226 Residential For-Sale Units
**Note:  The number of Affordable For-Sale Units has been agreed upon by the parties to be seven percent (7%) of the total number of For-Sale Units in the Development.  To the extent that the number of For-Sale Units in the Development changes, the number of Affordable For-Sale Units will also change.

     Section 2.6    Commencement and Completion of Construction of the Development. The Final Map for the Development shall be processed and recorded within the time frame set forth in the Schedule of Performance.  The City and the Authority agree to work cooperatively and in good faith with the Developer to ensure that the Final Map is processed in a timely manner; provided, however, that nothing in this Agreement shall be deemed to require the City, its Planning Commission or other local agency with discretionary approval authority to approve entitlements for the Development or otherwise commit their discretionary powers in any particular manner.  Citation and Eden shall commence and complete the construction of each of their respective components of the Development within the timeframe set forth in the Schedule of Performance.

     Section 2.7    Schedule of Performance.  All parties shall perform their respective obligations within the time frames set forth in the Schedule of Performance initially attached hereto as Exhibit E, which may be amended and updated from time to time with the approval of all parties, which approval shall not be unreasonably conditioned, withheld or delayed, and which shall not require the formal approval of the governing bodies of the City, Authority or HACA.  Each such amended or updated Schedule of Performance when approved shall be initialed by all of the parties and made a part of this Agreement whether or not physically attached hereto.

     Section 2.8  Financing Terms.

     (a)    Purchase Price for the Property Conveyed to Citation.  The purchase price for the portion of the Property to be conveyed to Citation is Twelve Million Dollars ($12 million)("Purchase Price"), which is the total of the following three payments:   (i) Citation will pay $8 million to the Authority to be used by the Authority as a subsidy for the Affordable Family Rental Housing and the Affordable Senior Rental Housing to be developed by Eden; (ii) Citation will pay $3 million (the "Transaction Allocation") to HACA to support the processing, on behalf of the Authority, of necessary HUD approvals and the conveyance of the Property; and (iii) Citation will pay $1 million (the "Relocation Contribution") to the Authority to cover costs associated with relocation of existing residents in the Existing Housing prior to disposition of the Property.

(b)    Payment of Purchase Price.  Citation shall pay the Purchase Price in accordance with the following:

(1)    Following the execution of, and in accordance with, the ENRA among the parties, Citation made a nonrefundable deposit to the City in the amount of Fifty Thousand Dollars ($50,000) (the "Initial Deposit"), which the City has placed in a City-managed cost-recovery account to secure the payment of certain legal and consulting fees that have been or will be incurred by the City and/or Authority in connection with the Development.  At close of escrow for conveyance of the Property, any remaining balance of the Initial Deposit will be credited toward the Purchase Price.  If, at the time of conveyance of the Property, the remaining balance of the Initial Deposit is less than $50,000, Citation will pay any shortfall in such amount at that time.

(2)    Upon the City's approval of a tentative map and/or a vesting tentative map for the Development (hereinafter, collectively, "Tentative Map") Citation will pay:  (i) the sum of Two Hundred Fifty Thousand Dollars ($250,000) to Authority, and (iii) the sum of One Million Five Hundred Thousand Dollars ($1,500,000) to HACA.  These sums shall be credited toward the Purchase Price, and shall be nonrefundable unless Authority fails to secure HUD approval of the disposition of the Property, relocate all residents of the Existing Housing, and convey title to the Property to Developer.

(3)    Upon the earlier to occur of the City's approval of the Final Map or HUD approval of the Disposition Application, Citation will pay:  (i) Seven Hundred Thousand Dollars ($700,000) to the Authority, and (ii) One Million Five Hundred Thousand Dollars ($1,500,000) to HACA.  These sums shall be credited toward the Purchase Price, and shall be nonrefundable unless Authority fails to relocate all residents of the Existing Housing and convey title to the Property to the Developer.

(4)    Upon the later to occur of the City's approval of the Final Map or release by HUD of the Declaration of Trust, Citation will pay the sum of Eight Million Dollars ($8,000,000) to the Authority or its order.  The $8,000,000 shall be placed in Escrow (as that term is defined in Exhibit H attached hereto) within three (3) business days following the City's approval of the Final Map or HUD's release of the Declaration of Trust, whichever is later.  The $8,000,000 shall remain in Escrow until the conveyance of the Property to Citation and Eden at which time Escrow shall release the $8,000,000 to the Authority or its order.  The $8,000,000 shall be used by the Authority, or its order, to fund the Authority Financing to subsidize the Affordable Family Rental Housing and/or Affordable Senior Rental Housing as set forth in Section 2.8(a)(i).

(i)    During the time that the $8,000,000 is held in Escrow, the funds shall be held in an interest-bearing account and all interest shall accrue and be paid to the Authority or its order, subject to the last sentence of this subsection (i).  If the conditions precedent for the release of the $8,000,000 from Escrow to the Authority or its order are not

met and Citation is entitled to have the $8,000,000 released to Citation, then all interest on the $8,000,000 which accrued while held in trust by Escrow, shall be paid to Citation with the $8,000,000 principal. Upon conveyance of the Property to Citation and Eden, any accumulated interest shall be used to reimburse the City for the City's contribution to Relocation Costs.

    (ii)  If the parties mutually agree to hold the $8,000,000 in trust in an investment account and not in an interest-bearing account in Escrow, the parties may do so, provided that prior to Escrow releasing the funds to an investment account holder, the Authority, City, HACA, Citation, Eden, Escrow and the investment account holder all execute a written agreement relating to the investment of funds, conditions for release and such other matters that the parties deem necessary which agreement shall be in form and substance acceptable to each party in each party's discretion (defined in Section 19.2(c)). If no agreement can be reached, the funds shall remain in an interest-bearing account in Escrow. Each party shall pay for its own costs and expenses related to the preparation review and negotiation of any investment agreements or other instruments relating to the investment account and to the deposit and release of the funds to and from Escrow.

    (c)  <u>City Loan</u>. Provided that all conditions to conveyance of the Property have been satisfied, the City agrees to provide a loan to Eden in the amount of One Million Five Hundred Thousand Dollars ($1,500,000)(the "City Loan") to assist in financing the construction of the Affordable Family Rental Housing and/or Affordable Senior Rental Housing components. The City Loan will be evidenced by a nonrecourse promissory note, requiring payment on a residual receipts basis on such terms as the City and Eden shall mutually agree upon, and secured by a deed of trust recorded against the affected parcel(s) and subordinated to Eden's rental housing construction and permanent loans for affected parcel(s). The City Loan will be funded following satisfaction of the conditions agreed upon by the City and Eden as set forth in a Loan Agreement to be executed by the City and Eden. The City's financial contribution to the Development is limited to the City Loan and City Relocation Funds, as such term is defined in Section 3.3(b).

    (d)  <u>Authority Financing</u>. Provided that all conditions to conveyance of the Property have been satisfied, the Authority agrees to provide financial assistance to Eden in the amount of Eight Million Dollars ($8,000,000)(the "Authority Financing") to assist in development and construction of the Affordable Family Rental Housing and/or Affordable Senior Rental Housing components. The loans and/or grants will be structured in such manner as the parties determine will maximize the feasibility of the transaction and, where relevant, its tax credit eligibility or HUD Section 202 financing. Eden and the Authority shall execute such loan and/or grant agreements, notes, deeds of trust, security agreements and other documentation as may be necessary to effectuate the Authority Financing. Any portion of the Authority Financing in the form of a loan will be evidenced by a nonrecourse promissory note, requiring payment on a residual receipts basis on such terms as the Authority and Eden shall mutually agree upon. The Authority Financing, whether in the form of a loan or grant, shall be secured by a deed of trust recorded against the affected parcel(s) and subordinated to Eden's

rental housing construction and permanent loans for affected parcel(s). The Authority Financing will be funded with funds to be provided to the Authority by Citation pursuant to Section 2.8(b)(4) of this Agreement, following satisfaction of the conditions agreed upon by the Authority and Eden as set forth in a Loan Agreement to be executed by the Authority and Eden. The Authority's financial contribution to the Development Components under this Agreement is limited to the Authority Financing and the Authority Relocation Funds, as such term is defined in Section 3.2(e).

Section 2.9    Development Costs; Design Review. Except as otherwise expressly stated herein, Developer will be responsible for all development costs, including without limitation all design, development, demolition and construction costs, the cost of all permits, impact and processing fees, and the cost of all on-site and off-site public improvements required in connection with the Development.

Section 2.10    Planning and Entitlement Costs; Environmental Review. Except as otherwise expressly stated herein, Developer shall be responsible for payment of all costs incurred by the Authority, HACA and City in connection with the environmental review requirements associated with the disposition of the Property and the Development pursuant to the California Environmental Quality Act ("CEQA") and National Environmental Policy Act ("NEPA").

Pursuant to Section 2.11(a) below, Citation and Eden established and funded a standard cost recovery account with the City's Planning Department to ensure prompt payment of all City costs associated with processing CEQA and NEPA clearance documents, Tentative Maps, General Plan Amendment, and zoning amendments for the Development. The parties acknowledge that prior to the execution of this Agreement, Citation and Eden have deposited $175,000 into the cost recovery account which was a condition precedent to initiating formal planning activities for the Development. Citation and Eden will be jointly responsible for payment of all planning and entitlement costs and fees as they are incurred.

Section 2.11    Expenses. Citation and Eden will be responsible for paying up to Five Hundred Thousand Dollars ($500,000) (the "Transactional Expense Payment") to cover City and Authority legal, consulting and other costs and expenses incurred commencing on August 1, 2006 in connection with the negotiation and preparation of the Exclusive Negotiating Rights Agreement and this Agreement and other transactional activities associated with the disposition and development of the Property ("Transactional Costs"). The Transactional Expense Payment shall be in addition to the Purchase Price and the sums payable pursuant to Sections 2.8 and 2.11(a). The Transactional Expense Payment shall be paid as follows:

(a)    Cost Recovery Account. The City shall establish a separate cost-recovery account (the "Transactional Cost Account") to manage payment of all Transactional Costs.

(b)    Payment of Transactional Costs. As Transactional Costs are incurred,

City and Authority shall submit invoices to Eden and shall clearly mark such invoices as Transactional Costs. Invoices shall include copies of any third-party (e.g., consultant and legal) invoices. Eden and Citation shall be jointly responsible for payment of such invoices, and shall ensure payment in full within 30 days after receipt.

(c)    Reimbursement of City-Incurred Transactional Costs. If the total Transactional Costs incurred by the City and Authority exceed $250,000, the City will pay for such additional costs with funds from the City's Inclusionary Zoning In Lieu Fee Fund; provided, however, upon transfer of the Property to the Developer, Citation and Eden jointly and severally agree to reimburse the City for such additional costs up to the amount of $250,000 so that the aggregate amount of Transactional Costs paid by Citation and Eden equals the total of Transactional Costs incurred, up to a maximum of $500,000.

(d)    Use of Funds in Cost Recovery Account. The Initial Deposit described in Section 2.8(b)(1) above will be deposited into the Transactional Cost Account to serve as security to ensure prompt payment of the City and Authority Transactional Costs. If any invoice for Transactional Costs remains unpaid 30 days following transmittal to Eden, then the City or Authority, as applicable, may draw funds from the Transactional Cost Account, and Citation and Eden shall be required to replenish the Transactional Cost Account up to the amount of $50,000 within 30 days. At the close of escrow for conveyance of the Property after any remaining reimbursements due the City are made in accordance with this Section 2.11 and subject to Section 4.2(a)(4), any remaining balance in the Transactional Cost Account shall be credited toward Citation's Purchase Price.

Section 2.12       Revitalization Plan Evolution.

(a)    Initial Plan. Under the Disposition Application, the Authority is committed to have a Revitalization Plan initially consisting of the Disposition Application together with such amendments, supplements or clarifications as HUD may require and accept, and such further amendments as the Authority and Developer may propose and HUD approves.

(b)    Improvement. It is contemplated by the parties that as Developer pursues the further planning and implementation of the Revitalization, Developer, Authority and/or the City will identify areas in which the Revitalization Plan can be improved upon so as to make it more economically feasible or so as to better achieve its underlying objective of community revitalization. Where future amendments to the Revitalization Plan are advisable or required by unforeseen circumstances, subject to HUD approval, the Authority and Developer will work together to develop changes which accomplish the original goals set forth in the Revitalization Plan to the maximum extent feasible. The Authority, City and the Developer shall execute such documents acceptable to all parties as may be necessary and appropriate to the implementation of this Agreement.

(c)    Amendments. Developer shall cooperate with the Authority in the preparation of any amendment to the Revitalization Plan and submission to HUD that may be

necessitated by the evolution of plans prior to Closing.

