1  BAY AREA LEGAL AID
   LISA S. GREIF (State Bar No. 214537)
2  NAOMI YOUNG (State Bar No. 105041)
   PHILLIP R. MORGAN (State Bar No. 99979)
3  405 14th Street, 11th Floor
   Oakland, California 94612
4  Telephone: 510-663-4744
   Facsimile: 510-663-4740
5  Email: lgreif@baylegal.org
          nyoung@baylegal.org
6         pmorgan@baylegal.org

7  THE CALIFORNIA AFFORDABLE HOUSING LAW
   PROJECT OF THE PUBLIC INTEREST LAW PROJECT
8  DEBORAH COLLINS (State Bar No. 154532)
   MICHAEL RAWSON (State Bar No. 95868)
9  CRAIG CASTELLANET (State Bar No. 176054)
   449 15th Street, Suite 301
10 Oakland, California 94612
   Telephone: 510-891-9794, ext. 156
11 Facsimile: 510-891-9727
   Email: dcollins@pilpca.org
12        mrawson@pilpca.org
          ccastellanet@pilpca.org
13
   Attorneys for Petitioners ARROYO VISTA TENANTS ASSOCIATION, et al.
14

15                    UNITED STATES DISTRICT COURT

16                   NORTHERN DISTRICT OF CALIFORNIA

17

18 | ARROYO VISTA TENANTS ASSOCIATION,      CASE NO. C 07-05794 MHP
   | RHENAE KEYES, ANDRES ARROYO, DARL[I]
19 | BROWN, ELISE VEAL
                                            REPLY MEMORANDUM IN SUPPORT OF
20 |         Petitioner/Plaintiff,           PLAINTIFFS' MOTION FOR PRELIMINARY
                                            INJUNCTION
21 |     vs.
                                            Hearing Date: March 3, 2008
22 | CITY OF DUBLIN; DUBLIN HOUSING AUTH[   Time: 2:00 p.m.
   | HOUSING AUTHORITY OF ALAMEDA COU[     Courtroom: 15, 18th Floor
23 | and DOES 1 through 20, inclusive,      Judge: Honorable Marilyn Hall Patel
24 |         Respondents.

25 | SCS DEVELOPMENT COMPANY, dba
   | Citation Homes Central, a California
26 | Corporation; EDEN HOUSING, INC., a Californ[
27 | Nonprofit, and DOES 21 through 50,

28 |         Real Parties in Interest.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

FACTUAL SUMMARY ................................................................................................. 2

ARGUMENT .................................................................................................................. 2

I. THE HOUSING ACT FLATLY PROHIBITS ENTERING INTO *ANY* TRANSACTION TO DISPOSE OF PUBLIC HOUSING WITHOUT PRIOR WIRTTEN HUD APPROVAL ... 7

II. BOTH THE HOUSING ACT AND CRAA PROHIBIT "ADVANCE" DISPLACEMENT OF RESIDENTS WITHOUT A PRIOR APPROVED RELOCATION PLAN ... 8

III. DEFENDANTS HAVE NOT PROVIDED THE RELOCATION ASSISTANCE REQUIRED BY BOTH THE HOUSING ACT AND THE CRAA ... 13

IV. DEFENDANTS ARE VIOLATING THE HOUSING ACT BY TAKING PUBLIC HOUSING UNITS OFF THE MARKET WITHOUT HUD APPROVAL ... 14

V. PLAINTIFFS WILL SUFFER HARM IF AN INJUNCTION DOES NOT ISSUE AND THE BALANCE OF HARDSHIP TIPS DECIDEDLY IN THEIR FAVOR ... 14

VI. THE RELIEF REQUESTED BY PLAINTIFFS IS ENTIRELY CONSISTENT WITH FEDERAL AND STATE LAW ... 15

CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

**CASES** **Page**

*Givens v. Butler Metropolitan Housing Authority*
   2006 U.S. Dist. LEXIS 91541 *11 (S.D. Ohio 2006)

*Price v. City of Stockton*
   390 F.3d 1105 (9th Cir. 2004)    14

*United States v. Hoflin*
   880 F.2d 1033 (9th Cir. 1989)    7

**STATUTES AND REGULATIONS**

<u>Federal Statutes</u>

42 U.S.C. § 1437p    8

<u>Federal Regulations</u>

24 C.F.R § 970.7    7, 8

   § 970.19    8

   § 970.21    4

   § 970.25    9,14

<u>State Statutes</u>

Cal. Govt. Code § 7260    9,11

<u>State Regulations</u>

25 Cal. Code Reg. § 6008    11

   § 6010    9,11

   § 6016    11

   § 6038    9

**INTRODUCTION**

Plaintiffs' preliminary injunction motion seeks to enjoin the defendants from the *de facto* demolition and unlawful displacement of residents they are undertaking at Arroyo Vista. Contrary to the impression defendants wish to make, Arroyo Vista is a long-standing, diverse community of families with children, seniors, and persons with disabilities residing in single-family homes located on *cul de sacs* throughout the development. It is a public housing success story of tenants who have lived in Dublin for years, raised their children in Dublin, worked in or near Dublin, and who have been long-standing neighbors in a cohesive community -- some for up to 20 years. It is a deeply affordable residential development that is not readily replicated for extremely and very low-income tenants. Notably, defendants offer no documentary evidence that the development is in deplorable condition other than the self-serving declaration of DHA's executive director. Also contrary to defendants' speculation, HUD approval of DHA's proposed disposition and demolition of 150 scarce public housing homes is not a done deal. Unless and until defendants' application to dispose of Arroyo Vista is completed and approved, the plaintiff tenants may not have to move at all.

