DECLARATION OF LISA S. GREIF
IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION

EXHIBIT 4

0103



Ramón P. Arias
Executive Director

# BAY AREA LEGAL AID

### WORKING TOGETHER FOR JUSTICE

March 14, 2008

Via E-Mail to drichman@opcservices.com
And First Class U.S. Mail

David J. Richman
Overland, Pacific & Cutler, Inc.
7901 Oakport Street, Suite 4800
Oakland, CA 94621

**Re:    Comments to January 2008 draft Relocation Plan for Arroyo Vista Development Project**

We submit the following comments to the January 2008 Draft Relocation Plan for Arroyo Vista on behalf of our clients Arroyo Vista Tenants Association, Rhenae Keyes, Darlene Brown, Andres Arroyo, Elise Veal, and their families. We request that these comments be attached to the Draft Plan and included in the record of all public hearings at which the Draft Relocation Plan is considered for approval.

## INTRODUCTION

As indicated in the Draft Plan, the City, DHA, and HACA (collectively referred to as "the public entities") are obligated to comply with both state and federal law in planning for and relocating residents of Arroyo Vista, a public housing development of 150 single-family homes. The Draft Plan purports to comply with the California Relocation Assistance Act (Govt. C. §7260, *et seq.*) and Department of Housing and Community Development ("HCD") Guidelines (25 C.C.R. §6000 *et seq.*) (the "CRA Act") and the disposition and demolition requirements of the United States Housing Act, as amended, 42 U.S.C. §1437p (the "Housing Act"). For the reasons discussed below, the Draft Plan does not comply with the CRA Act or the Housing Act and implementing regulations. It also does not comply with the anti-displacement and relocation provisions of the Housing and Community Development Act, 42 U.S.C. §5304(d) (the "HCD Act") and implementing regulations.

We urge the City, DHA, and HACA to reject the Draft Plan. It must be amended to fully comply with all applicable state and federal laws, and the Arroyo Vista Project should cease or be suspended until such plan is prepared, distributed for public comment pursuant to the public participation requirements of the CRA Act, and reviewed and approved at a public hearing by the legislative bodies of the displacing public entities – the City, DHA, and HACA.

Alameda County Regional Office
405 14th Street, 11th Floor
Oakland, CA 94612

Phone: 510.663.4744
Toll Free: 800.551.5554
Fax: 510.663.4740

www.baylegal.org

LSC

March 14, 2008

## A.  THE DRAFT RELOCATION PLAN DOES NOT COMPLY WITH THE CRA ACT AND HCD'S GUIDELINES.

### 1.  The Draft Plan Must Be Rejected As Untimely and Incomplete.

The Draft Plan should be rejected as untimely and incomplete, and the Arroyo Vista Development Project should cease or be suspended until the public entities fully comply with the CRA Act, including preparation of a relocation plan that complies with state law. A relocation plan should have been prepared and submitted to the local legislative bodies for consideration long before the public entities entered into the DDA, submitted an Application to HUD, and began relocating residents of Arroyo Vista.

Under California law, a relocation plan assists the local legislative body in deciding whether a project that will result in displacement – here disposition and redevelopment of Arroyo Vista -- may go forward at all. Key elements of the relocation plan that are necessary to such a decision include projected dates of displacement; an analysis of the relocation needs of all persons to be displaced; a detailed explanation as to how those needs will be met, including an analysis of the housing resources available to meet them. It also must detail the advisory services, procedures, and relocation payments to be made, including specific procedures for locating comparable replacement housing, evaluate those costs and identify the resources that will pay them. A standard information notice to be sent to all residents also must be included in the plan, as well as a plan for citizen participation. The displacing public entities also must make a written determination that necessary resources will be available as required. Cal. Govt. C. §7261(a); 25 C.C.R. §6038. Finally, the relocation plan is subordinate to and must be consistent with the local jurisdiction's housing element. *Id.*

In order to enable the local legislative body to make an informed decision as to whether a project that will result in displacement may go forward, a public entity whose project will result in displacement of residential tenants must prepare a relocation plan at the earliest stage of a project, and well before the commencement of *any* actions which will cause displacement. Govt. C. §7261(a); *see also* 25 C.C.R. §§6010, 6038(a) [a relocation plan must be prepared and submitted for approval to the local legislative body *prior* to proceeding with *any phase* of a project or other activity that will result in displacement].

DHA selected Citation Homes Central and Eden Housing, Inc. to redevelop Arroyo Vista and commenced negotiations for the sale of Arroyo Vista in July 2006. *See* Draft Plan at 7. The developers' proposal at that time was to demolish all existing public housing units and redevelop the site as a mixed income development. *See* Draft Plan at 37. Thus, the public entities planned at least as early as July 2006 to displace all Arroyo Vista residents. DHA then amended its PHA Plan to provide for the disposition and demolition of Arroyo Vista in November 2006, reiterating that all Arroyo Vista residents would be displaced. *See* Draft Plan at 39-40. Without regard to the relocation planning requirements of state law, the public entities entered into an exclusive negotiating agreement with the developers in April 2007 (Draft Plan at 44), a DDA in July 2007 (Draft Plan at 47), and submitted an Application to HUD to dispose of the property in August 2007 – all actions that will and, in fact, have

caused the displacement of Arroyo Vista residents. In fact, since July 2007 the public entities have displaced at least 50 households from Arroyo Vista without any approved relocation plan.[1]

In the absence of a relocation plan, the City, DHA, and HACA could not make informed decisions to dispose of Arroyo Vista. Likewise, the public and Arroyo Vista residents were deprived of any opportunity to participate in a relocation committee and preparation of the relocation plan. A timely plan also would have addressed the relocation needs and adequately budgeted for relocation of *all* persons that moved from Arroyo Vista since July 2006. Finally, without an approved relocation plan, the local legislative body could not ensure that its relocation assistance policies provide for fair, uniform, and equitable treatment of all affected persons and minimize the adverse impact of displacement on both the residents and the community. *See* Cal. Govt. C. §7260.5(a), 7261(a). For these reasons, the Draft Plan should be rejected and the project should cease or be suspended until the public entities fully comply with the requirements of the CRA Act.

### 2. The Draft Plan Must Be Rejected Because the Analysis Of Relocation Needs Of Arroyo Vista Residents Does Not Comply With 25 C.C.R. §§6038(b)(3) and 6048.

The Draft Plan does not adequately analyze the relocation needs of all residents and previously displaced persons. A relocation assistance plan must include a written analysis, pursuant to 25 C.C.R. §6048, of the aggregate relocation needs of *all* persons to be displaced, *and* a detailed explanation as to how these needs are to be met. 25 C.C.R. §6038(b)(3).

**a. The Draft Plan does not identify or analyze the needs of all displaced persons.** The Draft Plan partially reports the needs of the 147 households that either occupied Arroyo Vista at the time the survey was initiated (September 2007), or that had already been displaced by the public entities. Draft Plan at 11-15, 52. Former residents of three vacant units were not considered at all in the survey of needs. *Id.* at 12.[2] The Draft Plan also does not consider the relocation needs of any persons that moved from Arroyo Vista after July 24, 2006 when the public entities initiated negotiations with the private developers. State law requires the public entities to conduct a survey and analysis of housing needs "immediately following the initiation of negotiations". 25 C.C.R. §6048(a). Any households that moved from Arroyo Vista after that date are "displaced persons" within the meaning of the CRA Act, and their relocation needs should have been addressed in the Draft Plan. Govt. C. §7260(c); 25 C.C.R. §6008(f). By deferring a survey and analysis of the housing needs of Arroyo Vista residents for more than 14 months, the public entities unlawfully excluded these displaced persons from the survey and the Draft Plan. This prevents the legislative body from determining whether adequate housing resources are available to assist *all* displaced persons, and impedes its ability to determine the impact on the housing stock of the community. The CRA Act

---

[1] Although the Draft Plan indicates that 45 households have been relocated to date, counsel for the public entities represented to the Court in February 2008 that approximately 50 households have been moved from Arroyo Vista. *See* Defendants' Opposition to Motion for Preliminary Injunction in *Arroyo Vista Tenants Association, et al. v. City of Dublin, et al.*, U.S. District Court, Case No. C-07-05794-MHP filed February 11, 2008 at p. 2 (Exhibit 1 hereto).

[2] In its application for disposition, DHA reported to HUD that there were two vacant units at Arroyo Vista at the time it prepared a relocation budget; thus, the budget provided for relocation costs for 148 households. *See* Application for Disposition at §7, Line 7. Failure to include a household that resided at Arroyo Vista when the application was submitted to HUD should be explained in the Draft Plan.

requires the public entities to locate and survey these displaced persons and explain how their needs will be met in a relocation plan. 25 C.C.R. §6050. The public entities also must provide all relocation assistance and benefits for which these displaced persons qualify and compensate them for costs incurred as a result of the public entities' failure to comply with the CRA Act. *Id.* Accordingly, the project must cease or be suspended until these households are located and surveyed, and the Draft Plan is amended to account for their housing needs. *See* 25 C.C.R. §6016.

      **b.** **The public entities failed to survey the relocation needs of the 147 residents addressed in the Draft Plan.** The relocation needs analysis must be based on an interview of *all* eligible persons to obtain *specific* information upon which to plan to meet their housing needs, as well as counseling and assistance needs. 25 C.C.R. §6048(c). OPC reports that it had direct contact with only 118 Arroyo Vista households. Though it claims that its failure to interview all households is the fault of residents (Draft Plan at 12), its own survey letter reflects that it was sent only to residents who then resided at Arroyo Vista and that 33 households had already moved by then. *See* Exhibit 2 hereto. Thus, again, the public entities' delay in surveying the residents resulted in an incomplete survey.

      **c.** **The public entities failed to obtain all information necessary to evaluate the residents' relocation needs.** The survey of even the 118 residents that were purportedly interviewed failed to obtain all information necessary to fully analyze and address their housing needs. 25 C.C.R. §6048(c).[3] A relocation plan must include a description of the locational characteristics of the displacement area neighborhood that corresponds to the requirements of comparable replacement housing. 25 C.C.R. §6048(d). Among other requirements, a comparable replacement unit must be located in an area that is not generally less desirable than the "displacement" dwelling with respect to public utilities, public and commercial facilities and neighborhood conditions, including schools and municipal services, and reasonably accessible to the displaced persons' place of employment. 25 C.C.R. §6008(c)(2). Thus, information must be provided in the relocation plan concerning Arroyo Vista's proximity to residents' present employment sources, medical and recreational facilities, parks, community centers, shopping, transportation and schools. 25 C.C.R. §6048(d). Likewise, if the displaced person wishes, every reasonable effort shall be made to relocate such person within or near her existing neighborhood, and whenever practicable, reasonably close to the displaced persons' relatives, friends, services, or organizations with whom there is an existing dependency relationship. 25 C.C.R. §6008(c)(2). *Id.* In addition, the displaced person's preferences for ownership or rental relocation units must be surveyed and analyzed. 25 C.C.R. §6048(c).