Section 2.13    Budgetary Controls.

(a)    The Revitalization Plan shall include a budget (referred to herein as the "Development Budget," notwithstanding that it may also include expense items other than for the Development Components), as it may be amended from time to time, which Development Budget is attached hereto as Exhibit B.  The City, Authority and HACA shall have no contractual obligation to pay or provide any amount to Developer or for the Revitalization under this Agreement, except for the City Loan, Authority Financing, City and Authority relocation assistance as described in Section 4.2(a)(2) and (3) herein respectively, HACA relocation vouchers as described in Section 4.2(b) herein, and Transactional Costs over $500,000.  The parties recognize that financial needs may arise which require budget revisions so that the Revitalization may be accomplished, and they will consider and pursue such revisions in good faith.

(b)    It is the responsibility of Developer to propose, prepare and ascertain the sufficiency of the Development Budget, discuss its conclusions with the Authority and the City, and identify sources for such further funds as may be required for completion those portions of the Revitalization which are the obligation of the Developer.

# ARTICLE 3.
## GENERAL DUTIES OF PARTIES

Section 3.1    Developer's Obligations.  In addition to any obligations stated elsewhere in this Agreement, the Developer shall have the following duties and responsibilities which shall be performed within any applicable Performance Deadlines set forth in the Schedule of Performance.

(a)    Affiliates.  All obligations of the Developer stated herein shall include, without explicit mention, Citation's or Eden's obligation to cause their respective Affiliates to meet the same obligations with respect to matters in which the Affiliate is involved.

(b)    Requirements.  Developer shall diligently and in good faith seek to develop and construct the Development in accordance with the requirements of this Agreement, the Closing Documents and all Applicable Requirements.

(c)    Compliance with Revitalization Plan.  Developer shall diligently and in good faith manage and implement the Development in compliance with the Revitalization Plan, and so as not to cause a default thereunder.  Developer shall not be deemed to have failed in the foregoing obligation if any default under the Revitalization Plan was materially caused, occasioned or hindered in its cure by any actions, omissions, delays or breaches of warranty of the Authority or the City, or for reasons beyond the control of the Developer.

(d)    <u>Development Schedule</u>.  Developer shall accomplish all tasks shown on the Schedule of Performance to be performed by Developer by the applicable Performance Deadline shown on the Schedule of Performance.

(e)    <u>Financing</u>.  Developer shall obtain binding commitments for all construction and permanent financing, including any public funding, needed for the Development as shown in the approved Financing Plan.  The Developer will be responsible for maximizing use of leveraged financing sources from the Low Income Housing Tax Credit program, and other housing, community economic development funding sources, as available.

(f)    <u>Employees, Agents and Contractors</u>.  Except as otherwise stated herein, Developer shall be solely responsible for the selection, hiring, contracting with, directing, and discharging of all employees, agents and contractors whom or which Developer utilizes in accomplishing its duties hereunder.  Developer shall use reasonable care and due diligence to select qualified, competent and trustworthy entities and individuals for such purposes. Notwithstanding the foregoing, the Authority and the City shall have the right to require Developer to terminate or reassign any employee, agent or contractor upon evidence of a conflict of interest causing the Authority or the City to violate its obligations under Applicable Requirements.

(g)    <u>Information</u>.  Upon request, the Developer shall provide the Authority on a timely basis with all information with respect to the Development which the Authority requires to prepare any filings and reports required by the Revitalization Plan.

(h)    <u>Approvals</u>.  Developer shall, on an ongoing and timely basis, advise the Authority and the City as to the status of the processing of all applications necessary to obtain all governmental approvals required in accordance with this Agreement and all Applicable Requirements.  Developer shall as soon as practical advise the Authority and the City of any hearings regarding matters described in this Agreement to enable the Authority and the City to elect to attend such hearings.

(i)    <u>Applications</u>.  Developer shall keep the Authority and the City fully informed concerning the development of all applications for government assistance and public or private financing.  Upon request, Developer will provide the Authority and the City with a reasonable number of copies of all formal submissions.

(j)    <u>Cooperation and Skill</u>.  Developer recognizes the relationship of trust and confidence established between it and the Authority and City by this Agreement and agrees to (i) keep itself and the Authority and City fully informed as to the progress of the Development (ii) consult and cooperate fully with the Authority and City in furthering the interest of the Authority and City in the Development as set forth in the Revitalization Plan, (iii) furnish its best skill and judgment in the accomplishment of the Development, and (iv) furnish sound business administration and management.

(k)    Indemnification. Developer shall indemnify, defend and hold harmless the Authority and the City and its Commissioners, Council members, officers, employees and agents from and against any and all losses, costs, damages, claims, causes of action, demands, suits, liabilities, obligations, judgments and expenses (including any attorney fees and other costs of litigation) arising out of or relating to any injury, disease or death of persons or damage to or loss of property resulting from or in connection with any breach by Developer, its Affiliates, or its or their respective agents or employees of any provision of this Agreement, or arising out of any performance of activities under this Agreement, except to the extent such claims arise from the gross negligence or willful misconduct of the Authority or City, their board members, council members, officers, employees, agents, successors, and assigns. The Developer's liability shall not be limited by any provisions or limits of insurance set forth in this Agreement. This indemnification shall survive the expiration or termination of this Agreement.

(l)    Real Estate Tax Exemptions and Abatements. Developer shall be responsible for obtaining property tax exemptions for the Development, or any portion thereof, or shall be responsible for the payment of property taxes or possessory interest taxes on such sites. Developer shall apply for welfare exemption for low income housing to the extent applicable.

(m)    Additional Responsibilities. Except at the election of the Authority, Developer, in consultation with the Authority, shall prepare for execution by the Authority all required applications to the City or to any and all other agencies from which the Developer may be required to obtain permits, approvals and the like.

(n)    Security for Subdivision Improvements. Developer shall, at Developer's sole cost and expense, provide a bond or such other security as City may approve in City's sole discretion to secure performance of conditions of approval imposed in connection with the Final Map and/or any Subdivision Improvement Agreement required in connection with the subdivision of the Property.

(o)    Execution of Documents. Whenever statute or regulation or the successful implementation of the Agreement requires the Developer to take actions or execute documents consistent with the Developer's powers and obligations under this Agreement, the Developer will do so promptly, provided that any documents prepared for the Developer's execution shall be in form and substance acceptable to the Developer in its sole discretion.

Section 3.2    Authority Obligations. In addition to any obligations stated elsewhere in this Agreement, the Authority shall have the following duties and responsibilities which shall be performed within any applicable Performance Deadlines set forth in the Schedule of Performance.

(a)    Approvals. The Authority shall review on an expeditious basis any matter submitted and advise Developer of approval or of why approval is being withheld. The

Authority's approval, where called for in this Agreement, shall in all instances be evidenced by a writing explicitly granting such approval and signed by the Executive Director, or her written designee.

(b) <u>HUD Approval</u>. The Authority will promptly submit the Disposition Application to HUD and will work diligently to obtain HUD approval of such application. Upon approval by HUD the Authority will make diligent efforts to comply with the Revitalization Plan, and will not permit any default thereunder which would adversely affect the Revitalization. The Authority will endeavor, with Developer's assistance, to secure the approval of HUD for all activities contemplated herein over which HUD has authority, such as the disposition of the Property. HUD approval of the Disposition Application shall be deemed HUD approval of the disposition of the Property and of this Agreement. The Authority shall not be deemed to have failed in the foregoing obligation if any default was caused, occasioned or hindered in its cure by any actions, omissions, delays or breaches of warranty of the Developer, or Developer's Affiliates, contractors or employees.

(c) <u>Access to Site</u>. So long as it retains title to or control of the Property, or any portion thereof, the Authority shall provide Developer reasonable access to such Property (including buildings and improvements thereon) pursuant to that License and Right of Entry Agreement dated April 11, 2007 between the Authority and Developer.

(d) <u>Protection of Authority Funds; Efficient Administration</u>. The Authority shall ensure that the proceeds to be provided by Citation to the Authority shall be set aside specifically for use in a manner consistent with this Agreement, and shall expend such funds only in accordance with this Agreement, the Revitalization Plan, any approved development plan and the budgets and schedules therein contained, as the same may be amended from time to time.

(e) <u>Authority Assistance</u>. In addition to the Authority Financing described in Section 2.8(d) above, the Authority shall pay up to Six Hundred Thousand Dollars ($600,000)("Authority Relocation Funds") of costs incurred in the relocation of residents of the Existing Housing.

(f) <u>Indemnification</u>. The Authority shall indemnify, defend and hold harmless Developer and their respective officers, directors, employees and agents from and against any and all losses, costs, damages, claims, causes of action, demands, suits, liabilities, obligations, judgments and expenses (including any attorney fees and other costs of litigation) arising out of or relating to or resulting from or in connection with the Authority's actions or omission or by and of their respective agents or employees of any provision of this Agreement relating to relocation, or arising out of any performance of relocation activities under this Agreement (the "Relocation Costs"), except to the extent such claims arise from the gross negligence or willful misconduct of the Developer, their officers directors, employees, or agents. This indemnification shall survive the expiration or termination of this Agreement.

(g)    Execution of Documents.  Whenever statute or regulation or the successful implementation of the Agreement requires the Authority to take actions or execute documents consistent with the Authority's powers and obligations under this Agreement, the Authority will do so promptly, provided that any documents prepared for the Authority's execution shall be in form and substance acceptable to the Authority in its sole discretion.

Section 3.3    City Obligations.  In addition to any obligations stated elsewhere in this Agreement, the City shall have the following duties and responsibilities which shall be performed within the applicable Performance Deadlines set forth in the Schedule of Performance.

(a)    Approvals.  The City shall review on an expeditious basis any matter submitted and advise Developer of approval or of why approval is being withheld.  The City's approval, where called for in this Agreement, shall in all instances be evidenced by a writing explicitly granting such approval and signed by the City Manager, or his written designee.

(b)    City Assistance.  In addition to the City Loan described in Section 2.8(c) above and Transactional Costs in excess of $500,000 pursuant to Section 2.11 above, the City shall provide additional financial assistance to the Authority in the amount of up to One Million Five Hundred Thousand Dollars ($1,500,000)("City Relocation Funds") to assist Authority in the relocation of residents of the Existing Housing.

Section 3.4    HACA Obligations.  In addition to any obligations stated elsewhere in this Agreement, the Authority shall have the following duties and responsibilities which shall be performed within any applicable Performance Deadlines set forth in the Schedule of Performance.

(a)    Approvals.  The Authority shall review on an expeditious basis any matter submitted and advise Developer of approval or of why approval is being withheld.  The Authority's approval, where called for in this Agreement, shall in all instances be evidenced by a writing explicitly granting such approval and signed by the Executive Director, or her written designee.

(b)    Vouchers.  HACA shall provide up to 150 Section 8 Housing Choice Vouchers to assist eligible residents of the Existing Housing in relocating to new homes. HACA shall also apply to HUD for a special allocation of such vouchers, although such application shall not be construed to qualify or condition in any way HACA's obligation to provide vouchers to eligible residents of the Existing Housing.

Section 3.5    Mutual Obligations.

(a)    External Communications.  The parties agree to cooperate and consult with each other regarding any public statements or publications made regarding the Revitalization.  The Authority, as property owner, shall have the final decision with regard to

communications with local elected officials, former and prospective tenants, and with HUD relating to the Revitalization Plan.

(b)    Information.  The Authority, City and HACA and Developer shall provide each other all necessary information relating to the Revitalization Plan, as expeditiously as possible for the orderly progress of the Revitalization.  The Authority shall coordinate all relevant communication with HUD, and each shall provide the other with copies of all relevant correspondence, directives, and other written material either to or from HUD with respect to this Revitalization.  Prior to the transfer of title to the Property, the Authority, City and Developer will meet as frequently as may be necessary, but no less often than monthly, for regular briefings and progress reports.

## ARTICLE 4.
## PREDEVELOPMENT REQUIREMENTS

Section 4.1    Disposition Approval.  The Authority shall diligently pursue such HUD approval as may be required pursuant to Section 18 of the Act and 24 CFR Part 970 as may be required to obtain HUD approval to dispose of the Property in accordance with the Revitalization Plan. Developer shall provide reasonable assistance in preparing submissions and obtaining approval, as requested by the Authority.

Section 4.2  Relocation and Rehousing.