Defendants' response is little more than a "who me?" defense. Claiming to be only interested in the welfare of the tenants they are encouraging to abandon their homes, defendants are implementing the DDA *before* their incomplete application is approved by HUD. They are plainly relocating residents without HUD approval and before any relocation plan undergoes the review and analysis required by state and federal law, providing whatever relocation assistance the defendants alone deem appropriate, and boarding up the tenants' empty homes. Defendants' smoke and mirrors cannot hide the fact that they want Arroyo Vista vacated as soon as possible to meet the timeline of their DDA for sale and demolition, and they are taking unauthorized action to accomplish that goal. Their actions contradict state and federal laws that regulate the disposition and demolition of public housing, require approval *by others* of fully vetted relocation plans, and *if approved*, mandate the provision of relocation assistance pursuant to those plans – laws that are intended to minimize the exact harm to tenants that defendants have caused here by prematurely displacing Arroyo Vista residents and turning their neighborhood into a ghost town threatened by "thieves and squatters."

**FACTUAL SUMMARY**

Defendants' opposition conjures up a scenario in which only a few disgruntled tenants oppose the sale and demolition of Arroyo Vista, 50 households have been "voluntarily" relocated to comparable homes because of defendants' relocation activities, and no one is being encouraged or scared into moving out prior to HUD's approval of the application. The real facts belie this scenario:

- **Numerous tenants oppose defendants' implementation of the DDA unless and until HUD approves defendants' still incomplete application.**

This includes not just the four named plaintiffs and their families, but the other twenty-seven members of the Arroyo Vista Tenants Association (AVTA), and eight other present and former tenants. *See* Declarations of Andres Arroyo [plaintiff], Darlene Brown [plaintiff], Shawn Costello [current resident], Carolyn Evans [current resident], Gretta Evans [displaced person], Rhenae Keyes [plaintiff], Shirley Sanders [current resident], Elise Veal [plaintiff], and the Supplemental Declaration of Rhenae Keyes on behalf of AVTA filed on January 28, 2008 and Declarations of Darlyn Anderson [displaced person], David Arroyo [son of plaintiff Arroyo], Joyce McQuarters [current resident], Shirley Portley [displaced person], and Antone Tucker [current resident] filed on February 19, 2008 with this Reply Memorandum; *see also* the Supplemental Declarations of Gretta Evans, Rhenae Keyes (Second Supplemental), Shirley Sanders, and Elise Veal filed herewith. After all, Arroyo Vista has been their home and community -- for many of them for more than one or two decades. *See* Declarations of Andres Arroyo ¶2 [21 years], Darlene Brown ¶2 [17 years], Shawn Costello ¶3 [23 years], Shirley Sanders ¶3 [13 years]; Elise Veal ¶2 [17 years], and Joyce McQuarters ¶3 [19-1/2 years]. Moreover, many are extremely low-income families with children, seniors, and/or persons with disabilities, all of whom face an exceptionally difficult housing market in the Dublin community. *See, e.g.*, Declarations of Andres Arroyo ¶2 and Gretta Evans ¶2 [seniors with disabilities]; Declarations of Darlyn Anderson ¶2; Darlene Brown ¶2; Shawn Costello ¶¶2, 4 [persons with disabilities]; Rhenae Keyes ¶ 2 [parent with disabilities with two children with disabilities]; Carolyn Evans ¶2 [three children]; Shirley Sanders 2 [one son]; Antone Tucker ¶2 [one son]; and Elise Veal ¶1 [six children, one of them with disabilities].

2

Reply Memorandum in Support of
Plaintiffs' Motion for Preliminary Injunction,                                    Case No. C-07-05794 MHP

- **Since at least April 2007, months before the DDA was even adopted or the application for disposition submitted to HUD, defendants have led the tenants to believe that sale and demolition of Arroyo Vista is a *fait accompli*, and they will have to move in the very near future.**