The Draft Plan acknowledges that all relocation will be accomplished off-site, and states that residents were "queried" as to their housing preferences and locational needs. Draft Plan at 14. However, the interview form did not even seek information as to the location of residents' jobs, factors limiting accessibility, the area of residents' preferred relocation, ownership or tenant

---

[3] A resident survey must obtain the following information: household income, whether the person is elderly or has disabilities, family size, age of children, location of job and factors limiting accessibility, area of preferred relocation, type of unit preferred, ownership or tenant preference, need for social and public services, special schools and other services, eligibility for publicly assisted housing, and with reference to the present dwelling, the rent, type and quality of construction of the displacement unit, the number of rooms and bedrooms, amount of habitable living space, and locational factors including, among others, public utilities, public and commercial facilities (including transportation and schools), neighborhood conditions (including municipal services), and other matters that concern a household faced with displacement. 25 C.C.R. §6048(c).

preference, residents' need for social and public services and facilities, including schools, special schools and other services, or neighborhood conditions. *See* Draft Plan at 55. Moreover, the Draft Plan contains no description of the locational characteristics of Arroyo Vista. Thus, a summary conclusion that approximately 15% of residents expressed a desire to move from Dublin, "many" requested to remain in the "tri-city" area, and "some" expressed a desire to remain in Dublin is not supported by the interview form, a description of locational characteristics and resident preferences for relocation, or a detailed explanation of how those needs will be met. Indeed, though the Draft Plan acknowledges that 159 school-age children reside at Arroyo Vista, there is not even a description of their proximity to schools, parks, and recreational facilities or their desire to remain at those schools. Such information, like residents' needs to remain in close proximity to their jobs, other family members, medical providers, child care providers, and the like is "essential to ensuring that no residents are incapacitated by the relocation." *Id. See, e.g.,* Declarations of Andres Arroyo, Darlene Brown, Shawn Costello, Carolyn Evans, Rhenae Keyes, Shirley Sanders, and Elise Veal attached as Exhibit 3 hereto.

   **d. The Draft Plan does not include "a detailed explanation" as to how even the reported needs will be met.** The Draft Plan reports the total number of occupants to be displaced (not counting those displaced between July 2006 and September 2007), the income "categories" within which 147 households purportedly fall, number of children, total number of school-age children, number of persons with disabilities, number of elderly persons, "average" occupancy per unit, special language needs, the number of "current" units by bedroom size, and the purported number of units "required" by bedroom size. Without a "detailed explanation" of how these relocation needs will be met, the information reported is inadequate to determine what housing resources are available to meet the needs, the cost of relocating all displaced persons, or whether resources are available to pay for such costs. For example:

- The Draft Plan reports that 86 Arroyo Vista families fall within "HUD's" extremely low income category (i.e., that they have incomes between $17,600 for a household of one and $33,200 for a household of 8). *See* Draft Plan at 14, 53. However, DHA reported to HUD on September 30, 2007 that while 65% of Arroyo Vista residents fell within the extremely low income category, 44% of them have incomes of *less than $15,000* per year, and 25% of those families have incomes *below $10,000*. *See* Exhibit 4 hereto. Thus, nearly half of the families have incomes well below "extremely low." The Draft Plan reports that Section 8 vouchers from HACA will be provided to eligible residents to maintain appropriate affordability levels. Draft Plan at 14. Yet, even assuming that residents are able to secure Section 8 units that are affordable and available to them, families with minimal incomes can ill afford to pick up many of the other costs of relocating – costs that will not be covered according to the Draft Plan. For example, credit check fees are typically charged for every unit a resident applies for and typically range between $75 to $90 *per unit*. Likewise, California landlords are permitted and therefore typically charge up to two times the amount of the rent for unfurnished homes as a security deposit. Yet, the Draft Plan "caps" credit check fees at a one-time $75 cost, and security deposits at one month's rent. *See* Draft Plan at 22. Families with minimal resources will suffer significant hardship if forced to incur these "uncovered" relocation costs, and some will simply be unable to relocate if they have to do so at their own expense. Therefore, even if HUD approves the application for disposition of Arroyo Vista, disposition cannot proceed and demolition cannot occur before all residents have relocated to a comparable replacement

March 14, 2008

home.

- The Draft Plan reports that 17 households have physical or mental disabilities "to some degree". Draft Plan at 13. A relocation plan must be more specific in identifying the housing needs of persons with disabilities. It must identify the number of households requiring special facilities and the nature of such facilities. 25 C.C.R. §6048(d). Nonetheless, the Draft Plan does not identify the number of persons and households that reside in and require an accessible home or other special facilities; does not analyze the housing barriers these residents face; and fails to provide a "detailed explanation" as to how persons with disabilities will be assisted in securing accessible homes. Rather, the Draft Plan merely provides that "members of households with disabilities will receive special consideration for accessibility, *if necessary*, and *perhaps* proximity to particular medical facilities."[4] Draft Plan at 15. The Plan must describe the nature of facilities required by persons with disabilities and a detailed explanation of how those needs will be met.[5] At least one Arroyo Vista resident already displaced was denied *any* 'special consideration' in meeting her accessibility needs. As a result, she now resides in a non-accessible unit and is confined much of the time to her second floor bedroom because she cannot get down the stairs in a wheelchair. *See* Declaration and Supplemental Declaration of Gretta Evans in Support of Plaintiffs' Motion for Preliminary Injunction attached hereto as Exhibit 5. The request of another resident for a reasonable accommodation of her need for 3-bedrooms based on disability was ignored. *See* Declarations of Rhenae Keyes in Support of Plaintiffs' Motion for Preliminary Injunction attached hereto as Exhibit 3. In the absence of a careful analysis of the special housing needs of persons with disabilities, and a detailed explanation in the relocation plan of how those needs will be met, the legislative body cannot in good faith determine that fair, equitable and uniform relocation policies that do not discriminate against persons with disabilities are in place and will be followed.

- The Draft Plan reports that 22 Arroyo Vista households reside in 4-bedroom units, 29 reside in 3-bedroom units, family sizes at Arroyo Vista range from 1 to 8 persons per household, and that household size is known for all displacee households. Draft Plan at 12. It further reports that some families are "potentially" over-housed, and that "[a]ny anomalies will be addressed during the relocation process." *Id*. Such "anomalies" must be identified and analyzed in the relocation plan. Instead, the Draft Plan unilaterally reduces the need for 4-bedroom units from 22 to *one* and the need for 3-bedroom units from 29 to 26. Draft Plan at 52. Thus, it calls for 24 families to be down-sized – from 3 and 4-bedroom units to mostly *one*-bedroom units based on an unsupported speculation that "some" families "may" be over-housed. Without an

---

[4] As discussed above, the Draft Plan does not even contain a description of the proximity of Arroyo Vista to medical facilities.

[5] For example, how many residents require fully accessible homes? How many residents with physical and/or mental disabilities require additional bedrooms for in-home care providers and/or disability-related equipment? What relocation services and assistance will be provided to reasonably accommodate these special needs? Will the public entities pay for installation of accessibility features? Will the public entities ensure that prospective Section 8 landlords accept families with disabilities and permit modification to make units accessible as required by state and federal fair housing laws? Under what circumstances will residents with disabilities be relocated according to their preferences and within close proximity to their medical providers, public transportation, and other necessary services?

March 14, 2008

accurate analysis of family size by unit size and an analysis of whether families that "may" be over-housed qualify for "special consideration" or a "reasonable accommodation," the legislative body cannot determine that the number and size of units required to relocate all residents is accurate.

• The Draft Plan reports that the first language of some Arroyo Vista residents is Spanish, Farsi, Punjabi, Chinese and Tagalog, and that relocation information and assistance will be provided in the primary language of these residents "as necessary" to insure that all displacees have a complete understanding of the relocation program and their eligibility for benefits. Draft Plan at 15. Yet, the plan offers no detailed explanation as to how this assistance will be provided. C.C.R. §6046(b) provides that all informational material should be provided in the native language(s) and English. Yet, the Draft Plan and DHA's letter dated February 12, 2008 to some residents stating that the plan was available for review at particular locations are exclusively in English, and provide *no* information to residents with language barriers as to the availability of a Draft Plan or a notice in their native language.

For these reasons, the Draft Plan must be rejected and the project must cease or be suspended until a complete survey of the housing needs of all "displaced persons" is conducted, and the Draft Plan is amended to include the results of that survey and a "detailed explanation" as to how those needs will be met.

### 3. The Draft Plan Must Be Rejected Because the Analysis Of Housing Resources Does Not Comply With 25 C.C.R. §§ 6038(b)(4) and 6052.

A relocation plan must include a written analysis of relocation housing resources that complies with 25 C.C.R. §6052. 25 C.C.R. §6038(b)(4). Like the analysis of residents' relocation needs, the analysis of relocation housing resources must be sufficiently detailed to determine that the requisite comparable replacement housing will be available for all potential displacees. 25 C.C.R. § 6052. The analysis of relocation housing resources (Draft Plan at 15-16, 52) is wholly inadequate to determine that comparable replacement homes are or will be available for all potential displacees.

**a. The analysis of relocation housing resources fails to address the housing needs of *all potential* displaced persons.** As discussed above, the public entities failed to survey *or* analyze the housing needs of families that moved from Arroyo Vista after July 2006. Likewise, because it neglected to identify or analyze all of the housing needs of the 147 households reported in the Draft Plan, its summary conclusion that sufficient comparable replacement homes are available to meet the relocation needs of all displaced persons is not supported. The analysis of relocation housing resources fails to comply with 25 C.C.R. §§ 6048(b) and 6052 on this ground alone. This significant defect cannot be corrected until the survey is updated to obtain and analyze all information from the missing households and to identify and analyze all relocation needs of all persons that have or will be displaced.

**b. There is no indication in the Draft Plan that the November 2007 "survey" of available comparable relocation resources was submitted to or reviewed by other local housing, development and planning agencies.** When, as here, more than 15 households will be displaced, the housing resource survey results must be submitted for review to local housing, development and

planning agencies and compared to other existing information on housing availability. 25 C.C.R. §6052(a)(2). The survey areas reportedly included the Tri-City area (Dublin, Pleasanton, and Livermore); Hayward, Castro Valley, San Leandro, Fremont, and Oakland (Alameda County); Concord, Richmond and San Pablo (Contra Costa County); and Stockton (San Joaquin County).[6] There is no indication in the Draft Plan that the survey results – identifying 32 "available" homes in the Tri-Valley area, 224 in Alameda, Contra Costa, and San Joaquin Counties, and 458 in Oakland were submitted or reviewed by the local housing, development and planning agencies of those communities or compared to existing information as to housing availability in those communities. *See* Draft Plan at 15-16, 52. The Draft Plan cannot be approved absent a review by those communities and a comparison of existing data as to the purported availability of housing in other communities to absorb Dublin's displacement of over 400 persons.

     c. **The analysis of relocation housing resources does not analyze the availability of housing for all potential displacees that meets the "comparable replacement housing" standards set forth in 25 C.C.R. §6008.** As acknowledged in the Draft Plan, comparable replacement housing must be decent, safe and sanitary; comparable in terms of size, living space, and type and quality of construction; in an area that does not have unreasonable environmental conditions; in a location that is not less desirable than the "displacement" units with respect to schools, employment, health and medical facilities, and other public and commercial facilities and services; and within the financial means of the displaced households (affordable rent and utilities not to exceed 30% of the household incomes). *See* Draft Plan at 17; 25 C.C.R. §6008(c). In addition, every reasonable effort must be made to relocate residents in their existing neighborhoods and reasonably close to relatives, friends, services or organizations with whom there is an existing dependency relationship; the comparable units must be available on the private market and available to families without regard to race, color, sex, marital status, religion national origin and other protected categories consistent with state and federal anti-discrimination laws; and to the extent practicable, the units must be functionally equivalent and substantially the same as the "displacement" units. 25 C.C.R. §6008(c). Replacement units that do not satisfy the standards of comparable replacement housing, including the locational criteria, cannot be counted as a relocation resource. 25 C.C.R. §6052(d).