(a)    In accordance with the Schedule of Performance, the Authority will relocate all residents of the Property to relocation housing, in accordance with the Revitalization Plan and in compliance with all Applicable Requirements, including HUD.  The Authority shall be responsible for all federal and state relocation benefits, costs incurred in moving residents to their new homes, and any other cost or expense arising from or related to all relocation matters in connection with the Revitalization Plan.  Citation, the City and the Authority shall each contribute financially to cover the anticipated Relocation Costs, as more specifically described below and each party's contribution shall be applied to the Relocation Costs in the order specified below:

(1)    FIRST:  Citation shall pay $1,000,000 to the Authority to cover Developer's share of the Relocation Costs, pursuant to Section 2.8(a)(iii) herein; provided, however, that Citation shall not be obligated to pay the $1,000,000 unless and until the conditions precedent described in Sections 2.8(b)(2) and (3) above are satisfied.  In the event, as expected, the City or the Authority have advanced funds for Relocation Costs prior to Citation's payment, upon the Authority's receipt of Citation's $1,000,000, all or a portion of Citation's $1,000,000 may be used to reimburse the Authority and/or the City for funds advanced for Relocation Costs;

(2)    SECOND:  The Authority shall contribute up to $600,000 pursuant to Section 3.2(e) herein.

(3)     THIRD:  The City shall contribute up to $1,500,000 pursuant to Section 3.3(b) herein;

(4)     FOURTH:  Under Section 2.11, Citation and Eden are responsible for paying up to $500,000 for Transactional Costs.  In the event the Transactional Costs are less than $500,000 and the Relocation Costs exceed $3.1 million, Developer agrees to use such savings (i.e., the difference between the actual Transactional Costs that Developer is responsible for under Section 2.11 and the $500,000 maximum) to reimburse the Authority for Relocation Costs.  Such reimbursement, if any, shall be made through escrow upon conveyance of the Property.

(5)     FIFTH:  The parties acknowledge that the RFQ states:  "The Authority would manage and fund the relocation of the existing Arroyo Vista Residents."  Notwithstanding that representation, the parties have agreed to share Relocation Costs to the extent provided above.  In the event that Relocation Costs exceed the sums set forth above, the parties agree to discuss possible alternative methods to obtain the funds necessary to pay such costs.  Nothing in this paragraph (5) is intended to obligate nor should this paragraph (5) be construed to mean that Citation or Eden are responsible for any Relocation Costs in excess of Citation's and Eden's contribution stated in paragraphs (1) and (4) above.

(b)     HACA shall provide rental assistance vouchers to eligible residents of the Existing Housing and shall coordinate the distribution of such vouchers to residents.  HACA shall also apply to HUD for a special allocation of vouchers, although such application shall not be construed to qualify or condition in any way HACA's obligation to provide vouchers to eligible residents.

(c)     Consistent with the Relocation Plan and representations made by the Authority to relocated Arroyo Vista residents regarding their first priority to reapply to the newly constructed Affordable Units, the Developer shall submit to the Authority, for its review and approval, a Rehousing Policy which will contain the following elements, at a minimum:

(1)     Households that were eligible under the Relocation Plan ("Prior Residents") who apply to move to the Revitalized Community in accordance with established procedures and who meet eligibility and screening standards shall have a preference over other applicants who are not Prior Residents.  Developer shall propose such procedures and standards for Authority's approval.

(2)     Eligibility for Prior Residents will require that household members demonstrate a continuing commitment to be law-abiding and lease-compliant and to meet behavioral standards which would be expected in the private rental market; and have no disqualifying prior history of serious criminal acts or lease violations.

(3)     Eligibility of Prior Residents for purchase of the Affordable For-

Sale Housing units will require that households meet income eligibility requirements and screening standards including mortgage qualification requirements, and that such residents shall have a preference over other similarly situated applicants who are not Prior Residents.

(4)    The Authority shall be responsible for maintaining a list of Prior Residents whom are eligible for return to the Revitalized Community, and shall maintain regular contact with such residents so that they are fully informed as to the progress of the Development.

Section 4.3    <u>Tenant and Homebuyer Selection</u>.  Developer shall comply with the City Inclusionary Zoning Regulations, defined in Section 8.19 herein, and with all applicable state and federal fair housing laws in the selection of tenants and homebuyers.

Section 4.4    <u>Demolition</u>.  Following the completion of relocation from the Property and transfer of the Property to the Developer, the Developer shall undertake the following activities:

(a)    Existing Housing and all physical improvements and unusable infrastructure on the Property shall be demolished.  Developer agrees to grant a license and right of entry for HACA to enter the Property for thirty (30) days after the Closing in order for HACA to remove such appliances, doors, and other components of the Existing Housing as HACA may request for use in its other facilities, in the event it has not already completed such tasks prior to Closing;

(b)    All debris from the demolition of the Existing Housing and all other known surface and subsurface physical obstructions shall be removed;

(c)    If and to the extent of any known Hazardous Materials, all remediation and removal of Hazardous Materials shall be performed.

(d)    Developer shall comply with the City's Construction Debris and Recycling Ordinance.

The Developer shall complete all demolition and remediation activities on the Property in compliance with all Applicable Requirements and by the Performance Deadline set forth in the Schedule of Performance.

## ARTICLE 5.
## DEVELOPER PREDEVELOPMENT COMPONENT

Section 5.1    <u>Developer Responsibility and Management</u>.  Developer shall conduct any predevelopment work described in Section 2.3 and this Article, all in accordance with the Schedule of Performance.  Developer will ensure that work which it conducts is conducted in

conformance with all applicable laws and will obtain all necessary permits and approvals of third parties.

Section 5.2    License.  The Developer may enter the Property and the Existing Housing and conduct all such inspections and testing as it wishes, pursuant to that License and Right of Entry Agreement dated April 11, 2007 between the Authority and Developer.

Section 5.3    Master Planning.  Developer shall conduct such master planning as is necessary and economically feasible, consistent with the approved Revitalization Plan and Applicable Requirements, and will best achieve the Revitalization.  Within such responsibility:

(a)    Developer will analyze the current development plans and review their conclusions with the Authority.

(b)    Developer will conduct such design, planning, marketing, engineering and other studies as are necessary.  Developer and its consultants shall actively participate in the community meetings carried out by the Authority.  The Authority shall provide Developer with reasonable advance notice of such community meetings.

(c)    Developer will obtain issuance of applicable zoning, land use, planned unit development ("PUD") subdivision, resubdivision, street and alley closings and dedications, historic preservation approvals, environmental reviews, and other approvals and interpretations consistent with and necessary for the Development.

(d)    Developer shall propose a plan for interrelating the various Development Components and phases, which shall address cost-sharing arrangements, CC&Rs, reciprocal easement agreements and similar issues.

Section 5.4    Infrastructure and Site Improvements.  Developer shall design and construct all roads, streets, utility lines and conduits, sewers, and other site improvements, consistent with Applicable Requirements.

Section 5.5    Timing of Subdivision and Conveyance.  In accordance with the Schedule of Performance and consistent with the preconditions specified in this Agreement, the respective parties shall undertake the following activities, in sequential order: (a) Developer shall prepare the Final Map and take all actions necessary to obtain approval for recording the Final Map; (b) upon HUD approval of the Disposition Application, the Authority shall sign the Final Map; (c) upon relocation of all residents of the Existing Housing from the Property, the Final Map is recorded; and (d) the Authority shall convey title to the subdivided parcels directly to Citation or Eden, or their respective Affiliates.  Concurrently with the recording of the grant deeds, the deeds of trust for the Authority Financing and the City Loan to Eden, and their regulatory agreements, will be recorded on the appropriate parcels.

## ARTICLE 6.
## CONDITIONS PRECEDENT TO AUTHORITY
## CONVEYANCE OF PROPERTY TO DEVELOPER

Section 6.1  Conditions Precedent to Authority Performance.

(a)     Conditions Precedent in General.  In addition to the completion of the activities in Section 3.1, as conditions precedent to the Authority's obligation to make the Authority Financing and to convey the Property to the Developer and as conditions precedent to the City's obligation to make the City Loan, the conditions set forth in this Article 6 must first be met by the Developer or waived by the Authority and City by the times specified in the Schedule of Performance or such other date as may be agreed upon by the Parties.  Each of the disposition requirements set forth below must be met by the Developer prior to the conveyance of the Property to the Developer.  No portion of the Property shall be conveyed by the Authority until all disposition requirements identified herein and in the Revitalization Plan have been fully satisfied.

(b)     Additional Agreements to be Negotiated.  It is anticipated that the satisfaction of the disposition requirements listed below will require further negotiation and the execution of additional agreements necessary for the sale of the Property, for the Authority's funding of the Authority Financing and for City's funding of the City Loan.  These agreements will include, but will not be limited to:

(1)     Authority loan and/or grant agreements for the predevelopment, construction and/or permanent funding of Authority funds for the Affordable Family Rental Housing and the Affordable Senior Rental Housing components.

(2)     City loan documents and City Affordable Housing Regulatory Agreements.

Section 6.2     Financing Plans and Commitments.  The Developer shall submit to the Authority and City for approval an updated Financing Plan for each separate Component, i.e. Affordable Family Rental Housing Component, Affordable Senior Rental Housing Component, and the For-Sale Housing Component.

(a)     The Financing Plan shall contain, at a minimum:

(1)     a preliminary development budget;

(2)     a proposed sources and uses statement for the period of the construction; and

(3)     a proposed sources and uses statement from the date of the origination of the permanent loan, if any, or in the absence of a permanent loan, from the date

of the issuance of the Certificate(s) of Occupancy or the equivalent for the development.

For the rental Affordable Units only, the Financing Plan should also include the following:

(4)    a preliminary 30-year cash flow analysis of the development, including an analysis of the development from the date of the issuance of the Certificates of Occupancy or the equivalent;

(5)    a preliminary initial operating budget for the development, including without limitation an operating reserve fund and capital replacement reserve fund; and

(6)    all underlying assumptions for each of the above, including terms, conditions, and pricing of all debt and equity.

(b)    Approvals.  The Developer shall also submit to the Authority and City for approval any revisions to any of the Financing Plans for the Development.

Section 6.3    Construction Documents.  The Developer will have prepared, or will have seen to the preparation of, construction plans and specifications, budgets, schedules and a construction contract as provided in Article 8 (the "Construction Documents") and will diligently perform all obligations described in that Article; provided, however, that as of conveyance of the Property, the Construction Documents shall only cover demolition, grading, preliminary site improvements and infrastructure.  The Construction Documents shall be subject to the review and approval of the Authority.  Developer will make best efforts to minimize development costs, consistent with long term efficient operation and upkeep, marketability, and contribution to family and neighborhood quality of life.

Section 6.4    Permits and Approvals.  The Developer shall have obtained, with the approval of the Authority and in the name of the Authority, where appropriate) all necessary permits, approvals, and entitlements including, without limitation, all building and construction permits, licenses, easements, zoning and approvals necessary for the portion of the Development for which it is responsible, including utilities necessary for that portion of the Development, and roads, transportation, and other facilities or physical improvements contemplated by the Revitalization Plan and Construction Documents.  Developer shall, on an ongoing and timely basis, advise the Authority as to the status of the processing of all applications necessary to obtain all governmental approvals required in accordance with this Agreement, applicable approvals and requirements, and the Construction Documents. Developer shall advise the Authority of any hearings regarding matters described in this section with sufficient advance notice to enable the Authority to elect to attend such hearings.

Section 6.5    Affiliate.  If Developer intends to request the Authority to convey the Property or any part thereof to an Affiliate of Eden or Citation, the Developer shall submit to

the Authority for its approval, which shall not be unreasonably withheld, conditioned or delayed, the formation documents of such Affiliate.

Section 6.6    HUD Approval. The Developer shall cooperate with the Authority, and provide such documents as the Authority may reasonably request, in support of the Authority's efforts to obtain HUD approval of the Disposition Application.

Section 6.7 Environmental Review and Approval.

(a)    The City, with the cooperation of the Authority and the Developer, shall diligently pursue the required environmental review of the development of the Property pursuant to this Agreement, in accordance with the provisions of CEQA and NEPA, including, but not limited to, any required reviews or studies and any necessary archaeological or historical resource assessments. The Developer acknowledges that the environmental review process under CEQA and NEPA for the Development may involve consideration of input from interested organizations and individuals; that approval or disapproval of the use of the Property following completion of the environmental review process is within the discretion of the City as lead agency; and that neither the Authority nor the City make any representation regarding the ability of the City to approve the use of the Property at the conclusion of the environmental review process required by CEQA and NEPA, or regarding the imposition of any mitigation measures as conditions of any approval that may be granted.

(b)    Consistent with CEQA and NEPA requirements, this Agreement only constitutes a basis for negotiation of the Development documents as those documents pertain to the Property, and does not constitute approval of the use of the Property. The parties recognize that the City has the absolute discretion and right to approve or disapprove the use of the Property, and no cost shall be incurred by the City or the Authority as a result of such decision.