Tenants have been urged to move now because the market is tight, there might not be enough section 8 vouchers or section 8 units, and that if they stay, they will see bulldozers raze their homes. *See* Brown Decl. ¶¶5, 9; Keyes Decl. ¶¶9-12; Sanders Decl. ¶¶6-7; *see also* Anderson Decl. ¶¶3-4, 10; Second Supplemental Keyes Decl . ¶5; McQuarters Decl. ¶5. What defendants do not tell the tenants is: (1) The application to HUD is not yet even complete, still missing an environmental review and a required relocation plan that HUD must approve—such that the application is not a "done deal," and if it is not approved, no one will have to move. *See, e.g.*, Gouig Decl. in Support of Defs. Oppn. ¶¶26, 35 [acknowledging application is incomplete, telling tenants that approval of application is likely, but that she does not think it appropriate to cause confusion by vacillating on the possibility of HUD approval]. (2) A relocation plan required by state law requires tenant input, as well as review and approval of the legislative bodies that are displacing them, that federal and state law require far more in relocation advisory services and benefits than defendants have been offering. *See* Gouig Decl. ¶¶37, 38 [Outlining the relocation assistance DHA says it provides, yet acknowledging that as of February 11, 2008, a draft relocation plan for comment by residents and the public and consideration by the DHA Commission had *still* not been circulated much less approved.]  And, (3) that if defendants do not provide adequate comparable replacement housing and financial resources to provide the full measure of relocation benefits mandated by law, disposition and demolition of Arroyo Vista cannot proceed. *See, e.g.*, Costello Decl. ¶8 [if you don't move, we will vacate you]; Keyes Decl. ¶12 and Second Supp. Keyes Decl. ¶5 [if residents do not move they will see the bulldozers coming]. In fact, even if HUD approves the application, the property may not be sold or the homes demolished until all residents have received a minimum 90-day notice of HUD's decision and their relocation rights and been relocated to comparable relocation housing. *See* Argument Plaintiffs Memorandum of Points and Authorities in Support of Preliminary Injunction filed January 28, 2008 (Pltf. Opening Memo") at 8:4-19, 11-13:15.

3

Reply Memorandum in Support of
Plaintiffs' Motion for Preliminary Injunction,                                                            Case No. C-07-05794 MHP

- **Defendants have engaged in a concerted effort to frighten and cajole tenants into abandoning their homes in Arroyo Vista.**

Defendants' denial of such a campaign simply is not credible – the tenants uniformly tell a different story. *See* Arroyo Declaration ¶5 [offered a "good deal"]; Brown Decl. ¶¶5-6, 9 [offered referral lists and told better chance of finding housing if use Section 8 now than rather than waiting for a 90-day notice]; Costello Decl. ¶8 [threatened with being vacated if he did not move]; Carolyn Evans Decl. ¶15 [offered Section 8 voucher and only 60 days to use it]; *see also* Anderson Decl. ¶4 [told to hurry up and apply for an apartment at the Grove because only so many apartments were available]; Declaration of David Arroyo ¶3 [parents offered a 'good deal' – a good place to live and a moving company to help them move]; Anderson Decl. ¶6; Keyes Decl. ¶¶10, Keyes Second Supp. Decl. ¶4; McQuarters Decl. ¶¶6-7, Ex. 1 thereto; Sanders Supp. Decl. ¶¶2-3, Ex. 1 thereto [tenants required to complete DHA's 'Notice of Intent to Vacate form as a condition of receiving Section 8 voucher].

- **The relocation assistance that defendants *have* provided without HUD approval, tenant input, or approval of the legislative body falls short of both state and federal law as well as what defendants told HUD and the residents they would provide.**

Merely providing public housing tenants with a Section 8 voucher, referral lists, partial moving expenses, partial security deposits and partial credit check fees that defendants unilaterally and artificially capped, and rental assistance payments apparently only when DHA staff deem it necessary, does not comport with either state or federal law. *See* Gouig Decl. ¶37 [outlining DHA's unauthorized relocation assistance scheme].

Security Deposits. Though federal law requires defendants to provide "actual" and reasonable relocation expenses (24 C.F.R. §970.21(d)(2)), defendants acknowledge in their application to HUD that landlords may charge as much as two months' rent for security deposits (Greif Decl. Ex. 3 at 151), and that defendants therefore proposed to pay deposits of up to $2500, they have "capped" security deposits at $2400, and then refused even to pay that. *See* Gouig Decl. ¶37; *compare* Anderson Decl. ¶9 [displaced person forced to borrow $1000 to pay a $3000 security deposit because Overland Pacific &

4

Reply Memorandum in Support of
Plaintiffs' Motion for Preliminary Injunction,                                        Case No. C-07-05794 MHP

Cutler ("OPC") would pay only $2000 of the "actual" deposit]; Gretta Evans Decl. ¶¶18, 19; Supp. Gretta Evans Decl. ¶¶10-16 [displaced person forced to borrow money to pay $2500 security deposit and defendants continue to refuse to reimburse even $2400 they promised until Ms. Evans' daughter vacates Arroyo Vista].

Credit Check Fees. Similarly, Ms. Anderson and Ms. Evans have been deprived of actual "credit check" fees they have had to pay. *Id.* [forced to pay $90 credit check fee that defendants refuse to reimburse]; Anderson Decl. ¶¶7, 9 [received approximately $70 for credit check, but had to pay others herself for a series of apartments DHA refused to approve].