     The relocation plan also must separately include information concerning available homeownership and rental units; the number of units available by cost for each required unit size must be identified; resources available to meet the housing needs of seniors and persons with disabilities must be separately identified, including information on the number of units with special facilities and the nature of those facilities. 25 C.C.R. §6052(c). Likewise, the analysis of available housing resources must include a description of the locational characteristics of each of the survey area neighborhoods that corresponds to the comparable replacement housing requirements of 25 C.C.R. §6008(c). Further, publicly-assisted housing cannot be counted as replacement housing unless it is

---

[6] Attachment 2 to the Draft Plan is misleading in that it reports that 224 comparable units are purportedly available in Alameda County. *See* Draft Plan at 52. However, an unidentified number of these units are located in Contra Costa and San Joaquin Counties. *See* Draft Plan at 15. In addition, although only five households are reported as "ineligible" for Section 8 assistance, 99 of these 224 units are *not* Section 8 units (*see* Draft Plan at 52), and cannot reasonably be counted as available to the 142+ households that require Section 8 assistance to secure affordable replacement units. Likewise, 27 units purportedly available in the Tri-Valley region are not available to persons with Section 8 vouchers, and therefore, cannot be counted as "comparable replacement units" for families in need of Section 8 assistance. *Id.*

March 14, 2008

reasonably established that the units will be available when needed, they have been inspected to determine whether they are decent, safe, and sanitary; and the income ceilings, rent ranges, and age restrictions, if any, have been considered.

The Draft Plan purports to identify 32 available units in the Tri-Valley area; 224 units in Alameda, Contra Costa, and San Joaquin Counties; and 458 units in Oakland.   None of these units can be counted as available comparable replacement units for failure to meet the requirements of 25 C.C.R. §6008(c) and 6052:

- There is no indication in the Draft Plan that any of the units were inspected to ensure that they are decent, safe, and sanitary.  Given the public entities' determination that the homes in Arroyo Vista are unsuitable for rehabilitation, and that it is in the best interest of Arroyo Vista residents to relocate them, it also is unreasonable to identify other units as comparable replacement housing without *any* consideration as to the condition of those homes.

- The table of "available units" (Draft Plan at 52) breaks the units down by bedroom-size, but there is no analysis of the living space size or the type and quality of construction.  Likewise, there is no indication that the units are of the same type as Arroyo Vista – single-family homes as opposed to apartments -- or any analysis of the quality of construction.

- There is no analysis of the neighborhood areas included in the survey with respect to environmental conditions, locational characteristics, resident preferences, or residents' needs to remain close to families, friends, and others with whom they have a dependency relationship.  Likewise, without an analysis of the locational characteristics of Arroyo Vista, resident preferences, and other resident needs against which to analyze and compare the characteristics of the survey areas, it cannot be determined that the survey areas are reasonably comparable to the displacement area.  For example, an analysis of just the schools in Dublin compared to schools in Oakland and San Leandro indicates that it is unreasonable to assume that "replacement units" located in Oakland and San Leandro are comparable to Arroyo Vista units.  The academic performance index for Dublin schools (832 as of August 2007) exceeds performance standards and are considered to be "high performing," while Oakland and San Leandro school districts continue to fall well below state performance standards (658 and 696 API's respectively).[7]

- The only analysis with respect to "affordability" is that most residents will be relocated with the use of Section 8 vouchers.  However, the 588 "Section 8" replacement units cannot be counted because there is no analysis as to whether they will be "available" when needed, or that they are decent, safe, and sanitary.  In addition, the income ceilings and rent ranges of units located outside of HACA's jurisdiction have not been analyzed to determine affordability.   Of the "survey" areas, HACA's income ceilings and rent ranges are only applicable in the communities it serves – Castro Valley, Dublin, Fremont, Hayward, Pleasanton, and San Leandro.  Without an analysis of the income ceilings and rent ranges by bedroom size applicable to units located in Livermore, Concord, Richmond, San Pablo, Stockton, and Oakland, none of the residents can  be assumed to be eligible for Section 8

---

[7] Schools with API's below 800 fall below state performance standards.  *See* Exhibit 6 hereto.

March 14, 2008

assistance in those communities or, if eligible, that the units will be affordable to them. *See, e.g.*, Declarations of Elise Veal (Ex. 3) and Gretta Evans (Ex. 5). If residents are not eligible for Section 8 assistance in other communities, they may nonetheless be eligible to receive a replacement housing payment for not less than 42 months to pay the difference between their rent at Arroyo Vista and increased rent at a replacement unit. For example, Gretta Evans who was determined to be ineligible for Section 8 assistance in Stanislaus County should have been provided a replacement housing payment of over $10,000. *See* Declaration of Gretta Evans (Ex. 5). Thus, without a complete analysis of the affordability levels of replacement units, the Draft Plan's estimated cost of relocating over 400 Arroyo Vista residents is entirely unreliable, and does not enable the legislative body to determine that sufficient resources are or will be available to meet those costs.

- There is no analysis or detailed explanation that any of the replacement units will be available to Arroyo Vista residents without regard to race, color, sex, marital status, religion, national origin, disability, familial status, and other protected categories consistent with state and federal anti-discrimination laws, or any explanation as to how the public entities will ensure that such discrimination does not occur. This is of significant concern given the demographics of Arroyo Vista residents (52% Caucasian, 28% African American, 21% Hispanic or Latino, 15% Asian, 4% Native Hawaiian or Pacific Islander, and 1% American Indian or Alaska Native; 63% are families with children; and 31% of families include members with disabilities). It also is of particular concern since some residents have already experienced discrimination in their search for replacement housing, but received no assistance from the public entities or its agents in addressing those problems. *See* Declarations of Elise Veal (Ex. 3) and Gretta Evans (Ex. 5). Indeed, the Draft Plan itself is indicative of the discrimination faced by persons with disabilities given that the public entities made no effort to identify resident needs for accessible units or to identify *any* replacement units that are accessible to persons with disabilities.

- The survey of replacement units does not indicate whether any of the purportedly available units are homeownership, although the survey must identify homeownership units for those residents that elect to purchase rather than rent, and some residents have been given referrals for homeownership counseling.

- Although the housing needs analysis identifies 18 senior Arroyo Vista residents, Attachment 2 identifies only 5 purportedly available units for seniors indicating that there is a deficit of units available to accommodate seniors that desire to reside in senior-restricted housing and/or that desire to relocate outside the Tri-Valley area.

- *No* replacement units are identified as available to meet the housing needs of persons with disabilities, and no information is provided as to the number of units with special facilities or the nature of those facilities.

In the absence of a complete survey and an analysis of the identified housing resources that complies with 25 C.C.R. §§6008(c) and 6052, the Draft Plan does not demonstrate that sufficient housing resources exist to ensure a comparable replacement home for all Arroyo Vista residents and those that have already been displaced. It also cannot accurately estimate the cost of relocating the

residents or whether funds are available to meet those costs in the absence of such information. Accordingly, the Draft Plan cannot be approved.

### 4. The Draft Plan Must Be Rejected Because It Does Not Include A Plan to Provide Last Resort Housing as Required by 25 C.C.R. §§6038(b)(8), 6054 and Article 4 of HCD's Guidelines.

When a relocation plan does not demonstrate that "comparable replacement housing" units are or will be available for all potential displacees, the relocation plan must include a detailed plan by which the public entities will provide last resort housing. 25 C.C.R. §6038(b)(8). Because the survey and analysis of relocation needs and resources are incomplete, the public entities cannot determine that comparable replacement housing is or will be available as required. *See* 25 C.C.R. §6054(b). Therefore, the Draft Plan must be rejected, and the public entities cannot proceed with any phase of the project unless they provide last resort housing, including the preparation of a "last resort" replacement housing plan and otherwise comply with Article 4 of HCD's Guidelines. *Id.*; *see also* 25 C.C.R. §§6124 and Article 4 of HCD's Guidelines, 25 C.C.R. §6120 *et seq.*

### 5. The Draft Plan Must be Amended to Discount The Number of "Available" Units Due to Concurrent Displacement.

In its analysis of available housing resources, the public entity must discount the gross figure representing the number of units purportedly available to reflect concurrent displacement. 25 C.C.R. §6052(d)(3). Displacement by other public entities must be taken into account. *Id.* The Draft Plan acknowledges that the Oakland Housing Authority is concurrently displacing 87 households to demolish Tassafaronga Village, a public housing development. Draft Plan at 16. Moreover, the Tassafaronga relocation plan and the Draft Plan (both prepared by OPC) identify 458 purportedly available Section 8 units in Oakland. *Compare* Tassafaronga relocation plan, Attachment 2 with Draft Plan at 52.[8] Ignoring that nearly identical inventories of "available Section 8 units" were identified in both plans, the Draft Plan disingenuously concludes that the concurrent displacement of Tassafaronga residents will not negatively impact relocation of Arroyo Vista residents and vice versa due to the distance between the displacement locations, and the "longer timetable" for displacing Arroyo Vista residents. Draft Plan at 52; Ex. 7 at 14. Arroyo Vista residents are being urged to move now, just as Tassafaronga residents are being displaced; indeed, nearly 50 Arroyo Vista households have been already been displaced. Second, if the "distance" between the two locations means that Oakland residents are not anticipated to relocate to communities outside of Oakland, and Arroyo Vista residents are not likely to relocate to Oakland, then the identified "housing resources" are a sham; 125 should be omitted from the Tassafaronga plan and 458 from the Draft Plan. At a minimum, the Guidelines require that 87 "replacement" units (the number of Tassafaronga displaced households) must be deducted from the Draft Plan.

### 6. The Draft Plan Must be Rejected For Lack of An Adequate Relocation Assistance

---

[8] The Tassafaronga relocation plan is attached hereto as Exhibit 7. In the Tassafaronga relocation plan, as in the Draft Plan for Arroyo Vista, OPC also identified nearly identical "Section 8 replacement units" in Dublin, Pleasanton, Livermore, Hayward, Castro Valley, San Leandro, Fremont, Concord, Richmond, San Pablo, and Stockton (125 units for the Tassafaronga plan and 126 for the Arroyo Vista Draft Plan). *Compare* Ex. 7 at page 13 and Attachment 2 with Draft Plan at 52.

### Advisory Program as Required by Article 2 of HCD's Guidelines.

Public entities must develop and implement a relocation assistance advisory program for the provision of specified services that satisfies Article 2 of HCD's Guidelines and applicable state and federal anti-discrimination laws. 25 C.C.R. §§6030, 6032. The program must be administered so as to provide advisory services which offer "maximum assistance to minimize the hardship of displacement" and ensure that all persons displaced from their homes are relocated into housing that meets the criteria for comparable replacement housing. 25 C.C.R. §6032.