(c)    The Developer shall have prepared and submitted to the City such information and such environmental documentation as may be necessary to perform the environmental review process required by NEPA and CEQA for the Development. The Authority shall have no obligation to convey the Property until HUD has certified the NEPA environmental documentation and City has certified an Environmental Impact Report ("EIR") for the Development. The Developer shall be responsible for implementing at Developer's cost, any environmental mitigation measures required by HUD or the City as a condition of approval pursuant to NEPA or City certification of the EIR.

Section 6.8    Approval Process. After the Developer submits to the Authority for approval any item provided for in the Schedule of Performance, the Authority shall have twenty-one (21) days following the submission to approve or disapprove such submission. If rejected by the Authority in whole or in part, the Authority shall provide Developer with reasons for the rejection, either orally or in writing. Developer shall then submit modified documents to the Authority within fifteen (15) days or such longer period as the parties may

agree upon. The Authority shall then have fifteen (15) days to review and approve or disapprove the modified submission, and shall provide Developer with reasons for any disapproval. If, by the end of the Authority's period of review, Developer does not receive the written approval of the Authority, and has not received any reason for a disapproval, Developer must provide the Authority with written notice pursuant to Section 23.3 that the Authority will be deemed to have approved the submission unless the Authority approves or disapproves the submission within five (5) days. The Developer and the Authority may repeat the foregoing process and time periods if both parties shall so agree in writing.

## ARTICLE 7.
## DESIGN

Section 7.1    Design in Conformance with Scope of Development and Conceptual Design. In designing and constructing the Development, the Developer shall cause all subsequent design documents to be consistent with the Scope of Development, attached as Exhibit C, and the Conceptual Design, attached as Exhibit D, approved by the City and the Authority; provided, however, the parties acknowledge that the site plan and elevations submitted with Developer's proposal are preliminary. The parties will cooperate in good faith to develop and refine the Development's site plan and elevations. The Scope of Development and the Conceptual Design shall establish the baseline design standards from which the Developer shall prepare all subsequent Design Documents.

Section 7.2    City Entitlement Procedures and Submittal Requirements. Developer shall comply with all City regulations and procedures required in connection with Developer's application for planning approvals, entitlements and permits necessary for development of the Development and each component thereof.

Section 7.3    Design Documents. The Developer shall proceed diligently to prepare design development and construction documents for the proposed Development, consistent with the Scope of Development and the Conceptual Design, including, without limitation, such drawings as may reasonably be required to show the location, bulk, height and other principal external features of the proposed Development. In connection with its submittal to the City and the Authority for its approval, the Developer shall provide to the Authority such elevations, sections, plot plans, specifications, diagrams and other design documents ("Design Documents") at each of the stages described in Section 7.3, as may reasonably be required by the Authority for its review. The Design Documents shall incorporate any conditions imposed by the City's entitlements process.

Section 7.4    Submittal and Review of Documents. Within the times set forth in the Schedule of Performance, the Developer shall submit to the City and the Authority the Documents as set forth below:

(a)    Design Development Drawings. The Design Development Drawings

shall be based on the Conceputal Design and the Scope of Development and shall be submitted to the City and the Authority concurrently. The Design Development Drawings shall indicate estimated structural dimensions, and delineation of site features and elevations, materials and colors, landscaping and other features. The drawings shall fix and describe all design features, as well as the size, character, and quality of the entire Development as to architectural, structural, and mechanical systems. Key details shall be provided in preliminary form.

      (b)    <u>Final Construction Drawings</u>. Final Construction Drawings are to be a continuation of approved Design Development Drawings and shall be submitted by the Developer to the City. The Final Construction Drawings must provide all the detailed information necessary to obtain a building permit for that phase. The Final Construction Drawings to allow for the Developer to obtain the building permit must provide all the detailed information necessary to build the Development including complete building, site, landscape, requirements, standards, and specifications.

    Section 7.5    <u>Project Approvals</u>. Within the times set forth in Section 7.6, the Authority shall have the right to review and approve the Design Documents. The purpose of the Authority's review of the Design Documents is to ensure consistency with the Scope of Development and the provisions of this Agreement. Provided that the architectural submittals meet the requirements set forth in Section 7.3, the Authority shall be required to approve those Design Documents which are logical progressions from concepts set forth in previously approved Design Documents.

    Section 7.6    <u>Approval Process</u>. The Authority shall approve or disapprove submittals under this Article 7 within ten (10) days of receipt of the submittal from the Developer. In the event the Authority disapproves a submittal of the Design Documents pursuant to Section 7.4, the Authority shall submit a list of reasons for such disapproval to the Developer, together with its notice of disapproval. Upon receipt of such a list, the Developer shall have ten (10) days to resubmit a revised submission. The Authority's failure to approve or disapprove within seven (7) days shall be deemed to be approval of such change.

    Section 7.7    <u>Additional Permits and Approvals</u>. Within the times specified in the Schedule of Performance, Developer shall obtain all permits and approvals necessary to construct the Development including demolition and building permits. All applications for such permits and approvals shall be consistent with the approved Design Documents. The Developer acknowledges that execution of this Agreement by the City does not constitute waiver by the City of any of its ordinances, resolutions, or regulations applicable to the application to the City for land use entitlements, does not constitute approval by the City of any required permits, applications, or allocations, and in no way limits the discretion of the City in the permit, allocation and approval process.

    Section 7.8    <u>Authority Review</u>. The Developer shall be solely responsible for all aspects of Developer's conduct in connection with the Development, including, but not limited to, the quality and suitability of the Plans and Specifications, the supervision of construction

1460\02\435574.9

work, and the qualifications, financial condition, and performance of all architects, engineers, contractors, subcontractors, suppliers, consultants, and property managers. Any review or inspection undertaken by the Authority with reference to the Development is solely for the purpose of determining whether the Authority is properly discharging its obligations to the Authority, and should not be relied upon by the Authority or by any third parties as a warranty or representation by the Authority as to the quality of the design or construction of the Development.

## ARTICLE 8.
## CONSTRUCTION

Section 8.1    Commencement of Construction. The Developer shall commence or cause to be commenced construction of the Development in accordance with the Performance Deadline set forth in the Schedule of Performance.

Section 8.2    Completion of Construction. The Developer shall diligently prosecute or cause to be prosecuted to completion the construction of the Development, and shall complete or cause to be completed the construction of the Development no later than the Performance Deadline specified in the Schedule of Performance.

Section 8.3    Construction Pursuant to Plans. The Developer shall construct or cause to be constructed the Development substantially in accordance with the Final Construction Drawings and the terms and conditions of all City and other governmental approvals.

Section 8.4    Construction Bonds. The Developer shall require its contractor to procure and deliver to the Authority and the City copies of labor and material (payment) bonds and performance bonds, or a dual bond which covers both payment and performance obligations, in a penal sum each of not less than one hundred percent (100%) of the scheduled cost of construction of the Affordable Senior Rental Housing and Affordable Family Rental Housing components of the Development, and one hundred percent (100%) payment bond, or such other assurance of completion as may be acceptable to the City, Authority and any applicable construction lenders. Said bonds shall be issued by an insurance company which is licensed to do business in California and has a rating equivalent to AAA or AA+ by an insurance company listed in the current year's Federal Register or as otherwise approved by the Authority and the City. The labor and materials (payment) bond shall name both the Authority and the City as a co-obligee or assignee.

Section 8.5    Compliance with Applicable Law. The Developer shall cause all work performed in connection with the Property to be performed in compliance with all Applicable Requirements.

Section 8.6    Non-Discrimination During Construction. The Developer, for itself and its successors and assigns, and transferees agrees that in the construction of the Development

provided for in this Agreement:

    (a)    It will not discriminate against any employee or applicant for employment because of race, color, religion, creed, national origin, ancestry, disability, medical condition, age, marital status, sex, sexual preference/orientation, Acquired Immune Deficiency Syndrome (AIDS) acquired or perceived, or retaliation for having filed a discrimination complaint (nondiscrimination factors). The Developer will take affirmative action to ensure that applicants are considered for employment by the Developer without regard to the nondiscrimination factors, and that Developer's employees are treated without regard to the nondiscrimination factors during employment including, but not limited to, activities of: upgrading, demotion or transfer; recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Developer agrees to post in conspicuous places, available to its employees and applicants for employment, the applicable nondiscrimination clause set forth herein:

    (b)    It will ensure that its solicitations or advertisements for employment are in compliance with the aforementioned nondiscrimination factors; and

    (c)    It will cause the foregoing provisions to be inserted in all contracts for the construction of the Development entered into after the Effective Date of this Agreement; provided, however, that the foregoing provisions shall not apply to contracts or subcontracts for standard commercial supplies or raw materials.

    Section 8.7    <u>Equal Opportunity/Non-Discrimination in Employment and Contracting Procedures, Including Utilization of Minority and Women Businesses</u>. The Developer and the Authority acknowledge and agree that it is the policy of the Authority to promote and ensure equal opportunity through employment and in the award of contracts and subcontracts for construction. Subject to the foregoing, the Developer shall employ or select employees, contractors and subcontractors in accordance with the Equal Opportunity and Nondiscrimination policies attached hereto as Exhibit G.

    (a)    During the construction of the Development, the Developer shall provide to the Authority such information and documentation as reasonably requested by the Authority.

    (b)    The Developer shall use reasonable efforts to monitor and enforce, or shall cause its general contractor to monitor and enforce, the equal opportunity requirements imposed by this Agreement. In the event, after notice from the Authority and an opportunity to cure such failure as set forth in Article 14 of this Agreement, the Developer fails to use reasonable efforts to monitor or enforce these requirements, the Authority or City may declare the Developer in default of this Agreement and pursue any of the remedies available under this Agreement.

    Section 8.8    <u>Prevailing Wages</u>. In the construction of the Development, for all on-site and adjacent construction activities, the Developer shall comply with, if and to the extent applicable, the federal Davis-Bacon Act and implementing rules and regulations, and Section

1720 et seq. of the California Labor Code and its implementing regulations.  The Developer shall be responsible for any costs or damages incurred by the Authority and the City as a result of the Developer's noncompliance with such laws.  The Developer shall also comply with all applicable reporting and recordkeeping requirements of the applicable prevailing wage statutes and regulations.

Section 8.9     Progress Reports.  Until such time as the Developer is entitled to issuance of the Certificates of Occupancy or the equivalent for all units in the Development, the Developer shall provide the Authority and the City with monthly progress reports, as reasonably requested in writing by the Authority and/or the City, regarding the status of the construction of the Development.

Section 8.10     Entry by the Authority and the City.  The Developer shall permit the Authority and the City, through their officers, agents, or employees, to enter the Property at all reasonable times and in a safe, unobtrusive manner to review the work of construction to inspect the Property for compliance with this Agreement.  The Authority and the City are under no obligation to (a) supervise construction, (b) inspect the Property, or (c) inform the Developer of information obtained by the Authority or the City during any review or inspection, and the Developer shall not rely upon the Authority or the City for any supervision, inspection, or information.

Section 8.11     Taxes; Fees.  At all times both prior to and after obtaining any applicable property tax exemptions, the Developer shall pay when due all real property taxes and assessments assessed and levied on the Property after the Developer takes title to the Property or portions thereof, and shall remove any levy or attachment made on the Property.  The Developer may, however, contest the validity or amount of any tax, assessment, levy, attachment or lien on the Property.  The Developer shall pay all charges, assessments, impact fees, permit fees, application fees, special taxes or levies related to the Development.  The parties acknowledge that Eden shall apply for welfare exemption for low-income housing to the extent applicable.

Section 8.12          Hazardous Materials.
(a)          Certain Covenants and Agreements.  The Developer hereby covenants and agrees that:

(i)          The Developer shall not knowingly permit the Development or any portion thereof to be a site for the use, generation, treatment, manufacture, storage, disposal or transportation of Hazardous Materials or otherwise knowingly permit the presence of Hazardous Materials in, on or under the Development in violation of any applicable law;

(ii)          The Developer shall keep and maintain the Development and each portion thereof in compliance with, and shall not cause or permit the Development or any portion thereof to be in violation of, any Hazardous Materials Laws;

(iii)    Upon receiving actual knowledge of the same the Developer shall immediately advise the Authority and the City in writing of: (A) any and all enforcement, cleanup, removal or other governmental or regulatory actions instituted, completed or threatened against the Developer or the Development pursuant to any applicable Hazardous Materials Laws; (B) any and all claims made or threatened by any third party against the Developer or the Development relating to damage, contribution, cost recovery, compensation, loss or injury resulting from any Hazardous Materials (the matters set forth in the foregoing clause (A) and this clause (B) are hereinafter referred to as "Hazardous Materials Claims"); (C) the presence of any Hazardous Materials in, on or under the Development in such quantities which require reporting to a government agency; or (D) the Developer's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Development classified as "borderzone property" under the provisions of California Health and Safety Code, Sections 25220 et seq., or any regulation adopted in accordance therewith, or to be otherwise subject to any restrictions on the ownership, occupancy, transferability or use of the Development under any Hazardous Materials Laws.  If the Authority and/or the City reasonably determines that the Developer is not adequately responding to a Hazardous Material Claim, the Authority and/or the City shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any such Hazardous Materials Claims and to have their reasonable attorney's fees in connection therewith paid by the Developer.