Moving Expenses. Though defendants said they would pay actual or "fixed" moving expenses, Ms. Anderson was compensated only for a truck rental, and OPC continues to hold one-half of Ms. Evans' moving expenses $1650 hostage until her daughter vacates Arroyo Vista. Anderson Decl. ¶¶5, 9; Gretta Evans Decl. ¶¶18-19, Supp. Gretta Evans ¶¶10-16; Portley Decl. ¶¶3-5; Tucker Decl. ¶¶5-6; *see also* Veal Decl. ¶¶14-18 [one-half of moving expense withheld preventing her from moving]. Gretta Evans, who was determined to be ineligible for Section 8 assistance, also was never offered a relocation assistance payment to cover the $300 rent increase and increased utility costs she has experienced for a 42 month period. Supp. Gretta Evans Decl. ¶¶16-17.

Rental Assistance Payments. Under defendants' claim that rental assistance payments would be provided as necessary and the formula defendants told HUD they would follow to provide such assistance, Ms. Evans would have been entitled to nearly $10,000 as a relocation assistance payment (not even counting increased utilities). *Id.; see also* Gouig Decl. ¶37; Greif Decl. Ex. 3 at 151. Ms. Evans received no such assistance; indeed, she was not even told of her right to receive a relocation assistance payment. Supp. Gretta Evans Decl. ¶¶16, 17. She also was not provided with necessary counseling and advisory services to assist her in locating an accessible home to accommodate her disability. *Id.* ¶16. Rather, John Morris of OPC suggested that she simply look for homes in other communities where the rents are cheaper. Tucker Decl. ¶4. As a result, she lives in Patterson and is confined most of the time to her upstairs bedroom. Supp. Gretta Evans Decl. ¶17.

- **It is not plaintiffs that seek to deprive their neighbors of relocation assistance by seeking a preliminary injunction requiring defendants to comply with the law, but defendants that have sought to defray their relocation costs by ushering tenants out the back-door.**

By displacing residents in advance of HUD approval or any approved relocation plan, defendants are clearing the way for a $12 million sale and gentrification of the only public housing development in Dublin called for by their DDA. Greif Decl. Ex. 2 at 37-39, 53 [DDA calls for sale of Arroyo Vista for $12 million, demolition of all existing public housing units, and redevelopment of 226 "for sale" dwellings (mostly market-rate) and 179 rental units whose affordability level is dependent on available funding]. Contrary to their self-serving depiction of Arroyo Vista as badly in need of repairs (Gouig Decl. ¶7), defendants' application for disposition is based on DHA's determination that it is purportedly in the best interests of "the residents" and DHA to dispose of it, *not* because it is obsolete or unsuitable for housing purposes, but to get $12 million for it. *See* Greif Decl. Ex. 3 at 144-45.

Moreover, the DDA plainly calls for all residents to be relocated with Section 8 vouchers from HACA and financial contributions from Citation, DHA, and the City. *Id*. at 51 (§4.2). By shielding their back-door relocation assistance scheme from public review for nearly a year and depriving residents input into a relocation plan, required notices, or required relocation benefits as described above, defendants' have managed to displace 50 households. If the experiences of Ms. Anderson and Gretta Evans are any indication, defendants' motive is evidence – to reduce the real cost *to them* of re-housing 150 lower income households they are displacing. A preliminary injunction will not deprive the tenants of their rights to relocation assistance. It will ensure that *if* they ultimately have to move, they will be afforded all of the protections that both state and federal law require.

These true facts underlie plaintiffs' legal contentions because the procedures and benefits required by state and federal law are intended to protect tenants just like the plaintiffs from the very actions that defendants are now taking. We now show that, contrary to defendants' arguments, those laws have been violated. A preliminary injunction is both appropriate and necessary.

## ARGUMENT

### I. THE HOUSING ACT FLATLY PROHIBITS ENTERING INTO *ANY* TRANSACTION TO DISPOSE OF PUBLIC HOUSING WITHOUT PRIOR WRITTEN HUD APPROVAL.

Defendants admit they have no approval from HUD to dispose of Arroyo Vista, and that they entered into the DDA to dispose of Arroyo Vista in July 2007. Gouig Decl. ¶¶24, 27. They argue that entering into the DDA without prior HUD approval does not violate the Housing Act, as long as the agreement it entered into is "conditioned" on HUD approval. Def. Oppn. at 6-9. Distilled to its essence, defendants ask the Court to rewrite the statute and the regulations.

Ignoring the plain language of HUD's regulation, defendants argue that HUD approval is 'statutorily required' only before defendants can actually dispose of the property or carry out redevelopment, suggesting that Congress must have intended to permit the adoption of a "conditional" DDA prior to HUD approval. Def. Oppn. at 7. That is not what the law permits. HUD's regulation is clear: "A PHA must obtain written approval from HUD *before* undertaking **any transaction** involving demolition or disposition of PHA-owned property under the [Annual Contributions Contract]." 24 C.F.R. §970.7(a) (emphasis added). "Any" means "any;" the regulation does not distinguish between a "final transaction" or a "conditional transaction," but prohibits "any" transaction. Courts should not read words into a statute or regulation that the Legislature or agency did not use. *See United States v. Hoflin*, 880 F.2d 1033, 1037 (9th Cir. 1989) [rejecting defendants' argument to read "knowing" into statute where the 'language is plain and the meaning is clear].