Each advisory program must include measures, facilities and services as are necessary to, among other things, (1) fully inform eligible persons as to the availability of relocation benefits and assistance, the eligibility requirements therefore, the procedures for obtaining benefits and assistance in accordance with the requirements of 25 C.C.R. §6046;[9] (2) determine the extent of the need of each eligible person for relocation assistance in accordance with the requirements of §6048; (3) assure eligible persons that there will be available comparable replacement housing that meets the criteria of 25 C.C.R. §6008(c) and sufficient in number and kind and *available to* such eligible persons; (4) provide current and continuing information on the availability, prices and rents of comparable sales and rental housing, security deposits, closing costs, typical down payments, interest rates, and terms for residential property in the area; (5) assist each eligible person to complete applications for payments and benefits; (6) assist each eligible person *to obtain* and move to a comparable replacement dwelling; (7) provide *any services required* to insure that the relocation process does not result in different or separate treatment on any basis protected by state or federal anti-discrimination laws or any other arbitrary circumstances, (8) supply information to eligible persons concerning federal and state programs offering assistance to displaced persons; and (9) provide other advisory assistance to eligible persons in order to minimize hardship; (10) inform all persons subject to displacement of the public entities' policies with regard to eviction; and (11) establish and maintain a formal grievance procedure for use by displaced persons seeking review of the public entities' decisions with respect to relocation assistance. 25 C.C.R. §6040.

The Draft Plan states that technical and advisory assistance will be provided to displaced households through distribution of an Informational Statement (Attachment 5) and other activities that parallel the list of measures, facilities and services set forth in the preceding paragraph and 25 C.C.R. §6040. See Draft Plan at 18-19. The informational statement and implementation of its "advisory program" to date, however, have been seriously deficient to provide the requisite technical assistance and advisory assistance. For example:

- Contrary to assurances in the Draft Plan that the public entities will fully inform eligible persons as to the availability of relocation benefits and assistance, the eligibility requirements therefore, and the procedures for obtaining benefits and assistance (Item #1 above) and will assist each resident to obtain comparable replacement housing (Item #6 above), the Informational Statement provides that the only assistance to be provided residents in obtaining a comparable replacement unit will be referrals to "appropriate and available"

---

[9] Any person who occupies property from which she will be displaced, any person who moves from real property as a result of acquisition by a public entity whether the move is voluntary or involuntary, and any person who moves as a result of inducement or encouragement by a public entity is eligible for relocation assistance and benefits. *See* 25 C.C.R. §6034.

March 14, 2008

housing units, and residents are encouraged to actively seek such housing themselves.[10]

- Similarly, with respect to Item #1 above, the Informational Statement misinforms residents as to the availability of moving expenses, stating that "if [residents] move as a result of displacement by the Displacing Agency," they will receive a payment to assist in moving their personal property. Yet, any Arroyo Vista residents that have moved from the property since April 2006 are displaced persons within the meaning of the CRA Act and are eligible for relocation assistance and benefits. *See* Section A.1 above, and fn. 7.

- The informational statement also is incomplete because it does not summarize all relocation benefits provided for according to the Draft Plan. Specifically, it does not inform residents that they are eligible to receive credit check and security deposit costs. *See* Draft Plan at 22.

- While the Draft Plan assures at page 15 that relocation information and assistance will be provided in Spanish, Farsi, Punjabi, Chinese and Tagalog to insure that all displacees have a complete understanding of the relocation program and their eligibility for benefits (*see* Item #1 above), the Informational Statement is in English, with the exception of one line in Spanish that "Spanish speaking representatives are available" -- albeit without specifying where they are available and for what purpose. As with the Draft Plan and notice of its availability for review, no information is provided in any other languages.

- The Informational Statement also misinforms residents that if they are evicted, they will jeopardize the relocation benefits they may be entitled to receive. (*See* Item #10 above.) This conflicts with 25 C.C.R. §6058 which expressly provides that "[e]viction is permissible only as a last resort [and] in no way affects the eligibility of evicted displaced persons for relocation payments." It also contradicts the eviction policy set forth in the Draft Plan at page 31.

- The Informational Statement and "eviction policy" of the Draft Plan at page 32 also provide for "eviction for refusal to accept one of a 'reasonable number' of offers of replacement dwellings. This information is misleading because it does not explain that eviction is not permitted unless a displaced person refuses – *without justification* – reasonable choices of specifically identified comparable replacement units which fully satisfy the comparable replacement criteria set forth in the Guidelines. Likewise, the reasonable offers (at least three) must be in writing in a language understood by the displaced person. *See* 25 C.C.R. §6042.

- The Draft Plan provides that the public entities will determine the extent of the need of each eligible person for relocation assistance in accordance with the requirements of §6048 (see Item #2 above) and assure eligible persons that there will be available comparable replacement housing that meets the criteria of 25 C.C.R. §6008(c) and that is sufficient in number and kind and *available to* such eligible persons (see Item #3 above). Yet, as discussed above, the woefully inadequate surveys and analyses of needs and available

---

[10]Moreover, as indicated in the Declarations of Elise Veal and Gretta Evans (Exs. 3 and 5), the 'referral lists' provided to residents to date have not been current, and many of the units listed have not been comparable or available. (*See* Item #4 above.)

housing resources belie that the public entities have or will provide requisite advisory services with respect to the residents' relocation needs and the availability of comparable replacement housing to meet those needs.

- The Draft Plan provides at page 18 that the public entities will assist each eligible person to complete applications for payments and benefits (*see* Item #5 above), and the informational statement provides that relocation claims must be filed within 18 months from the date of a move. However, no claim form is included in the Draft Plan. Moreover, as a condition of receiving Section 8 assistance, rather than assisting residents in completing "claim forms," residents have been required to complete notices of an intent to vacate their homes. *See* Declarations of Joyce McQuarters, Shirley Sanders and Rhenae Keyes (Ex. 3), Others have been deprived of relocation benefits after being coerced to purportedly "assign" their rights to relocation assistance to others. *See also* Declarations of Gretta Evans and Declaration of Shirley Portley (Ex. 5). Residents that have received pre-completed claim forms for "moving expenses" have been deprived of those moving expenses. *See* Declarations of Gretta Evans (Ex. 5) and Elise Veal (Ex. 3).

- The Draft Plan assures at pages 17 and 19 (see Item #7 above) that services will be provided to ensure that displacement does not result in any arbitrary or unlawful discrimination in violation of state and federal anti-discrimination laws, and that the public entities will provide any services required to insure that the relocation process does not result in different or separate treatment on any basis protected by state or federal anti-discrimination laws or any other arbitrary circumstances. Yet, as discussed above, the analyses of needs and housing resources in the Draft Plan are indicative that the public entities have failed to take any "anti-discrimination" measures. They failed to analyze the housing needs of persons with disabilities and families with children, arbitrarily reduced required unit sizes for large families on the presumption that some families are "over-housed," and failed to identify *any* replacement units that are accessible to persons with disabilities. Moreover, in relocating those residents that have already moved or attempted to move, the public entities failed to assist residents in need of accessible units or a reasonable accommodation, and have taken no steps to assist residents that have faced discrimination in their searches for replacement homes. *See* Declarations of Gretta Evans (Ex. 5), Rhenae Keyes and Elise Veal (Ex. 3).

- While the Draft Plan assures that the public entities will supply information to eligible persons concerning federal and state programs (Item #8 above), *no* information is included in the informational statement or the Draft Plan with regard to the income ceilings and rent ranges of Section 8 units located outside of HACA's jurisdiction even though the primary relocation benefit to be provided most residents is Section 8. The lack of such information has and will result in residents being ineligible for Section 8 assistance which will likely result in an increased cost for replacement housing payments.

- The Draft Plan does not provide that the public entities will provide advisory assistance to eligible persons in order to minimize hardship as required by 25 C.C.R. §6040. *See* Draft Plan at 18-19. This advisory service is one of the minimum requirements of an advisory program and must be included in the Plan and implemented.

March 14, 2008

- The Draft Plan provides that the public entities will establish and maintain a formal grievance procedure for use by displaced persons seeking review of the public entities' decisions with respect to relocation assistance, and will follow the standards and requirements of Article 5 of HCD's Guidelines (25 C.C.R. §6150 *et seq.*). Draft Plan at 19, 30-31. However, Attachments 10 and 11 to the Draft Plan do *not* follow the standards or requirements of Article 5. Attachment 10 is HACA's grievance procedure for resolution of disputes between it and conventional public housing tenants involving a tenant's lease or HACA's regulations. Attachment 11 is HACA's "informal hearing" process for resolution of specific disputes involving tenant participation in the Section 8 program. Neither procedure involves resolution of disputes regarding relocation assistance and benefits and cannot be substituted for the requirements of Article 5. A City, by ordinance, may designate a relocation appeals board established pursuant to Health and Safety Code §33417.5 to hear relocation appeals from local public entities that do not have an appeal process. In the absence of such an ordinance, however, public entities must establish procedures to implement the provisions of Article 5. 25 C.C.R. §6152 *Id.* The Draft Plan must be amended to include a grievance procedure that fully complies with Article 5.

### 7. The Draft Plan Must Be Rejected Because the Public Entities Failed To Comply With The Public Participation Requirements of The CRA Act.

HCD's Guidelines provide that when a substantial number of persons will be displaced from their homes, the public entity shall encourage the residents to be displaced to participate in a relocation committee. The committee shall include residential tenants to be displaced, business people, and members of existing organizations within the area. 25 C.C.R. §6012. Over 400 residents of Arroyo Vista are threatened with displacement and nearly 50 households have already been displaced. As indicated in the Draft Plan, however, residents were not encouraged to form or participate in any relocation committee. *See also* Arroyo Vista Resident Comment Letters submitted with these comments.

Section 6012 further requires the displacing entities to guarantee "timely and full access to all documents relevant to the relocation program," to provide "technical assistance necessary to interpret elements of the relocation plan and other pertinent materials," and the right to submit written or oral comments and objections to the relocation plan and to have those comments attached to the plan when it is forwarded to the local legislative body for approval. *Id.* Although the displacing entities began relocating residents in July 2007, a Draft Plan was not made available for resident review and comment until February 2008, after nearly 50 households had already been relocated. Moreover, a letter dated February 12, 2008, announcing that a Draft Plan was available for review, while received by some residents was never received by others. *See* Resident Comment Letters submitted herewith. Likewise, despite the hardship to lower income tenants, most of whom do not have computers and cannot afford copying costs, the Draft Plan was not included with the letter. Instead, residents were instructed to review it on-line or during regular business hours (when many of them work) at particular locations in Hayward and Dublin. Copies of a relocation plan must be made available to the public upon request. 25 C.C.R. §6038(e)(1). At least one resident's request to review the Draft Plan at the Arroyo Vista property management office was denied, and she was not provided with a copy. *See* Comment Letter from Resident Sherlita McQuarters. There also is no indication in the February

Page 16                                                                                    March 14, 2008

12, 2008 letter that either the letter or the Draft Plan were made available in other languages to residents with language barriers.