(iv)    Without the Authority's or the City's prior written consent, which shall not be unreasonably withheld or delayed, the Developer shall not take any remedial action in response to the presence of any Hazardous Materials on, under, or about the Development (other than in emergency situations or as required by governmental agencies having jurisdiction), nor enter into any settlement agreement, consent decree, or other compromise in respect to any Hazardous Materials Claims.

(b)    Indemnity.  Without limiting the generality of the indemnification set forth in Section 13.3 below, the Developer hereby agrees to indemnify, protect, hold harmless and defend (by counsel reasonably satisfactory to the Authority and the City) the Authority, the City, their boardmembers, officers, and employees from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, administrative and judicial proceedings and orders, judgements, remedial action requirements, enforcement actions of any kind, and all costs and expenses incurred in connection therewith (including, but not limited to, attorney's fees and expenses), arising directly or indirectly, in whole or in part, out of: (1) the failure of the Developer or any other person or entity, other than any indemnitee, to comply with any Hazardous Materials Law relating in any way whatsoever to the handling, treatment, presence, removal, storage, decontamination, cleanup, transportation or disposal of Hazardous Materials into, on, under or from the Development; (2) the presence in, on or under the Development of any Hazardous Materials or any releases or discharges of any Hazardous Materials into, on, under or from the Development, except for any Hazardous Materials that existed in, on, or under those portions of the Property conveyed by the Authority to the Developer prior to such

conveyance; or (3) and any activity carried on or undertaken on or off the Property subsequent to conveyance of the Property by the Authority to the Developer, and whether by the Developer or any successor in title or any employees, agents, contractors or subcontractors of the Developer or any successor in title, or any third persons at any time occupying or present on the Development, in connection with the handling, treatment, removal, storage, decontamination, cleanup, transport or disposal of any Hazardous Materials at any time located or present on or under the Development. The foregoing indemnity shall further apply to any residual contamination on or under the Development, or affecting any natural resources, and to any contamination of any property or natural resources arising in connection with the generation, use, handling, treatment, storage, transport or disposal of any such Hazardous Materials, and irrespective of whether any of such activities were or will be undertaken in accordance with Hazardous Materials Laws. The provisions of this subsection shall survive expiration or termination of this Agreement, and shall remain in full force and effect. This indemnity obligation shall not extend to any claim arising solely from the Authority's or City's gross negligence or willful misconduct.

        (i)     <u>No Limitation</u>. The Developer hereby acknowledges and agrees that the Developer's duties, obligations and liabilities under this Agreement, including, without limitation, under subsection (b) above, are in no way limited or otherwise affected by any information the Authority and the City may have concerning the Development and/or the presence within the Development of any Hazardous Materials, whether the Authority and the City obtained such information from the Developer or from its own investigations.

      Section 8.13       <u>As-Is Conveyance</u>.

        (a)     Any deed to Developer shall be made "AS IS," with no warranties or representations by the Authority or the City concerning the condition of the Property, including the presence or absence of any Hazardous Materials. Developer hereby agrees and acknowledges that except in the event of any fraud, misrepresentation, or withholding of information by Authority or the City: (i) neither Authority or the City, nor anyone acting for or on behalf of Authority or the City, has made any representation, statement, warranty or promise to Developer concerning the development potential or condition of the Property; (ii) in entering into this Agreement, Developer has not relied on any representation, statement or warranty of Authority or the City, or anyone acting for or on behalf of Authority or the City, other than as may expressly be contained in writing in this Agreement; (iii) all matters concerning the Property have been or shall be independently verified by Developer and that Developer shall purchase the Property on Developer's own prior examination thereof; and (iv) THAT DEVELOPER IS PURCHASING THE PROPERTY IN AN "AS IS" PHYSICAL CONDITION AND IN AN "AS IS" STATE OF REPAIR.

        (b)     <u>General Release</u>. Subject to Sections 8.12(b) and 8.13(a) above, Developer and its owners, employees, agents, assigns and successors agree that upon the Closing, Developer shall be deemed conclusively to have released and discharged Authority, City and their agents, employees, trustees, assigns and successors, from any and all damages,

losses, demands, claims, debts, liabilities, obligations, causes of action and rights, whether known or unknown, by Developer regarding the Property, including, but not limited to, the environmental condition of the Property.

(c)    Waiver of Civil Code § 1542. Developer agrees that, with respect to the General Release contained in Section 8.13(b) above, the General Release extends to all matters regarding the Property, whether or not claimed or suspected, to and including the date of execution hereof, and constitutes a waiver of each and all the provisions of the California Civil Code § 1542, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Developer herein acknowledges that the effect and import of the provisions of Civil Code § 1542 have been explained to it by its own counsel. Developer understands and acknowledges the significance and the consequence of such specific waiver of unknown claims and hereby assumes full responsibility for any injuries, damages, losses or liabilities that it may hereinafter incur from the waiver of these unknown claims.

Section 8.14    Environmental Work. The Developer shall be responsible for performing the work of any investigation and remediation on the Property which may be required in order to develop the Development. The determination as to whether any such remediation is needed, and as to the scope and methodology thereof, shall be made by mutual agreement of the governmental agency with responsibility for monitoring such remediation, the Authority, the City and the Developer. The Developer shall notify the Authority and the City promptly upon discovery of any actionable levels of Hazardous Substances, and upon any release thereof, and shall consult with the Authority and the City in order to establish the extent of remediation to be undertaken and the procedures by which remediation thereof shall take place. The Developer shall comply with, and shall cause its agents and contractors to comply with, all laws regarding the use, removal, storage, transportation, disposal and remediation of Hazardous Substances. The investigation and remediation work shall be carried out in accordance with all applicable laws (including Environmental Laws) and such other procedures and processes as may be described in this Agreement.

Section 8.15    City and Other Governmental Authority Permits. Before the commencement of construction or development of any buildings, structures or other work of improvement upon the Property, the Developer shall, at its own expense, secure or cause to be secured any and all permits which may be required by the City or any other governmental agency regulating such construction, development or work. The Authority and the City shall

provide all assistance deemed appropriate by the Authority and the City to the Developer in securing these permits.

Section 8.16    Zoning of the Property.  It shall be the responsibility of the Developer at the Developer's sole cost and expense, to ensure that the zoning of the Property shall be such as to permit the development and use of the Property in accordance with the provisions of this Agreement.  The Authority shall cooperate with the Developer in seeking any variances, conditional use permits, parcel maps or other discretionary approvals needed to implement this Agreement.

Section 8.17    Mitigation Requirements.  The Developer shall comply with any mitigation requirements imposed by the City in connection with any CEQA or NEPA review.

Section 8.18    Certificates of Occupancy.  Promptly after completion of the various components of the Development in accordance with those provisions of this Agreement (including the dates for beginning and completion thereof, as they may have been extended by the Authority and the City), the Developer shall seek issuance of Certificates of Occupancy or the equivalent by the City in conformity with applicable rules and ordinances. Such Certificates of Occupancy or equivalent shall be conclusive evidence that the covenants in this Agreement with respect to the obligations of the Developer to construct the portions of the Development described in such certificates and the dates for the beginning and completion thereof have been met.  Such certifications and determinations shall not constitute evidence of compliance with or satisfaction of any obligation of the Developers to any holder of a deed of trust securing money loaned to finance the Development or any part thereof and shall not be deemed a notice of completion under the California Civil Code.

Section 8.19    City Requirements.  Developer will be required to comply with the City's Inclusionary Zoning Regulations (Dublin Municipal Code Chapter 8.68)(hereinafter "Chapter 8.68") for the Development.  Compliance shall be achieved by constructing affordable units as defined in and required by Dublin Municipal Code Section 8.68.030 or by receiving City Council approval of a waiver pursuant to Dublin Municipal Code Section 8.68.040E prior to City approval of the last discretionary approval for the applicable Development Component.  Unless waived or modified by the City Council, the Development will be subject to all of the requirements set forth in Chapter 8.68 including without limitation, requirements related to: (i) allocation of units by income levels, (ii) concurrent construction of affordable and market rate units within each Development Component, (iii) design of affordable units, (iv) geographic distribution of affordable units within each Development Component, (v) execution and recordation of affordable housing agreements for each Development Component, (vi) annual reporting, (vii) City right of first refusal, and (viii) tenant and homebuyer selection criteria.  The parties acknowledge that certain financing and regulatory constraints may impede Eden's ability to initiate construction of the affordable units (senior and multifamily) concurrently with the market-rate units within the Development. Accordingly, the parties acknowledge that the affordable rental units may be constructed prior to, concurrently with, or following construction of the market rate units provided the

Developer receives a waiver from the City's requirements in Chapter 8.68 for, among other things, concurrent construction of market rate and affordable units.

(a)    Family and Senior Housing.  Eden and the City will execute and record an Affordable Housing Agreement and Declaration of Restrictive Covenants against the Family and Senior Housing parcels that will require compliance with the affordability requirements for a minimum of 55 years.  The Affordable Housing Agreement and Declaration of Restrictive Covenants shall apply to the Affordable Family Rental Housing and the Affordable Senior Rental Housing components of the Development.

(b)    For-Sale Housing.  Citation and the City will execute and record an Affordable Housing Agreement against the single-family parcels that will require compliance with Chapter 8.68, including without limitation requirements addressing homebuyer eligibility and sale price restrictions.  The Affordable Housing Agreement shall require, among other conditions, that seven percent (7%) of the units within the For Sale Development Component be sold to buyers whose household income falls between 80% and 120% of the Area Median Income, as defined in Chapter 8.68.  Except as required pursuant to the Rehousing Policy described in Section 4.3(b), the Affordable Housing Agreement shall not require Citation to provide any for sale units to buyers whose household income falls below 80% of the Area Median Income.

## ARTICLE 9.
## OWNERSHIP, OPERATION AND DISPOSITION
## OF RENTAL DEVELOPMENT

Section 9.1    Ownership.  The Affordable Family Rental Housing and Affordable Senior Rental Housing developed hereunder shall be owned by a either (a) Eden or its Affiliate, or (b) a limited partnership in which Eden or its Affiliate will be the sole managing general partner.  Eden will determine the form of ownership entity for each Development Component which best effectuates the intent of this Agreement, including the utilization of Section 202 financing, LIHTC or any other financing or business plan in the most efficient manner.

Section 9.2    Regulatory Restrictions.

(a)    The owner of the Affordable Senior Rental Housing and Affordable Family Rental Housing components will employ admission and occupancy standards, rent policies, lease provisions, and other management practices which represent best practices in the private sector, and contribute to the success of the developments.  The Authority and the City shall have the right to review and approve policies and lease documents substantially relating to statutory or regulatory rights of residents, such as admissions policies, continued occupancy policies, and grievance procedures, if any.

(b)    Applicants for the Affordable Rental Units in the Development will be

1460\02\435574.9

37

drawn first from Prior Residents subject to screening and selection criteria approved by the Authority and the City, which approval shall not be unreasonably withheld, conditioned or delayed.

Section 9.3    Property Management. Eden's selection of a management agent, and the terms of any management agreement and management plan, will be subject to the Authority's and the City's review and approval. Notwithstanding the foregoing (but still subject to the Authority's and the City's review of the management agreement), the initial management agent will be the Eden Housing Management, Inc.

## ARTICLE 10.
## OBLIGATIONS WHICH CONTINUE THROUGH AND
## BEYOND THE COMPLETION OF CONSTRUCTION

Section 10.1    Maintenance. The Developer hereby agrees that, prior to completion of the construction of Development, the Property undergoing construction shall be maintained in a neat and orderly condition to the extent practicable and in accordance with industry health and safety standards, and that, once the Development is completed, the Development shall be well maintained as to both external and internal appearance of the buildings, the common areas, and the parking areas. So long as the Developer owns the Development or any portion thereof, the Developer shall maintain or cause to be maintained the Development in good repair and working order, and in a neat, clean and orderly condition, including the walkways, driveways, parking areas and landscaping, and from time to time make all necessary and proper repairs, renewals, and replacements. Developer agrees to comply with City requirements regarding maintenance of the Development and to submit to the City for review and approval such documents as may be reasonably requested by the City.