Defendants' contend that some "conditional" transactions must be anticipated, because their application would otherwise lack specificity and the project, if approved, would then not be finalized. Yet, all the necessary elements for a disposition application can be "planned" without entering into a contract with a private developer prior to HUD approval. Indeed, at the same time defendants announced that they had selected Eden and Citation to redevelop Arroyo Vista in July 2006, defendants knew the perameters of the project. *See* Grief Decl. Ex. 11 at 261-62 [DHA's July 2006 newsletter informing residents of the same project perameters as are included in the DDA]. Likewise, when defendants modified their PHA Plan in

7

Reply Memorandum in Support of
Plaintiffs' Motion for Preliminary Injunction,                                    Case No. C-07-05794 MHP

November 2006 to permit disposition and demolition of Arroyo Vista, they had already selected Eden and Citation to redevelop the property, knew that they intended to demolish all units, relocate all residents, and develop a mixed-income development of for-sale market rate homes, senior units, and low-income housing tax credit units. *See* Greif Decl. Ex. 3 at 132 [resolution approving demolition and disposition of Arroyo Vista]. Nonetheless, they submitted an application to HUD that still lacks a comprehensive relocation plan or an environmental review – rendering it indefinite and non-specific as to key elements.

Defendants also misconstrue the circumstances under which a negotiated sale may occur. Contrary to defendants' argument, 24 CFR §970.19 does not authorize a negotiated sale *in advance* of HUD approval. Rather, it expressly provides that *"[w]here HUD approves the disposition* of real property…the PHA shall dispose of the property…for not less than fair market value *unless* HUD *authorizes* negotiated sale for reasons found to be in the best interests of the PHA or the federal government…."  Thus, this regulation too requires HUD approval of the application *before* any negotiated sale may occur, not after.

More importantly, however, the problem with defendants' interpretation is that once a transaction is entered into, even conditionally, and implementation begun as it was here, the project becomes *a fait accompli*. Tenants start moving out (here, with defendants' unsubtle encouragement), vacant units are boarded up, and HUD is left in the untenable position of reviewing a done deal. That is why HUD requires approval *before* the PHA enters into "*any transaction.*" Defendants violated the requirements of 42 U.S.C. §1437p and 24 CFR §970.7(a).

## II. BOTH THE HOUSING ACT AND CRAA PROHIBIT "ADVANCE" DISPLACEMENT OF RESIDENTS WITHOUT A PRIOR APPROVED RELOCATION PLAN.

Plaintiffs' moving papers show that defendants violated both the federal Housing Act and the California Relocation Assistance Act (CRAA) by displacing residents without prior HUD approval of their disposition application, including a relocation assistance plan and timeline, and without having first adopted a formal relocation plan that meets the requirements of state law. *See* Pltf. Opening Memo at 11-14; 18-21. In response, defendants contend that a formal relocation plan is not required yet, and that they, in fact, have not displaced any residents. Neither contention has merit.

The Housing Act requires defendants to submit a relocation plan and a relocation timetable to HUD as part of the disposition application. 42 U.S.C. §1437p(a)(4); 24 C.F.R. §§970.7(a), (a)(6), (a)(11); 970.21(c), (d), (f); 970.21(c), (d), (f). Without such a plan, HUD could not know whether to approve the project or not (unless, of course, all the tenants were already gone). Here, HUD itself has stated unequivocally that relocation of residents may not begin until after the department approves the application: "Pursuant to 24 CFR 970.25, if DHA is relocating residents based on the disposition of Arroyo Vista, the relocation of the residents cannot begin until after the department approves the application." Letter from Dominique Blom, Deputy Assistant Secretary, Office of Public Housing Investmets, HUD, to Lisa Greif, dated November 20, 2007. Greif Decl., Exh. 6 at 211. To plaintiffs' knowledge, defendants have yet to submit a comprehensive relocation plan to HUD, yet they admit they have already "relocated" nearly 50 households.