Because the public entities failed to comply with the public participation requirements of Section 6012, not all residents were provided a meaningful opportunity to review and comment on the Draft Plan. Accordingly, the Draft Plan should be rejected. When the Draft Plan is amended to fully comply with the CRA Act, we request notice of its availability, and that the revised Plan be distributed by hand-delivery or first class mail to each Arroyo Vista resident and all persons previously displaced for an additional 30-day review period. See 25 C.C.R. §6046(c).

Finally, the February 12, 2008 letter does not specify the time or place of the April 15, 2008 hearing at which the Draft Plan will be presented to the DHA Commission. Accordingly, we request written notice of the time and place of the hearing. The hearing notice also must be provided to all residents and previously displaced residents of Arroyo Vista.

### 8. The Proposed Relocation Benefits and Payments Should Be Amended To Comply with the CRA Act and to Minimize the Hardship of Displacement to Arroyo Vista's Lower Income Residents.

The Draft Plan provides that the public entities are required to comply with the CRA Act and Guidelines and federal regulations governing the disposition of public housing projects (24 CFR 970), but the Uniform Relocation Assistance Act does not apply to the disposition of Arroyo Vista. See Draft Plan at 8. However, in its analysis of relocation benefit categories, the Draft Plan states that relocation benefits will be provided in accordance with the provisions of 42 U.S.C. §4601 (the Uniform Relocation Assistance Act), the CRA Act, and the Authority's own rules pertaining thereto. See Draft Plan at 22. Please clarify the inconsistency in the Draft Plan with respect to whether benefits will or will not be provided pursuant to the Uniform Relocation Assistance Act. Please also provide us with a copy of the "Authority's own rules" and "Authority-approved procedures" for submission of claim forms and documentation. To the extent that such rules and procedures reduce the level of benefits or conflict with the procedures required under state and federal law, we object on the grounds that they would be preempted by state and federal law. Moreover, as discussed in Sections B and C below, in addition to the CRA Act, the public entities must comply with the Housing Act (42 U.S.C. §1437p) and implementing regulations and the HCD Act (42 U.S.C. §5304(d)) and implementing regulations.

**a. The "part-time residents" category of the Draft Plan should be omitted from the Draft Plan.** Relying on 25 C.C.R. §6008(g), the Draft Plan provides that any residents of Arroyo Vista that have 'second homes' will be treated as "part-time" residents and deprived of any relocation benefits other than moving expenses pursuant to 25 C.C.R. §6090. Draft Plan at 22. In the absence of a complete needs analysis or any evidence in the Draft Plan that *any* Arroyo Vista residents have 'second homes,' we object to the reduction of benefits of any displaced person. The income and resource limitations imposed on public housing residents would preclude residents from having second homes, and the income and resources of all public housing residents are annually certified by the Housing Authority. Accordingly, in the absence of any analysis and documentation that Arroyo Vista resident(s) have 'second homes,' the "part-time" category of displaced persons should be omitted from the Draft Plan.

**b. Actual credit check fees and security deposits should be provided to all displaced persons.** The CRA Act requires public entities to pay for "actual moving and related expenses" of displaced persons as are reasonable and necessary. Govt. C. §7262(a). In its application for disposition of Arroyo Vista, DHA acknowledges that California landlords typically charge two-times the amount of the rent as a security deposit, and that it is typical for prospective landlords to charge for credit checks of prospective tenants. *See* Application for Disposition at §7, Line 7. Using a 2-bedroom unit at HUD FMRs of $1250/month rent, DHA further reported to HUD that it allocated $2500 per household for security deposits and $75 for credit checks. *Id.* Yet, it proposes in the Draft Plan to cap security deposits at *one-month's rent* based on HACA's maximum monthly rent standards for Alameda County and Dublin/Pleasanton.[11] Likewise, despite the fact that it also is typical for Section 8 tenants to have to apply for multiple units and pay multiple credit check fees (that often exceed $75) before a landlord accepts their voucher, a "one-time" credit check cost of $75 is unreasonable. A failure to pay for "actual credit check fees and security deposits" does not minimize the hardship of displacement, and particularly not for public housing residents with minimal income and resources to cover such costs. *See* Declarations of Darlyn Anderson (Ex. 3) and Gretta Evans (Ex. 5). As a practical matter, refusing to pay the actual cost of security deposits and credit check fees will impede the ability of residents to relocate in the event HUD approves the application for disposition and delay the project. *See* Section B below [federal law prohibits disposition and demolition from proceeding until all residents are relocated to comparable replacement housing]. For these reasons, we urge the Commission to require DHA to pay for the actual credit check fees and security deposits incurred by residents to secure a comparable replacement home.

**c. Advance Payment of Credit Checks, Security Deposits, and Moving Expenses.** We appreciate that requests for advance payments will be expeditiously processed to help avoid the loss of comparable replacement housing. However, a displacing entity also must provide advance payment of moving expenses whenever later payment would result in financial hardship for the resident, and particular consideration must be given for the financial limitations and difficulties experienced by low and moderate income persons. 25 C.C.R. §6090(c). In addition, the public entities have previously employed a policy of withholding one-half of residents' moving expenses until the unit is actually vacated. This policy conflicts with 25 C.C.R. §6090(c) and has caused considerable hardship for residents that have had to either advance moving costs themselves, incur debt in order to move, or cancel their move. *See* Declarations of Gretta Evans (Ex. 5) and Elise Veal (Ex. 3). Moreover, pursuant to state law, residents' security deposits must be reimbursed within 21 days of vacating the property. Accordingly, there is no reason to also withhold one-half of the moving expenses of lower income residents. The Draft Plan should be amended to provide that the public entities may not withhold any portion of moving expenses, and that once a resident removes their personal property and sweeps the unit clean, their full security deposit should be promptly reimbursed and in no event, not later than 21 days from the date the resident vacates the unit.

**d. Residential Moving Expenses.** The proposal in the Draft Plan at page 23 for payment of Moving Expenses for displaced persons conflicts with 25 C.C.R. §§6090 and 6098. Payment of actual reasonable moving expenses pursuant to §6090 or the receipt of a fixed moving expense and

---

[11] In addition, reducing the security deposits for remaining residents when the 50 households already displaced presumably received security deposits consistent with the application to HUD would result in relocation policies and procedures that are not fair, uniform and equitable.

dislocation allowance in accordance with the Federal Highway Administration schedules is at the option of the resident. 25 C.C.R. §6098. If a displaced persons elects to receive actual reasonable moving expenses, she is entitled to submit a claim (or request an advance) for all expenses itemized in 25 C.C.R. §6090(a), not just for packing, unpacking, insurance, and utility connection charges. They also are entitled to storage of personal property for a period not to exceed 12 months and the reasonable replacement value of property lost, stolen or damaged through no fault of the displaced person, her agent or employee in the process of moving if insurance covering such loss is not reasonably available. *Id.* In addition, transportation of persons and property can exceed 50 miles from the displacement site "where relocation beyond such distance of 50 miles is justified." 25 C.C.R. §6090(a)(1). The public entities have repeatedly informed residents that they may move anywhere within the United States that has a housing authority. *See, e.g.,* HACA's "It's all about choice" flyer at Draft Plan, Ex. 7. Accordingly, residents that elect to move more than 50 miles away should not now be penalized in light of the counseling and advice previously provided by the public entities. Such moves and all reasonable moving expenses incurred are justified and should be compensated. Restricting their moving expenses to 50 miles deprives them of HACA's promised 'choice'. Accordingly, the Draft Plan and informational statement must be amended to comply with 25 C.C.R. §§6090 and 6098 and to accurately inform displaced persons of all relocation assistance and benefits required.

   **e.    Rental Assistance Payments/Downpayment Assistance.** We disagree that April 11, 2007 is the date of "initiation of negotiations' for purposes of this project. The public entities selected the private developers' proposed redevelopment of Arroyo Vista and initiated negotiations with them on April 24, 2006 and DHA amended its PHA Plan on November 21, 2006. Moreover, the public entities admit in the Answer filed in *Arroyo Vista Tenants Association, et al. v. City of Dublin, et al.* that they "initiated negotiations" with the private developers in April 2006. Accordingly, all residents that resided at Arroyo Vista for 90 days prior to April 24, 2006 are eligible for rental or downpayment assistance. As discussed above, the Draft Plan should be amended to identify all such residents that moved and analyze their needs for relocation assistance and the housing resources available to meet those needs.

   The Draft Plan is unclear as to the method for determining comparable rents for Section 8 Eligible households. Draft Plan at 24. The plan reports that the "schedule method" will be used "in combination with the Section 8 payment standards," to establish a schedule of reasonable "acquisition costs" of "comparable replacement" units based on a current analysis of the housing market. *Id.* Where the schedule method is used to determine comparable rents, however, it is "rental charges" rather than acquisition costs that must be surveyed. 25 C.C.R. §6104(d)(1)(B); 6102(c)(1). In addition, the survey of housing resources does not identify or analyze rental or acquisition costs of the purportedly available units. Accordingly, please clarify in the Draft Plan whether the "maximum monthly rent standards" reflect HACA's current housing assistance payment standards for Alameda County and Dublin/Pleasanton or whether those amounts are based on a current survey of "rental charges". In addition, the last paragraph of page 24 is unclear. It appears that residents must search for comparable replacement units that are below the "maximum monthly rent standards," but without any guidance as to the rent levels for which they should search. For example, if a Section 8 eligible household should be looking for a one-bedroom unit that rents for *less* than $1250.00, that amount should be specified in the Draft Plan. Without a clear explanation, tenants may incur numerous credit check costs to secure a comparable replacement unit only to have it rejected by HACA. *See, e.g.,*

Declaration of Darlyn Anderson.[12] The informational statement also should specify the rent levels of "comparable replacement units." An example of how the rental assistance payment for Section 8 households that are charged 40% of their income for rent will be calculated should also be set forth in this section to assist displaced persons in determining whether they are entitled to a rental assistance payment. Finally, to the extent that a rental assistance payment is required, payments must be made to ensure that the tenant's rent does not exceed 30% of their income in any given month. In other words, if the quarterly payments meet or exceed the "rent differential" for three months, the tenant will have sufficient funds to meet her monthly rent obligation. If not, withholding the "rent differential" for a quarter would subject the tenant to a default on the rent which would exacerbate the hardship of displacement rather than minimize it. It also would mean that the unit is not comparable if it is not affordable at 30% of the tenant's household income.

As discussed above, because Arroyo Vista residents have been provided referrals to communities outside of HACA's jurisdiction, the eligibility levels and housing assistance payment standards of each housing authority in those jurisdictions should be addressed in the Draft Plan and made available to residents along with the referral lists. Otherwise, residents will be unaware of the "rent levels" for which they should be looking and will incur unnecessary time, effort and credit check costs to locate a replacement home for which they may not qualify.

With respect to "over-income households," the Draft Plan does not identify the comparable rents, or explain the method used to derive them. Without identification of the "comparable rents" by bedroom size that are applicable to these households, these families will also have insufficient information with respect to the rent levels for which they should look which will impede their search for a comparable replacement home. Moreover, by using an example of $575 as a "comparable" rent in the "calculation example" on page 26, the implication is that comparable rents are inexplicably lower for over-income households than for Section 8 renters. Moreover, a family's monthly financial housing need pursuant to 25 C.C.R. §6104 cannot be estimated and therefore included in the relocation budget without reference to comparable rents. The Draft Plan should be amended to fully explain the comparable rents for over-income households and the method used to determine comparable rents.