Section 10.2    Mechanics' Liens. The Developer shall indemnify the Authority and the City and hold the Authority and the City harmless against and defend the Authority and the City in any proceeding related to any mechanic's lien, stop notice or other claim brought by a subcontractor, laborer or material supplier who alleges having supplied labor or materials in the course of the construction of the Development by the Developer. This indemnity obligation shall survive the issuance of Certificates of Occupancy or the equivalent by the City and the termination of this Agreement.

Section 10.3    Developer To Indemnify Authority, City. The Developer shall indemnify, defend, and hold the Authority, the City, their directors, councilmembers, officers, employees, agents, and their successors and assigns harmless against all claims for bodily injury, death or property damage which arise out of or in connection with entry onto, ownership of, occupancy in, or construction on the Property by the Developer or its contractors, subcontractors, agents, employees or tenants. This indemnity obligation shall not extend to any claim to the extent arising from the Authority's or City's gross negligence or willful misconduct, or the Authority's or the City's failure to perform its obligations under this Agreement, and shall survive both the issuance of Certificates of Occupancy or the equivalent

by the City and termination of this Agreement.

Section 10.4    Non-Discrimination. The Developer covenants by and for itself and its successors and assigns that there shall be no discrimination against or segregation of a person or of a group of persons on account of race, color, religion, creed, sex, sexual orientation, marital status, ancestry or national origin in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Property by the Developer, nor shall the Developer or any person claiming under or through the Developer establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessee or vendees of the Property.

Section 10.5    Mandatory Language in All Subsequent Deeds, Leases and Contracts. All deeds, leases or contracts entered into by the Developer on or after the date of execution of this Agreement as to any portion of the Property shall contain the following language:

(a)    In Deeds:

"The grantee herein covenants by and for himself, herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of, any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the premises herein conveyed, nor shall the grantee or any person claiming under or through him or her, establish or permit any practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the premises herein conveyed. The foregoing covenants shall run with the land."

(b)    In Leases:

"The lessee herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through him or her, and this lease is made and accepted upon and subject to the following conditions that there shall be no discrimination against or segregation of any person or group of persons, on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the premises herein leased nor shall the lessee himself or herself, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or

segregation with reference to the selection, location, number, use, or occupancy, of tenants, lessees, sublessees, subtenants, or vendees in the premises herein leased."

(c)    In Contracts:

"The contractor herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through it, and this contract is made and accepted upon and subject to the conditions that there shall be no discrimination against or segregation of any person or of a group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the property herein transferred nor shall the contractor or any person claiming under or through it establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants, or vendees in the property herein transferred. The foregoing provisions shall be binding upon and shall obligate the contractor and any subcontracting parties, successors, assigns and other transferees under the contract."

Notwithstanding the foregoing, with respect to familial status, nothing herein shall be construed to apply to housing for older persons, as defined in Section 12955.9 of the Government Code nor shall be construed to affect Sections 51.2, 51.3, 51.4, 51.10, 51.11, and 799.5 of the Civil Code, relating to housing for senior citizens. Subdivision (d) of Section 51 and Section 1360 of the Civil Code and subdivisions (n), (o), and (p) of Section 12955 of the Government Code shall apply to this Section.

Section 10.6    Employment Opportunity. During the operation of the Development, there shall be no discrimination by the Developer on the basis of race, color, creed, religion, sex, sexual orientation, marital status, national origin, ancestry, or handicap in the hiring, firing, promoting, or demoting of any person engaged in the operation of the Development.

## ARTICLE 11.
## NON-DISCRIMINATION AND OTHER FEDERAL AND STATE REQUIREMENTS

Section 11.1    Certain Requirements. Developer will comply with all applicable state and federal laws, rules and regulations, including but not limited to the requirements of the following, as the same may be amended from time to time:

(a)    The Fair Housing Act, 42 U.S.C. 3601-19, and regulations issued thereunder, 24 CFR Part 100; Executive Order 11063 (Equal Opportunity in Housing) and

regulations issued thereunder, 24 CFR Part 107; the fair housing poster regulations, 24 CFR Part 110, and advertising guidelines, 24 CFR Part 109.

    (b)    Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, and regulations issued thereunder relating to nondiscrimination in housing, 24 CFR Part 1.

    (c)    Age Discrimination Act of 1975, 42 U.S.C. 6101-07, and regulations issued thereunder, 24 CFR Part 146.

    (d)    Americans with Disabilities Act, 42 U.S.C. 12181-89, and regulations issued thereunder, 28 CFR Part 36.

    Section 11.2    Access to Records.
    (a)    The Authority, the City, or their duly authorized representatives, shall, until 3 years after completion of the Term, have access to and the right to examine, upon reasonable notice, any of the Developer's directly pertinent books, documents, papers, or other records involving transactions related to this Agreement for the purpose of making audit, examination, excerpts, and transcriptions.

    (b)    The Developer agrees to include in first-tier subcontracts under this contract a clause substantially the same as paragraph (a). The term "subcontract" as used in this clause excludes contracts and purchase orders not exceeding $10,000.

    (c)    The period of access and examination under paragraphs (a) and (b) for records relating to (1) litigation or settlements of disputes arising from the performance of this Agreement, or (2) costs and expenses of this Agreement to which the Authority, the City, or their duly authorized representatives has taken exception shall continue until disposition of such appeals, litigation, claims, or exceptions.

    Section 11.3    Interest of Members of Congress. No Member of or delegate to the Congress of the United States shall be admitted to any share or part of this Agreement or to any benefit to arise therefrom.

    Section 11.4    Interest of Member, Officer, or Employee and Former Member, Officer, or Employee of Authority. No member, officer, or employee of the Authority, no member of the governing body of the locality in which the project is situated, no member of the governing body by which the Authority was activated, and no other public official of such locality or localities who exercises any functions or responsibilities with respect to the project, shall, during his or her tenure, or for one year thereafter or such longer time as the Authority's Code of Ethics may require, have any interest, direct or indirect, in this Agreement or the proceeds thereof, unless the conflict of interest is waived by the Authority and by HUD.

    Section 11.5    Lobbying Activities. The Developer shall comply with 31 USC 1352 which prohibits the use of Federal appropriated funds to pay any person for influencing or

attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with any of the following covered Federal actions: the awarding of any Federal contract; the making of any Federal grant; the making of any Federal loan; the entering into of any cooperative agreement; or the modification of any Federal contract, loan, or cooperative agreement.  The Developer further agrees to comply with the requirement of such legislation to furnish a disclosure (OMB Standard Form LLL) if any funds other than Federal appropriated funds (including profit or fee received under a covered Federal transaction) have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress, in connection with a Federal contract, grant, loan, or cooperative agreement, which payment would be prohibited if made from Federal appropriated funds.

## ARTICLE 12.
## ROLE OF HUD

Section 12.1   HUD Approval.  The parties hereto acknowledge that this Agreement and the conveyance of the Property are subject to HUD approval.  Developer and the Authority agree to cooperate to obtain all necessary HUD approvals and acknowledge that HUD approvals must be obtained as a condition precedent to certain obligations contained herein.  Nothing herein shall be understood to authorize or obligate the Authority to act in the absence of required HUD approvals.

Section 12.2   No Relationship Created.  Nothing contained in the Revitalization Plan or this Agreement nor any act of HUD or the Authority, shall be deemed or construed to create any relationship of third-party beneficiary, principal and agent, limited or general partnership, joint venture, or any association or relationship involving HUD, except between HUD and the Authority as provided under the terms of the Revitalization Plan.

## ARTICLE 13.
## INSURANCE

Section 13.1   Developer.  Developer shall maintain and keep in full force and effect, and shall cause all of its Contractors to maintain and keep in full force and effect, during the term of this Agreement, such insurance as is set forth on Exhibit F, Insurance.  Each such policy shall name the Authority and the City as additional insureds and, in instances where the Authority and City are acting as lenders, as loss payees.  Each such policy shall be underwritten and issued by reputable companies licensed to do business in California, shall not be subject to cancellation without 30 days' prior written notice to the Authority and the City, and shall be primary and non-contributory to any insurance carried by the Authority or the City.  Any language purporting to limit the insurer's liability for failure to give the required 30 days' prior written notice shall be unacceptable to Authority and City.  Developer shall provide

the Authority and the City with a certificate of insurance, and if such certificate evidences the limits and coverages required by Exhibit F, the Authority and the City shall provide Developer, upon request, with a notice of acceptance.

# ARTICLE 14.
## TERMINATION FOR CAUSE

Section 14.1    Events of Default by the Developer.
The following shall constitute an Event of Default by the Developer:

(a)    Subject to Section 14.1(d) and notice and cure, (i) if Developer shall fail to comply with the Performance Deadlines set forth in the Schedule of Performances as the same may be extended from time to time; or (ii) if Developer shall materially breach or fail to diligently pursue its obligations under this Agreement or any other agreement between the Authority, the City and the Developer.

(b)    Subject to Section 14.1(d), if the Developer (i) is or becomes insolvent or bankrupt or otherwise ceases to pay its debts as they mature or makes any arrangement with or for the benefit of its creditors or consents to or acquiesces in the appointment of a receiver, trustee or liquidator for the Development or for any substantial part of it; (ii) institutes any bankruptcy, winding up, reorganization, insolvency, arrangement or similar proceeding under the laws of any jurisdiction, or any such proceeding is instituted against the Developer in any jurisdiction which is not stayed or dismissed within 90 days after its institution; (iii) files any action or answer admitting, approving or consenting to any such proceeding; (iv) becomes subject to levy of any distress, execution or attachment upon its property which interferes with its performance hereunder, and the Developer fails within 30 days to discharge such levy, execution or attachment, or to substitute another entity (whether or not an Affiliate) acceptable to the Authority and the City to perform the obligations of the Developer without material delay in performance; or (v) is convicted of any criminal offense or violation of law.

(c)    Prior to conveyance of the Property, default hereunder by either of the Developers or with respect to any portion of the Property shall constitute a default by both Developers for which the Authority and/or City may exercise any of its remedies under this Agreement with respect to both Developers and the entire Property. Following conveyance of the Property to Citation and Eden, default by Eden or default related to the Affordable Family Rental Housing or the Affordable Senior Rental Housing shall entitle the Authority and the City to exercise its remedies under this Agreement with respect only to Eden and the Affordable Family Rental Housing and the Affordable Senior Rental Housing (and not with respect to Citation and the For-Sale Housing Component) and default by Citation or default related to the For-Sale Housing Component shall entitle the Authority and the City to exercise its remedies under this Agreement with respect only to Citation and the For-Sale Housing Component (and not with respect to Eden and the Affordable Family Rental Housing and the Affordable Senior Rental Housing). In such event, termination of the Agreement pursuant to

Section 14.3 shall mean termination of the Agreement only with respect to Eden or Citation, whichever is in default hereunder. For purposes of this Section 14.1 only, "conveyance of the Property" shall mean recordation of grant deeds for the Property.

(d)     It shall not be an Event of Default if the delay in completing the work or proceeding with Developer's obligations hereunder arises from as a result of a delay in, or nonoccurrence of, a Development Contingency (defined in Section 15.1) or from other unforeseeable causes beyond the control and without the fault or negligence of Developer and materially interferes with the work or the timing of the work. Examples of such causes include (i) acts of God, or of the public enemy, (ii) acts of a governmental entity in either its sovereign or contractual capacity (iii) acts of a contractor other than Developer, or subcontractor, in the performance of an agreement with the Authority and the City (and not pursuant to a contract with the Developer or an affiliate of Developer), (iv) fires, (v) floods, (vi) epidemics, (vii) quarantine restrictions, (viii) strikes, (ix) freight embargoes, (x) unusually severe weather, or (xi) delays of subcontractors or suppliers at any tier arising from unforeseeable causes, or (xii) changes in regulatory requirements affecting the Development.

Section 14.2     Events of Default by the Authority, City.

(a)     Subject to Section 14.2(b) and notice and cure, it shall be an Event of Default by the Authority and/or City if (i) the Authority and/or City shall fail to diligently perform its obligations under this Agreement and such failure materially impairs the ability of Developer to accomplish the Development within the time required by this Agreement or otherwise perform its material obligations hereunder and (ii) the Authority and/or the City shall fail to perform its obligations within the Performance Deadlines set forth in the Schedule of Performance.

(b)     It shall not be an Event of Default if any failure by Authority and/or City arises from the failure to occur of any Development Contingency as hereinafter defined or of unforeseeable causes beyond the control and without the fault or negligence of Authority or City. Examples of such causes include (i) acts of God, or of the public enemy, (ii) acts of a governmental entity other than the Authority, HACA or the City, in either its sovereign or contractual capacity (iii) acts of another contractor or subcontractor in the performance of an agreement with the Developer (and not pursuant to a contract with the Authority and/or City or an affiliate of Authority and/or City), (iv) fires, (v) floods, (vi) epidemics, (vii) quarantine restrictions, (viii) strikes, (ix) freight embargoes, (x) unusually severe weather, or (xi) delays of subcontractors or suppliers at any tier arising from unforeseeable causes, or (xii) changes in regulatory requirements affecting the Development.