The CRAA also requires defendants to prepare and circulate a comprehensive relocation plan well in advance of any displacement: "No public entity may proceed with *any* phase of a project or other activity which will result in the displacement of *any* person *until* …[¶6] a relocation plan meeting the requirements of section 6038 has been prepared." 25 C.C.R. §6010. Moreover, relocation planning and notice requirements must begin as soon as negotiations of a project that will cause displacement begin. As the following table demonstrates, defendants' failure to even circulate a draft relocation plan for review until February 2008 turns the Legislature's "advance planning" mandate on its head:

| **Steps Required Prior to Displacement Pursuant to California Law** | | | |
|---|---|---|---|
| Step | Timing | Date Defendants Acted | Authority |
| 1  Mandate to comply with the CRAA attaches | Upon Initiation of Negotiations | July 2006 | 25 CCR § 6038(a); Gov't C § 7261 |
| 2  Prepare relocation plan<br>• Relocation Plan must contain proposed initial or "general" notice to residents who may be displaced | "As soon as possible after initiation of negotiations *and* prior to proceeding with any phase of a project or other | February 2008 | Gov't C § 7261(a); 25 CCR §§ 6010; 6038(a); |

9

Reply Memorandum in Support of
Plaintiffs' Motion for Preliminary Injunction,                                            Case No. C-07-05794 MHP

| | | | | |
|---|---|---|---|---|
| | | activity that will result in displacement" | | |
| 3 | Notice of plan preparation must be provided to all households | At least 30 Days prior to approval | February 2008 | Gov't C § 7261; 25 CCR § 6038(e); |
| 4 | Approval of relocation plan by legislative body | Prior to issuing notice of relocation | **TO DATE, NONE APPROVED** | Gov't C § 7261; 25 CCR § 6038(a); |
| 5 | General notice of relocation<br><br>• Must contain specific information | Within 60 days following initiation of negotiations and not less than 90 days prior to displacement | Improper notice sent April 2007[1] | Gov't C § 7261; 25 CCR § 6046(a)(1) |
| 6 | Notice of eligibility | As soon as eligibility is established | Improper notice starting July 2007 | 25 CCR §§ 6040, 6046(a)(1) Richman Decl ¶ 8 |
| 7 | Notice of displacement | 90 days prior to displacement | **TO DATE, NONE PROVIDED** | Gov't C § 7261; 25 CCR §§ 6042(d); |

In response, defendants argue that "initiation of negotiations" did not occur until April 2007 when defendants and real parties entered into an Exclusive Negotiating Agreement. Def. Oppn. at 10-11. Plaintiffs disagree. Defendants plainly initiated negotiations with Eden and Citation in July 2006. Answer ¶23. At that time, they already knew that redevelopment of Arroyo Vista would occur, and that all residents would be displaced. Greif Decl. Ex. 11 at 260-61. Likewise, they amended their PHA Plan to permit disposition of Arroyo Vista on November 21, 2006 knowing it would result in resident displacement. Greif Decl. Ex. 3 at 132. The amendment provides for the same mixed-income development decided upon in July 2006. *Id*. However, this dispute is not material to defendants' violation of their "planning" obligation, since *no relocation plan* has yet to be adopted by any legislative body, although at least 50 households have already been displaced.

---

[1] *See* Defendants issuance of the April 12, 2007 notice -- nearly a year before any plan will even be submitted to the DHA Commission for review as required by 25 CCR § 6038(a) – is invalid. *See* Def. Opp. at 20, Def. Ex. I [Notice dated April 12, 2007]. Defendants also make no showing that such notice was even properly delivered. 25 C.C.R, § 6046(c).

10

Reply Memorandum in Support of
Plaintiffs' Motion for Preliminary Injunction,                                                                 Case No. C-07-05794 MHP

Defendants further argue that because DHA is not acquiring the property, but selling it, the "initiation of negotiations" regulation does not require a plan to be prepared until the sale is complete. Defendants are wrong. A *public entity* is prohibited from proceeding with *any phase of a project or other activity* which will result in the displacement of any person *until* "[a] relocation plan meeting the requirements of section 6038 has been prepared." 25 C.C.R. § 6010(a)(6) (emphasis added). Moreover, the question is not whether the project is characterized as an 'acquisition' by a public or private entity. It is the "causal connection" between the displacing activity and the displacement which will result therefrom. *Peter Kiewit Sons' Co. v. Richmond Redevelopment Agency*, 178 Cal.App.3d 435, 444 (1986). The displacing activity is disposition of Arroyo Vista, pursuant to an unlawful DDA entered into by public entities, which calls for and has resulted in the displacement of 50 households without *any* approved relocation plan.

Defendants also argue that they have not displaced anyone: that all they have done is provide some relocation assistance to tenants who have "voluntarily" chosen to move. The CRAA, however, defines a "displaced person" as "[a]ny person who moves from real property…[a]s a direct result of the …displacing activity as the public entity may prescribe under a program or project undertaken by a public entity, of real property on which the person is a residential tenant." Govt. Code § 7260(c)(1)(A)(ii); *see also* 25 CCR §6008(f).[2]

Here, there can be no dispute that 50 Arroyo Vista households have moved as a result of this project. *See* Def. Oppn at 2. The tenants' were told that it was a foregone conclusion that they would have to move because of the defendants' sale of the property to real parties and its subsequent demolition, and that they should move now because if they waited, they might lose out on valuable relocation assistance. *See* pp 3-4, *supra*; *see also* Pltf. Memo at 12-14. While neither point was true, the tenants had no way of knowing that. To the contrary, despite defendants' written notices, the tenants were constantly encouraged to move early, with no understanding that they might not ever have to move. *See*, e.g., Anderson Decl. ¶¶3-6, 10. These circumstances virtually define duress, not

---

[2] "Displaced person" includes person who (1) moves as a result of written notice of intent to acquire by public entity or by any person having an agreement with the public entity; (2) as result of the rehabilitation, demolition or other displacing activity undertaken by a public entity or any person having agreement with or acting on behalf of public entity.