**f. Displacement of Residents.** The Draft Plan provides at page 29 that no residents will be displaced until comparable replacement housing is located as defined in 25 C.C.R. §6008(c) and (d). However, no Arroyo Vista residents may be displaced unless HUD approves DHA's application for disposition. The Draft Plan should be amended to specify that no residents will be displaced prior to such approval.

---

[12] If the "maximum monthly rent standards" are based on HACA's current housing assistance payment standards, and Section 8 eligible households are subject to the rules and regulations of the Section 8 voucher program, it would be discriminatory to subject them to different rules and regulations for locating a Section 8 home than those applicable to all other Section 8 recipients within HACA's jurisdiction. For example, if a family that desires and needs to reside in Dublin locates a Section 8 home that is available to them in Dublin at the maximum monthly rent standard, the family should not be steered to Oakland where rents may be lower but there also is a greater poverty concentration. A fundamental goal of the CRA Act is to minimize the hardship to displaced residents so that they do not suffer disproportionate harm for the public good; it is not to minimize the public entities' relocation costs.

March 14, 2008

    **g. Comparable replacement units must be decent, safe, and sanitary.** The Draft Plan provides that residents will be permitted to relocate to Section 8 authorized units that meet federal housing quality standards whether they meet decent, safe, and sanitary requirements as defined in 25 C.C.R. §6008(d). This potentially conflicts with the subsection (d)(2) of that regulation. "When the term decent, safe and sanitary is interpreted, under local, state or federal law, as establishing a higher standard, the elements of the higher standard which exceed the provision of [6008(d)(1)] are incorporated herein." Thus, if a Section 8 unit meets HQS standards but not a higher decent, safe and sanitary standard, the tenant may not be forced to accept the unit as a "comparable replacement unit."

    **h. Claims and supporting documentation for relocation benefits.** The Draft Plan should be amended to include a sample claim form, to identify the documentation that will be required of residents to substantiate eligibility for assistance and for particular benefits, and to specify to whom claims should be submitted. Likewise, the informational statement should notify residents of the specific claims process and documentation requirements. Advance notice of the specific documentation that will be required will minimize the hardship to displaced persons in later retrieving such documentation. The Draft Plan also should be amended to provide for reasonable accommodations for persons with disabilities and to minimize the hardship to lower income residents of having to retrieve their relocation assistance payments from HACA's office located in Hayward.

    **9. The Draft Plan Should Be Amended to Clarify the Projected Dates of Displacement.**

    The Draft Plan should be amended to provide that the 150-day notice and 90-day notices will not issue unless HUD approves the disposition application. In addition, the Draft Plan should update the status of the environmental review, and in particular, the anticipated date that it will be brought forward for public hearing. In its application to HUD, DHA represented that the environmental review was anticipated to be completed mid-year, and therefore represented that it anticipated HUD will approve the application on or about August 1, 2008. Since HUD cannot approve an application that lacks an environmental review, the current status of that review will better enable the displacing entities to project the dates of displacement.

    **10. The Draft Plan Should Explain the Basis for Reducing the Relocation Budget and Provide an Analysis of the Factors included in the Budget.**

    The application to HUD and DDA provide for a budget of $3.1 million for relocation assistance, and the application sets forth the factors and calculations as to how that budget was determined. The Draft Plan now reduces the budget to $2.8 million without any explanation. The basis for reducing the budget should be explained in the Draft Plan, and the factors and calculation should be set forth in the Draft Plan. Because the analysis of needs and housing resources are incomplete, and comparable rents are unclear, it is unclear how the public entities arrived at a budget of $2.8 million. Moreover, it is impossible for the public entities to determine that sufficient funds are available to meet relocation needs without a complete analysis of needs and resources.

    **11. The Draft Plan Is Inconsistent With The City=s Housing Element. (25 C.C.R. §6038(C)).**

A determination that the Plan is consistent with the Housing Element is required pursuant to 25 C.C.R. §6038(c). It does not appear that the Agency even considered the Agency=s Housing Element in drafting the Plan. Thus, any determination that the Draft Plan complies with the Housing Element will be unfounded. In Dublin, the City adopted a revised general plan housing element on June 3, 2003. The Draft Plan contains no analysis of consistency with the City's housing element. In fact, the Draft Plan is completely inconsistent with many aspects of City's housing element. First, the element identifies a serious and growing affordable housing crisis in the City, finding that 37% of renter households pay more in rent than they can afford, and there are no homes affordable to even moderate income households for sale in the city. (2003 Housing Element, Appendix A at 33-35, hereinafter cited as "A-##".) The Draft Plan identifies a need to relocate families in Dublin or the "tri-city area" but fails to take into account the barriers to offering comparable replacement housing in Dublin when the housing element determines that the City is "less affordable compared to some of the other cities in the County." (A-28.) Indeed, the housing element identifies the existing need for 798 units of housing for very low income households, yet expects to create only 338 such units during the planning period, over 100 of which are for seniors only, leaving a huge deficit of affordable units for the very low income families displaced. (A-36, 41-43.) Without anticipated units at affordable levels, the legislative body cannot determine that the Draft Plan is consistent with the housing element because it cannot identify how comparable replacement housing will be provided in Dublin.

**B.    THE DRAFT PLAN SHOULD BE AMENDED TO COMPLY WITH THE HOUSING ACT AND IMPLEMENTING REGULATIONS.**

The Housing Act also requires a relocation plan and timetable for the relocation of tenants, including persons with disabilities that require reasonable accommodations. 24 C.F.R. §§970.7(a)(6), 970.21(d). A PHA cannot relocate residents before HUD has approved an application to dispose of the property. 42 U.S.C. §1437p(a)(4); 24 C.F.R. §970.21(b), (e). Accordingly, the projected dates of displacement or timetable should specify that the notices cannot issue prior to approval of a disposition application by HUD.

The Plan must identify the number of residents to be displaced and describe the type of counseling and advisory services the PHA will provide, the housing resources available to provide housing for displaced residents, estimate the relocation costs, and identify the source of funding for payment of those costs. 24 C.F.R. §970.7(a)(11); 24 C.F.R. §970.21(c), 970.21(f). For substantially the same reasons that the Draft Plan is deficient under state law, it is deficient under the Housing Act and should be amended. Specifically, the Draft Plan should be identify the number of all residents to be displaced, including those that were displaced prior to submission of the application to HUD. The timetable for relocating residents should be updated to reflect the timetable for relocation, and the counseling and advisory services to be provided should be fully analyzed.

Under the Housing Act, necessary counseling and comparable housing are required benefits. Comparable housing can be provided with Section 8 assistance, provided that the resident is actually relocated to a Section 8 unit. Comparable replacement housing also must include reasonable accommodation costs and services for persons with disabilities, and payment of actual and reasonable *relocation* expenses. 42 U.S.C. §1437p(a)(4); 24 C.F.R. §970.21. In addition, if CDBG or HOME funds will be used in connection with a disposition project, a PHA must comply with all of the relocation and anti-displacement provisions of 42 U.S.C. §5304(d). 24 C.F.R. §970.21(c)(2).

Page 22                                                            March 14, 2008

The Draft Plan does not provide for necessary counseling, reasonable accommodation costs or services for persons with disabilities, or payment of all actual and reasonable relocation expenses, such as the actual cost of security deposits and credit checks.   Nor does it comply with the HCD Act.

## C.    THE DRAFT PLAN DOES NOT COMPLY WITH THE HCD ACT AND REGULATIONS.

The DDA calls for Eden Housing, Inc. to use HOME funds in connection with the proposed redevelopment of 'family' units.  Where HOME funds will be used in connection with a disposition or demolition project, the public entities are required to comply with the anti-displacement and relocation provisions of the Housing and Community Development Act, 42 U.S.C. §5304(d) (the "HCD Act"). 24  C.F.R. §970.21; 24 C.F.R. §42.325, 42.350.  Among other requirements, the HCD Act provides for payment of any security deposit or credit check that is necessary to rent or purchase a replacement dwelling unit.  It also provides for comparable replacement housing that must remain affordable for 60 months rather than 42 months, and interim living costs or out-of-pocket costs incurred in connection with displacement.  While the Draft Plan provides for partial credit check and security deposit costs, it does not provide for "any necessary" security deposit or credit check, replacement housing payments of up to 60 months or interim living costs.  Accordingly, the Draft Plan does not comply with the HCD Act and implementing regulations.

## CONCLUSION

We urge the City, DHA, and HACA to fully comply with all relocation assistance obligations and to minimize the hardship to Arroyo Vista residents.  The Draft Plan should be rejected and amended to fully comply with all applicable state and federal laws.  Finally, we urge the City, DHA, and HACA to cease the displacement of Arroyo Vista residents prior to approval of the application for disposition.

Thank you for the opportunity to comment on this Draft Plan.  We look forward to your prompt written response.

Sincerely,

BAY AREA LEGAL AID
Lisa Greif
Naomi Young
Phillip Morgan

THE CALIFORNIA AFFORDABLE HOUSING LAW
PROJECT OF THE PUBLIC INTEREST LAW PROJECT
Craig Castellanet
Deborah Collins
Mike Rawson

Page 23                                                  March 14, 2008

cc:     Via email:

        Juliet Elizabeth Cox
        Goldfarb & Lipman LLP
        1300 Clay Street
        Ninth Floor
        Oakland, CA 94612
        jcox@goldfarblipman.com

        Ariana Mohit
        Meyers, Nave, Riback, Silver & Wilson
        575 Market Street
        Suite 2600
        San Francisco, CA 94105
        amohit@meyersnave.com

DECLARATION OF LISA S. GREIF
IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION

EXHIBIT 5

0127

# goldfarb
# lipman
# attorneys

1300 Clay Street, Ninth Floor
Oakland, California 94612
510 836-6336

M David Kroot
Lee C. Rosenthal
John T. Nagle
Polly V. Marshall
Lynn Hutchins
Karen M. Tiedemann
Thomas H. Webber
John T. Haygood
Dianne Jackson McLean
Michelle D. Brewer
Jennifer K. Bell
Robert C. Mills
Isabel L. Brown
James T. Diamond, Jr.
Margaret F. Jung
Heather J. Gould
William F. DiCamillo
Juliet E. Cox
Erica Williams Orcharton
Amy DeVaudreuil
Barbara E. Kautz
Luis A. Rodriguez
Xochitl Marquez
Rafael Yaquian

April 8, 2008

Ms. Lisa S. Greif
Bay Area Legal Aid
405 14th Street, 11th Floor
Oakland, California 94612

Re:  *Draft Relocation Plan for Arroyo Vista Development Project*

Dear Ms. Greif:

The Dublin Housing Authority ("DHA") and its relocation consultant, Overland Pacific & Cutler ("OPC"), have received your comments, on behalf of four Arroyo Vista tenants and their families as well as the "Arroyo Vista Tenants Association," on the Draft Relocation Plan for the Arroyo Vista Development Project (the "Project"). This letter responds to your comments, as well as to the substantially similar comments submitted by Elise Veal. Your letter of March 14, 2008, and Ms. Veal's letter of March 25, as well as this response, will be provided to the Dublin Housing Authority Commissioners for their consideration along with the Draft Relocation Plan.