Section 14.3    Procedure for Termination For Cause.    Upon the occurrence of an Event of Default by either the Authority, the City or the Developer, the other party shall have the right to notify the defaulting party in writing of such Event of Default, whereupon the defaulting party shall have sixty (60) days from its receipt of such notice to cure such Event of Default or begin curing of the default if such cure takes longer than 60 days to complete. If

the defaulting party shall fail to cure the default or begin curing of the default, as applicable, within the time provided in such notice, the non-defaulting party may, by written notice, terminate this Agreement and/or pursue such other remedies as may be available at law or equity.

Section 14.4    Continuing Obligations.  In no event shall a termination of this Agreement impair or delay the performance by the Authority, City or Developer of their obligations under any of the Closing Documents.  The Authority's, City's and Developer's sole rights and remedies with regard to any Development Component which has gone to Closing shall be under the respective Closing Documents.

## ARTICLE 15.
## DEVELOPER TERMINATION WITHOUT FAULT

Section 15.1    Development Contingencies.  The parties agree that the following matters are conditions precedent to the Authority's, City's and Developer's ability to proceed with the Development and to fulfill the terms and conditions of this Agreement.  The parties' ability to perform responsibilities hereunder is substantially contingent upon (i) actions by third parties over which Developer, Authority and City have limited control, (ii) availability of funding for the Affordable Family Rental Housing and Affordable Senior Rental Housing components, or (iii) factual circumstances which cannot be fully determined as of the date of this Agreement ("Development Contingencies").  Such Development Contingencies are as follows, to be performed at the times set forth below, as included in the Schedule of Performance:

(a)    Allocation or award of financing for the Affordable Family Rental Housing or Affordable Senior Rental Housing components on terms acceptable to Eden, which in Eden's reasonable judgment (as described in Section 19.2(e)) makes such components financially feasible.  Terms include, without limitation, loan or grant amount, interest rate, term to maturity, payment terms, lien priority and subordination requirements.

(b)    The receipt of all necessary government approvals and permits, including without limitation HUD's approval of the Revitalization Plan and this Agreement, and the Authority's and City's approval of the Development after the completion of all required environmental review;

(c)    Recordation of the Final Map;

(d)    Execution, delivery and recordation, where appropriate, of the Authority Financing documents; and

(e)    Execution, delivery and recordation, where appropriate, of the City Loan documents.

Section 15.2   Revision or Termination.  In the event a Development Contingency does not occur, so long as Developer is in compliance with this Agreement and has used its best efforts to cause it to occur, in a manner generally consistent with the Revitalization Plan and in a manner which reasonably permits the accomplishment of the Revitalization in accordance with this Agreement, the parties will attempt to revise the Revitalization Plan in a mutually acceptable fashion by extending deadlines, revising scope of development, or otherwise.  If the parties cannot, within 60 days after Developer provides the Authority and City with notice that a Development Contingency has not occurred, agree to amend the Revitalization Plan or cannot thereafter secure HUD approval of any amendment so agreed to, then Developer may terminate this Agreement by delivering written notice to the Authority and the City.

Section 15.3   No Liability.  In the event that Developer terminates this Agreement as provided in this Article 15, no party shall have any liability to any other party except under any separate contracts entered pursuant to this Agreement and except for continuing indemnities provided elsewhere in this Agreement.

## ARTICLE 16.
## PARTIES' DISPUTES

Section 16.1   Definition of Claim Governed by Dispute Clause.  "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of Agreement terms, or other relief arising under or relating to this Agreement. A claim arising under the Agreement, unlike a claim relating to the Agreement, is a claim that can be resolved under the Agreement clause that provides for the relief sought by the claimant. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim by complying with the requirements of this Article, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

Section 16.2   Applicability of Dispute Clause.  Except for disputes arising under applicable labor standards (i.e., Davis-Bacon and California prevailing wage laws) all disputes arising under or relating to this Agreement, including any claims for damages for the alleged breach thereof which are not disposed of by the Agreement, shall be resolved under this Article.  Notwithstanding the above, this Article shall apply only to disputes involving the Authority or HACA.

Section 16.3   Written Claims to be Submitted to Contracting Officer.  All claims by Developer shall be made in writing and submitted to the Contracting Officer for a written decision.

Section 16.4   Notice of Decision or Decision Date.  The Contracting Officer shall,

within 15 days after receipt of the request, decide the claim or notify Developer of the date by which the decision will be made. In no event shall the Contracting Officer render a decision later than 60 days from the receipt of the request.

Section 16.5    Effect of Contracting Officer's Decision.  The Contracting Officer's decision shall be final unless Developer files suit in a court of competent jurisdiction within the applicable statue of limitations.

Section 16.6    Developer's Duty to Perform Pending Claim Resolution.  Developer shall proceed diligently with performance of this Agreement, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the Agreement, and comply with any decision of the Contracting Officer.

Section 16.7    Identification of Contracting Officer.  For purposes of this Agreement, Authority's Contracting Officer shall be Christine Gouig, her written designee, or her successor as Authority Executive Director.

## ARTICLE 17.
## SECURITY FINANCING AND RIGHTS OF HOLDERS

Section 17.1    Holder Not Obligated to Construct.  Deeds of trust or other security instruments securing loans approved by the Authority pursuant to the approved Financing Plan are each referred to as a "Security Financing Interest."  The holder of any Security Financing Interest authorized by this Agreement is not obligated to construct or complete any improvements or to guarantee such construction or completion; nor shall any covenant or any other provision in this Agreement or in the grant deeds from the Authority to the Developer conveying the Property or any part thereof be construed so to obligate such holder.  The holder of any Security Financing Interest which succeeds to the interest of the Developer through sale, assignment, foreclosure or deed in lieu of foreclosure shall not be deemed to be the successor in interest of Developer with respect to any obligation or liability of Developer under this Agreement.  However, nothing in this Agreement shall be deemed to permit or authorize any such holder to devote the Property or any portion thereof to any uses, or to construct any improvements thereon, other than those uses of improvements provided for or authorized by this Agreement.

Section 17.2    Additional Mortgagee Protections.  The Authority and the City shall consider in good faith requests to make amendments to this Agreement as reasonably requested by a holder of a Security Financing Interest, prior to or concurrently with the recording of a lien securing the Security Financing Interest, to provide any reasonably required modifications to this Agreement and other assurances to such holder and the Authority's and HACA's Executive Directors and the City's City Manager are hereby authorized to enter into such amendments without further action by the Authority, HACA or the City, respectively.

## ARTICLE 18.
## REPRESENTATIONS AND WARRANTIES

Section 18.1    Developer's Warranty of Good Standing and Authority . Eden, with respect only to Eden's organization, and Citation, with respect only to Citation's organization, hereby represents and warrants to the Authority as follows:

(a)    Organization. Developer is duly organized, validly existing and in good standing under the laws of the State of California and has the power and authority to own its property and carry on its business as now being conducted.

(b)    Authority of Developer. Developer has full power and authority to execute and deliver this Agreement and to perform and observe the terms and provisions of all of this Agreement.

(c)    Authority of Persons Executing Documents. This Agreement and all other documents or instruments executed and delivered, pursuant to this Agreement have been executed and delivered by persons who are duly authorized to execute and deliver the same for and on behalf of Developer, and all actions required under Developer's organizational documents and applicable governing law for the authorization, execution, delivery and performance of this Agreement and all other documents or instruments executed and delivered, have been duly taken (to the extent such actions are required as of the date of execution and delivery of the above-named documents).

(d)    Valid and Binding Agreements. This Agreement and all other documents or instruments which have been executed and delivered pursuant to or in connection with this Agreement constitute or, if not yet executed or delivered, will when so executed and delivered constitute, legal, valid and binding obligations of Developer enforceable against it in accordance with their respective terms, subject to the laws affecting creditors rights and principles of equity.

(e)    No Breach of Law or Agreement. Neither the execution nor delivery of this Agreement or of any other documents or instruments executed and delivered, pursuant to this Agreement, nor the performance of any provision, condition, covenant or other term hereof or thereof, will conflict with or result in a breach of any statute, rule or regulation, or any judgment, decree or order of any court, board, commission or agency whatsoever binding on Developer, or any provision of the organizational documents of Developer, or will conflict with or constitute a breach of or a default under any agreement to which Developer is a party, or will result in the creation or imposition of any lien upon any assets or property of Developer, other than liens established pursuant hereto.

(f)    Pending Proceedings. Developer is not in default under any law or regulation or under any order of any court, board, commission or agency whatsoever, and

there are no claims, actions, suits or proceedings pending or, to the knowledge of Developer, threatened against or affecting Developer or the Development, at law or in equity, before or by any court, board, commission or agency whatsoever which might, if determined adversely to Developer, materially affect Developer's ability to perform Developer's obligations under this Agreement.

       (g)    <u>Financial Statements</u>. The financial statements of Developer and other financial data and information furnished by Developer to the Authority fairly present the information contained therein. As of the date of this Agreement, there has not been any adverse, material change in the financial condition of Developer from that shown by such financial statements and other data and information.

      Section 18.2   <u>Authority's Warranty of Good Standing and Authority</u>. The Authority represents and warrants to Developer that (i) the Authority is a duly organized, validly organized, public body, corporate and politic, and is in good standing under the laws of California, (ii) the Authority has all necessary power and authority under California law, (iii) this Agreement has been duly entered into and is the legally binding obligation of the Authority, (iv) this Agreement will not violate any judgment, law, consent decree, or agreement to which the Authority is a party or is subject to and will not violate any law or ordinance under which the Authority is organized, and (vi) there is no claim pending, or to the best knowledge of the Authority, threatened, that would impede the Authority's ability to perform its obligation hereunto.

      Section 18.3   <u>City's Warranty of Good Standing and Authority</u>. The City represents and warrants to Developer that (i) the City is a duly organized, validly organized, public body, corporate and politic, and is in good standing under the laws of California, (ii) the City has all necessary power and authority under California law, (iii) this Agreement has been duly entered into and is the legally binding obligation of the City, (iv) this Agreement will not violate any judgment, law, consent decree, or agreement to which the City is a party or is subject to and will not violate any law or ordinance under which the City is organized, and (vi) there is no claim pending, or to the best knowledge of the City, threatened, that would impede the City's ability to perform its obligation hereunto.

## ARTICLE 19.
## MISCELLANEOUS

      Section 19.1   <u>Term</u>. This Agreement shall commence with the execution hereof and shall terminate upon Construction Completion in accordance with the Schedule of Performance, as such schedule may have been amended by the parties, unless sooner terminated in accordance with provisions herein. Completion of construction shall be evidenced by issuance of Certificates of Occupancy or equivalent are issued by the City for all units in the Development. Notwithstanding the above, certain provisions of this Agreement shall survive the expiration or termination of this Agreement, and shall continue independently of the Closing Documents. Those provisions are Sections 3.1(k), 3.2(f), 8.12(b), 10.2 and

10.3.

Once the Closing has occurred, the Closing Documents will govern the parties' obligations as to matters set forth in them.  In the event of any conflict between the Closing Documents and this Agreement, the Closing Documents will govern.  No termination of this Agreement, in and of itself, shall release the other parties from the obligations it has undertaken in the Closing Documents nor increase the rights and remedies it may have under such documentation.

Section 19.2        Decision Standards.

(a)    In any approval, consent or other determination by any party required under any of this Agreement, the party shall act reasonably and in good faith, unless a different standard is explicitly stated.

(b)    "Good faith" means honesty in fact in the conduct or transaction concerned based on the facts and circumstances actually known to the individual(s) acting for the party.

(c)    "Discretion," "sole discretion," "option," "election" or words of similar import in this Agreement denote the party's privilege to act in furtherance of the party's interest.

(d)    "Judgment" denotes a subjective standard obligating the party to use good faith in forming its professional opinion or estimate.

(e)    "Reasonable judgment" denotes an objective standard obligating the party in good faith to act in a manner which is consistent with usual and customary practices of entities similarly situated, and not arbitrary or capricious.