11

Reply Memorandum in Support of
Plaintiffs' Motion for Preliminary Injunction,                                    Case No. C-07-05794 MHP

"voluntary" moves.  The defendants' provision of some relocation assistance to nearly 50 residents further shows that defendants fully recognized that tenants were "moving" as a direct result of this project. *See* Def. Oppn. at 5:22-25

Defendants' claim that plaintiffs have presented no evidence that tenants moved out because of the project.  This is not true –Greta Evans attests that she moved because Arroyo Vista was going to be demolished.  Gretta Evans Decl. ¶4.  She started searching for a home after receiving a newsletter in the spring of 2007 that residents may be able to get a Section 8 voucher. *Id*. ¶7.  She has been struggling ever since her move to receive the relocation assistance OPC promised her.  Supp. Gretta Evans Dec. ¶¶11-17.[3] *See also* Anderson Decl. ¶¶3-5, 10 [moved because she was told the sale was approved and she should hurry to get another place].  While other displaced residents have not yet been located pending discovery, they attended the same meetings and heard the same information as the plaintiffs. *See, e.g.*, Sanders Decl. ¶¶6-7.  The only reasonable inference is that they moved because of the impending sale and demolition of Arroyo Vista.  It is difficult to conceive that 50 tenant households would suddenly leave their tight-knit, affordable community because they "wanted to," or that defendants would give them any relocation assistance at all had their moves been truly "voluntary".

Defendants also argue that no law prohibits provision of moving assistance while a disposition application is pending or before a relocation assistance plan is adopted.  This is pure sophistry.  As we have shown, the law *does* require HUD approval of a relocation plan and timeline *before* any relocation may occur.  *See* Greif Decl., Ex. 6 at 211.  Likewise, like federal law, the state relocation plan must set forth the relocation benefits that the public entity proposes to provide, and the legislative body must *approve* that plan.  *See* Pltf. Memo at 18-20.  Defendants cannot avoid these requirements by "voluntarily" providing inadequate relocation assistance to any persons who it claims were "voluntarily" displaced.  Nor are plaintiffs attempting to deprive the other tenants of benefits they could otherwise get.  Rather, they are insisting that all tenants receive the full services, benefits and

---

[3] Defendants' suggestion that she elected to divide her relocation assistance with her daughter is belied by the true facts.  *See* Supp. Gretta Evans Decl. ¶¶ 11-15; see also Portley Decl. ¶¶3-5; Tucker Decl. ¶¶4-5.  Moreover, the requirement to provide comparable replacement housing cannot be waived absent absent a major disaster or during periods of declared national or state emergencies.  25 C.C.R. §6042(a), (e).

12
Reply Memorandum in Support of
Plaintiffs' Motion for Preliminary Injunction,                                              Case No. C-07-05794 MHP

notice the law provides, not the diminished benefits defendants are offering. Finally, unless HUD approves the disposition and a relocation plan is approved, residents have no need for relocation assistance because they need not move at all.

### III. DEFENDANTS HAVE NOT PROVIDED THE RELOCATION ASSISTANCE REQUIRED BY BOTH THE HOUSING ACT AND THE CRAA.

Defendants have not provided the relocation assistance the law requires, or even what they "said" they would provided. As discussed in plaintiffs opening memorandum, federal law requires more than referral lists, and the offer of a Section 8 voucher. It requires an actual Section 8 home to go with the voucher, and an accessible home for persons with disabilities. It also requires "actual and reasonable relocation expenses," not partial security deposits, partial credit check fees, and partial moving expenses. Similarly, state law requires comparable replacement homes that are decent, safe, and sanitary and affordable to residents at 30% of their income, and requires a rental assistance payment sufficient to ensure such affordability for 42 months. *See* Plaintiffs' Memo at 14-17; 21-23.

Defendants respond by implying that because no plaintiffs have moved, they could not have been deprived relocation assistance and benefits. Def. Oppn. at 19-20. They miss the point. Two of the plaintiffs, Rhenae Keyes and Elise Veal, who considered relocating early were denied the relocation services and benefits they needed to move. Rhenae Keyes was down-sized to a 2-bedroom voucher, and her request for a reasonable accommodation was ignored. Keyes Decl. ¶¶13-17; Keyes Second Supp. Decl. ¶2-3. Plaintiff Veal was provided referral lists that did not address her family's need to remain in Dublin. Veal Decl. ¶9, Ex. 1; Veal Supp. Decl. ¶6-8, Ex. 1. She also was refused one-half of her moving expenses until after she moved, making it impossible for her to move. *Id*. ¶¶10-18, Exs. 2, 3, 6. Other tenants that did move, like Darlyn Anderson and Gretta Evans, were denied full security deposits, credit checks, and moving expenses. Ms. Evans was not even offered any rental assistance payment, and has received only $825 as her entire "relocation assistance." *See* pp. 4-5 *supra*. If the "assistance" offered to plaintiffs and these former residents is any indication, it serves only to underscore the need for approved relocation plans to ensure fair and uniform relocation policies are followed.