**The Draft Plan is Timely.**
Your understanding of the requirements of Section 7261 of the Government Code and of Section 6038 of Title 25 of the California Code of Regulations (the "Guidelines") is incorrect. These provisions do not require preparation of a relocation plan before any action on a project if any aspect of that project could possibly result in displacement. Rather, they require preparation of a relocation plan before displacement. Moreover, they require preparation of a plan "as soon as possible" after the initiation of negotiations for a project that may involve displacement, not "immediately" after the initiation or "simultaneously" with negotiations.

As your own letter indicates, many steps were necessary before DHA could say with any certainty when or how displacement of Arroyo Vista's residents for the Project might occur. For this reason, preparation of a meaningful relocation plan was not possible until DHA and its partners on the Project had entered into their Disposition and Development Agreement (the "DDA") evidencing their commitment to proceed with the Project if HUD approves the disposition of Arroyo Vista. The DDA—not the earlier Exclusive Negotiating Rights Agreement or the even earlier DHA resolution selecting developers for the Project—provided the project outline necessary for preparation of a relocation plan, including a commitment to the Project's scope and phasing and a projection of displacement dates. Without this information, DHA and OPC could not have conducted any analysis of the needs of tenants who would actually be affected by displacement or of the resources available to meet those needs.

Facsimile
510 836-1035
San Francisco
415 788-6336
Los Angeles
213 627-6336
San Diego
619 239-6336
Goldfarb & Lipman LLP

1460\02\544373.3

**0128**

Ms. Lisa S. Greif
April 8, 2008
Page 2

Under the Relocation Law and Guidelines, the sole remedy for failure to prepare a
relocation plan in a timely manner is to cease displacement until a plan is complete. (25
Cal. Code Regs. § 6016.) DHA has not required any Arroyo Vista resident to relocate,
and thus has no need to cease any displacement activities. The Draft Relocation Plan is
a timely effort to fulfill DHA's relocation planning obligations.

**The Draft Relocation Plan Analyzes the Relocation Needs of All Displaced Persons.**
Your comments suggest incorrectly that a Relocation Plan for Arroyo Vista must
address the needs of persons who moved away from Arroyo Vista as long ago as July
2006. These persons were not "displaced persons" under the Relocation Law or
Guidelines, however, because they did not move for any reason relating to the Arroyo
Vista Project. Rather, because the April 2007 Exclusive Negotiating Rights Agreement
represents DHA's first written agreement to carry out the Arroyo Vista Project if HUD
approves that Project, DHA intends to provide relocation assistance to all eligible
persons who resided at Arroyo Vista when DHA approved the ENRA. On the
assumption that all April 2007 residents will prove eligible, the Draft Relocation Plan
properly analyzes these persons' relocation needs.

The Draft Relocation Plan does consider the relocation needs of all April 2007
residents, including those households who, by the time of the interviews in September
2007, already had availed themselves voluntarily of relocation assistance. Pages 11 and
12 of the Draft Plan specifically state that OPC sent letters to all 147 households and
interviewed 118 households. The aggregate relocation needs were based on the total of
147 households, as indicated in the table of household characteristics and needs,
Attachment 2. For households who refused to participate in interviews, OPC based its
estimate of needs on the information available to the DHA regarding household size and
incomes, to the extent such information was available.

As stated in the Draft Relocation Plan, the interview process queried each household—
as thoroughly as that household would accommodate—about the household members'
relocation needs and preferences relating to transportation, employment, education, and
general location. Out of respect for tenants' privacy, however, the Draft Relocation Plan
does not include each and every tenant's precise answer to these questions. The
Relocation Law and Guidelines do not require this level of detail, because the relocation
plan is an aggregate view of residents' overall needs rather than a catalog of each
tenant's personal desires.

The Draft Plan contains assurances that households will be relocated to areas that are
not generally less desirable in terms of access to schools, employment, doctors and
other services and facilities. Further, as is clearly indicated in the Draft Plan, each
household's relocation needs will be individually considered at the time of that
household's move. Resources offered to each household will take into account that
household's unique characteristics, needs, and interests.

1460\02\544373.3

Ms. Lisa S. Greif
April 8, 2008
Page 3

Households with "very low" and "extremely low" incomes will receive Section 8
Housing Choice vouchers to assure that their portion of the rent does not exceed 30% of
the household's income for as long as the household and the unit continue to be eligible
for the Section 8 program. Additionally, the Draft Plan provides specifically that DHA
will pay all actual and reasonable moving expenses in accordance with the requirements
of the Guidelines. The credit check fee allocated in the Draft Plan, as well as the deposit
amount, is based on OPC's previous, extensive experience with regard to these costs:
The typical credit check fee is $25, not $75, meaning that the allocation of $75 per
household allows for up to three credit checks. It should be noted that the DHA,
recognizing the financial situation of the residents of Arroyo Vista, is voluntarily
electing to provide the credit check fees and the security deposit. These benefits are not
required pursuant to the Guidelines.

Households including persons with disabilities will receive assistance from OPC in
finding alternative housing that meets their self-defined needs, to the extent that those
needs are consistent with regulations governing the Section 8 program. As you are
aware, however, relocating households may choose their own housing, whether or not it
is accessible, as long as that housing is decent, safe, and sanitary.

The Draft Relocation Plan assures that disability-related needs will be accommodated.
The Draft Plan meets the requirements of Section 6048 of the Guidelines by setting
forth the general needs of the disabled population at Arroyo Vista and providing that
these needs will be addressed for each individual household. Additional information in
the Plan itself on the specifics of particular residents' disabilities, or about their
particular housing preferences or needs, would infringe unacceptably and needlessly on
their rights to personal privacy.

Households who are "overhoused" with reference to public housing occupancy
standards could be required to move to an appropriately sized unit even if Arroyo Vista
were not redeveloped. Those households have been identified in the Plan to the extent
necessary for DHA to determine whether or not appropriate relocation resources are
available. As the Draft Plan clearly states, however, households requiring larger units as
"reasonable accommodations" for disability, such as to house live-in care providers, will
be entitled to those units.

OPC has been able to date to accommodate all households interested in relocation,
including households in which some members are not fluent in English. For the most
part, households with non-English speakers also contained members fluent in English.
Translation services have been provided either by household members or by OPC staff.
Translation services will continue to be provided to households requiring them. All
informational materials and household notices will be translated if necessary, but the
Relocation Law and Guidelines do not require translation of the entire Draft Plan.

Ms. Lisa S. Greif
April 8, 2008
Page 4

**The Draft Relocation Plan Analyzes the Available Housing Resources.**
Your objections to the Draft Relocation Plan's survey of available housing resources
indicate a profound misunderstanding of the Relocation Law and Guidelines and of the
process of planning responsibly for residential relocation. The purpose of the survey of
available housing for preparation of a relocation plan is to determine whether or not the
local housing stock generally and usually includes resources appropriate to meet
residents' needs. The survey's intent is not to match individual households to particular
units. Given the legal prerequisites to relocation as well as the likely delay between
preparation and implementation of the relocation plan, your assumption that specific
units identified as "available" in a relocation plan survey will, or must, actually be
available when relocation occurs is fundamentally unreasonable.

For each eligible household, the Draft Relocation Plan explains that OPC will
investigate available housing resources and provide at least three (but likely many more
than three) referrals to units that are comparable replacement housing *for that household*
within the meaning of the Relocation Law and Guidelines. Comparability
determinations will take into account all of the household's particular needs including
access to schools, employment and public facilities. Additionally, before approving any
unit as a suitable relocation site for a particular household, the housing authority from
which the household will receive Section 8 assistance will inspect each unit to ensure
that it meets the housing quality standards. If the tenant is not receiving Section 8
assistance, OPC will inspect the unit to ensure that it is decent, safe, and sanitary and
meets all other requirements of the Relocation Law. OPC is also available to assist
residents who believe that housing is being denied to them on a discriminatory basis.

The Draft Relocation Plan also does take into account affordability of the available
units, contrary to your misunderstanding. The Housing Authority of the County of
Alameda ("HACA") will provide Section 8 vouchers to all residents who are eligible for
the Section 8 program, in accordance with HACA's eligibility standards including
HACA's standards for income eligibility. Residents who elect to "port" their vouchers to
other jurisdictions need not qualify for Section 8 under those jurisdictions' income
standards. Nevertheless, voucher eligibility ensures that those households will not pay
more than 30% of their incomes for their portion of the rent, as long as they choose
housing for which the total monthly rent falls within the jurisdiction's "payment
standard" based on the Fair Market Rents issued by HUD. On the other hand, the Draft
Relocation Plan provides that those few tenants whose incomes make them ineligible
for Section 8 will receive replacement housing payments if such payments are necessary
to ensure that comparable replacement housing, within the household's financial means
as provided by law, is available to them.

Because the Draft Relocation Plan contemplates that some Arroyo Vista residents will
relocate outside Dublin, DHA circulated the Draft Relocation Plan to other housing
agencies. DHA sent the Plan to the Housing Authorities of Contra Costa County,

Ms. Lisa S. Greif
April 8, 2008
Page 5

Livermore and Oakland. To date no comments have been received from any of the agencies that received the Draft Plan.

**The Draft Relocation Plan Provides Adequately for "Last Resort Housing."**
Because most of Arroyo Vista's displaced residents will be eligible for Section 8 vouchers that will ensure that their portion of the rent does not exceed 30% of their income, these displaced households will not fall within the "Last Resort Housing" category. As the Draft Relocation Plan acknowledges, however, households whose incomes are too high to qualify for Section 8 vouchers but too low to pay market rents without exceeding 30% of their income may require Last Resort Housing. As authorized by Section 6139 of the Guidelines, the Draft Relocation Plan contemplates meeting any Last Resort Housing obligations by paying rental assistance exceeding the caps set forth in Sections 6102 and 6104 of the Guidelines to any displacees who are ineligible for Section 8 vouchers. The Draft Relocation Plan's provision for Last Resort Housing payments to those households found eligible satisfies the requirements for a Last Resort Housing Plan.

**The Draft Relocation Plan Accounts Adequately for Concurrent Displacement.**
Contrary to your suggestion, the Draft Relocation Plan does take into account the impact of concurrent relocation. As the Draft Plan demonstrates at Attachment 2, there are currently 714 housing units available in the Tri-Valley, Alameda County and Oakland areas—almost *five times* as many units as were required for the displacement of the residents of Arroyo Vista even before accounting for the households that had already moved at the time of Plan preparation. When those 45 households are deducted, the available resources represent almost *seven times* the total number of units required to relocate those residents remaining at Arroyo Vista.

Even assuming that 87 households at the Oakland Housing Authority's Tassafaronga complex will be relocated at approximately the same time as the Arroyo Vista tenants, the relocation resources identified in the Arroyo Vista Relocation Plan and the Tassafaronga Relocation Plan are adequate to meet both relocation needs. Furthermore, the resources identified in the Draft Relocation Plan were those available in late summer or early fall of 2007, but the Arroyo Vista relocation is expected to occur over six to twelve months. For this reason, the total number of housing units necessary at any given time will be less than the amount currently available.