Section 19.3    Notices.  Any notice or other communication given or made pursuant to this Agreement shall be in writing and shall be deemed given if (i) delivered personally or by courier, (ii) telecopied, (iii) sent by overnight express delivery, or (iv) mailed by registered or certified mail (return receipt requested), postage prepaid, to a party at its respective address set forth below (or at such other address as shall be specified by the party by like notice given to the other party):

If to Authority, to:    Christine Gouig
                        Executive Director
                        Housing Authority of the City of Dublin
                        c/o Housing Authority of the County of Alameda
                        22941 Atherton Street
                        Hayward, California  94541
                        FAX:  510-727-8554

1460\02\435574.9                              50

90

| | |
|---|---|
| and a copy to: | Robert C. Mills<br>Goldfarb & Lipman LLP<br>1300 Clay Street, 9th Floor<br>Oakland, California  94612<br>FAX:  510-836-6336 |
| If to City, to: | Richard C. Ambrose<br>City Manager<br>City of Dublin<br>100 Civic Plaza<br>Dublin, California  94568<br>FAX: 925-833-6651 |
| and a copy to: | Elizabeth Silver, Esq.<br>Meyers Nave Riback Silver & Wilson<br>555 12th Street, Suite 1500<br>Oakland, California 94607<br>FAX: 510-444-1108 |
| If Developer, to: | Linda Mandolini<br>Executive Director<br>Eden Housing, Inc.<br>409 Jackson Street<br>Hayward, California  94544<br>FAX:  510-582-6523 |
| and to: | Charles G. McKeag<br>Vice President, Land Acquisition and Development<br>Citation Homes Central<br>404 Saratoga Avenue, Suite 100<br>Santa Clara, CA  95050<br>FAX: 408-985-6071 |

All such notices and other communications shall be deemed given on the date of personal or local courier delivery, telecopy transmission, delivery to overnight courier or express delivery service, or deposit in the United States Mail, and shall be deemed to have been received (i) in the case of personal or local courier delivery, on the date of such delivery, (ii) in the case of telecopy, upon receipt of electronic confirmation thereof, (iii) in the case of delivery by overnight courier or express delivery service, on the date following dispatch, and (iv) in the case of mailing, on the date specified in the return receipt therefor.

Section 19.4   Representatives.  To facilitate communication, the parties to this Agreement shall designate a representative with responsibility for the routine administration of

51

each party's obligations under this Agreement. The parties initially appoint the following as representatives:

| | |
|---|---|
| Authority: | Christine Gouig, Executive Director, Authority |
| City: | Joni Pattillo, Assistant City Manager, City |
| HACA: | Christine Gouig, Executive Director, HACA |
| Developer: | Kathy Schmidt, Senior Project Developer, Eden |
| | Charles McKeag, Vice President, Citation |

Section 19.5    <u>Further Assurances</u>.  Each party shall execute such other and further documents as may be reasonably necessary or proper for the consummation of the transaction contemplated by this Agreement.

Section 19.6        <u>Restrictions on Transfers and Assignments</u>.

(a)    As used in this Section, the term "Transfer" means:

(1)    Any total or partial sale, assignment or conveyance, or any trust or power, or any transfer in any other mode or form, of or with respect to this Agreement or any aspect of the Development or any part thereof or any interest therein or any contract or agreement to do any of the same; or

(2)    Any total or partial sale, assignment or conveyance, or any trust or power, or any transfer in any other mode or form, of or with respect to any ownership interest in the Developer or any contract or agreement to do any of the same; or

(3)    Any merger, consolidation, sale or lease of all or substantially all of the assets of Developer.

(b)    <u>Purpose of Restrictions on Transfer</u>.  The Developer recognizes that the qualifications and identity of Developer, including Affiliates of the Developer (all of which are included in the definition of "Developer" as set forth in Article 1), are of particular concern to the Authority and the City, in view of:

(1)    The importance of the Revitalization to the general welfare of the community; and

(2)    The financial assistance and other public aids that have been made available by law and by the government for the purpose of making such Revitalization possible; and

(3)    The reliance by the Authority and the City upon the unique qualifications and ability of the Developer to construct the Development and, after Construction Completion, upon the continuing interest which the Developer will have in the

Property to assure the quality of the use, operation and maintenance deemed critical by the Authority and the City for the Development; and

(4)    The fact that the Property is not to be acquired or used for speculation, but only for development and operation by the Developer in accordance with the Agreement; and

(5)    The importance to the Authority, the City and the community of the standards of use, operation and maintenance of the Development.

The Developer further recognizes that it is because of such qualifications and identity that the Authority and the City is entering into this Agreement with the Developer and that Transfers are permitted only as provided in this Agreement.

(c)    <u>Prohibited Transfers</u>.  Except as expressly permitted in this Agreement, the Developer represents and agrees that the Developer has not made or created, and will not make or create or suffer to be made or created, any Transfer, either voluntarily or by operation of law without the prior written approval of the Authority and the City.  Any Transfer made in contravention of this Section shall be void and shall be deemed to be a default under this Agreement whether or not the Developer knew of or participated in such Transfer unless such Transfer is rescinded by the Developer within thirty (30) days following written notice by the Authority to the Developer to rescind such Transfer.

Section 19.7    <u>Permitted Transfers</u>.  Notwithstanding the provisions of Section 19.6, the following Transfers shall be permitted and are hereby approved by the Authority and the City:

(a)    Any Transfer creating a Security Financing Interest permitted pursuant to the approved Financing Plan;

(b)    After the issuance of the Certificates of Occupancy or the equivalent by the City, a Transfer of one of the For Sale units to the purchasers of such units.

(c)    Any Transfer directly resulting from the foreclosure of a Security Financing Interest or the granting of a deed in lieu of foreclosure of a Security Financing Interest or as otherwise permitted under Article 17.

(d)    Any Transfer by a mortgagee, trustee, beneficiary or assignee under a mortgage, deed of trust or such other reasonable security interest following foreclosure, trustee's sale or the obtaining of title by deed or assignment in lieu of foreclosure or sale, provided that the identity of the transferee is approved by Authority and the City, which approval shall not unreasonably be withheld and shall be deemed given if not denied by Authority's and City's notice to the transferring entity, accompanied by the reasons for such denial, given within thirty (30) days of the request to Authority and the City for such approval.

(e)    Any Transfer: (i) to an entity in which either Eden or Citation, as applicable, holds a controlling interest, defined for the purpose of this subparagraph as a 51% or greater ownership interest or having control by means of a common board or the right to appoint or approve the appointment of a majority of the directors, (ii) to an institutional investor which has provided funds for the Development, or (iii) to an entity in which such institutional investor holds a controlling interest; provided that in any such instance there is no change in the ultimate management of Developer. With respect to the Affordable Family Rental Housing and Affordable Senior Rental Housing components, any Transfer to an Affiliate of Eden or to a limited partnership of which Eden or an Affiliate of Eden is the sole managing general partner.

Section 19.8    Transfers with Authority, City Consent.

The Authority and the City may, in their sole discretion, approve in writing other Transfers as requested by the Developer. In connection with such request, there shall be submitted to the Authority and the City for review all instruments and other legal documents proposed to effect any such Transfer. If a requested Transfer is approved by the Authority and the City such approval shall be indicated to the Developer in writing. Such approval shall be granted or denied by the Authority and the City within thirty (30) days of receipt by the Authority and the City of Developer's request for approval of a Transfer. Consent to Transfers requested by investors, such as the removal of a general partner for default under a limited partnership agreement, shall not be unreasonably withheld, and shall be provided for with respect to each Development Component in the documentation for such Component.

Section 19.9    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed original, but all of which, together, shall constitute one instrument.

Section 19.10    Interpretation and Governing Law. This Agreement shall not be construed against the party who prepared it but shall be construed as though prepared by both parties. This Agreement shall be construed, interpreted, and governed by the laws of California without regard to the choice of law provisions thereof.

Section 19.11    Severability. If any portion of this Agreement is declared by a court of competent jurisdiction to be invalid or unenforceable such portion shall be deemed severed from this Agreement and the remaining parts shall continue in full force as though such invalid or unenforceable provision had not been part of this Agreement.

Section 19.12    Final Agreement. Unless otherwise provided herein, this Agreement constitutes the final understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations, understandings and agreements between the parties, whether written or oral. This Agreement may be amended, supplemented or changed only by a writing signed or authorized by or on behalf of the party to be bound thereby.

Section 19.13  <u>Non-Recourse</u>.  No member, official, employee, agent, or consultant of the Authority, the City, or of any Affiliate of the Authority or the City, shall be personally liable to Developer, or any successor in interest or person claiming by, through or under Developer, in the event of any default or breach, or for or on account of any amount which may be or become due, or in any claim, cause or obligation whatsoever under the terms of this Agreement.  No officer, director, shareholder (which is an individual), principal (which is an individual), employee, agent or consultant of the Developer or of any Affiliate of the Developer shall be personally liable to the Authority or the City or any successor in interest or person claiming by, through or under the Authority or the City, in the event of any default or breach, or for or on account of any amount which may be or become due, or in any claim, cause or obligation whatsoever under the terms of this Agreement.

Section 19.14  <u>Developer Employees and Liabilities</u>.  It is understood that persons engaged or employed by Developer as employees, agents, or independent contractors shall be engaged or employed by Developer and not by the Authority or the City.  Developer alone is responsible for their work, direction, compensation and personal conduct.  Nothing included in any provision of this Agreement shall impose any liability or duty upon the Authority or the City to persons, firms, or corporations employed or engaged by Developer in any capacity whatsoever, or make the Authority or City liable to any such persons, firms, or corporations, or to any government, for the acts, omissions, liabilities, obligations, and taxes, of whatsoever nature, of Developer or of its employees, agents, or independent contractors.

Section 19.15  <u>Developer Not an Agent</u>.  Nothing in this Agreement shall be deemed to appoint Developer as an agent for or representative of the Authority or the City, and Developer is not authorized to act on behalf of the Authority or the City with respect to any matters except those specifically set forth in this Agreement.  The Authority and the City shall not have any liability or duty to any person, firm, corporation, or governmental body for any act of omission or commission, liability, or obligation of Developer, whether arising from actions under this Agreement or otherwise.  Nothing contained in this Agreement nor any act of the Authority or the City, shall be deemed or construed to create any relationship of third-party beneficiary, principal and agent, limited or general partnership, joint venture, or any association or relationship between Developer and the City or the Authority.

Section 19.16  <u>Conflict of Interest</u>.  Developer covenants that neither it nor any of its directors, officers, partners or employees has any interest, nor shall acquire any interest, directly or indirectly, which would conflict in any manner or degree with the performance of the services hereunder.  Developer further covenants that in the performance of this Agreement, no person having such interest shall be employed by it.  Notwithstanding the foregoing, nothing herein shall prevent Developer or any of its members or affiliates from (1) engaging in other development projects in the Dublin area or elsewhere, or (2) competing for or undertaking any other similar project in any other city.

Section 19.17  <u>Waivers</u>.  The failure of either party to insist in any one or more cases

upon the strict performance of any of the other party's obligations under this Agreement or to exercise any right or remedy herein contained shall not be construed as a waiver or a relinquishment for the future of such obligation, right or remedy. No waiver by either party of any provision of this Agreement shall be deemed to have been made unless set forth in writing and signed by that party.

Section 19.18 <u>Successors</u>. The terms, covenants, agreements, provisions, and conditions contained herein shall bind and inure to the benefit of the parties hereto, their successors and assigns. In the event that the Authority consolidates its functions, or otherwise merges with HACA or other housing authority following execution of this Agreement, the rights and obligations of the Authority under this Agreement shall be binding and inure to the benefit of such successor entity.

Section 19.19 <u>Headings; Exhibits</u>. The headings in this Agreement are inserted for convenience only and shall not be used to define, limit or describe the scope of this Agreement or any of the obligations herein. All attachments that are labeled Exhibits are attached hereto and incorporated herein by reference thereto.

Section 19.20 <u>Construction</u>. Whenever in this Agreement a pronoun is used, it shall be construed to represent either the singular or the plural, either the masculine or the feminine, as the case shall demand.

Section 19.21 <u>Cumulative Rights</u>. Except as expressly limited by the terms of this Agreement, all rights, powers and privileges conferred hereunder shall be cumulative and not restrictive of those provided at law or in equity.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement by their duly authorized signatories effective on or as of the date written at the commencement of this Agreement.

Approved as to Form

_____
Asst. City Attorney

**AUTHORITY:**

Housing Authority of the City of Dublin, a public body, corporate and politic

By: _____
    Christine Gouig, Executive Director

**CITY:**

City of Dublin, a municipal corporation

By: _____
    Richard C. Ambrose
    City Manager

**HACA:**

By: _____
    Christine Gouig
    Executive Director

**DEVELOPER:**

Eden Housing, Inc., a California non-profit public benefit corporation

By: _____
    Linda Mandolini
    Executive Director

SCS Development Corporation, a California corporation, dba Citation Homes Central

By: _____
Its: VICE PRESIDENT — LAND