### IV. DEFENDANTS ARE VIOLATING THE HOUSING ACT BY TAKING PUBLIC HOUSING UNITS OFF THE MARKET WITHOUT HUD APPROVAL

Plaintiffs' showed in their moving papers that defendants are violating the Housing Act by refusing to re-rent vacant units, thus taking public housing units off the market, without HUD approval. *See* Pltfs. Opening Memo at 17-18. In response, defendants argue they "should not re-rent these units at turnover" while HUD is considering their application for disposition, citing 24 CFR § 970.25(a). There are at least two problems with this argument. Defendants have yet to submit a *complete* application. Instead, they have strung the application out for over six months by submitting required components in a piecemeal fashion. In the meantime, vacant units have been removed from the market, destroying the viability of occupied homes.

Second, defendants are not only refusing to re-rent the units. They are boarding them up. Nothing in this regulation allows DHA to create blight and expose the 100 households that have not abandoned Arroyo Vista to the hazards associated with vacant and boarded up homes. In fact, defendants' actions constitute *de facto* demolition, without any HUD approval of a disposition *or* demolition application, also in violation of the Housing Act. *See Givens v. Butler Metropolitan Housing Authority*, *supra* at *15

### V. PLAINTIFFS WILL SUFFER HARM IF AN INJUNCTION DOES NOT ISSUE AND THE BALANCE OF HARDSHIP TIPS DECIDEDLY IN THEIR FAVOR.

Defendants' argument that plaintiffs will suffer no irreparable harm if the injunction is denied ignores the harm already caused by defendants' unlawful activities. Def. Oppn. at 25. By jumping the gun to relocate their neighbors -- without HUD approval, an approved relocation plan, or required relocation services, notices, and benefits, defendants have vacated nearly one-third of plaintiffs' neighborhood, destroying their cohesive community in the process, and exposing plaintiffs to blight and security risks. Further, by depriving plaintiffs of relocation plans approved by HUD and the local government *before* displacing their neighbors and threatening to displace plaintiffs, they deprive plaintiffs of any meaningful opportunity to make an informed decision as to whether, where, and when to move.

Defendants' argument that the balance of hardships does not favor plaintiffs is equally flawed. First, defendants utterly ignore the alternative outcome with respect to their disposition application – that HUD will *disapprove* it. In that case, neither plaintiffs nor any more of their neighbors need move at all. Second, the notion that tenants will have less time to move if defendants are required to comply with state and federal laws is not supported by the law. Even if HUD approves the application, the 90-day notice required by federal law is a minimum period within which residents must move. If defendants fail to adequately assist residents in actually securing comparable, accessible, and affordable replacement homes within such 90-day period, the sale cannot be completed and demolition cannot commence. Second, in the event plaintiffs and their neighbors are required to move, having a comprehensive relocation plan that comports with federal and state law can only benefit plaintiffs and their neighbors who have been unable to make informed decisions as to whether, when, and where to move in the absence of any approved relocation plan at all. Thus, an order requiring defendants to fully comply with all state and federal relocation requirements serves both the interests of plaintiffs and their neighbors.

## VI. THE RELIEF REQUESTED BY PLAINTIFFS IS ENTIRELY CONSISTENT WITH FEDERAL AND STATE LAW.

Defendants argue that enjoining implementation of the DDA is too broad. Def. Oppn. at 24. Plaintiffs submit a revised (Proposed) Order clarifying that the order would not prevent defendants from lawful planning activities. Plaintiffs also have modified the proposed Order to enjoin defendants from displacing residents in the absence of HUD approval and full compliance with state and federal law.

## CONCLUSION

Plaintiffs' probability of success on the merits is established and the balance of hardships tips decidedly in their favor. The preliminary injunction submitted with this Reply Memorandum should issue.

15

Reply Memorandum in Support of
Plaintiffs' Motion for Preliminary Injunction,                                    Case No. C-07-05794 MHP

1  Dated: February 19, 2008                Respectfully Submitted:

2

3
                                           By:  ____/s/ Lisa S. Greif_____
4                                               BAY AREA LEGAL AID
                                                Lisa S. Greif
5                                               Phillip R. Morgan
                                                Naomi Young
6

7                                               CALIFORNIA AFFORDABLE HOUSING
                                                LAW PROJECT OF THE PUBLIC INTEREST
8                                               LAW PROJECT
                                                Deborah Collins
9                                               Michael Rawson
10                                              Craig Castellanet

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

Reply Memorandum in Support of
Plaintiffs' Motion for Preliminary Injunction,                              Case No. C-07-05794 MHP