**The Draft Relocation Plan Provides Adequately for Advisory Assistance.**
The Draft Relocation Plan describes, at pages 18 and 19, an adequate relocation assistance advisory program as required by Article 2 of the Guidelines. These advisory services are in addition to the information provided in the General Information Notice. The Plan provides specifically that DHA and OPC will fully inform eligible households of the nature of available relocation benefits and the procedure for obtaining them; will determine each household's relocation needs; will provide adequate referrals to replacement housing and updated information regarding available housing; will provide

Ms. Lisa S. Greif
April 8, 2008
Page 6

special assistance when needed, such as transportation or personal contact with prospective landlords; will assist displacees in ensuring that they do not suffer housing discrimination; will supply information concerning federal and state housing programs; will assist tenants in completing rental or housing program applications; will pay benefits to eligible households; will inform all displacees of DHA's eviction policies; and will establish a formal grievance procedure.

The bulk of your comments on the Draft Relocation Plan complain that the General Information Notice issued to tenants in April 2007 was deficient in meeting these commitments. In fact, however, DHA and OPC did not intend the General Information Notice to provide the level of detail you demand. To the contrary, the General Information Notice is intended to be just that—*general* in nature. Moreover, because the General Information Notice was issued—as required by Sections 6040 and 6046 of the Guidelines—before preparation of the Draft Relocation Plan, the detail you demand was not yet available and could not have been in the Notice.

The Grievance Procedure attached as part of the Draft Relocation Plan meets the requirements for a relocation grievance procedure. The Guidelines do not require that DHA adopt a special procedure for relocation-related grievances, but rather require that DHA have a grievance procedure that meets the standards of the Guidelines. The Grievance Procedure followed by DHA and HACA with respect to tenant grievances satisfies the requirements of Article 5 of the Guidelines, because it includes an informal oral presentation and the right to request a hearing. The procedures allow the tenant to review all files prior to the hearing, to be represented by counsel of the tenant's choice, to present evidence, and to receive a written decision. Although the Grievance Procedure attached to the Draft Plan fully complies with the requirements of Article 5 of the Guidelines, DHA, in response to your comments, is proposing to adopt a grievance procedure specific to the relocation process in the form attached to the Relocation Plan provided to the DHA Board for approval. The DHA Board, upon approval of the Relocation Plan will adopt the grievance procedure attached to the Plan presented to the Board.

**DHA Has Complied With All Public Participation Requirements.**
The Guidelines call for relocating agencies to "encourage" the formation of relocation committees. Rather than rely upon the limited input of a small number of self-selected residents, DHA elected instead to rely upon a committee of the whole, conducting (as described in the Draft Relocation Plan) several meetings and workshops on the relocation process and the process for plan preparation. All residents of Arroyo Vista were invited to those meetings. Comments and suggestions from the residents were incorporated into the process of preparing the relocation plan and ensuring that the residents were fully informed of their rights. For example, the residents, after an initial meeting, suggested that information on the Section 8 Housing Voucher program could be better disseminated in smaller groups of residents. DHA, in response to that comment, invited all residents to participate in small group orientation sessions.

1460\02\544373.3

Ms. Lisa S. Greif
April 8, 2008
Page 7

In addition, DHA sent notice to all residents, including those who had previously
moved, of the Draft Relocation Plan's availability. Letters were sent to residents'
addresses at Arroyo Vista for those tenants who have not moved, and to tenants'
forwarding addresses for those tenants who have. The Plan was available on the OPC,
DHA and City of Dublin websites. In addition, hard copies were available at the on-site
Arroyo Vista management office, the HACA office, the City of Dublin Library and
Dublin City Hall, and all residents who requested a copy of the Draft Plan from the
management office received one. It should be noted that posting of the Draft Plan on the
OPC website and other websites was specifically done at the residents' suggestion in
order to increase accessibility.

**The Draft Relocation Plan Provides for Adequate Relocation Compensation.**
Relocation assistance and benefits to the residents of Arroyo Vista will be provided to
comply with the California Relocation Law and with the United States Housing Act's
rules governing disposition of public housing property. Benefits will not be provided
pursuant to the Uniform Relocation Act (the "URA"), or to any special DHA rules. The
Draft Relocation Plan's reference to the URA and to "Authority" rules and regulations is
incorrect, and will be revised in the final Relocation Plan presented to the DHA Board
for adoption.

Your suggestion that DHA remove references in the Draft Relocation Plan to "part-time
residents" is unnecessary. Any part-time resident will be entitled to moving assistance
but not to rental assistance payments, but if no resident of Arroyo Vista is a "part-time"
resident this provision will not apply. Until OPC has examined each resident's
eligibility, which it will not do until HUD has approved Arroyo Vista's disposition,
DHA cannot conclude that no Arroyo Vista resident falls into this category.

The Draft Relocation Plan's provisions for credit checks and security deposits are based
on OPC's significant and recent experience providing relocation assistance to similar
low-income populations, including to approximately 45 Arroyo Vista households who
have moved as of the date of the Draft Relocation Plan. These benefits exceed the
requirements of the Relocation Law, minimize financial hardship that may result to
Arroyo Vista's low-income tenants from displacement, and ensure that tenants will not
bear any moving-related costs. To date, benefits in the amounts described in the Draft
Relocation Plan have proven adequate; but if relocation in accordance with the
Relocation Law and the Housing Act is impossible in the future within the limits set by
the Relocation Plan, DHA may revise the Plan as necessary.

The Draft Relocation Plan does not indicate that OPC will withhold payment for
moving expenses until residents complete their moves. Rather, as in most relocation
efforts, residents may request that OPC hire, and pay directly, a moving company to
move the residents' possessions. In addition, DHA will comply with Section 6090(c) of
the Guidelines and provide advance payments for moving expenses, consistent with its
fiduciary obligations, when necessary to avoid financial hardship.

1460\02\544373.3

0134

Ms. Lisa S. Greif
April 8, 2008
Page 8

The Draft Relocation Plan accurately describes the moving benefits to which Arroyo
Vista residents are entitled. Because DHA does not anticipate using temporary
relocation, storage is not anticipated to be necessary. As the Draft Plan states, DHA
intends to pay for insurance for all professional moves to cover replacement of any
property lost, stolen or damaged.

Section 8 Housing Choice vouchers may be used anywhere in the United States where
there is a housing authority administering a Section 8 program, but this portability
feature of the Section 8 program does not mean that Arroyo Vista residents who choose
to move more than 50 miles away have made that choice because of Arroyo Vista's
redevelopment. Rather, if a resident elects to move more than 50 miles away from
Arroyo Vista, the Draft Relocation Plan provides—consistent with Section 6090 of the
Guidelines—that DHA will consider whether such a move is justified and determine on
a case by case basis whether to cover the unusual moving expenses.

Detailed explanations of the benefits available to individual households have been, and
will be, provided in each household's Notice of Eligibility. OPC has also customized
this information to address tenants' expressed needs and interests without overwhelming
them with information that is not relevant to these expressed needs. For example, to the
extent that tenants wish to seek replacement housing outside HACA's jurisdiction,
HACA can provide—and has provided—those tenants with information regarding other
jurisdictions' Section 8 payment standards.

Tenants who are or may be eligible for rent differentials have received, and will receive,
detailed explanations of this benefit if and when it becomes relevant to their plans. The
Draft Relocation Plan makes clear at page 25 that households eligible for 42-month rent
differential payments will receive these payments *in advance* with full payment
received in just 12, rather than 42, months after a household has relocated. Your
concern that tenants will not have sufficient funds to make rent payments is thus
unfounded.

Page 29 of the Draft Plan confirms that DHA staff will inspect all replacement units to
which referrals are made to verify that they are at least "decent, safe and sanitary" as
defined in Section 6008 of the Guidelines. As you surely know, the "Housing Quality
Standards" applicable to Section 8-funded units are more demanding than the standards
in Section 6008. Accordingly, the Draft Plan adequately ensures that all replacement
units will meet the standards of the Guidelines.

Arroyo Vista's residents have been informed repeatedly that DHA will not issue any
notices giving them deadlines to move unless and until HUD approves Arroyo Vista's
disposition. Nevertheless, the Draft Plan provides expressly that 150-day and 90-day
notices to vacate will issue, if at all, only after HUD has approved DHA's disposition
application.

1460\02\544373.3

0135

Ms. Lisa S. Greif
April 8, 2008
Page 9

The relocation budget was adjusted downward based on the information obtained as a result of the tenant interviews and the survey of comparable housing resources. The original budget provided in the application to HUD was an estimate based on a general assumption about household needs and available resources. Additional information obtained as a result of the completion of the Draft Plan as well as the change in the Dublin rent standards resulted in the decrease in the budget. Although the Relocation Plan estimates that the relocation costs will be less than the original estimate of $3.1 million, the DDA provides for funding of $3.1 million in costs, which funds will continue to remain available if necessary.

**The Draft Plan is Consistent With Dublin's Housing Element.**
The Draft Relocation Plan is fully consistent with the City of Dublin's housing element. As your comments indicated, the City of Dublin suffers from a shortage of housing units available to all income levels. The Arroyo Vista Project is an effort to meet some of these needs by replacing obsolete housing units with a greater number of housing units. The Arroyo Vista Project will in fact increase the number of affordable rental units, as the new project will contain a total of 194 affordable units (an increase of 30 affordable rental units and 14 affordable homeownership units) and an additional 184 market-rate units.

**The Relocation Plan Need Not Comply With the HCD Act.**
Your belief that the DDA requires Eden Housing to use HOME or CDBG funds to construct the affordable portion of the Arroyo Vista Project is in error. The DDA relies upon a budget prepared by Eden and accepted by DHA that does not include HOME funds or other federal funds. Eden's list of potential sources of funding does not express any commitment to use those funds, and in fact no HOME funds have been applied for in relation to this project. For this reason, the Draft Plan need not comply with the HCD Act.

**The City and HACA Need Not Adopt a Relocation Plan.**
Neither the City of Dublin nor HACA will displace any Arroyo Vista tenants for the Arroyo Vista Project. Rather, only DHA—the landlord at Arroyo Vista—may or will require Arroyo Vista tenants to relocate to accommodate Arroyo Vista's disposition. The City and HACA have had an opportunity to comment on the Draft Relocation Plan, but under Section 6038(a) of the Guidelines only DHA, the public entity that may cause displacement, needs to approve any relocation plan.

**Conclusion**
DHA has committed, if HUD approves DHA's application to dispose of and redevelop Arroyo Vista, to relocating all Arroyo Vista residents displaced by Arroyo Vista's redevelopment. With the minor revisions described in this letter, the Draft Relocation Plan will be a timely and complete plan for accomplishing such relocation in accordance with all applicable laws. We encourage you to assist your clients in

1460\02\544373.3

Ms. Lisa S. Greif
April 8, 2008
Page 10


understanding the Plan and in taking advantage of the services DHA, HACA, and OPC
have made and will make available to them.


Very truly yours,


KAREN M. TIEDEMANN
ktiedemann@goldfarblipman.com

KMT:jec

cc:      Ms. Elise Veal, 6700 Dougherty Road #15, Dublin, California 94568